## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MOTOROLA, INC.

      Plaintiff,

    vs.

RESEARCH IN MOTION LIMITED
RESEARCH IN MOTION CORPORATION

      Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No.
1:08-cv-104-SLR

## DEFENDANT RESEARCH IN MOTION'S BRIEF IN SUPPORT OF
## MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

Patricia Smink Rogowski (#2632)
**CONNOLLY BOVE LODGE & HUTZ LLP**
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
(302) 658-9141
progowski@cblh.com
*Attorneys for Defendants*

Dated: March 31, 2008

**OF COUNSEL**
William F. Lee
Dominic E. Massa
Michelle D. Miller
**Wilmer Cutler Pickering Hale & Dorr LLP**
60 State Street
Boston, MA 02109
(617) 526-6000

# TABLE OF CONTENTS

Page

I.  NATURE AND STATE OF PROCEEDINGS .................................................. 1

II.  SUMMARY OF ARGUMENT .............................................................. 1

III.  FACTUAL BACKGROUND ................................................................ 3

    A.  The 2003 Cross-License Agreement Between the Parties. ................................. 3

    B.  RIM's Emergence as a Competitive Threat. ........................................... 3

    C.  The Current Licensing Dispute Between the Parties. ................................... 4

    D.  RIM's Comprehensive Northern District of Texas Action and ........................... 5
        Motorola's Later-Filed Actions.

    E.  The Parties and Their Dispute Have a Substantial Connection ........................... 7
        to the Northern District of Texas.

IV.  ARGUMENT ........................................................................... 8

    A.  Transfer to the Northern District of Texas is Required to Avoid ........................ 10
        Duplicative and Piecemeal Litigation Concerning the Same Patents.

    B.  Transfer to the Northern District of Texas Will Promote ............................... 12
        "The Convenience of the Parties and the Witnesses, and
        the Interests of Justice."

        (i)  Transfer to the Northern District of Texas Would ............................... 13
               Promote the Practical Consideration of "Ease, Speed,
               or Expense" of Trial.

        (ii)  The Local Interest in Adjudicating Local Disputes ............................. 13
               Favors Transfer to the Northern District of Texas.

        (iii)  The Convenience of Third-Party Witnesses Is Not ............................ 14
               Favored by Litigating the Parties' Dispute in the
               District of Delaware.

V.  CONCLUSION ........................................................................ 14

# TABLE OF AUTHORITIES

Page

## CASES

*Ballard Med. Prods. v. Concord Lab., Inc.* .................................................................... 10
    700 F. Supp. 796 (D. Del. 1988)

*Bank of America v. S.I.P. Assets LLC* ........................................................................... 10
    C.A. No. 07-159 GMS, 2007 WL. 2698192  (D. Del. Sept. 11, 2007)

*Cashedge, Inc. v. Yodlee, Inc.* .................................................................................... 10
    No. Civ. A. 06-170, 2006 WL 2038504 (D. Del. July 19, 2006)

*Jumara v. State Farm Ins. Co.* .................................................................................... 12
    55 F.3d 873 (3rd Cir. 1995)

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.* ................................................ 14
    77 F. Supp. 2d 505 (D. Del. 1999)

*Micron Technology, Inc. v. Mosaid Technologies, Inc.* ................................................. 9
    2008 WL 540182 (Fed. Cir., Feb. 29, 2008)

*Nilssen v. Osram Sylvania Inc.* ............................................................... 10, 11, 13, 14
    C.A. No. 00-695-JJF, 2001 WL 34368395 (D. Del. May 1, 2001)

*Pall Corp. v. Bentley Lab., Inc.* .................................................................................. 11
    523 F. Supp. 2d 450 (D. Del. 1981)

*Van Dusen v. Barrack* ................................................................................................. 9
    376 U.S. 612 (1964)

*Virgin Wireless, Inc. v. Virgin Enterprises Ltd.,* ................................................ 9, 10, 12
    201 F. Supp. 2d 294 (D. Del. 2002)

## OTHER AUTHORITIES

28 U.S.C. § 1404(a) ...................................................................................................... 9

Wright and Miller, Federal Practice and Procedure, ................................................... 14
    § 3851 (2d ed. 1986)

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff Motorola, Inc. filed a First Amended Complaint on February 20, 2008 (Docket No. 5) against defendants Research In Motion Limited and Research In Motion Corporation. Defendants' response to the First Amended Complaint is due on April 10, 2008 pursuant to this Court's March 7, 2008 Order to Extend Time (Docket No. 11).

## II.    SUMMARY OF ARGUMENT

The parties to this action, Research In Motion Limited ("RIM Limited") and Research In Motion Corporation (collectively, "RIM"), and Motorola, Inc. ("Motorola"), are engaged in an important licensing dispute – a single dispute which manifests itself in a variety of contract, antitrust, and patent claims.  This dispute arose during the course of licensing negotiations between RIM and Motorola regarding a proposed extension of a 2003 Cross License Agreement between the parties, negotiations that included face-to-face meetings at RIM's United States headquarters in Irving, Texas.  The parties' dispute, encompassing many more issues than just the limited declaratory judgment claims asserted by Motorola in the present action, is the subject of a comprehensive action filed by RIM in the Northern District of Texas.  Judicial economy and efficiency, the interests of justice, and the convenience of the parties and witnesses dictate that the parties' dispute should be resolved, in its entirety, through the comprehensive action pending in the Northern District of Texas.

In an effort to resolve the parties' entire dispute in a single forum, RIM filed suit against Motorola in the Northern District of Texas – where the parties have significant ongoing operations, where relevant witnesses and documents are located, and where licensing negotiations that resulted in the parties' dispute took place.  Motorola, in contrast, filed two separate actions against RIM, in two separate jurisdictions – bringing its "defensive" declaratory

judgment claims in the present action, but bringing its "offensive" patent infringement claims in the Eastern District of Texas. RIM filed its suit in the Northern District of Texas at precisely 12:01 a.m. on February 16, 2008, immediately upon the expiration of a Standstill Agreement between the parties, under which the parties had agreed not to commence any action against each other until after the end of the day on February 15. Motorola commenced the filing of its Complaints in this District and in the Eastern District of Texas before midnight on February 15, in breach of the Standstill Agreement.

It would be manifestly wasteful to litigate the parties' dispute in three separate actions, in three separate jurisdictions. RIM's comprehensive Northern District of Texas action is the only appropriate vehicle for a complete and efficient resolution of the *entire* dispute between the parties. Indeed, Motorola has represented to the court in the Northern District of Texas that there is "considerable overlap" among the three separate actions between the parties and that "given the multiplicity and duplication of averments spread out over ... three districts, Motorola is *considering* motions seeking the most economical and expeditious manner of resolving the pending claims and disputes between the parties." (Rivers Decl., Ex. L, at 3.) Motorola, however, is largely responsible for the fractured nature of the parties' litigation, having chosen to split its offensive and defensive patent claims between two separate jurisdictions. It would be disingenuous at best for Motorola to suggest that its choice to litigate its offensive and defensive patent claims in two separate jurisdictions is more "economical and expeditious" than litigating the parties' entire dispute in RIM's comprehensive Northern District of Texas action. Nor can Motorola suggest that the District of Delaware is the most convenient forum or the forum having the most significant contacts with the parties' dispute, having chosen to split its claims between

the Eastern District of Texas and this District on the basis of its status as a plaintiff or a

defendant in interest.

For all these reasons, RIM respectfully requests that the Court transfer the present action

to the Northern District of Texas.[1]

## III.    FACTUAL BACKGROUND

### A.    The 2003 Cross License Agreement Between The Parties

In 2003, RIM and Motorola entered into a Cross License Agreement, whereby Motorola

granted RIM a non-exclusive license to practice patents that Motorola claimed were essential to

certain wireless communication standards.  (Declaration of Brian Rivers, ("Rivers Decl."), ¶3.)

During the creation of these standards, Motorola had committed to certain standards

organizations that it would license any patents that it claimed to be "essential" on fair,

reasonable, and non-discriminatory ("FRAND") terms.  (*Id.*, ¶4.)  Standards organizations relied

on such FRAND commitments in determining which technologies to incorporate into the

resulting standards.  (*Id.*)

### B.    RIM's Emergence As A Competitive Threat

During the term of the Agreement, the competitive situation between RIM and Motorola

changed substantially.  RIM achieved significant growth in its popular line of BlackBerry

devices (which offer telephone, email, Internet, text messaging, and other advanced capabilities)

and in its accompanying wireless email server technology.  (*Id.,* ¶6.)  With these products, RIM

emerged as a robust competitor in the wireless communications field—with RIM's products

---

[1] RIM has simultaneously requested that the court in the Eastern District of Texas transfer
Motorola's offensive patent claims to the Northern District of Texas, where all of the parties'
claims can be consolidated into RIM's comprehensive litigation.

attracting market share that previously had belonged to traditional communication companies like Motorola. (*Id.,* ¶7.)

In response to RIM's success, Motorola devoted significant resources to developing products and services similar to RIM's. In mid-2006, Motorola introduced the "Q" smart phone which, like most BlackBerry devices, enables email and Internet, and includes a full QWERTY keyboard. (*Id.,* ¶5 and Ex. H.) Later the same year, Motorola announced the acquisition of Good Technology, a company with mobile computing technology that competes with RIM's BlackBerry Enterprise Server technology. (*Id.,* ¶5 and Ex. I.) Despite its efforts, Motorola has not been able to replicate the success of RIM's products. The "Q" phone has not been as popular as RIM's BlackBerry devices. (*Id.,* ¶7 and Ex. J.) Motorola has suffered declines in market share for wireless handset devices, and has been unable to stem its losses in this area.

C.    **The Current Licensing Dispute Between The Parties**

Having failed to defeat RIM in the marketplace, Motorola attempted to do so through its unreasonable licensing demands. Rather than negotiate in good faith to extend the terms and conditions of the license Motorola attempted to recover its losses in the marketplace by demanding unfair and anticompetitive royalties from RIM and by coupling these demands with threats of patent litigation. (Rivers Decl., ¶¶10-11.) In particular, Motorola demanded royalty rates multiple times the effective rate of the Agreement – royalty demands that not only conflicted with the good-faith-bargaining requirements of the Agreement, but also contravened the licensing obligations that Motorola assumed through its participation in certain standards organizations. (*Id.*) Motorola also threatened to assert certain non-standards-essential patents against RIM and threatened to enjoin RIM's business. (*Id.*)

Although the Agreement expired on December 31, 2007, the parties agreed to refrain from commencing any action against each until after February 15, 2008. (*Id.*, Ex. A.) According

to the Standstill Agreement, the parties agreed "not to file, commence, initiate or prosecute any judicial, administrative or other proceeding or litigation of any kind" until after February 15, 2008. (*Id.*, Ex. A at ¶1.)

### D.    RIM's Comprehensive Northern District of Texas Action and Motorola's Later-Filed Actions.

Given Motorola's unreasonable demands, the parties were unable to reach agreement on licensing terms during the standstill period, and on February 16, 2008, RIM filed a Complaint against Motorola in the Northern District of Texas raising substantially all of the issues between the parties.  To ensure that RIM's Northern District of Texas Complaint was the first filed action between the parties, RIM filed its Complaint by hand, immediately upon the expiration of the parties' Standstill Agreement at 12:01 a.m. on February 16, 2008.  (Rivers Decl., Ex. B and C.)

Motorola, on the other hand, commenced the electronic filing of its Complaints in this District and in the Eastern District of Texas on February 15, completing the filing of the present action on February 16.  (*Id.*, Exs. D-G.)  Motorola's commencement of the electronic filing process on February 15 amounts to a breach of the parties' Standstill Agreement.  Motorola's efforts regarding the final time of filing were ultimately unsuccessful, because RIM filed its comprehensive Northern District of Texas Complaint at precisely 12:01 a.m.  Thus, any claim by Motorola that it was first to file would amount to an admission that it violated the parties' Standstill Agreement, the consequence of which would be for this Court to dismiss Motorola's Complaint in accordance with the Standstill Agreement.

Apart from considering the timing of the parties' filings, it is of paramount importance that the entire dispute between the parties can only be resolved through RIM's comprehensive action in the Northern District of Texas – the forum having the most significant contacts with the parties, third-party witnesses, and the parties' dispute.  RIM's comprehensive Northern District

of Texas Complaint asserts breach of contract, promissory estoppel, and antitrust claims based on Motorola's breach of its commitments to standards organizations to license "essential" patents on fair, reasonable, and non-discriminatory terms; affirmative patent infringement claims for Motorola's infringement of certain RIM patents; and declaratory judgment claims for invalidity and noninfringement by RIM of certain Motorola patents. (*Id.*, Ex. B.)

Shortly after RIM initiated its Northern District of Texas action, Motorola completed the filing of two separate actions, in two separate courts, each raising only a portion of the dispute between the parties. Motorola filed the present declaratory judgment claims (where Motorola is the plaintiff in name, but the defendant in interest) asserting noninfringement of certain RIM patents. (*Id.*, Ex. F.) But, rather than litigate all of the parties' patent claims in a single action, Motorola chose to file a separate action in the Eastern District of Texas accusing RIM of infringing certain Motorola patents. (*Id.*, Ex. D.)

As shown in the following chart, only RIM's Northern District of Texas action encompasses *all* of the issues between the parties. Even together, Motorola's separate actions fail to include the antitrust and contract issues at the heart of the parties' licensing dispute.

| Jurisdiction | Antitrust Claims | Contract Claims | Patent Claims (RIM Patents) | Patent Claims (Moto. Patents) |
|---|---|---|---|---|
| **Northern District of Texas** | √ | √ | √ | √ |
| **Eastern District of Texas** | × | × | × | √ |
| **District of Delaware** | × | × | √ | × |

The RIM and Motorola patents at issue in the Northern District of Texas action relate to substantially similar technology for use in wireless communication devices. The asserted RIM patents include patents directed to systems and methods for speech compression used in wireless

communication devices and patents directed to features of keyboards used in wireless communication devices. (*Id.*, ¶13.)

The Motorola patents in the Northern District of Texas action have been asserted against certain features of RIM's BlackBerry wireless communication devices and wireless e-mail systems. (*Id.*, ¶14.) Many of the same RIM and Motorola devices will be relevant to both the RIM and Motorola patents. (*Id.*, ¶15.) Much of the same technical, financial, and marketing information will be relevant to the parties' claims regarding both the RIM and Motorola patents. (*Id.*, ¶16.) Thus, the actions now pending in three different jurisdictions involve overlapping patents, overlapping wireless communication technologies, overlapping products and services (handheld devices with email, Internet, messaging, and other advanced features and related mobile wireless e-mail services), and many of the same witnesses and documents. (*Id.*, ¶¶15-16.)

**E.      The Parties and Their Dispute Have A Substantial Connection to the Northern District of Texas**

The Northern District of Texas has concrete connections to the parties and to their dispute. RIM and Motorola both have substantial operations in the Northern District of Texas. RIM Corporation, the United States subsidiary of RIM Limited and a party to each of Motorola's actions, has its principle offices in the Northern District of Texas (Irving). (Rivers Decl., ¶17.) RIM's Irving facility currently include substantially all of RIM's licensing and standards employees, as well as engineering, manufacturing, sales, and marketing employees. (*Id.*) RIM's licensing and standards employees, and their documents, located in the Northern District of Texas will be central to RIM's and Motorola's damages claims. (*Id.*, ¶¶18-19.)

Motorola also has significant operations in the Northern District of Texas. Motorola employs over 1,000 people at a facility in Fort Worth, Texas at which it manufactures wireless

communication devices. (*Id.,* ¶20 and Ex. M.) Indeed, six of the named inventors of Motorola's asserted patents were based in the Northern District of Texas when they filed their patent applications: Mr. Gregory Lewis Cannon (Keller), Mr. David P. Kilp (Colleyville), and Mr. Nick P. Lagen (Forth Worth), the named inventors of the '447 Patent; and Mr. John D. Deletic (Dallas), Mr. Vick T. Cox (Plano), and Mr. John A. Davis (Plano), the named inventors of the '211 Patent. (*Id.,* ¶21.) According to publicly available records, at least Mr. Cox and Mr. Davis appear to still reside in the Northern District of Texas. (*Id.,* ¶21 and Ex. K.) Regardless of whether these individuals continue to reside in the Northern District of Texas, discoverable information regarding the work that lead to their patents likely remains in that District. Neither Motorola, nor RIM, have any operations, employees, or relevant documents in the District of Delaware.

The dispute between the parties also has a substantial connection to the Northern District of Texas. The parties' negotiations relating to the extension of the Agreement included at least six face-to-face meetings at RIM's U.S. headquarters in Irving, including meetings on August 27, September 12, October 1, November 19, November 29, and December 14, 2007. (*Id.,* ¶¶9 and 19.) None of the negotiations between RIM and Motorola took place in the District of Delaware. (*Id.*) Many of the key subject matters presented in both RIM's and Motorola's Complaints, including the patented technologies, the products embodying the patented technologies, the products accused of infringement, and the development, manufacture and sale of such products, have a substantial nexus to the Northern District of Texas. (*Id.,* ¶21.) There is no such nexus to the District of Delaware.

## IV.    ARGUMENT

Transfer of the present action to the Northern District of Texas, where RIM's comprehensive action is pending, is necessary to avoid duplicative and piecemeal litigation

between the same parties, and to avoid the waste of public and private resources. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[2] 28 U.S.C. § 1404(a). "The purpose of this statute is 'to prevent waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" *Virgin Wireless, Inc. v. Virgin Enterprises Ltd.*, 201 F. Supp. 2d 294, 299 (D.Del. 2002) (Robinson, J.), citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964).

As the United States Court of Appeals for the Federal Circuit recently discussed in *Micron Technology, Inc. v. Mosaid Technologies, Inc.*, analyzing the circumstances under which it is appropriate to transfer a patent case under 28 U.S.C. § 1404(a), "[t]he general rule favors the forum of the first-filed action, whether or not it is a declaratory judgment action." --- F.3d ---, 2008 WL 540182 (Fed. Cir., Feb. 29, 2008). The Federal Circuit cautioned, however, that "[t]he first-filed suit rule, for instance, will not always yield the most convenient and suitable forum. Therefore, the trial court weighing jurisdiction additionally must consider the real underlying dispute: the convenience and suitability of competing forums." *Id.*

The present action should be transferred to the Northern District of Texas because the identical patents will be addressed there in the context of RIM's more comprehensive Northern District of Texas action, the Northern District of Texas can compel third party witnesses living within the jurisdiction, and both parties' have significant connections to the Northern District of Texas. Only RIM's Northern District of Texas action encompasses the entire dispute between the parties. In contrast, Motorola purposefully chose to raise only a limited portion of the

---

[2] Motorola's present action could have been brought against RIM in the Northern District of Texas, where venue and personal jurisdiction are appropriate in light of RIM's United States headquarters being located in Irving, Texas.

parties' dispute in the present action. Moreover, the parties and their dispute have actual,

tangible connections to the Northern District of Texas, whereas the parties and their disputes

have no connections to the District of Delaware. Maintaining the present action in this District

would result in piecemeal, duplicative litigation, that would risk having inconsistent *Markman*

constructions for the same patents and inconsistent judgments in multiple jurisdictions in actions

between the same parties.

### A.    Transfer To The Northern District of Texas Is Required To Avoid Duplicative And Piecemeal Litigation Concerning The Same Patents.

When separate patent actions in separate jurisdictions concern overlapping issues,

Delaware courts will transfer an action in the interest of justice and to avoid the waste of judicial

resources. *Bank of America v. S.I.P. Assets LLC*, C.A. No. 07-159 GMS, 2007 WL 2698192, *3

(D.Del. Sept. 11, 2007 (transferring overlapping patent litigation in part because "allowing both

cases to proceed concurrently would be both inconvenient to the parties and an insufficient use

of judicial resources"); *Cashedge, Inc. v. Yodlee, Inc.*, No. Civ. A. 06-170, 2006 WL 2038504,

*2 (D.Del. July 19, 2006) (transferring patent action to California because "same parties, similar

technologies, and related patents" were at issue); *Virgin Wireless, Inc.*, 201 F. Supp. 2d at 301

(despite Delaware action's "first filed" status, transferring trademark license action where it

would be a "waste of judicial resources" for suits "predicated on the same transactions and

occurrences" to "progress in parallel"); *Nilssen v. Osram Sylvania, Inc.*, C.A. No. 00-695-JJF,

2001 WL 34368395, * 4 (D.Del. May 1, 2001) (transferring patent action to Illinois where *six* of

twenty-six asserted patents in Delaware action were at issue in Illinois action); *Ballard Med.*

*Prods. V. Concord Lab., Inc.*, 700 F.Supp. 796, 801-802 (D.Del. 1988) (transferring patent action

"in the interest of justice" so that "all issues arising relating to patents" be litigated "in one place,

before one court"); *Pall Corp. v. Bentley Lab., Inc.*, 523 F. Supp. 2d 450, 453 (D.Del. 1981)

(transferring patent action where "impossible to justify continued maintenance" of two suits involving same parties and issues).

RIM's Northern District of Texas action addresses *all* of the patents for which Motorola seeks a declaratory judgment in this action; equally importantly, RIM's Northern District of Texas litigation is the *only* action that encompasses *all* of the substantially overlapping issues between the parties – the contract and antitrust issues relating to Motorola's commitment to license its standards-essential patents on FRAND terms; the contract issues relating to Motorola's commitment to negotiate in good faith to extend the terms and conditions of the parties' 2003 Cross License Agreement; and the patent infringement issues relating to both parties' patents (which will involve the same areas of technology and the same products).

Motorola's separate actions in this District and in the Eastern District of Texas, in stark contrast, each raise only a portion of the pending issues, and even together do not raise all of the issues pending in the Northern District of Texas action. Transfer is required to avoid duplicative litigation of overlapping claims in three separate jurisdictions—litigation that would waste the resources of the courts and the parties, and also create the possibility of inconsistent *Markman* constructions and judgments. The Northern District of Texas action is the only available vehicle for efficiently and fully resolving all pending claims. To pursue these overlapping actions in three separate jurisdictions would almost certainly result in "inconsistent judgments virtually guaranteeing that [certain] of the judgments will get reversed on appeal." *Nilssen*, 2001 WL 34368395 at * 4, n. 10.

**B.    Transfer To The Northern District Of Texas Will Promote "The Convenience of the Parties and the Witnesses, And The Interests Of Justice"**

In considering transfer, courts often weigh a set of "private and public interests," all reflective of the general rule holding transfer appropriate "[f]or the convenience of the parties

and witnesses [and] in the interest of justice." *Virgin Wireless, Inc.*, 201 F. Supp. 2d at 299-300,

citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3rd Cir. 1995).

The public interests include: (1) enforceability of judgment; (2) practical considerations

regarding the ease, speed or expense of trial; (3) the administrative difficulty resulting from court

congestion; (4) the local interest in deciding local controversies in the home forum; (5) the

public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law

in diversity cases. *Id.* The private interests include: (1) the plaintiff's choice of forum; (2) the

defendant's preferred forum; (3) whether the claim arose elsewhere; (4) the convenience of the

parties as indicated by their relative physical and financial conditions; (5) the convenience of the

witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted

in a certain forum; and (6) the location of books and records to the extent that they could not be

produced in a certain forum. *Id.* No single factor is dispositive; the court must balance all of the

factors, while respecting and giving deference to the plaintiff's choice of forum. *Id.*

As discussed above, transfer of this case is compelled by the courts' and the parties'

interest in avoiding duplicative litigation, including potentially conflicting *Markman*

constructions, concerning identical patents at issue both in this action and in RIM's Northern

District of Texas action. Other significant public and private factors compel transfer, as shown

below.

**(i)    *Transfer To The Northern District of Texas Would Promote The Practical Considerations of "Ease, Speed, or Expense" of Trial.***

It is indisputable that litigating the parties' disputes in *three* separate courts cannot be

easier, faster, or less expensive than litigating all issues in the Northern District of Texas —

where all issues already have been raised, and where both RIM and Motorola have established

bases of operation. (Rivers Decl., ¶¶17 and 20.) By litigating the patents at issue in both this

action and the Northern District of Texas before a single court, both parties would significantly lower their costs and this Court could avoid expending its limited judicial resources on a matter already fully being litigated elsewhere. *See Nilssen*, 2001 WL 34368395 at *4 (transferring case for "practical considerations" of "ease, speed, and expense" where related case already pending in other jurisdiction).

### (ii)    *The Local Interest in Adjudicating Local Disputes Favors Transfer to the Northern District of Texas.*

The Northern District of Texas has a substantial local interest in adjudicating the dispute between the parties, given that the dispute between RIM and Motorola arose during licensing negotiations in the Northern District of Texas and that both parties have major business centers in the Northern District of Texas. (*Id.*, ¶¶17-21 .) In contrast, the parties' disputes are not tangibly connected to this District—and the District's interest in adjudicating this case is thus attenuated. (*Id.*, ¶¶9 and 19.)

RIM has substantial, tangible connections to the Northern District of Texas. (*Id.*, ¶¶17-18.) RIM's licensing and technology standardization group is based in Irving, as are its sales, marketing and manufacturing employees. These Northern District of Texas employees possess highly relevant information pertaining to RIM's contract and antitrust claims and to damages issues relevant to both parties' patent infringement claims. (*Id.*.)

Furthermore, Motorola maintains a significant presence in the Northern District of Texas, employing over 1,000 people in that District. (*Id.*, ¶20.) Moreover, both Motorola documents and witnesses relevant to the parties' dispute are likely located in the Northern District of Texas. (*Id.*, ¶¶17-21).

While Motorola is incorporated in Delaware, that fact is not a dispositive factor— "indeed, it is not mentioned in § 1404, nor is it among the eleven factors identified by the Third Circuit

Court of Appeals in *Jumara*." *Mentor Graphics*, 77 F. Supp. 2d at 509, n. 6; *see also Nilssen*, 2001 WL 34368395 at *2 (describing party's incorporation in Delaware as a "minimal" contact). In this action, the true dispute arose in the Northern District of Texas, and that district has the greater interest in determining all of the relevant issues.

> **(iii)    The Convenience of Third-Party Witnesses Is Not Favored By Litigating the Parties' Dispute in the District of Delaware.**

The convenience of trial witnesses is an important factor in determining whether to transfer venue, "probably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer." *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 77 F. Supp. 2d 505, 510 (D.Del. 1999), quoting Wright and Miller, Federal Practice And Procedure, § 3851 at 415 (2d ed. 1986). The courts consider only the convenience of third-party witnesses who may not be available for trial in Delaware; both RIM and Motorola must secure the attendance of their employee witnesses. *Nilssen*, 2001 WL 34368395 at *2; *Mentor Graphics*, 77 F. Supp. 2d at 510. Motorola cannot demonstrate that the convenience of any third-party witness would be favored by litigating the parties' dispute in this District.

## V.   CONCLUSION

For the foregoing reasons, RIM respectfully requests that the Court transfer this case to

the United States District Court for the Northern District of Texas.

Respectfully submitted,

Dated:  March 31, 2008

*[signature]*

Patricia Smink Rogowski (#2632)
**CONNOLLY BOVE LODGE & HUTZ LLP**
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
(302) 658-9141
progowski@cblh.com
*Attorneys for Defendants*

**OF COUNSEL**
William F. Lee
Dominic E. Massa
Michelle D. Miller
**Wilmer Cutler Pickering Hale & Dorr LLP**
60 State Street
Boston, MA  02109
(617) 526-6000

601622-2

15

## CERTIFICATE OF SERVICE

I, Patricia Smink Rogowski, hereby certify that on this 31st day of March, 2008, I

electronically filed **DEFENDANT RESEARCH IN MOTION'S BRIEF IN SUPPORT OF**

**MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)** with the Court

Clerk using CM/ECF which will send notification of such filing(s) to:

Josy W. Ingersoll (No. 1088)
Elena C. Norman (No. 4780)
Monté T. Squire (No. 4764)

I hereby further certify that on this 31st day of March, 2008, I have served this document

on the attorneys of record at the following addresses as indicated:

**VIA E-Mail**
Jesse J. Jenner ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
*jesse.jenner@ropesgray.com*

Norman H. Beamer
ROPES & GRAY LLP
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 617-4000
*norman.beamer@ropesgray.com*

Nicole M. Jantzi
ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
*nicole.jantzi@ropesgray.com*

   */s/ Patricia Smink Rogowski*
Patricia Smink Rogowski (Bar ID No. 2632)
progowski@cblh.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MOTOROLA, INC. | ) | Civil Action No. |
| | ) | 1:08-cv-104-SLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RESEARCH IN MOTION LIMITED AND | ) | |
| RESEARCH IN MOTION CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF BRIAN RIVERS, ESQ.

I, Brian Rivers, Esq., depose and say:

1.    I am an attorney, a member of the State Bar of Texas, and an employee of

Defendant Research In Motion Limited (referred to collectively with Research In Motion

Corporation as "RIM"). I joined RIM in June, 2004 as Director of Licensing. I am currently

Vice President of IP Licensing. In my present position, I manage a group of approximately one

dozen RIM intellectual property licensing personnel located in RIM's United States headquarters

in Irving, Texas. I currently maintain an office at RIM's facilities in Irving, Texas and in

Waterloo, Ontario. I reside in Ontario, Canada. I submit this affidavit upon personal knowledge

or information and belief in support of RIM's Motion to Transfer this case to the United States

District Court for the Northern District of Texas.

### Exhibits

2.    True and correct copies of the following documents are attached hereto as

Exhibits to this Declaration:

Exhibit A:    Standstill Agreement between RIM and Motorola, December 5, 2007;

| Exhibit B: | Complaint by RIM against Motorola, N.D. Tex. (Dallas), February 16, 2008; |
| Exhibit C: | E-mail from Russ Emerson, Esq. to Clerk, N.D. Tex. re: Timing of Filing; |
| Exhibit D: | Complaint by Motorola against RIM for Patent Infringement, E.D. Tex. (Marshall), February 16, 2008; |
| Exhibit E: | Notice of Electronic Filing re: E.D. Tex. Complaint; |
| Exhibit F: | Complaint by Motorola against RIM for Declaratory Relief, D. Del., February 16, 2008; |
| Exhibit G: | Notice of Electronic Filing re: D. Del. Complaint; |
| Exhibit H: | Motorola Press Release, entitled "Motorola and Verizon Wireless Announce the Highly Anticipated MOTO Q," May, 22, 2006; |
| Exhibit I: | Motorola Press Release, entitled "Motorola to Acquire Good Technology," November 11, 2006; |
| Exhibit J: | "Smart mobile device shipments hit 118 million in 2007, up 53% on 2006" Canalys research release 2008/021, dated February 5, 2008; |
| Exhibit K: | Residence Reports for Motorola Inventors, John A. Davis and Vick T. Cox produced using ChoicePoint Autotrack; |
| Exhibit L: | Motorola's Notice of Related Case and Motion to Consolidate; |
| Exhibit M: | Selections from Research In Motion Annual Report for Fiscal Year Ended March 3, 2007; and |
| Exhibit N: | Dun & Bradstreet Business Information Report re: Motorola's Fort Worth, Texas Facility. |

## RIM and Motorola Cross License Agreement

3.      In 2003, RIM and Motorola entered into a Cross License Agreement, whereby Motorola granted RIM a non-exclusive license to practice patents that Motorola claimed were essential to certain wireless communication standards. During the negotiations preceding the Cross License Agreement, and again during the 2007/2008 negotiations to extend that Agreement, Motorola provided RIM with a list of patents Motorola claimed to be "essential" to the practice of several standardized technologies that RIM has incorporated into its BlackBerry® devices.

4.      As a condition of membership in the standard-development organizations ("SDO") responsible for these standardized technologies, a member (such as Motorola) agrees to

license any essential patents on fair, reasonable, and non-discriminatory terms ("FRAND"), or sometimes defined as reasonable and non-discriminatory terms ("RAND"). SDOs rely on FRAND and RAND commitments in order to develop and finalize technology standards. Without such commitments to license essential intellectual property on FRAND or RAND terms, the adoption of a finalized standard would be prohibitively expensive.

## RIM and Motorola Become Competitors

5.      Although RIM has been making its multi-functional, mobile-email BlackBerry® devices since 1999, Motorola did not attempt to break into this market until mid-2006, with the launch of its "Q" mobile phone. Like RIM's BlackBerry® products, the "Q" has a full QWERTY keyboard, and is capable of sending and receiving email and connecting to the internet. Unlike during the RIM/Motorola license negotiations in 2003, when the parties' products were directed to different consumer markets, Motorola's introduction of its "Q" product in 2006 put the parties in direct competition. This competition was heightened by Motorola's acquisition of Good Technology in early 2007. Good was, and Motorola now is, a direct competitor to RIM in the market for email server technology.

6.      The demand for RIM's BlackBerry® devices has resulted in annual revenues of over 3 billion dollars in Fiscal 2007. During the period from Fiscal Year 2005 to Fiscal Year 2007, the popularity of RIM's BlackBerry® devices increased dramatically, from 2.5 million subscribers in Fiscal 2005, to 4.9 million subscribers in Fiscal 2006, to 8 million subscribers at the conclusion of Fiscal 2007. *See* Ex. M [RIM 2007 Annual Report], at 9.

7.      While RIM's market share for "smart mobile devices" has been increasing, Motorola's has decreased. In the fourth quarter of 2007, RIM continued its success with a 41 percent share of the U.S. smart mobile device market, the highest in the industry, and doubled its

- 3 -

sales for the second quarter in a row. RIM also had 11.4% of the worldwide market for smart mobile devices, and increase from its 8.9% share for Q4 2006. However, Motorola's share of this market decreased from 7.1% in Q4 2006 to 6.5% in Q4 2007. *See* Ex. J [Canalys research release].

8.      Despite Motorola's introduction of its Q product as a direct competitor to the BlackBerry®, Motorola has approximately half the worldwide market share of smart mobile devices as RIM (6.5% versus 1.4%). *See* Ex. J [Canalys research release].

### The Licensing Dispute Between the Parties

9.      As the expiration of the Cross License Agreement neared, RIM attempted to negotiate an extension of this agreement with Motorola. The licensing negotiations between RIM and Motorola began in June 2007 and continued into February 2008. These negotiations included face-to-face meetings at RIM's U.S. headquarters in Irving, Texas, and included sessions on August 27, September 12, October 1, November 19, November 29, and December 14, 2007. RIM personnel involved in these negotiations, including Randall Mishler, Esq. and Mr. Abdul Zindani, are employed at RIM's facility in Irving and reside in the Northern District of Texas. None of the parties' negotiations occurred in the District of Delaware.

10.     During the parties' licensing negotiations, Motorola demanded unfair and anticompetitive royalties from RIM and coupled those demands with threats of patent litigation. Motorola's demanded royalty rates were multiple times the imputed rate of the 2003 Cross License Agreement. Motorola's royalty demands contravene the licensing commitments that Motorola made to the European Telecommunications Standards Institute (ETSI) and the Institute of Electrical and Electronics Engineers (IEEE) – to offer to license its patents that it claims to be essential on FRAND or RAND terms.

- 4 -

11.    In addition to refusing to offer to license its purportedly essential patents on

FRAND or RAND terms, Motorola also threatened to bring suit against RIM for infringement of

certain non-essential patents in order to enjoin RIM's business operations.

### The Patents-in-Suit

12.    The RIM and Motorola patents being litigated in the Northern District of Texas,

the Eastern District of Texas, and the District of Delaware all relate to technologies used in

mobile wireless communication devices such as the BlackBerry® and the Motorola Q.

13.    The RIM patents asserted in the Northern District of Texas, which are the subject

of Motorola's declaratory judgment claims in the District of Delaware, include patents directed

to systems and methods for speech compression and patents directed to features of keyboards

used for wireless communication devices.

14.    The Motorola patents in the Northern District of Texas litigation also relate to

various aspects of mobile wireless communications and data handling, including establishing

data connections with the wireless networks, and identifying, retrieving, categorizing, and

pushing to hand-held devices customized data from a data source.

15.    Both RIM's and Motorola's products are related generally to the technologies

described in the above-mentioned patents. RIM's BlackBerry® series of handheld devices and

Motorola's Q series of "smart" phones are dual-mode devices that integrate both cellular

telephone and data communication functionality. As such, the products at issue in the related

litigations (Eastern and Northern Districts of Texas and District of Delaware) all employ various

technologies that establish data connections with wireless networks, transmit data (including

email) to and from a mobile wireless handset, and compress speech during mobile wireless

communication. In order to understand either RIM's or Motorola's patents and the inventions

- 5 -

covered by them, the court will need to understand how wireless data networks are set up and how they operate, and how multi-mode handset devices connect with networks to transmit both speech and data communications.

16.    Much of the same technical, financial and marketing discovery will be relevant to the parties' claims regarding both the RIM and Motorola patents. Many of the same documents pertaining various aspects of RIM's and Motorola's products and business are relevant to all of the related litigations: research and development of products and services, the technical set up and operation of the products, financial results and projections, and marketing. Witnesses who will testify on these topics will overlap as well.

### Connections to the Northern District of Texas

17.    Research In Motion Corporation has its principal place of business (its corporate headquarters) at 122 West John Carpenter Parkway, Suite 430, Irving, Texas. This site houses RIM's Global Department of Licensing and Standards. Irving, Texas is within the Northern District of Texas, just miles from the Dallas Division courthouse.

18.    RIM licensing personnel, and their documents, are located in Irving, Texas. These personnel, including at least Mr. Mishler and Mr. Zindani, likely possess discoverable information regarding RIM's claims and defenses.

19.    A significant portion of the licensing negotiations between RIM and Motorola occurred in the Northern District of Texas, including six face-to-face meetings at RIM's U.S. headquarters in Irving. None of these negotiations took place in the District of Delaware.

20.    Motorola maintains a significant presence in the Northern District of Texas. Motorola employs over 1,000 people at a facility located at 5555 N Beach Street, Fort Worth, Texas. This facility is involved in the manufacturing of semiconductors and related devices, as

- 6 -

well as radio, television and communication equipment. *See*, Ex. N [Dun & Bradstreet Business Information Report].

21.    Based on the information recorded on the face of Motorola's patents-in-suit, six of Motorola's named inventors resided in the Northern District of Texas when they filed their patent applications: Mr. Gregory Lewis Cannon (Keller), Mr. David P. Kilp (Colleyville), and Mr. Nick P. Lagen (Forth Worth), all of the named inventors of U.S. Patent No. 5,974,447; and Mr. John D. Deletic (Dallas), Mr. Vick T. Cox (Plano), and Mr. John A. Davis (Plano), all of the named inventors of U.S. Patent No. 5,706,211. Based upon publicly available information, at least Mr. Cox and Mr. Davis appear to still reside in the Northern District of Texas. *See* Ex. K [Residence Reports]. Regardless of the present location of these inventors, discoverable information regarding the work they performed in Northern District of Texas in connection with the patents-in-suit likely remains in that District.

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Brian Rivers, Esq.

# EXHIBIT A

## STANDSTILL AGREEMENT

THIS STANDSTILL AGREEMENT is entered into and effective as of December 5, 2007, by and between Motorola, Inc. (hereinafter "Motorola"), a corporation organized and existing under the laws of Delaware and having a place of business at 1303 East Algonquin Road, Schaumburg, Illinois and Research In Motion Limited (hereinafter "RIM"), a corporation having a place of business 295 Phillip Street, Waterloo, Ontario.

WHEREAS, Motorola and RIM previously entered into a license agreement, dated March 27, 2003, whereby certain Motorola patents relating to wireless communication standards and wireless technology were non-exclusively licensed to RIM and certain RIM patents relating to same were non-exclusively cross-licensed to Motorola (the "existing license agreement");

WHEREAS, the existing license agreement will expire December 31, 2007 and the parties have been discussing the possibility of entering into a subsequent patent license agreement; and

WHEREAS, the parties desire to enter into this Standstill Agreement in order to allow the parties to continue their licensing discussions, in good faith, after the expiration of the existing license agreement without fear that either party will institute a judicial, administrative or other proceeding against the other party relating to either party's patents directed to wireless communication standards or wireless technology.

NOW, THEREFORE, intending to be legally bound, and in consideration of the terms, conditions and mutual obligations set forth herein, the parties agree as follows:

1.  For a period commencing as of the effective date hereof up to and including the end of the day on Friday, February 15, 2008, hereafter the "Standstill Period"), Motorola and RIM each agrees and covenants not to file, commence, initiate or prosecute any judicial, administrative or other proceeding or litigation of any kind in any jurisdiction worldwide against the other party or its parents, subsidiaries and affiliates, or any of the customers or suppliers of any of the foregoing based on either party's patents relating to wireless communication standards or wireless technology.

2.  As consideration for entering into this Standstill Agreement, Motorola and RIM agree that during the Standstill Period they will continue their license discussions and negotiations in good faith and make all reasonable efforts to consummate a subsequent license agreement relating to their respective patents directed to wireless communication standards or wireless technology prior to the expiration of the Standstill Period.

3.  Motorola and RIM expressly acknowledge and agree that this Standstill Agreement is not intended to be an extension of the existing license agreement or any of the rights, grants, terms, licenses or covenants therein. Nothing in this Standstill Agreement shall prevent either party from seeking after the Standstill

Period damages or other remedies for patent infringement by the other party occurring during the Standstill Period or declaratory relief with respect to the other party's patents.

4.    Motorola and RIM expressly acknowledge and agree that this Standstill Agreement is not intended to alter substantively or adversely the rights of either party as they exist prior to the execution of this Standstill Agreement. Rather, this Standstill Agreement is intended to maintain the status quo, and, in particular, whatever rights the parties may have as of the execution of this Standstill Agreement.

5.    This Standstill Agreement is personal to the parties and shall not prevent either party from enforcing its patents relating to wireless communication standards or wireless technology against any entity other than a party to this agreement, its parents, subsidiaries and affiliates, or the suppliers and customers of any of the foregoing.

6.    This Standstill Agreement shall expire at the end of the Standstill Period, provided, however, that Motorola and RIM agree that if either party violates this Standstill Agreement, the other party shall be free to terminate this agreement immediately and seek whatever remedies for breach of this agreement the terminating party deems appropriate, including without limitation dismissal of the proceeding or litigation commenced by the other party in breach of this Standstill Agreement and any consequential damages arising out of such breach. This Standstill Agreement may be amended or extended only by express, written agreement between the parties.

7.    The parties acknowledge and represent that (1) each has the power and authority to enter into and be bound by this Standstill Agreement and (2) this Standstill Agreement has been duly authorized by all necessary and proper corporate action.

IN WITNESS WHEREOF, each of the parties hereto has caused this Standstill Agreement to be executed in duplicate by its duly authorized officer or representative.


**MOTOROLA, INC.**                    **RESEARCH IN MOTION LIMITED**

BY: _Thomas J Meredith_              BY: _Jim Balsillie_

NAME: _THomas J. MEREDiTH_           NAME: _JIM BALSILLIE_

TITLE: _CFO_                         TITLE: _CO-CEO_

DATE: _Dec. 17, 2007_               DATE: _DECEMBER 14, 2007_

# EXHIBIT B



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RESEARCH IN MOTION LIMITED and          §
RESEARCH IN MOTION CORPORATION          §
                                         §
                                         §
        Plaintiffs,                      §    Civil Action No.
                                         §
v.                                       §    3 - 0 8 C V 0 2 8 4 - G
                                         §    Jury Trial Demanded
MOTOROLA, INC.,                          §
                                         §
        Defendant.                       §

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
FEB 1 6 2008
CLERK, U.S. DISTRICT COURT
By _____
        Deputy

## COMPLAINT

Plaintiffs Research In Motion Limited and Research In Motion Corporation

(collectively "RIM"), on personal knowledge as to their own acts, and on information and

belief as to all others based on their own and their attorneys' investigation, allege as follows:

## NATURE OF THE ACTION

1.      This is an action brought by RIM against Motorola, Inc. ("Motorola") for

Motorola's infringement of RIM's patents, as well as its continuing pattern of unfair and

anticompetitive conduct with respect to its own patents that it has committed to licensing to

others on fair, reasonable and non-discriminatory terms.  In particular, RIM seeks remedies

for (a) Motorola's infringement of RIM's U.S. Patent Nos. 5,664,055  ("the '055 Patent"),

5,699,485 ("the '485 Patent"), 6,278,442 ("the '442 Patent"), 6,452,588 ("the '588 Patent"),

6,489,950 ("the '950 Patent"), 6,611,254 ("the '254 Patent"), 6,611,255 ("the '255 Patent"),

6,919,879 ("the '879 Patent), and 7,227,536 ("the '536 Patent"); (b) Motorola's breaches of

its commitments to multiple standard development organizations ("SDOs") to license patents

that it claims are essential to wireless industry standards on fair, reasonable, and non-

discriminatory terms ("FRAND") (in some cases, alternatively referred to as "reasonable and non-discriminatory," or "RAND," terms); (c) Motorola's violations of Section 2 of the Sherman Act arising out of its false promises to various SDOs that it would continue to license patents that it claims are essential to implementing standards on FRAND or RAND terms; and (d) Motorola's breach of its 2003 license to RIM (the "2003 Cross-License Agreement"), which requires Motorola to negotiate in good faith an extension of that license beyond the January 2008 termination date.  In addition, RIM seeks judicial declarations that certain additional Motorola patents – that Motorola has injected into the parties' negotiations and that it has threatened to assert against RIM in an effort to enjoin RIM's business, if RIM does not agree to its excessive licensing demands – are invalid, and that RIM's products do not infringe any valid claims of these patents.

2.    Motorola has infringed, and is continuing to infringe, multiple RIM patents, and has refused to compensate RIM for its use of RIM's patented technologies.

3.    In addition to its infringement of RIM's patents, Motorola has manipulated and subverted various standards development processes with respect to its own patents that it claims are essential to industry standards, in order to injure RIM, a successful competitor and rival.  Motorola made promises to multiple SDOs to license its essential patents on FRAND or RAND terms.  The SDOs and other participants in those SDOs relied on Motorola's promises in adopting Motorola's technologies into technical standards that were being developed.  These standards have been implemented and are now used by mobile wireless companies all over the world, including RIM.  RIM has invested substantial resources in developing and marketing mobile wireless products and services, relying on the availability of

- 2 -

licenses on FRAND or RAND terms of proprietary technology that are required to implement the standard.

4.    Motorola has now broken its promises to the various SDOs by demanding that RIM pay exorbitant royalties for its patents that it claims are essential. Indeed, Motorola is now seeking license payments that represent an effective royalty rate multiple times the imputed percentage-based royalty that RIM has paid under the 2003 Cross-License Agreement. The royalty Motorola is seeking is also substantially in excess of royalties RIM has paid and is paying other parties claiming to own patents essential to the same widely-implemented standards as those Motorola claims to own.

5.    Motorola's unlawful conduct has not only threatened injury to RIM, but also has had substantial anticompetitive effects in markets for technologies that perform functions within various wireless communication technology standards. These technologies are essential inputs into the manufacture of products and services that comply with the standard. Before the relevant standards were established, there were alternative technologies to Motorola's that were available for selection to perform functions incorporated in the relevant standards. Once the SDOs incorporated Motorola's technologies in the relevant standards as a result of Motorola's promises, however, those alternative technologies were no longer viable because compliance with each of the pertinent standards requires the use of each of the selected technologies in all of its standard-compliant products. Motorola's unlawful conduct, if not constrained, will also cause anticompetitive effects in the downstream markets for standards-compliant products.

6.    RIM therefore seeks (a) a judicial declaration and compensation for Motorola's infringement of the '055, '485, '442, '588, '950, '254, '255, '879, and '536 Patents; (b) a

- 3 -

judicial declaration that Motorola's FRAND/RAND commitments constitute binding and

enforceable contractual obligations to license to RIM on FRAND/RAND terms the patents

Motorola asserts are essential to the implementation of several pervasive standards for

wireless voice and data communications; (c) a judicial declaration that, by contracting to

license its declared essential patents to SDOs and their members, including RIM, on

FRAND/RAND terms, Motorola has waived its right to seek injunctive relief to prevent the

use of its patents; (d) a judicial determination of what constitutes a FRAND/RAND royalty

rate in this case and an order compelling specific performance by Motorola of its contractual

obligation to license to RIM the patents Motorola claims are essential on FRAND/RAND

terms; (e) a judicial determination of and compensation for Motorola's breaches of contract

and violations of Section 2 of the Sherman Act; and (e) judicial declarations that Motorola's

United States Patent Nos. 5,359,317, 5,075,684, 5,764,899, 5,771,353, 5,958,006, 5,706,211,

and 6,101,531 (collectively, the "Motorola patents") are invalid, and that RIM's manufacture,

use, offer for sale, and sale of its products does not infringe any valid claim of any of the

Motorola patents.

## PARTIES

7.      Research In Motion Limited is a corporation organized and existing under the

laws of Canada, having a principal place of business at 295 Phillip Street, Waterloo, Ontario,

N2L 3W8 Canada. Research In Motion Corporation is a corporation organized and existing

under the laws of Delaware, having a principal place of business at 5000 Riverside Drive,

Irving, Texas 75039. At all times relevant to this Complaint, RIM conducted business in the

state of Texas.

8.     Founded in 1984, RIM has grown rapidly to become a leading designer, manufacturer and marketer of innovative wireless solutions for the worldwide mobile communications market. RIM markets its popular line of BlackBerry® "smart" phones that provide phone service, e-mail, Internet access, and text message communications to over twelve million subscribers, including many national, state and local governmental agencies.

9.     Through the development of integrated hardware, software and services that support multiple wireless network standards, RIM provides platforms and solutions for seamless access to time-sensitive information including e-mail, phone, text messaging (SMS and MMS), Internet and intranet-based applications. RIM technology also enables a broad array of third-party developers and manufacturers to enhance their products and services with wireless connectivity to data.

10.     Motorola is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1303 E. Algonquin Road, Schaumburg, IL 60196. At all times relevant to this Complaint, Motorola conducted business in the Northern District of Texas. Motorola has, for many years, developed and marketed wireless handsets and wireless enterprise and network equipment. More recently, Motorola has begun marketing "smart phones" (phones with email, Internet, messaging, and other advanced features) that compete with RIM's BlackBerry® devices. Motorola's subsidiary, Good Technology Group, also markets mobile computing software and services that compete with RIM's BlackBerry® Enterprise Server technology.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this action pursuant to the Federal Patent Act, 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, and pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

12.    The Court also has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. § 1367. The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

13.    Motorola's infringement of RIM's patents, its unfair and anticompetitive conduct, and its wrongful patent assertions, as described herein, have affected and are affecting interstate and foreign commerce, including commerce in this District.

14.    Venue is proper in this District under § 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 and § 1400(b). Motorola maintains a regular and established place of business in this District, and has committed and continues to commit acts of infringement in this District. Further, Motorola's unfair and unlawful conduct with respect to its own patents has had harmful effects in this District.

## BACKGROUND

### 1. The Mobile Wireless Industry

15.    The mobile wireless communication devices developed and marketed by RIM and Motorola connect to the networks of mobile wireless carriers to provide telecommunications service to consumers. Carriers operate the mobile wireless systems that enable consumers to place and receive telephone calls, send and receive e-mails, and connect to the Internet through mobile wireless handsets. Leading carriers in the United States include AT&T (formerly Cingular), T-Mobile USA, Verizon Wireless, and Sprint Corp.

16.     A number of companies around the world manufacture mobile wireless handsets. These manufacturers typically sell their handsets to the mobile wireless carriers, which in turn sell the handsets to consumers. Mobile wireless handsets contain, among other components, one or more computer chipsets that enable the phone to communicate with the carriers' wireless systems. Carriers, handset manufacturers, and chipset manufacturers must create equipment and devices compatible with each other by using common mobile wireless technology. Since carriers, handset manufacturers, and chipset manufacturers must create equipment and devices compatible with each other to provide mobile wireless services to consumers, developers and manufacturers participate in the crucial process of standards development.

17.     The progression from cell phones, which primarily focus on voice communications, to smart phones required more advanced mobile wireless technologies for transmission of data such as e-mail. Since the mass market introduction of the cell phone in 1980s, mobile wireless technology has evolved to keep pace with the rising volume of voice traffic as well as incorporate the data transmission capabilities necessary to support increasingly sophisticated phones and other handheld devices. The technology has evolved in what are commonly referred to as "generations" of mobile wireless technology.

18.     The first generation of mobile wireless technology (1G) consisted of analog devices and networks that carried only voice traffic. The second generation of mobile wireless technology (2G) began the transition to digital devices and networks providing more efficient use of available spectrum for voice traffic and limited support for data-intensive applications such as paging and text messaging. The emergence of 2G technologies coincided with the growing commercial use of the Internet. The greater data capacity of advanced 2G

- 7 -

networks allowed for the development of the first smart phones, which offered consumers new capabilities such as taking and transmitting photographs, sending and receiving email, and limited web browsing. Third generation (3G) wireless technology supports more advanced data intensive services, such as multimedia, web browsing, music and video downloads, e-commerce, and position location. Almost all wireless carriers currently support and provide 2G technology; many are also introducing 3G networks and services.

## 2. The Importance of Standards

19.    Before new wireless technologies can be broadly commercialized, service providers and device manufacturers must agree on common technology specifications to which each will build products or provide services. For all successful wireless technologies, that process has involved inclusive, multi-participant standards development efforts conducted under the auspices of leading standards development organizations.

20.    Standards play a critical role in the development of wireless data and telecommunications technologies. Standards facilitate the adoption and advancement of technology as well as the development of products that can interoperate with one another. Companies that produce products implementing a standard can make products by referencing only the standard, without the need to communicate separately with every other company with which their products may need to interoperate. Companies producing products implementing a standard can therefore be confident that their products will operate with other companies' products that also implement that standard, and consumers of those products can be confident that products from multiple vendors will work together.

21.    In addition to achieving interoperability, standards development facilitates (a) lower costs by increasing product manufacturing volume, (b) increased price competition by

- 8 -

eliminating 'switching costs' for consumers that desire to switch from products manufactured by one firm to those manufactured by another, and (c) earlier adoption of new technology.

22.    As a practical matter, the technologies that are used to transmit radio signals between base stations maintained by wireless service providers and devices used by subscribers must be described in standards adopted by a recognized SDO in order to be commercially successful.

23.    Once a standard has been adopted, patents that are essential to that standard – i.e., those that claim technologies selected by the participants in the standards development process for inclusion in a standard – gain undue significance that they would not have had but for adoption of the standard. Companies that produce products implementing a standard can become "locked in" to the technologies included in the standard if, because of cost or other considerations, it is not practical to develop or switch to other technologies, or if customers for their products have no practical choice other than to purchase products that comply with the standard. The owners of patents essential to a standard gain market power that is unrelated to the inherent value of the inventions claimed in their patents and is instead derived from the fact that their patented technologies have been incorporated in the standard.

24.    The inclusion of patented technology into a standard can thus enable the holders of patents that are essential to the standard, if not otherwise constrained, to extract monopoly rents from implementers of a standard and/or to prevent others from implementing the standard by refusing to license the patents on terms that would enable its implementation.

25.    In order to reduce the likelihood that implementers of their standards will be subject to abusive practices by patent holders, SDOs have adopted rules, policies and procedures that control the disclosure and licensing of patents that implementers may require

- 9 -

in order to practice the standard under consideration, and to commit to licensing these technologies to others on fair, reasonable, and non-discriminatory terms. These rules, policies and/or procedures are set out in the intellectual property rights policies ("IPR policies") of the SDOs.

26.     The IPR policies applicable to the standards at issue in this matter expect or require participants to disclose on a timely basis IPR, such as patents or patent applications, that they believe are relevant to standards under consideration. These disclosures permit the SDOs and their members to evaluate and select from competing technologies with full knowledge of claimed IPR rights that may affect the costs of implementing the standard.

27.     In addition, the IPR policies that governed the development of the standards at issue in this dispute encourage or require participants claiming to own essential patents to license those patents to any implementer of the standard on FRAND or RAND terms. As their inclusion in the IPR policies of various standards development organizations suggests, FRAND or RAND commitments are crucial to the standards development process. They enable participants in standards development to choose between competing technologies with the expectation that an owner of patented technology will be prevented from demanding unfair, unreasonable, or discriminatory licensing terms and thereby prevented from keeping parties seeking to implement the standard from doing so or imposing undue costs or burdens on them. Indeed, competing technologies may become obsolete as a result of not being selected for the standard.

28.     Patent owners that fail to honor FRAND commitments they have made are able to frustrate the implementation of the standard in commercial products by imposing

- 10 -

unfair, unreasonable, and discriminatory terms on their commercial rivals. That is precisely what Motorola is seeking to do to RIM.

### 3. Competition Between RIM and Motorola

29.     As consumers have transitioned from voice-only cell phones to more dynamic and multi-functional devices such as the BlackBerry®, competition has increased in the markets for mobile wireless handsets and for mobile wireless computing platforms.

30.     Motorola is and has been a supplier of wireless handsets and other wireless equipment, including its RAZR line of cell phones. Motorola has enjoyed success in the marketplace as a supplier of handsets designed primarily for voice communications., but has more recently begun marketing a more advanced commercial wireless e-mail device.

31.     RIM is a leading supplier of smart phones, which feature data-centric functions such as e-mails. Throughout most of RIM's existence as a company, it has focused its technological efforts on wireless data communications.

32.     In 1999, RIM introduced the BlackBerry® mobile e-mail system, which included the BlackBerry® handheld device. Motorola's Wireless Data Group, despite efforts, was not as successful in selling comparable mobile wireless handheld data devices.

33.     RIM's products and services in mobile wireless data have become broadly available throughout the United States, Canada, Europe, and Asia. RIM's BlackBerry® has become a leading platform used to provide e-mail and Internet connectivity to handheld devices.

34.     In response to RIM's success, Motorola has devoted significant resources to developing commercial wireless e-mail handheld devices. In mid-2006, Motorola introduced the "Q", which, like most BlackBerry® devices, contains a full QWERTY keyboard.

- 11 -

Industry analysts covering the launch of the "Q" initially referred to Motorola's new handheld as a "BlackBerry-killer." However, the "Q" has not achieved the commercial success that RIM's BlackBerry® has enjoyed.

35.    As smart phones have become more sophisticated, RIM and Motorola have become direct competitors in the handset market. For example, RIM offers BlackBerry® devices with built-in Wi-Fi capabilities. The devices enable the user to access the Internet from local Wi-Fi networks at home, in work, or at school. RIM anticipates deploying Wi-Fi in more handheld devices as it introduces new models in the future. Motorola has also attempted to make inroads with its own Wi-Fi compatible handsets, placing its devices in direct competition with RIM's Wi-Fi compatible devices.

36.    Motorola's competition with RIM now extends beyond handheld devices and into e-mail server technology. Unable to successfully develop commercially successful wireless data technology internally, in November 2006, Motorola announced the acquisition of Good Technology, which had developed mobile computing technology that competes with RIM's BlackBerry Enterprise Server technology.

37.    By consummating its purchase of Good Technology in January 2007, Motorola sought to expand into markets in which it previously did not successfully compete, and hoped to increase its share of the coveted "enterprise" user population – the lucrative segment of mobile computing consumers who use mobile wireless technology primarily for business and/or employment purposes. However, Motorola's Good Technology has not been able to capture a greater share of the "enterprise" market – the customer base among which RIM has served well and cultivated a loyal consumer following.

38.    In spite of Motorola's acquisition of Good Technology and development of the "Q" model series, Motorola has suffered declines in market share for mobile wireless handsets. Motorola has been unable to stem its loss of market share in handsets over the past year. Indeed, when Motorola recently announced that it is considering spinning off or selling its handset business, Motorola's share priced increased over ten percent in one day.

39.    Having suffered losses in the marketplace, Motorola has now resorted to demanding exorbitant royalties from its competitor, RIM, for patents that Motorola claims are essential to various standards for mobile wireless telecommunications and wireless computing that RIM practices. It also has demanded exorbitant royalties for additional patents, not essential to the standards, many of which were subject to the parties' 2003 Cross-License Agreement. Motorola's royalty demands violate the promises Motorola made to the SDOs that developed and adopted these standards: to license patents it believes are essential on FRAND or RAND terms. Motorola never told SDOs that it would not be willing to license its essential patents on FRAND or RAND terms when it considered the prospective licensee to be a competitive threat. However, that is precisely what Motorola has done. RIM succeeded in developing and marketing its popular BlackBerry® devices in direct competition with Motorola, and Motorola is trying to obtain through its subversion of the standard setting process and breach of FRAND and RAND commitments what it could not achieve through fair and open competition for the sale of products and services in the marketplace.

40.    Moreover, at the same time that Motorola has demanded exorbitant royalties for its own patents that it claims are essential to the standards, it is refusing to acknowledge or pay royalties for RIM's patents.

- 13 -

### 4. GSM and WLAN Technologies

41.    Motorola's licensing demands pertain to patents that it claims are essential to widely practiced standards for mobile wireless telecommunications and wireless computing. Motorola played an active role in the development of these standards.

#### (i) The GSM Family of Mobile Wireless Telecommunications Standards

42.    When mobile wireless technology transitioned from first generation technology (analog cell phones) to second generation technology supporting digital devices and data-intensive applications such as paging and text messaging, distinct technology "families" emerged to provide functionality for mobile wireless telecommunications. The most widely used family of mobile wireless technologies is based on Global System for Mobile Communications ("GSM") technology. GSM was initially standardized by the European Conference of Postal and Telecommunications Administration ("CEPT") and subsequently by the European Telecommunications Standards Institute ("ETSI"). ETSI is an independent, non-profit SDO founded in 1988 and headquartered in France. It is a consensus-oriented private SDO that produces global standards for information and communications technology, and currently has nearly 700 members in about 60 countries, including Motorola, RIM, and other leading telecommunications companies. GSM is deployed in the United States by AT&T (formerly Cingular Wireless) and T-Mobile, among others.

43.    Subsequent generations of GSM technology (GPRS and UMTS) are backward-compatible with earlier generations. The 2G standards have been supplemented by evolutionary improvements and advancements that permit greater data rates and increased voice capacity. Many GSM carriers have adopted a technology known as GSM Packet Radio Service ("GPRS"), which is often referred to as a "2.5G" technology.

- 14 -

44.    As demand for wireless systems that carry both data at faster speeds and voice at higher capacity has increased significantly, "3G" wireless standards have been proposed and adopted by SDOs. GSM carriers have deployed the Universal Mobile Telecommunications System (UMTS), which employs Wide-band CDMA (WCDMA) technology.

45.    UMTS has been standardized by ETSI and the 3rd Generation Partnership Project (3GPP). ETSI inspired the creation of, and is an organizational partner in, 3GPP. 3GPP is a collaboration among groups of telecommunications associations to make a globally applicable third generation (3G) mobile phone system specification based on GSM technology.

### (ii) WLAN

46.    Wireless local area networking ("WLAN"), commonly referred to as "Wi-Fi" technology, enables a personal computer or other portable device, such as a PDA or cell phone, to access the internet wirelessly at high speeds over short distances. Wi-Fi networks typically consist of one or more access points that are connected to an Ethernet local area network, each of which communicates by radio signals with devices such as notebook computers, and, increasingly, so-called "dual mode" cellular telephones.

47.    The use of Wi-Fi technology has grown quickly in the United States since its introduction in the 1990s. With the deployment of numerous home and business Wi-Fi networks, as well as public-access "hot spots" at coffee shops, hotels, and elsewhere, makers of handheld devices like RIM have added Wi-Fi functionality to their devices as an additional access technology in addition to GSM-based mobile wireless telecommunications standards. Wi-Fi complements mobile wireless telecommunications standards by offering much faster

- 15 -

connection speeds, but over much shorter distances, and with limited mobility. In addition,

Wi-Fi networks are often present within buildings where cellular signals are weak.

48.    Wi-Fi is based on the 802.11 wireless networking standard developed by the

Institute of Electrical and Electronics Engineers ("IEEE") beginning in the early 1990s. The

initial 802.11 protocol ("legacy 802.11") was released in 1997. Since then, there have been a

number of amendments issued, the most important of which are 802.11a (released in 1999),

802.11b (released in 1999), and 802.11g (released in 2003). Additional amendments, notably

802.11n, are currently under development.

## MOTOROLA'S INVOLVEMENT IN THE DEVELOPMENT OF MOBILE WIRELESS TECHNOLOGIES AND WLAN TECHNOLOGIES

49.    Motorola's ability to demand unfair, unreasonable and discriminatory licensing

terms is not a result of its superior product, skill or business acumen, but rather a result of its

false FRAND and RAND commitments made in connection with the standards development

processes for mobile wireless technologies and WLAN technologies.

### 1. Motorola's Participation in ETSI During the Development of the GSM, GPRS, and UMTS Technical Standards

50.    As set forth below, Motorola obtained the ability to demand and potentially

extract supra-competitive royalties for patents purportedly essential to the GSM, GPRS, and

UMTS standards because, as Motorola has asserted to RIM, its patented technology was

purportedly incorporated into those standards by the relevant SDOs, including ETSI and its

organizational partner 3GPP. Had Motorola told ETSI and its members that it would not

continue to license its patents on FRAND terms when faced with a competitive threat,

Motorola would not possess the monopoly power it presently wields. The SDOs or their

members would have chosen other viable alternative technologies competing to perform

- 16 -

functions incorporated in the standards, declined to incorporate into the standards the functions covered by Motorola's claimed patented technology, negotiated specific licensing terms before the technology was incorporated in the standards, or declined to adopt the standards altogether. Motorola's exercise of that monopoly power in its demand for non-FRAND royalties violates the condition on which Motorola obtained that power and is both unfair and anticompetitive.

### (i) Motorola's participation in ETSI and 3GPP and the development of GSM technologies

51.    As referenced above, since its inception, ETSI has set and developed technical standards and participated with other SDOs in standard-setting for various wireless communications technologies, including GSM, GPRS, and UMTS. To facilitate this standard setting activity, ETSI promulgated Rules of Procedure. Annex 6 to these Rules sets forth the organization's IPR policy.

52.    Clause 4 of the policy requires, among other things, that members timely disclose to the organization any IPR they own that may be essential to standards that have been developed or are being developed. Participants in ETSI standard development understand that this provision requires disclosure of all IPR that they believe might be essential to standards under consideration.

53.    Clause 6 of ETSI's IPR policy governs the availability of licenses to essential IPR. In relevant part, Clause 6.1 states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory [FRAND] terms and conditions under such IPR to at least the following extent:

- 17 -

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

54.    If an owner of an essential IPR refuses to undertake a FRAND commitment with respect to that IPR, then, as provided in Section 8 of the ETSI IPR Policy, ETSI may suspend work on relevant parts of the standard or redesign the standard to render the IPR non-essential.

55.    ETSI's IPR policy was designed to benefit all ETSI members, as well as other parties who implement an ETSI standard.  In particular, the stated objective of the policy, described in Clause 3.1, is to "reduce the risk" to those implementing the standards or other technical specifications "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

56.    During all times relevant to these allegations, Motorola has been a member of ETSI through its affiliates, Motorola A/S, Motorola GmbH, Motorola Ltd., and Motorola S.A.S.

57.    Motorola has participated in ETSI's development of communications standards for GSM, GPRS, and UMTS.  As a result of its membership and participation in ETSI,

- 18 -

Motorola was and is bound by the ETSI Rules of Procedure, including the ETSI Intellectual Property Rights Policy.

58.    Motorola has represented to RIM that it owns a number of patents that are essential to the GSM, GPRS, and UMTS standards. These patents are listed in Appendix A to the Complaint. Motorola made promises to license the purportedly essential patents on FRAND terms – promises it has refused to honor.

### (ii) Motorola's False FRAND Commitments With Respect to Patents it Claims Are Essential to GSM, GPRS, and UMTS

59.    Motorola was a member of ETSI throughout ETSI's involvement in the development of the GSM, GPRS and UMTS standards, and Motorola disclosed to ETSI a number of patents it claimed as essential to the GSM, GPRS, and UMTS standards. These patents are listed in Appendix A to the Complaint in Sections I–III.

60.    Motorola declared in filings with ETSI that it committed, on behalf of Motorola and all of its affiliates, to grant irrevocable licenses on FRAND terms under the IPR in accordance with Clause 6.1 of ETSI's IPR policy to the extent those intellectual property rights remain essential to the standard.

61.    At the time Motorola made these declarations to ETSI, promising to offer licenses to its patents essential to implementing the standard on FRAND terms, Motorola did not qualify its commitment or reserve the right to discontinue offering FRAND licenses in the future.

62.    Motorola's FRAND declarations were intended by Motorola to induce ETSI and its members to adopt standards based on technology covered by Motorola's patents.

63.    In fact, Motorola's FRAND declarations did induce ETSI into incorporating Motorola's patented technologies, rather than viable alternative technologies, into the

- 19 -

approved standards. But for Motorola's FRAND commitments, Motorola would not have

obtained monopoly power in markets for technologies to perform functions necessary to

practice the GSM, GPRS, and UMTS standards. Before the adoption of the relevant

standards, there were multiple viable alternative technology solutions competing in markets

for technologies to perform the relevant functions included in the standards. Once the SDO

participants selected Motorola's technologies, however, all alternative technological solutions

for those functions were excluded from use in connection with the relevant standards.

Accordingly, it was the FRAND declarations, on which Motorola has reneged, that conferred

market power on Motorola.

64.    In making these FRAND declarations, Motorola entered into an actual or

implied contract with ETSI, for the benefit of ETSI and any entity that implements GSM,

GPRS, or UMTS (or any other ETSI standards for which Motorola declared essential IPR and

undertook a FRAND commitment). Motorola is bound by its agreement to offer FRAND

licenses in accordance with Clause 6.1 of ETSI's IPR policy.

65.    RIM joined ETSI as associate member in 1999, became a full member in 2003,

and remains an active member today.

66.    RIM and other members of ETSI understood Motorola's FRAND commitment

to mean not only that Motorola would grant licenses to those patents and patents under

application it claims are essential to implement an ETSI standard, but also that it would

license those patents on fair, reasonable, and non-discriminatory terms. In particular, they

relied on these commitments to ensure that the royalties Motorola and other holders of

essential patents would permit efficient competitors such as RIM to offer standards-compliant

products profitably in competition with Motorola and other owners of essential patents.

- 20 -

67.    RIM has invested tremendous resources in developing and marketing products compliant with the GSM, GPRS, and UMTS standards in reliance on Motorola's FRAND commitments.

## 2. Motorola's Participation in IEEE and the Development of the WLAN Standard

68.    The standard setting arm of IEEE, the IEEE Standards Association ("IEEE-SA"), promulgates technical standards in a variety of fields, including telecommunications. Like the other SDOs at issue in this Complaint, IEEE-SA had an IPR policy at the time it was drafting the 802.11 (WLAN) protocols. Under the IPR policy, when individuals participating in IEEE standards development came to believe that a company, university, or other patent holder owned patents or patent applications that might be essential to implement an IEEE standard under development, IEEE-SA would request letters of assurance from those entities.

69.    The letters of assurance sought by IEEE provide either a general disclaimer that the patentee would not enforce the patent(s), or a promise by the patentee that it would license the patent(s) to an unrestricted number of applicants at either no cost or under reasonable terms and conditions that are demonstrably free of any unfair discrimination (i.e., on RAND terms).

70.    IEEE's IPR policy also states that if any party who submitted a letter of assurance with respect to certain patents becomes aware of additional essential patents not covered by prior letter(s) of assurance, it must submit an additional assurance for the newly discovered patent(s).

71.    According to IEEE's IPR policy, letters of assurances, once provided, are irrevocable and shall be in force at least until the standard's withdrawal. Additionally, any

- 21 -

subsequent assignee and transferee of the patent(s) must agree to abide by any assurances in place.

72.    If the letters of assurance were not provided for essential patents, the IEEE working group either would revise the standard so that compliance could be achieved without infringing the patent(s), or would discontinue work on the standard altogether.

73.    Motorola has represented to RIM that it owns a number of patents that are essential to comply with one or more amendments to the 802.11 standard. These patents are listed in Appendix A to the Complaint in Section IV. Motorola obtained rights to several of its WLAN essential patents through its recent acquisition of Symbol Technologies ("Symbol").

74.    Prior to the releases of the 802.11 protocols, Motorola and Symbol submitted letters of assurance to IEEE with respect to those protocols. The letters guaranteed that these essential patents would be licensed on RAND terms. Both Motorola's and Symbol's letters of assurance expressly apply to the essential patents they then held as well as any other essential patents they subsequently obtained.

75.    In reliance on these letters of assurance, IEEE released the 802.11 standard and various amendments to that standard incorporating Motorola's and Symbol's patented technology. Consistent with IEEE policy, absent the letters of assurance, the relevant IEEE working groups would have either revised the standards, employing other viable competing alternative technologies instead, or stopped working on the protocols.

76.    In making its RAND declaration, Motorola entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any entity that implements the 802.11 standard. Motorola is bound by its agreements to offer RAND licenses.

1620477_2.DOC

77. Similarly, Symbol, in making its RAND declarations, entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any other entity that implements the 802.11 standard, and Motorola is bound by that commitment.

78. RIM has participated in the work of IEEE, including its development of WLAN standards, through employees who are IEEE members.

79. RIM and other companies participating in the development of Wi-Fi in IEEE understood Motorola's RAND commitment to mean that Motorola would license patents it claims are essential only on reasonable and non-discriminatory terms. In particular, they relied on these commitments to ensure that the royalties Motorola and other holders of essential patents would seek would permit efficient competitors such as RIM to offer standards-compliant products profitably in competition with Motorola and other owners of essential patents.

80. RIM has invested tremendous resources in developing and marketing products with Wi-Fi components in reliance on Motorola's RAND commitments in connection with the 802.11 standard.

### 3. RIM's Reliance on FRAND and RAND Commitments with Respect to GSM and WLAN Technologies

81. RIM and other manufacturers of mobile wireless communication devices necessarily relied on the commitments of Motorola and others to disclose and license their essential patents. BlackBerry® handheld devices retrieve and transmit wireless data to/from corporate servers equipped with RIM's BlackBerry p software (BlackBerry® Enterprise Server) through wireless service providers. RIM's BlackBerry® wireless devices and e-mail services use GSM, GPRS, and UMTS mobile wireless technologies to transmit data. In order for BlackBerry® devices to connect to the standards-based wireless networks created by

- 23 -

service providers such as T-Mobile and AT&T, RIM has designed and manufactured its products to use these standards-based wireless technologies. RIM relied on the FRAND and RAND commitments of companies such as Motorola whose patented technology was selected as the basis of these standards.

82.    In the summer of 2007, RIM introduced its first BlackBerry® with built-in Wi-Fi capabilities. Currently, RIM offers three Wi-Fi products: the BlackBerry® Curve 8320 device, the BlackBerry® 8820 device, and the BlackBerry® Pearl 8120 device. The devices enable the user to access the Internet remotely from local Wi-Fi networks. In developing BlackBerry® devices to provide Wi-Fi capacity, RIM designed and manufactured its products to use standardized WLAN technologies. In so doing, RIM relied on the RAND declarations of Motorola and the other companies whose patented technologies were selected as the basis of WLAN standards.

## MOTOROLA HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS ESSENTIAL PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTION  TO EXTORT UNJUSTIFIED ROYALTIES

83.    In willful disregard of the commitments it made to ETSI and IEEE in order to persuade other participants in the standards development process to agree to include patented Motorola technology in the GSM, GPRS, UMTS, and WLAN standards, Motorola has refused to extend FRAND or RAND licensing terms to RIM for any of Motorola's purportedly essential patents on FRAND or RAND terms and has instead demanded of RIM terms that are unfair, unreasonable, and, on information and belief, discriminatory.

84.    Motorola's recent breach of these FRAND and RAND commitments stands in contrast to a pre-existing license agreement that it had entered into with RIM. RIM entered into a Cellular Essential Properties Cross License Agreement with Motorola on March 28,

- 24 -

2003 ("2003 Cross-License Agreement"). Under this agreement, Motorola granted RIM a non-exclusive worldwide license to practice patents that Motorola claimed were essential to various standards, including the GSM, GPRS, and UMTS standards described herein, as well as rights to a number of non-essential Motorola patents.

85.    The term of the 2003 Cross-License Agreement was five years. In addition, the agreement had a specific provision governing extension of its terms and conditions. Section 5.3 of the agreement states: "At least one year prior to termination of this Agreement, RIM and MOTOROLA agree to begin good faith negotiations, related to the terms and conditions of this Agreement to extend the terms and conditions hereof beyond the date of termination."

86.    During the five-year term of the 2003 Cross-License Agreement, RIM achieved substantial growth in its development and sale of smart phones and accompanying wireless e-mail services. During the 2003-2007 period, the BlackBerry® subscriber base grew from 534,000 to approximately 8 million. BlackBerry® service availability in that period grew from over fifty networks in thirty countries to over 300 networks in approximately 125 countries.

87.    As sales of Motorola's RAZR and other Motorola handsets declined, and in view of the rapid sales growth RIM has enjoyed, Motorola belatedly realized the need to develop more data-centric mobile wireless products and services. As explained above, Motorola responded to RIM's success in the sale of converged voice and data mobile wireless communications devices by marketing its own smart phone, the "Q", and by acquiring Good Technology. However, these efforts were not successful in preventing Motorola's loss of its share of sales of converged voice and data mobile wireless products. Analysts reports that, at

- 25 -

the end of 2007, Motorola's share of handset sales had fallen to thirteen percent or less, having decreased nearly one-half from a year earlier.

88.    Motorola's response to the declining fortunes of its handset business can be seen in the dramatic change between the royalties provided for in the 2003 Cross-License Agreement and the royalties Motorola has sought in its 2007-08 negotiation with RIM. This change cannot be explained by any increase in the value of Motorola's patent portfolio. Instead, Motorola's demand for unfair, unreasonable, and discriminatory royalties with respect to the patents Motorola claims to be standards-essential, along with its exorbitant royalty demands with respect to patents that were part of the 2003 Cross-License Agreement but not standards-essential, can only be explained by the fact that from 2003 to 2008, RIM has become a more substantial competitor to Motorola for the sale of mobile wireless communication devices and services.

89.    Indeed, Motorola is now seeking license payments that represent an effective royalty rate multiple times the imputed percentage-based royalty that RIM has paid under the 2003 Cross-License Agreement. The royalty Motorola is seeking is also substantially in excess of royalties RIM has paid and is paying other parties claiming to own patents essential to the same widely-implemented standards as those Motorola claims to own.

90.    In addition, Motorola has threatened to seek an injunction unless RIM agrees to license the patents that are not essential to any standard.

91.    In making these threats and demands in the course of the parties' negotiations, Motorola has breached its FRAND and RAND commitments.

- 26 -

## MOTOROLA'S UNFAIR, UNREASONABLE AND DISCRIMINATORY TERMS, AND ITS THREAT OF INJUNCTION VIOLATE ITS CONTRACTUAL OBLIGATION TO NEGOTIATE IN GOOD FAITH

92.    In repeatedly proposing to RIM terms that are unfair, unreasonable and discriminatory, and in demanding exorbitant royalties for the patents that are not standards-essential, Motorola has breached Section 5.3 of the 2003 Cross-License Agreement, which requires Motorola to negotiate in good faith regarding an extended or new license agreement.

93.    In demanding royalties that are multiple times the effective royalty rate of the 2003 Cross-License Agreement, multiple times greater than the royalty rates of FRAND licenses in the industry, and, on information and belief, far above the imputed licensing royalty rate that Motorola incurs for its own downstream products that compete with RIM, Motorola has repudiated its promise in the 2003 Cross-License Agreement.

### THE RELEVANT TECHNOLOGY MARKETS

94.    Motorola's unlawful conduct has had a substantial anticompetitive effect on several distinct and well-defined Mobile Wireless Technology Markets.

As a core part of the development of the standards at issue here, SDO participants sought to determine the appropriate technology to be used for each individual function required to practice the relevant standard. SDO participants evaluated and selected among viable alternative competing technologies – including alternatives Motorola claims are covered by its patents – that are capable of performing each required function. They selected among the alternatives based on technical and commercial merit and intellectual property considerations, including whether the alternative included technology protected by disclosed patents and, if so, whether the party claiming to own that technology had committed to make it available on

- 27 -

FRAND or RAND terms. Thus, before adoption of the standard, there were multiple competing alternative technology solutions in the market to perform each relevant function.

95.    Each GSM, GPRS, UMTS, and WLAN standard consists of a number of different technological functions. The technologies that perform these functions are essential inputs into the manufacture of products and services that comply with the standard.

96.    Because each of the standards at issue here specifies a set of distinct technologies to perform the various functions within the standard, once a standard was adopted there were, by definition, no substitutes for the standardized technologies on which each technology is based. For instance, if a manufacturer wishes to produce products, including wireless handsets, that incorporate UMTS technologies, it cannot do so without gaining access to UMTS technologies. Likewise, there are no commercially viable substitutes for GSM technologies, GPRS technologies, or WLAN technologies.

97.    Once SDO participants selected a technology to perform a particular function needed to practice a standard, all alternative technological solutions for that standard were excluded from use in connection with that standard. Thus, the selection of a particular technology in that standardization process reduced to a single option the technology to perform each function necessary to practice the standard.

98.    If the technology selected for inclusion in the standard was protected by patents, the patent owner would control the supply of that particular technological input for the standard. This is true for each function comprising the standard for which patented technology was selected.

99.    Motorola claims to own patents essential to practice the technologies that are used for certain individual functions of the GSM standard, GPRS standard, the UMTS standard, and the WLAN standard.

100.    The relevant markets in which to assess Motorola's conduct, therefore, are markets consisting of all competing technologies that perform the functions covered by Motorola's essential patents for the GSM standard (the "GSM technology markets"), the GPRS standard (the "GPRS technology markets"), the UMTS standards (the "UMTS technology markets"), and the WLAN standard (the "WLAN technology markets") (collectively, the relevant "Mobile Wireless Technology Markets").

101.    The standards described above are employed throughout the world. Accordingly, the geographic scope of each of the relevant Mobile Wireless Technology Markets described above is worldwide.

102.    Now that the relevant standards have been released and industry participants have developed products based upon those standards, if Motorola's claim of ownership of essential patents is correct, Motorola possesses a monopoly in each of the relevant Mobile Wireless Technology Markets and has obtained monopoly power in each.

103.    Motorola's monopoly power in each of these relevant Mobile Wireless Technology Markets is protected by high barriers to entry. Among other things, implementation of each of the GSM, GPRS, UMTS, and WLAN standards requires that the specified technologies identified in each standard be used in each product that claims to comply with the standard. Each selected technology is, in effect, locked in as the only method of providing the particular functionality to that standard.

- 29 -

## MOTOROLA ENGAGED IN UNFAIR AND ANTICOMPETITIVE CONDUCT THAT WILL INJURE RIM AND COMPETITION IN THE DOWNSTREAM MARKETS FOR MOBILE WIRELESS DATA PRODUCTS AND SERVICES

104.    Motorola's refusal to honor its FRAND and RAND commitments concerning the GSM, GPRS, UMTS, and WLAN standards, and its breach of its contractual obligation to negotiate in good faith an extension of the 2003 Cross-License Agreement, are driven by one objective – to harm a more successful competitor in the downstream markets for mobile wireless data products and services in which RIM and Motorola compete.

105.    By failing to comply with its commitments to offer FRAND and RAND licenses to implementers of the various relevant standards, Motorola seeks to raise the costs of its rival, RIM. These forced cost increases will harm RIM, competition in the downstream markets, and consumers in the downstream markets.

106.    The relevant downstream markets in which to assess these anticompetitive effects are the markets for data products and services, which include RIM's BlackBerry® handhelds and BlackBerry® Enterprise Server, and Motorola's comparable product and service offerings, such as the "Q" and Good Technology's software platform.

107.    The effects of Motorola's acts and practices described above are harmful to RIM, reduce competition in the mobile wireless data products and services markets, and permit Motorola to wrongfully obtain and exercise monopoly power in the relevant GSM, GPRS, UMTS, and WLAN technology markets.

## ANTICOMPETITIVE EFFECTS OF MOTOROLA'S CONDUCT

108.    The foregoing conduct by Motorola has caused and threatens to cause substantial harm to competition. These anticompetitive effects include each of the following:

- 30 -

a.    Motorola's conduct has improperly foreclosed competition in the GSM technology markets, the GPRS technology markets, the UMTS technology markets, and the WLAN technology markets by unlawfully conferring monopolies on Motorola and eliminating competing, alternative technologies to perform each function necessary to practice the standard.

b.    Motorola's conduct has increased and threatens to further increase royalties associated with the manufacture and sale of downstream products and services that employ the GSM standard, the GPRS standard, the UMTS standard, and the WLAN standard, resulting in increased prices and decreased quality and innovation for downstream products and services.

109.    Such harm will continue unless and until the Court issues appropriate relief as requested below.

## MOTOROLA'S ADDITIONAL PATENT ASSERTIONS

110.    In the course of the parties' 2007-08 negotiations to extend the term of the 2003 Cross-License Agreement, Motorola has accused RIM of infringing a number of additional Motorola patents that it contends are not essential to any wireless industry standards. Motorola has threatened to sue RIM, and to attempt to enjoin its business, based on these patents. The parties' negotiations have since broken down.

111.    During the parties' negotiations, Motorola supported its infringement accusations in part by providing RIM with claim charts purporting to compare certain claims of the Motorola patents to various RIM products. The claim charts contained claims from U.S. Patent No. 5,359,317 ("the '317 patent"); U.S. Patent No. 5,075,684; U.S. Patent No. 5,764,899 ("the '899 patent"); U.S. Patent No. 5,771,353 ("the '353 patent"); U.S. Patent No.

- 31 -

5,958,006 ("the '006 patent"); U.S. Patent No. 5,706,211 ("the '211 patent"); and U.S. Patent

No. 6,101,531 ("the '531 patent").

112.    RIM does not disclose the specifics of the Motorola claim charts here, because

as part of Motorola's efforts to impose unfavorable terms on licensees, Motorola insists that

parties seeking to negotiate a license enter into non-disclosure agreements that prevent

disclosure of certain information relating to the negotiations.

113.    RIM believes that none of its products infringes any of the Motorola patents

and that the Motorola patents are invalid.

114.    Motorola's accusations of infringement and the breakdown of the negotiations

in which these accusations arose gives rise to a case of actual controversy within the

jurisdiction of this Court, pursuant to 28 U.S.C. §§ 2201 and 2202.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### (Infringement of U.S. Patent No. 5,664,055)

115.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above,

as if set forth fully herein.

116.    On September 2, 1997, the United States Patent and Trademark Office duly

and legally issued U.S. Patent No. 5,664,055 ("the '055 Patent") entitled "CS-ACELP Speech

Compression System With Adaptive Pitch Prediction Filter Gain Based On A Measure Of

Periodicity." A copy of the '055 Patent is attached hereto as Exhibit 1.  RIM is the owner by

assignment of the entire right, title and interest to the '055 Patent.

- 32 -

117.    Upon information and belief, Motorola has infringed and continues to infringe the '055 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products and services, including wireless handsets, base stations, and other wireless communication, enterprise, and network related equipment and services, which embody and/or practice the claimed inventions of the '055 Patent in violation of 35 U.S.C. § 271.

118.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '055 Patent and/or has and continues to contribute to infringement of the '055 Patent by others in violation of 35 U.S.C. § 271.

119.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

120.    Upon information and belief, Motorola has had knowledge of the '055 Patent and its infringement thereof, but nevertheless has been and continues to willfully infringe the same. RIM therefore seeks and is entitled to an award of treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## SECOND CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,699,485)

121.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

122.    On December 16, 1997, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 5,699,485 ("the '485 Patent") entitled "Pitch Delay Modification During Frame Erasures." A copy of the '485 Patent is attached hereto as

- 33 -

Exhibit 2. RIM is the owner by assignment of the entire right, title and interest to the '485 Patent.

123.    Upon information and belief, Motorola has infringed and continues to infringe the '485 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products and services, including wireless handsets, base stations, and other wireless communication, enterprise, and network related equipment and services, which embody and/or practice the claimed inventions of the '485 Patent in violation of 35 U.S.C. § 271.

124.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '485 Patent and/or has and continues to contribute to infringement of the '485 Patent by others in violation of 35 U.S.C. § 271.

125.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

126.    Upon information and belief, Motorola has had knowledge of the '485 Patent and its infringement thereof, but nevertheless has been and continues to willfully infringe the same. RIM therefore seeks and is entitled to an award of treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## THIRD CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,278,442)

127.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

- 34 -

128.    On August 21, 2001, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,278, 442 ("the '442 Patent") entitled "Hand-Held Electronic Device With A Keyboard Optimized For Use With The Thumbs." A copy of the '442 Patent is attached hereto as Exhibit 3. RIM is the owner by assignment of the entire right, title and interest to the '442 Patent.

129.    Upon information and belief, Motorola has infringed and continues to infringe the '442 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '442 Patent in violation of 35 U.S.C. § 271.

130.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '442 Patent and/or has and continues to contribute to infringement of the '442 Patent by others in violation of 35 U.S.C. § 271.

131.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,452,588)

132.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

133.    On September 17, 2002, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,452,588 ("the '588 Patent") entitled "Hand-Held E-Mail Device." A copy of the '588 Patent is attached hereto as Exhibit 4. RIM is the owner by assignment of the entire right, title and interest to the '588 Patent.

- 35 -

134.    Upon information and belief, Motorola has infringed and continues to infringe the '588 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '588 Patent in violation of 35 U.S.C. § 271.

135.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '588 Patent and/or has and continues to contribute to infringement of the '588 Patent by others in violation of 35 U.S.C. § 271.

136.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,489,950)

137.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

138.    On December 3, 2002, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,489,950 ("the '950 Patent") entitled "Hand-Held Electronic Device With Auxiliary Input Device." A copy of the '950 Patent is attached hereto as Exhibit 5. RIM is the owner by assignment of the entire right, title and interest to the '950 Patent.

139.    Upon information and belief, Motorola has infringed and continues to infringe the '950 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '950 Patent in violation of 35 U.S.C. § 271.

140. Upon information and belief, Motorola further has been and continues to induce others to infringe the '950 Patent and/or has and continues to contribute to infringement of the '950 Patent by others in violation of 35 U.S.C. § 271.

141. Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,611,254)

142. RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

143. On August 26, 2003, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,611,254 ("the '254 Patent") entitled "Hand-Held Electronic Device With a Keyboard Optimized For Use With The Thumbs." A copy of the '254 Patent is attached hereto as Exhibit 6. RIM is the owner by assignment of the entire right, title and interest to the '254 Patent.

144. Upon information and belief, Motorola has infringed and continues to infringe the '254 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '254 Patent in violation of 35 U.S.C. § 271.

145. Upon information and belief, Motorola further has been and continues to induce others to infringe the '254 Patent and/or has and continues to contribute to infringement of the '254 Patent by others in violation of 35 U.S.C. § 271.

- 37 -

146.   Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,611,255)

147.   RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

148.   On August 26, 2003, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,611,255 ("the '255 Patent") entitled "Hand-Held Electronic Device With a Keyboard Optimized For Use With The Thumbs." A copy of the '255 Patent is attached hereto as Exhibit 7. RIM is the owner by assignment of the entire right, title and interest to the '255 Patent.

149.   Upon information and belief, Motorola has infringed and continues to infringe the '255 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '255 Patent in violation of 35 U.S.C. § 271.

150.   Upon information and belief, Motorola further has been and continues to induce others to infringe the '255 Patent and/or has and continues to contribute to infringement of the '255 Patent by others in violation of 35 U.S.C. § 271.

151.   Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

- 38 -

## EIGHTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,919,879)

152.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

153.    On July 19, 2005, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,919,879 ("the '879 Patent") entitled "Hand-Held Electronic Device With a Keyboard Optimized For Use With The Thumbs." A copy of the '879 Patent is attached hereto as Exhibit 8. RIM is the owner by assignment of the entire right, title and interest to the '879 Patent.

154.    Upon information and belief, Motorola has infringed and continues to infringe the '879 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '879 Patent in violation of 35 U.S.C. § 271.

155.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '879 Patent and/or has and continues to contribute to infringement of the '879 Patent by others in violation of 35 U.S.C. § 271.

156.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 7,227,536)

157.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

- 39 -

158.   On June 5, 2007, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,227,536 ("the '536 Patent") entitled "Hand-Held Electronic Device With a Keyboard Optimized For Use With The Thumbs." A copy of the '526 Patent is attached hereto as Exhibit 9. RIM is the owner by assignment of the entire right, title and interest to the '536 Patent.

159.   Upon information and belief, Motorola has infringed and continues to infringe the '536 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '536 Patent in violation of 35 U.S.C. § 271.

160.   Upon information and belief, Motorola further has been and continues to induce others to infringe the '536 Patent and/or has and continues to contribute to infringement of the '536 Patent by others in violation of 35 U.S.C. § 271.

161.   Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (Breach of Contract – FRAND/RAND)

162.   RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

163.   As set forth above, Motorola entered into express or implied contractual commitments with ETSI relating to the GSM, GPRS and UMTS standards, and with IEEE-SA relating to the WLAN standard.

- 40 -

1620477_2.DOC

164.    Each potential third party implementing each of the standards adopted by the SDOs – including RIM – was an intended beneficiary of those contracts.

165.    Motorola breached these contracts by refusing to offer licenses to patents it claims are essential to the various standards on FRAND/RAND terms and instead demanding unfair, unreasonable, and discriminatory royalties and threatening to seek an injunction unless RIM agrees to license a number of Motorola patents that are not essential to any standard.

166.    As a result of these multiple contractual breaches, RIM has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

167.    RIM will suffer irreparable injury by reason of the acts, practices, and conduct of Motorola alleged above until and unless the Court enjoins such acts, practices, and conduct.

### ELEVENTH CAUSE OF ACTION

#### (Promissory Estoppel)

168.    RIM repeats and re-alleges all of the allegations in all the paragraphs above as if set forth fully herein.

169.    Motorola made a clear and definite promise to potential licensees through its commitments to various SDOs that it would disclose relevant IPR, including potentially essential patents, and would license its essential IPR, including patents, on FRAND terms.

170.    The intended purpose of Motorola's promises was to induce reliance. Motorola knew or should have reasonably expected that this promise would induce mobile wireless device companies, like RIM, to develop products compliant with the relevant standards.

- 41 -

171.    RIM developed and marketed its products and services in reliance on Motorola's promises, as described above, including making its products and services compliant with GSM, GPRS, UMTS, and WLAN technical standards. RIM also relied on Motorola's promises in taking or refraining from taking actions in connection with certain standard-setting processes.

172.    Motorola is estopped from reneging on these promises to the various SDOs under the doctrine of promissory estoppel.

173.    RIM has been harmed as a result of its reasonable reliance on Motorola's promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

174.    RIM will suffer irreparable injury by reason of the acts and conduct of Motorola alleged above until and unless the court enjoins such acts, practices and conduct.

### TWELFTH CAUSE OF ACTION

#### (Breach of Contract – Breach of § 5.3 of the 2003 Cross-License Agreement)

175.    RIM repeats and realleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

176.    As set forth above, Motorola entered into a 2003 Cross-License Agreement with RIM, and assumed a contractual obligation to negotiate in good faith with respect to extending the terms and conditions of the 2003 Cross-License Agreement beyond the date of termination.

177.    Motorola breached this contract by refusing to negotiate in good faith the extension of the 2003 Cross-License Agreement. Motorola has sought an increase in royalties multiple times that of the pre-existing royalties under the 2003 Cross-License Agreement and

- 42 -

also has demanded exorbitant royalties for the patents that are not standards-essential, using the threat of an injunction with respect to patents it does not claim essential to any standard to extract unreasonable royalties on both.

178.    As a result of this contractual breach, RIM has been injured in its business or property and is threatened by the imminent loss of profits, loss of customers and potential customers, and the loss of goodwill and product image.

179.    RIM will suffer irreparable injury by reason of the acts, practices, and conduct of Motorola alleged above until and unless the Court enjoins such acts, practices, and conduct.

## THIRTEENTH CAUSE OF ACTION

### (False FRAND Commitments in Violation of Section 2 of the Sherman Act)

180.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

181.    Motorola has unlawfully monopolized the GSM technology markets, the GPRS technology markets, the UMTS technology markets, and the WLAN technology markets by making false FRAND/RAND commitments to ETSI and IEEE, that it used to induce SDOs into incorporating Motorola's patented technologies into the approved standards. Motorola's FRAND and RAND commitments were false because it never told the SDOs that it would be willing to license its essential patents on FRAND and RAND terms only if it did not face a competitive threat from its prospective licensee. The SDOs and other SDO members relied on Motorola's unconditional FRAND and RAND commitments in adopting the GSM, GPRS, UMTS, and WLAN technical standards.

182.    Motorola's monopoly power in these relevant technology markets was therefore unlawfully acquired. With the adopted standards effectively locking RIM and the

- 43 -

rest of the wireless data industry into using the technologies Motorola claims to be covered by its essential patents, Motorola obtained, through deception, monopoly power over the relevant wireless technologies markets – monopoly power that was conditioned on its FRAND and RAND commitments. Motorola has unlawfully exercised monopoly power in the relevant Mobile Wireless Technology Markets by breaching the very commitments that enabled it to obtain its conditional monopoly power.

183.    Motorola's conduct has foreclosed competition in each of the relevant Mobile Wireless Technology Markets.

184.    Motorola's exclusionary practices have left RIM unable to obtain – on fair, reasonable and non-discriminatory terms – licenses to practice technologies that Motorola claims are necessary to the continued manufacture and sale of many of its products. Thus, as a direct and proximate result of Motorola's illegal and anticompetitive conduct and continuing violation of Section 2 of the Sherman Act, RIM has suffered injury to its business and property and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

185.    RIM will suffer irreparable injury until and unless the Court enjoins such acts, practices, and conduct.

## FOURTEENTH CAUSE OF ACTION

### (Declaratory Relief – Breach of Contract)

186.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

187.    An actual and justiciable controversy has arisen and now exists between RIM and Motorola with respect to whether Motorola can assert the patents it claims are essential

- 44 -

against RIM in the face of its breach of its contractual obligation to license the essential

patents on FRAND/RAND terms and its other unfair and anticompetitive conduct.

188.    As set forth above, Motorola entered into contractual commitments with

various SDOs requiring it to license on FRAND/RAND terms patents that Motorola claims

are essential to the GSM, GPRS, UMTS, and WLAN standards. By obligating itself to

license patents it claims are essential on FRAND/RAND terms, Motorola waived its right to

seek injunctive relief or an exclusionary order that would bar RIM from practicing Motorola's

claimed essential patents.

189.    Each potential third party implementing each of the standards adopted by the

SDOs – including RIM – was an intended beneficiary of those contracts.

190.    Allowing Motorola to insist on highly inflated royalties or threaten an

injunction would defeat the purpose of the FRAND or RAND commitment. Technology

developers, product manufacturers and the consuming public cannot enjoy the benefits of

standardization without compliance with FRAND or RAND licensing commitments that

prevent parties from exploiting the monopoly power they acquire in the various technology

markets when their patented technologies are selected for a standard. Motorola should not be

permitted to extort unfair, unreasonable and/or discriminatory royalties with impunity by

threatening to enjoin implementers of standards, who as a practical matter have no choice but

to continue implementing those standards, from using the patents Motorola claims are

essential.

191.    This controversy between RIM and Motorola is real and adverse. Negotiations

regarding the extension of the 2003 Cross-License Agreement have broken down, and

Motorola has refused to license its declared patents on FRAND or RAND terms. Motorola is

- 45 -

seeking injunctive relief against RIM to prevent RIM from practicing Motorola's purportedly essential patents as a result of RIM's refusal to accede to Motorola's unreasonable demands. This would have an anticompetitive effect on RIM and consumer's of R IM's products.

192.    If Motorola is allowed to continue to insist on highly inflated royalties for its claimed essential patents and to threaten an injunction with respect to its non- standards essential patents in order to extract unreasonable royalty rates, RIM will face undue coercion and be forced to accept an unfair and anticompetitive license to the claimed essential patents. RIM would have no redress for Motorola's misconduct.  Alternatively, if RIM does not acquiesce to Motorola's unfair and unreasonable demands, then RIM is exposed to the threat of an injunction.

193.    RIM, therefore, seeks a declaratory judgment that Motorola is not entitled to injunctive or exclusionary relief for any alleged infringement of the patents that Motorola claims are essential to GSM, GPRS, UMTS, and WLAN or for infringement of the non-essential patents that Motorola previously was willing to make subject to the 2003 Cross-License Agreement but is now using as a coercive threat.  RIM further seeks a declaratory judgment that Motorola's sole remedy for any alleged infringement of such claimed essential patents is RIM's agreement to fair, reasonable, and non-discriminatory licensing terms.

## FIFTEENTH CAUSE OF ACTION

### (Declaratory Relief – Promissory Estoppel)

194.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

195.    An actual and justiciable controversy has arisen and now exists between RIM and Motorola with respect to the FRAND/RAND terms.

- 46 -

196.    Motorola made a clear and definite promise to potential licensees of its declared essential patents through its promise to various SDOs that it would disclose relevant IPR, including potentially essential patents and would license its essential IPR, including patents, on FRAND or RAND terms.  As a result, Motorola committed to license on FRAND/RAND terms patents that Motorola claims as essential to GSM, GPRS, UMTS, and WLAN.

197.    Each potential third party implementing each of the standards adopted by the SDOs – including RIM – was an intended beneficiary of those FRAND or RAND promises.

198.    The intended purpose of Motorola's promises was to induce reliance. Motorola knew or should have reasonably expected that these promises would induce potential licensees such as RIM to take (or refrain from taking) certain actions.

199.    RIM developed its products and services in reliance on Motorola's promises, as described above.

200.    RIM has been harmed by virtue of its reasonable reliance on Motorola's broken promises.

201.    This controversy between RIM and Motorola is real and adverse.  Negotiations regarding extending the 2003 Cross-License agreement have broken down, Motorola has refused to license its declared essential patents on FRAND or RAND terms, and is threatening to seek an injunction with respect to the patents that are not standards-essential to extract unreasonable royalty rates.  Because RIM has refused to accede to Motorola's unfair and unreasonable royalty demands, RIM is at risk of Motorola seeking injunctive relief against RIM to prevent RIM from practicing Motorola's patents.

1620477_2.DOC

202.    RIM, therefore, seeks a declaratory judgment that Motorola is estopped from reneging on its promises to the various SDOs and is estopped from seeking injunctive or exclusionary relief for any alleged infringements of the patents that Motorola claims are essential to GSM, GPRS, UMTS, and WLAN standards or the other patents that are not standards-essential but which Motorola is using as a coercive threat. RIM further seeks a declaratory judgment that Motorola's sole remedy for any alleged infringement of such claimed essential patents is RIM's agreement to reasonable and non-discriminatory license terms.

## SIXTEENTH CAUSE OF ACTION

### (Declaratory Judgment '317 Patent)

203.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

204.    A copy of the '317 Patent is attached hereto as Exhibit 10.

205.    Each of the claims of the '317 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

206.    RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '317 patent.

207.    To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '317 patent and that the '317 patent is invalid.

- 48 -

## SEVENTEENTH CAUSE OF ACTION

### (Declaratory Judgment '684 Patent)

208.     RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

209.     A copy of the '684 Patent is attached hereto as Exhibit 11.

210.     Each of the claims of the '684 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

211.     RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '684 patent.

212.     To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '684 patent and that the '684 patent is invalid.

## EIGHTEENTH CAUSE OF ACTION

### (Declaratory Judgment '899 Patent)

213.     RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

214.     A copy of the '899 Patent is attached hereto as Exhibit 12.

215.     Each of the claims of the '899 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

216.     RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '899 patent.

- 49 -

217.   To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '899 patent and that the '899 patent is invalid.

## NINETEENTH CAUSE OF ACTION

### (Declaratory Judgment '353 Patent)

218.   RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

219.   A copy of the '353 Patent is attached hereto as Exhibit 13.

220.   Each of the claims of the '353 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

221.   RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '353 patent.

222.   To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '353 patent and that the '353 patent is invalid.

## TWENTIETH CAUSE OF ACTION

### (Declaratory Judgment '006 Patent)

223.   RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

224.   A copy of the '006 Patent is attached hereto as Exhibit 14.

- 50 -

225. Each of the claims of the '006 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

226. RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '006 patent.

227. To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '006 patent and that the '006 patent is invalid.

### TWENTY-FIRST CAUSE OF ACTION

#### (Declaratory Judgment '211 Patent)

228. RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

229. A copy of the '211 Patent is attached hereto as Exhibit 15.

230. Each of the claims of the '211 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

231. RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '211 patent.

232. To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '211 patent and that the '211 patent is invalid.

-51-

## TWENTY-SECOND CAUSE OF ACTION

### (Declaratory Judgment '531 Patent)

233. RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

234. A copy of the '531 Patent is attached hereto as Exhibit 16.

235. Each of the claims of the '531 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

236. RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '531 patent.

237. To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '531 patent and that the '531 patent is invalid.

## PRAYER FOR RELIEF

WHEREFORE, RIM requests that the Court:

Adjudge and decree that Motorola has infringed U.S. Patent Nos. 5,664,055; 5,699,485; 6,278,442; 6,452,588; 6,489,950; 6,611,254; 6,611,255; 6,919,879; and 7,227,536;

Adjudge and decree that Motorola's conduct violates its express and implied contracts with ETSI and IEEE-SA and their members; that Motorola is estopped from denying its promises to license its claimed essential patents on FRAND or RAND terms; that Motorola breached its contractual commitment to negotiate in good faith with respect to extending the terms and conditions of the 2003 Cross-License Agreement; and that Motorola has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

- 52 -

1620477_2.DOC

Adjudge and decree that Motorola has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the International Trade Commission, to prevent RIM from using technology encompassed by any patents that Motorola has declared as essential to GSM, GPRS, UMTS, or WLAN or any of the other patents that are not standards-essential but which Motorola is using as a coercive threat;

Adjudge and decree that Motorola's commitment to license patents it claims are essential to GSM, GPRS, UMTS, or WLAN on FRAND or RAND terms is a binding contractual obligation, enforceable by RIM;

On RIM's First through Ninth claims for relief, enter judgment against Motorola, pursuant to 35 U.S.C. §284, in an amount sufficient to compensate for the damage suffered by RIM arising out of Motorola's acts of infringement as alleged herein, together with pre-judgment and post-judgment interest, and costs;

On RIM's First and Second claims for relief, enter judgment against Motorola for treble the amount of RIM's damages, pursuant to 35 U.S.C. §284, for Motorola's willful infringement, find this case exceptional, and award RIM its reasonable attorneys fees pursuant to 35 U.S.C. §285;

On RIM's Tenth though Thirteenth claims for relief, enter judgment against Motorola for the amount of damages proven at trial;

On RIM's Thirteenth claim for relief, enter judgment against Motorola for treble the amount of RIM's damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

Enjoin Motorola's continuing violations of law by (a) barring Motorola from asserting the patents and other IPR that it has claimed are essential to practice the relevant standards

- 53 -

against RIM; or (b) requiring Motorola to grant RIM a license to those patents and other IPR on FRAND/RAND terms;

On RIM's Sixteenth through Twenty-Second claims for relief, determine and declare that the claims of the '317, '684, '899, '353, '066, '211, and '531 patents are invalid and not infringed by RIM;

Award RIM its costs and expenses of litigation, including attorneys' fees; and

Enter judgment against Motorola for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff RIM hereby demands trial by jury in this action on all issues so triable.


Dated:  February 16, 2008

Respectfully submitted,


George W. Bramblett, Jr.
george.bramblett@haynesboone.com
Texas State Bar No. 02867000
Phillip B. Philbin
phillip.philbin@haynesboone.com
Texas State Bar No. 15909020
John R. Emerson
russ.emerson@haynesboone.com
Texas State Bar No. 24002053

HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202-3789
Tel: 214-651-5000
Fax: 214-651-5940

William F. Lee
Michelle D. Miller
William J. Bohler

WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: 617-526-6000
Fax: 617-526-5000

ATTORNEYS FOR PLAINTIFFS, RESEARCH IN MOTION LIMITED AND RESEARCH IN MOTION CORPORATION

- 55 -

# EXHIBIT C

**To:** Leigh Lyon
**Cc:** Ronnie Jacobson; "Rogers, Katherine" <Kat.Rogers@haynesboone.com>
**Subject:** RE: Date and Time Stamp for the Drop Box

Leigh, thank you for your call earlier today. We went ahead and checked the stamp machine and it now reads February 16, 6:30 am.

We'll follow the procedure outlined below, as well as write the actual date and time on the documents.

Thanks again for your help.

Russ Emerson

John Russell Emerson
Haynes and Boone, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202
direct phone:  (214) 651-5328
direct fax: (214) 200-0884
russ.emerson@haynesboone.com

**From:** Ronnie_Jacobson@txnd.uscourts.gov [mailto:Ronnie_Jacobson@txnd.uscourts.gov]
**Sent:** Friday, February 15, 2008 1:53 PM
**To:** Emerson, Russ; Rogers, Katherine
**Cc:** Leigh_Lyon@txnd.uscourts.gov
**Subject:** Date and Time Stamp for the Drop Box

Mr. Emerson:

    This email is in regards to the conversation that we had at the front counter earlier this afternoon. In the event that the date and time stamp for the Court's drop box behind the Earle Cabell Federal Building, is not stamping documents with the correct time and date tomorrow morning at 12:01 a.m., the procedure you need to follow to insure that your documents are filed on February 16, 2008, with indication of the time filed is as follow:

    Please send an email to Leigh Lyon at Leigh_Lyon@txnd.uscourts.gov and myself Ronnie_Jacobson@txnd.uscourts.gov, at the exact time you are filing the case.

    Contained in the email, please list the Style of the case and a basic listing of ALL the documents to be filed. In the event that you must use this procedure, we will receive the documents on Tuesday and print out the email and attach to the civil cover sheet to indicate when the documents were received.

Call me if you have any questions.

Thanks,

Ronnie
214/753-2166

| Ronnie Jacobson/TXND/05/USCOURTS | To | Leigh Lyon/TXND/05/USCOURTS@USCOURTS |
|---|---|---|
| | cc | |
| 02/20/2008 05:54 PM | bcc | |
| | Subject | Fw: Date and Time Stamp for the Drop Box |

History:    ⤹ This message has been forwarded.

----- Forwarded by Ronnie Jacobson/TXND/05/USCOURTS on 02/20/2008 05:53 PM -----



| "Emerson, Russ" <Russ.Emerson@haynesboone.com> | To | <Leigh_Lyon@txnd.uscourts.gov> |
|---|---|---|
| | cc | "Ronnie Jacobson" <ronnie_jacobson@txnd.uscourts.gov>, "Rogers, Katherine" <Kat.Rogers@haynesboone.com> |
| 02/16/2008 12:01 AM | Subject | RE: Date and Time Stamp for the Drop Box |

Leigh, Ronnie:

On Saturday, February 16, at 12:01 am, we filed the following documents in the new case Research in Motion Ltd. and Research in Motion Corp. v. Motorola, Inc.:

1.    Plaintiff's Complaint (including exhibits 1-16) and Jury Demand (an original and 4 copies);
2.    Civil Cover Sheet (an original and 4 copies);
3.    Certificate of Interested Persons (an original and 4 copies);
4.    Summons for the above-named Defendant (an original and 4 copies);
5.    Filing fee of $350.

**From:** Leigh_Lyon@txnd.uscourts.gov [mailto:Leigh_Lyon@txnd.uscourts.gov]
**Sent:** Friday, February 15, 2008 8:29 PM
**To:** Emerson, Russ
**Cc:** Ronnie Jacobson
**Subject:** Re: Date and Time Stamp for the Drop Box

Good gravy. I was told someone else had fixed so I did not check. I am mortified and so sorry! Will ensure it's corrected Tues am as well as ensure you are credited for correct time. My apologies, Russ.
Leigh Lyon
US District Court
214.753.2186 Work
972.655.8591 Mobile

----- Original Message -----
From: "Emerson, Russ" [Russ.Emerson@haynesboone.com]
Sent: 02/15/2008 06:31 PM CST

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **MOTOROLA, INC.,** | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 08-69 |
| | § | |
| v. | § | |
| | § | **JURY** |
| **RESEARCH IN MOTION LIMITED** | § | |
| **AND RESEARCH IN MOTION** | § | |
| **CORPORATION,** | § | |
| | § | |
| Defendants. | § | |
| | § | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Motorola, Inc. ("Plaintiff"), for its complaint against defendants Research in Motion Limited and Research in Motion Corporation (collectively "Defendants"), avers as follows:

### JURISDICTION AND VENUE

1.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.* This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

2.     Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b), (c), (d), and 1400(b).

3.     Upon information and belief, this Court has personal jurisdiction over Defendants because Defendants regularly conduct business in this district and have committed acts of patent infringement in this district. Defendant, Research in Motion Limited, although required to designate or maintain a resident agent for service of process, has not so designated or maintained a resident agent. The Secretary of State of the State of Texas is an agent for service of process

1

on defendant Research in Motion Limited, who has engaged in business in the State of Texas. Since said non-resident defendant does not maintain a regular place of business in Texas, has not designated an agent for service of process, and this lawsuit arises out of this non-resident defendant's transaction of business in Texas, service of Summons upon defendant Research in Motion Limited may be made through the Secretary of State.

### THE PARTIES

4.      Plaintiff Motorola, Inc., is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 1303 East Algonquin Road, Schaumburg, Illinois 60196.

5.      Upon information and belief, Defendant Research in Motion Limited is a corporation organized under the laws of Canada and has its principal place of business at 295 Phillip Street, Waterloo, Ontario, Canada N2L 3WB.  Upon information and belief, defendant Research in Motion Limited directly or indirectly through its subsidiaries and affiliated companies, distributes, markets, sells and/or offers to sell throughout the United States (including in this Judicial District), and/or imports into the United States consumer products, including wireless communication devices, associated equipment and software.

6.      Defendant Research in Motion Corporation is a corporation organized under the laws of the State of Delaware and has its principal place of business at 122 West John Carpenter Parkway, Suite 430, Irving, Texas 75039.  Upon information and belief, defendant Research in Motion Corporation directly or indirectly through its subsidiaries and affiliated companies, distributes, markets, sells and/or offers to sell throughout the United States (including in this Judicial District), and/or imports into the United States consumer products, including wireless communication devices, associated equipment and software.

2

**BACKGROUND**
**Asserted Patents**

7.    United States Patent No. 5,157,391, titled "APPARATUS AND METHOD FOR DISPLAYING A PLURALITY OF FUNCTION INDICATORS IN A SELECTIVE CALL RECEIVER" ("the '391 patent"), was duly and legally issued on October 20, 1992, to Inventor Randi F. Weitzen.  Plaintiff is the owner by assignment of all right, title and interest in and to the '391 patent, including the right to sue and recover for past infringement thereof.  A true and correct copy of the '391 patent is attached hereto as Exhibit A.

8.    United States Patent No. 5,359,317, titled "METHOD AND APPARATUS FOR SELECTIVELY STORING A PORTION OF A RECEIVED MESSAGE IN A SELECTIVE CALL RECEIVER" ("the '317 patent"), was duly and legally issued on October 25, 1994, to Inventors Fernando A. Gomez and Mark T. Stair.  Plaintiff is the owner by assignment of all right, title and interest in and to the '317 patent, including the right to sue and recover for past infringement thereof.  A true and correct copy of the '317 patent is attached hereto as Exhibit B.

9.    United States Patent No. 5,394,140, titled "METHOD AND APPARATUS FOR PRE-PROGRAMMED CALL-BACK-NUMBER-DETERMINED ALERT" ("the '140 patent"), was duly and legally issued on February 28, 1995, to Inventors Poh-T'in Wong, Allen J. Weidler and William J. Burke.  Plaintiff is the owner by assignment of all right, title and interest in and to the '140 patent, including the right to sue for past infringement thereof.  A true and correct copy of the '140 patent is attached hereto as Exhibit C.

10.    United States Patent No. 5,612,682, titled "METHOD AND APPARATUS FOR CONTROLLING UTILIZATION OF A PROCESS ADDED TO A PORTABLE COMMUNICATION DEVICE" ("the '682 patent"), was duly and legally issued March 18, 1997, to Inventors Michael J. DeLuca, George W. Smoot and Douglas R. Kraul.  Plaintiff is the

owner by assignment of all right, title and interest in and to the '682 patent, including the right to sue for past infringement thereof. A true and correct copy of the '682 patent is attached hereto as Exhibit D.

11.    United States Patent No. 5,764,899, titled "METHOD AND APPARATUS FOR COMMUNICATING AN OPTIMIZED REPLY" ("the '899 patent"), was duly and legally issued on June 9, 1998, to Inventors Gene Eggleston, Mitch Hansen and Anthony Rzany. Plaintiff is the owner by assignment of all right, title and interest in and to the '899 patent, including the right to sue and recover for past infringement thereof. A true and correct copy of the '899 patent is attached hereto as Exhibit E.

12.    United States Patent No. 5,771,353, titled "SYSTEM HAVING VIRTUAL SESSION MANAGER USED SESSIONLESS-ORIENTED PROTOCOL TO COMMUNICATE WITH USER DEVICE VIA WIRELESS CHANNEL AND SESSION-ORIENTED PROTOCOL TO COMMUNICATE WITH HOST SERVER" ("the '353 patent"), was duly and legally issued on June 23, 1998, to Inventors Gene Eggleston and Mitch Hansen. Plaintiff is the owner by assignment of all right, title and interest in and to the '353 patent, including the right to sue and recover for past infringement thereof. A true and correct copy of the '353 patent is attached hereto as Exhibit F.

13.    United States Patent No. 5,974,447, titled "METHOD AND SYSTEM FOR COUPLING A SELECTIVE CALL RECEIVER TO WIDELY DISTRIBUTED INFORMATION SOURCES" ("the '447 patent"), was duly and legally issued on October 26, 1999, to Inventors Gregory L. Cannon, David P. Kilp and Nick P. Lagen. Plaintiff is the owner by assignment of all right, title and interest in and to the '447 patent, including the right to sue and recover for past infringement thereof. A true and correct copy of the '447 patent is attached hereto as Exhibit G.

4

14.    Upon information and belief, Defendants have had knowledge of the '391 patent, the '317 patent, the '140 patent, the '899 patent, the '353 patent, and the '447 patent since at least January 1, 2008.

## CLAIM ONE
### (Infringement of U.S. Patent No. 5,157,391)

15.    Upon information and belief, Defendants have been and still are infringing, contributorily infringing or inducing infringement of at least claims 1, 8 and 9 of the '391 patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), in this district and elsewhere, by their activities, including making, using, offering to sell, importing, or selling certain wireless communication devices and related equipment, including at least the BlackBerry 8100, 8130, 8300, 8320, 8800, 8820, and/or 8830 device(s).

16.    Defendants' infringing activities have caused and will continue to cause Plaintiff irreparable harm for which it has no adequate remedy at law, unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283.

17.    Defendants, with actual knowledge of the '391 patent, with knowledge of their infringement, and without lawful justification, have willfully infringed the '391 patent, entitling Plaintiff to damages and treble damages pursuant to 35 U.S.C. § 284.

## CLAIM TWO
### (Infringement of U.S. Patent No. 5,359,317)

18.    Upon information and belief, Defendants have been and still are infringing, contributorily infringing, or inducing infringement of at least claim 1 of the '317 patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), in this district and elsewhere, by their activities, including making, using, offering to sell, importing, or selling certain wireless communication devices and related equipment, including at least the BlackBerry 8100, 8130, 8300, 8320, 8800, 8820, and/or 8830 device(s).

5

19.    Defendants' infringing activities have caused and will continue to cause Plaintiff irreparable harm for which it has no adequate remedy at law, unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283.

20.    Defendants, with actual knowledge of the '317 patent, with knowledge of their infringement, and without lawful justification, have willfully infringed the '317 patent, entitling Plaintiff to damages and treble damages pursuant to 35 U.S.C. § 284.

## CLAIM THREE
### (Infringement of U.S. Patent No. 5,394,140)

21.    Upon information and belief, Defendants have been and still are infringing, contributorily infringing, or inducing infringement of at least claims 1 and 15 of the '140 patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), in this district and elsewhere, by their activities, including making, using, offering to sell, importing, or selling certain wireless communication devices and related equipment, including at least the BlackBerry 8100, 8130, 8300, 8320, 8800, 8820, and/or 8830 device(s).

22.    Defendants' infringing activities have caused and will continue to cause Plaintiff irreparable harm for which it has no adequate remedy at law, unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283.

23.    Defendants, with actual knowledge of the '140 patent, with knowledge of their infringement, and without lawful justification, have willfully infringed the '140 patent, entitling Plaintiff to damages and treble damages pursuant to 35 U.S.C. § 284.

## CLAIM FOUR
### (Infringement of U.S. Patent No. 5,612,682)

24.    Upon information and belief, Defendants have been and still are infringing, contributorily infringing, or inducing infringement of at least claim 1 of the '682 patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), in this district and elsewhere, by their activities, including making,

6

using, offering to sell, importing, or selling certain wireless communication devices and related equipment, including at least the BlackBerry 8100, 8130, 8300, 8320, 8800, 8820, and/or 8830 device(s).

25.    Defendants' infringing activities have caused and will continue to cause Plaintiff irreparable harm for which it has no adequate remedy at law, unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283.

**CLAIM FIVE**
**(Infringement of U.S. Patent No. 5,764,899)**

26.    Upon information and belief, Defendants have been and still are infringing, contributorily infringing, or inducing infringement of at least claim 1 of the '899 patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), in this district and elsewhere, by their activities, including making, using, offering to sell, importing, or selling certain wireless communication devices and related equipment, including at least the BlackBerry 8100, 8130, 8300, 8320, 8800, 8820, and/or 8830 device(s); and the BlackBerry Exchange Server software.

27.    Defendants' infringing activities have caused and will continue to cause Plaintiff irreparable harm for which it has no adequate remedy at law, unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283.

28.    Defendants, with actual knowledge of the '899 patent, with knowledge of their infringement, and without lawful justification, have willfully infringed the '899 patent, entitling Plaintiff to damages and treble damages pursuant to 35 U.S.C. § 284.

**CLAIM SIX**
**(Infringement of U.S. Patent No. 5,771,353)**

29.    Upon information and belief, Defendants have been and still are infringing, contributorily infringing, or inducing infringement of at least claim 9 of the '353 patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), in this district and elsewhere, by their activities, including making,

using, offering to sell, importing, or selling certain wireless communication devices and related equipment, including at least the BlackBerry 8100, 8130, 8300, 8320, 8800, 8820, and/or 8830 device(s); and the BlackBerry Exchange Server software.

30.    Defendants' infringing activities have caused and will continue to cause Plaintiff irreparable harm for which they have no adequate remedy at law, unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283.

31.    Defendants, with actual knowledge of the '353 patent, with knowledge of their infringement, and without lawful justification, have willfully infringed the '353 patent, entitling Plaintiff to damages and treble damages pursuant to 35 U.S.C. § 284.

## CLAIM SEVEN
### (Infringement of U.S. Patent No. 5,974,447)

32.    Upon information and belief, Defendants have been and still are infringing, contributorily infringing, or inducing infringement of at least claim 8 of the '447 patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), in this district and elsewhere, by their activities, including making, using, offering to sell, importing, or selling certain wireless communication devices and related equipment, including at least the BlackBerry 8100, 8130, 8300, 8320, 8800, 8820, and/or 8830 device(s); and the BlackBerry Exchange Server software.

33.    Defendants' infringing activities have caused and will continue to cause Plaintiff irreparable harm for which they have no adequate remedy at law, unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283.

34.    Defendants, with actual knowledge of the '447 patent, with knowledge of their infringement, and without lawful justification, have willfully infringed the '447 patent, entitling Plaintiff to damages and treble damages pursuant to 35 U.S.C. § 284.

8

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter a judgment:

a.       Adjudging that Defendants have infringed at least the asserted claims of the '391 patent, the '317 patent, the '140 patent, the '682 patent, the '899 patent, the '353 patent, and the '447 patent;

b.       Permanently enjoining Defendants and its directors, officers, employees, attorneys, agents, and all persons in active concert or participation with any of the foregoing from further acts of infringement, contributory infringement or inducement of infringement of the asserted patents unless and until licensed under the asserted patents by Plaintiff;

c.       Awarding to Plaintiff damages sufficient to compensate Plaintiff for the infringement by Defendants, together with both pre-judgment and post-judgment interest;

d.       Trebling the damages awarded for infringement claims one through three and five through seven, as provided by 35 U.S.C. § 284;

e.       Finding this action constitutes an exceptional case under 35 U.S.C. § 285;

f.       Awarding to Plaintiff its costs and attorney fees; and

g.       Awarding to Plaintiff such other and further relief as this Court deems proper and just.

Damon Young (State Bar No. 22176700)
dyoung@youngpickettlaw.com
John Pickett (State Bar No. 15980320)
jpickett@youngpickettlaw.com
Lance Lee (State Bar No. 24004762)
llee@youngpickettlaw.com
**YOUNG, PICKETT & LEE**
4122 Texas Boulevard
P.O. Box 1897*
Texarkana, Texas 75503 (*75504)
Telephone: (903) 794-1303
Fax: (903) 792-5098

9

By: _/s/ John M. Pickett_

**Attorneys for Plaintiff**
**Motorola, Inc.**


OF COUNSEL:

Jesse J. Jenner
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
_jesse.jenner@ropesgray.com_

Norman H. Beamer
**ROPES & GRAY LLP**
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 617-4000
_norman.beamer@ropesgray.com_

Nicole M. Jantzi
**ROPES & GRAY LLP**
700 12th Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
_nicole.jantzi@ropesgray.com_

Dated: February 16, 2008

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b), Fed. R. Civ. P., and the Seventh Amendment to the Constitution of the United States, Plaintiff demands a trial by jury of all claims and all issues triable as of right by jury in this action.

# EXHIBIT E

**From:** txedCM@txed.uscourts.gov [mailto:txedCM@txed.uscourts.gov]
**Sent:** Saturday, February 16, 2008 12:24 AM
**To:** txedcmcc@txed.uscourts.gov
**Subject:** Activity in Case 2:08-cv-00069 Motorola, Inc. v. Research In Motion Limited Complaint

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT
RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once
without charge. To avoid later charges, download a copy of each document during this first
viewing.

### U.S. District Court [LIVE]

### Eastern District of TEXAS

## Notice of Electronic Filing

The following transaction was entered by Pickett, John on 2/16/2008 at 0:23 AM CST and filed
on 2/16/2008
**Case Name:**          Motorola, Inc. v. Research In Motion Limited
**Case Number:**      2:08-cv-69
**Filer:**                    Motorola, Inc.
                              Research In Motion, Corporation
**Document Number:** 1

**Docket Text:**
COMPLAINT *for Patent Infringement* against Research In Motion, Corporation, Research In
Motion Limited ( Filing fee $ 350 receipt number 1433502.), filed by Research In Motion,
Corporation, Motorola, Inc.. (Attachments: # (1) Exhibit A# (2) Exhibit B# (3) Exhibit C# (4)
Exhibit D# (5) Exhibit E# (6) Exhibit F# (7) Exhibit G# (8) Civil Cover Sheet)(Pickett, John)

**2:08-cv-69 Notice has been electronically mailed to:**

Motorola, Inc.     jpickett83@aol.com

John Michael Pickett     jpickett@youngpickettlaw.com, jpickett83@aol.com

**2:08-cv-69 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-0
] [69b3ab357877d7c124333e976b7dc16c0bbc48f10500d3eabd42873a26a9a2c91e7
64c65d6b4fde240ce49ab4cdcd3e89db6969df036717d2e9d75b1c4ee38cb]]
**Document description:**Exhibit A
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-1
] [4175743f1d8a86c9a6d1b9282cca3ebd7059211e69b5d96ba033a6e76082238d428
0333f243694548d4e29363a6f665fe2f5a33c465a5c8818a061bd92cfff10]]
**Document description:**Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-2
] [0979ce171de151dbb004d8ff55f05eabfbc013800e09ac710c3d6d266fad2936ced
44c84973c8df810082b8821768a248335459f0cbf8c1a398a934963f79f0d]]
**Document description:**Exhibit C
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-3
] [bcec540b7c9eaf0e3d49200363466014123872b407d59bf98ae4d664afd41634a90
9624573740c2866659418cc3d42ed618f5e885efb57af550df51b18714d3d]]
**Document description:**Exhibit D
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-4
] [7e65bd3d72a2ce60e4ea569b37ab2f5d33ceec6cb66cc84a5d0849dddcff75ff371
ddb46c8cb9c538a18f5006a5f745fc9372d2a604356eaf66211db93e15f8e]]
**Document description:**Exhibit E
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-5
] [3dcd666e3b4e6f8a30945518272c47fe3a566c031b24aed2c2eefac296d22e5f4cf
6e3b059d853506b5e4837311158a39615f2dab3dc27111351771b854a3b48]]
**Document description:**Exhibit F
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-6
] [54cd881b636495ab74a30430a9eaa499cdaf040bd5142a1bdc111a540b4096e3d35
2da898af48aa50e793bfd9beca2be3532534feb2a9596bb6778a1d9c236d4]]
**Document description:**Exhibit G
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-7
] [3b06e3fd58b618860a8f9ebf71261f0566820f3325981a9f2e62d4187675ecdd896
aa9a036732cfc8a2f83e570753baf966d7f55b762080e98fae8521b7e7a32]]

**Document description:** Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-8
] [00ea46104a83c4ef6c33e16fc7f3ac0d66baf52c5e07a22c5ee18bc4e5584223dd5
298ec388b6089f2977f0896319b5c02205bfde2b2a77e08118055eaafed5f]]

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MOTOROLA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C. A. No. _____ |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| RESEARCH IN MOTION LIMITED | ) | |
| AND RESEARCH IN MOTION | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, Motorola, Inc. ("Motorola"), for its complaint against defendants, Research in Motion Limited ("RIM Ltd.") and Research in Motion Corporation ("RIM Corp.," collectively "Defendants"), hereby demands a jury trial and avers as follows:

### JURISDICTION AND VENUE

1.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.*  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a) and 2201(a).

2.      Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b), (c), (d), and 1400(b).

3.      Upon information and belief, this Court has personal jurisdiction over Defendants, because defendant RIM Corp. is a corporation organized under the laws of the State of Delaware, and because Defendants regularly conduct business in this District.

1

## THE PARTIES

4.      Plaintiff Motorola is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 1303 East Algonquin Road, Schaumburg, Illinois 60196.

5.      Upon information and belief, defendant RIM Ltd. is a corporation organized under the laws of Canada and has its principal place of business at 295 Phillip Street, Waterloo, Ontario, Canada N2L 3WB.  Upon information and belief, defendant RIM Ltd. directly or indirectly through its subsidiaries and affiliated companies, distributes, markets, sells and/or offers to sell throughout the United States (including in this Judicial District), and/or imports into the United States products, including wireless communication devices, associated equipment and software.

6.      Upon information and belief, defendant RIM Corp. is a corporation organized under the laws of the State of Delaware and has its principal place of business at 122 West John Carpenter Parkway, Suite 430, Irving, Texas 75039.  Upon information and belief, defendant RIM Corp. directly or indirectly through its subsidiaries and affiliated companies, distributes, markets, sells and/or offers to sell throughout the United States (including in this Judicial District), and/or imports into the United States products, including wireless communication devices, associated equipment and software.

## BACKGROUND

7.      In March 2003, Motorola and Defendants entered into a cross-license agreement, whereby the parties agreed to license to each other certain United States Patents relating to cellular telephone technology.

8.      In anticipation of that license agreement's December 31, 2007 expiration, the parties engaged in negotiations directed toward an amicable solution.

2

9.     In an effort to avoid paying royalties as part of future license agreements, Defendants asserted that Motorola requires a license to practice several patents in Defendant's portfolio, including patents Defendants recently acquired from Multimedia Patent Trust.

10.     Specifically, upon information and belief, Defendants have stated to Motorola that Defendants are the owner by assignment of the following United States Patents ("patents in suit"):

a.     United States Patent No. 5,664,055, entitled "CS-ACELP SPEECH COMPRESSION SYSTEM WITH ADAPTIVE PITCH PREDICTION FILTER GAIN BASED ON A MEASURE OF PERIODICITY" ("the '055 patent"), which was issued on September 2, 1997, to Peter Kroon;

b.     United States Patent No. 5,699,485, entitled "PITCH DELAY MODIFICATION DURING FRAME ERASURES" ("the '485 patent"), which was issued on December 16, 1997, to Yair Shoham;

c.     United States Patent No. 6,611,254 B1, entitled "HAND-HELD ELECTRONIC DEVICE WITH A KEYBOARD OPTIMIZED FOR USE WITH THE THUMBS" ("the '254 patent"), which was issued on August 26, 2003, to Jason T. Griffin, John A. Holmes, Mihal Lazaridis, Herb A. Little, and Harry R. Major;

d.     United States Patent No. 6,611,255 B2, entitled "HAND-HELD ELECTRONIC DEVICE WITH A KEYBOARD OPTIMIZED FOR USE WITH THE THUMBS" ("the '255 patent"), which was issued on August 26, 2003, to Jason T. Griffin, John A. Holmes, Mihal Lazaridis, Herb A. Little, and Harry R. Major; and

e.     United States Patent No. 6,919,879 B2, entitled "HAND-HELD ELECTRONIC DEVICE WITH A KEYBOARD OPTIMIZED FOR USE WITH THE

3

THUMBS" ("the '879 patent"), which was issued on July 19, 2005, to Jason T. Griffin, David M. Walters, John A. Holmes, and Mihal Lazaridis.

11.    True and correct copies of the patents in suit are attached hereto as Exhibits A–E, respectively.

12.    A controversy has arisen as to whether Motorola requires a license to continue engaging in its sale of various mobile communication devices as well as for past sales of such devices. Defendants have represented to Motorola during the negotiations—including as recently as February 8, 2008—that Motorola is on notice of the patents in suit, that Motorola requires a license in order to continue selling various mobile communication devices, and that Defendants are entitled to damages for Motorola's past alleged infringement. Because Motorola is licensed under some of Defendants' patents and because no valid claim of the patents in suit is infringed, Motorola asserts that no additional license is necessary.

**CLAIM ONE**
**(The '055 Patent)**

13.    Upon information and belief, Motorola is licensed to practice the '055 patent.

14.    Upon information and belief, Motorola does not infringe and has not infringed any valid claim of the '055 patent.

15.    Upon information and belief, any claim by Defendants against Motorola for past damages for alleged infringement of the '055 patent is barred by the equitable doctrine of laches.

**CLAIM TWO**
**(The '485 Patent)**

16.    Upon information and belief, Motorola is licensed to practice the '485 patent.

4

17.    Upon information and belief, Motorola does not infringe and has not infringed any valid claim of the '485 patent.

18.    Upon information and belief, any claim by Defendants against Motorola for past damages for alleged infringement of the '485 patent is barred by the equitable doctrine of laches.

## CLAIM THREE
### (The '254 Patent)

19.    Upon information and belief, Motorola does not infringe and has not infringed any valid claim of the '254 patent.

## CLAIM FOUR
### (The '255 Patent)

20.    Upon information and belief, Motorola does not infringe and has not infringed any valid claim of the '255 patent.

## CLAIM FIVE
### (The '879 Patent)

21.    Upon information and belief, Motorola does not infringe and has not infringed any valid claim of the '879 patent.

## PRAYER FOR RELIEF

WHEREFORE, Motorola prays that the Court enter a judgment against Defendants:

a.    Declaring that Motorola has not infringed any valid claim of any of the patents in suit;

b.    Declaring that Defendants are not entitled to recover damages for any act of past infringement of any of the patents in suit;

c.    Finding this is an exceptional case under 35 U.S.C. § 285;

d.    Awarding to Motorola its costs and attorney fees; and

5

e.    Awarding to Motorola such other and further relief as this Court deems proper and just.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution, Motorola hereby demands a trial by jury of all claims and all issues triable as of right by jury in this action.

Respectfully submitted,

Josy W. Ingersoll (No. 1088)
Elena C. Norman (No. 4780)
Monté T. Squire (No. 4764)
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
enorman@ycst.com
*Attorneys for Plaintiff Motorola, Inc.*

Of Counsel:

Jesse J. Jenner
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036

Norman H. Beamer
ROPES & GRAY LLP
525 University Avenue
Palo Alto, CA 94301

Nicole M. Jantzi
ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005

Dated: February 16, 2008

6

# EXHIBIT G

**U.S. District Court**

**District of Delaware**

## Notice of Electronic Filing

The following transaction was entered by Norman, Elena on 2/16/2008 at 0:01 AM EST and filed on 2/15/2008

| | |
|---|---|
| **Case Name:** | Plaintiff(s) v. Defendant(s) |
| **Case Number:** | 1:99-mc-9999 |
| **Filer:** | |
| **Document Number:** | 11 |

**Docket Text:**
COMPLAINT - Motorola, Inc. v. Research In Motion Limited, et al.. Filing fee $ 350, receipt number 412682. (Attachments: # (1) Exhibit A-E# (2) Civil Cover Sheet # (3) Summons Forms - Unsigned # (4) Summons Forms - Unsigned # (5) # (6))(Norman, Elena)

**1:99-mc-9999 Notice has been electronically mailed to:**

**1:99-mc-9999 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/16/2008] [FileNumber=521515-0]
[729cb09c5c6dea88ffba477dd6677345dd900cce116219549ca4c079b7d795dbce50
f9bfa83b57aeff5e415c910a70be71c352134e8a1341213b9c1a8e5c932a]]
**Document description:**Exhibit A-E
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/16/2008] [FileNumber=521515-1]
[b5202ad55145de4c0ad7f60c10f6a982f4b2dce9c9a532f821d8cb876967b41d5563
26fd316e439b966f0ae4c6f60f30f39e7d484da7d1d0b8c2694a387a5063]]
**Document description:**Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/16/2008] [FileNumber=521515-2]
[00351614a35a1f14db88a89f8f85c0b54ef82b0b209259af169a13013dbef5f89539
38d21379b6ee48c7a1ff95fe76e1ec6151fa780db20af1a597c4c9e55478]]
**Document description:**Summons Forms - Unsigned
**Original filename:**n/a
**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1079733196 [Date=2/16/2008] [FileNumber=521515-3]
[a019d31362469d6255f36dc2ae1028ec86448466230463c46c297ba7206a01948ba3
5f334b1b5814065422aec751a8b8a72f1008c25b5ed846c7fab8fb91101c]]
**Document description:**Summons Forms - Unsigned
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/16/2008] [FileNumber=521515-4]
[e4cc2803c1b6d9a551a2cceb3b5fe49f35fa56ff5cab1977a174a47aa537bed59fb9
6840e8d809942161debbec4334249976157c5252635ac499f6e06cfec5a6]]
**Document description:**
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/16/2008] [FileNumber=521515-5]
[ab650f5d547fb3c491c04a469350d43683b2d508b61a8a0951aef8d89794dfb28948
ce9a8381320dbaa92c496d85de6771302227a5435b5221585206b5ed758d]]
**Document description:**
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/16/2008] [FileNumber=521515-6]
[62a321c29854de1ed6484ce645ab08e4952cdb0dd44fa990752a854684e696f9536d
6f5bce27b8471c5c785beb4bb4798801f1c8af539df72f9e2f29e5a7188c]]

# EXHIBIT H



**Motorola and Verizon Wireless Announce the Highly Anticipated MOTO Q™**

*The World's Thinnest QWERTY Device Delivers Email, Entertainment and Seamless Mobility in One Ultra-Thin Package*

BEDMINSTER, NJ and SCHAUMBURG, Ill. – 22 May 2006 – Motorola, Inc. (NYSE: MOT) and Verizon Wireless, the nation's leading wireless service provider, today announced that the highly anticipated Moto Q™ will be available starting on May 31. The Moto Q is exclusively available through Verizon Wireless and customers can purchase it online at www.verizonwireless.com on May 31 or at any Verizon Wireless Communications Store on June 5.

Perfect for customers who multi-task and want flexibility in today's fast-paced business environment, the Moto Q's style and phone-first mantra is built upon the design revolution created by the Motorola RAZR™ – the best-selling clamshell handset in the world. The Moto Q – which runs Microsoft Windows Mobile® 5.0 software - delivers an uncompromising mobile experience in an all-in-one handheld device that combines the reliability of a great phone, personal productivity capabilities, powerful enterprise connectivity and entertainment in a thin and stylish form factor. The Moto Q also utilizes Verizon Wireless' BroadbandAccess network – the nation's most award-winning wireless broadband network – to send and receive data.

"The Moto Q is a real must-have device that enables true seamless mobility by liberating all of us from the constraints of our offices and living rooms," said Ed Zander, chief executive officer of Motorola, Inc. "On Verizon Wireless' broadband EV-DO network, the Moto Q brings together all of the converged solutions you need to work, stay in touch or have fun. With the best voice, data and design technology in one ultra-thin, intelligent, hard-working device, the Moto Q allows you to be productive and entertained wherever you go."

The Moto Q will redefine what customers expect from a QWERTY handheld. With Windows Mobile® software, the Moto Q puts a "mini notebook" in Verizon Wireless customers' pockets by providing enough power to let them leave their laptop at home to check email*, review presentations, documents, and stay connected for a week or a weekend. Couple that with its "cool enough for Friday night" design, multiple entertainment options and simple, intuitive features, and the Moto Q will help Verizon Wireless customers stay productive, creative and in-touch while on the go and however they choose.

Denny Strigl, president and chief executive officer of Verizon Wireless, said, "Enterprise technology, consumer electronics and mobile are converging to create major productivity advantages for the work world. But those advantages have only been available to a select few – until now. The Moto Q offers power, style and ease-of-use in a cool ultra-thin format, giving Verizon Wireless customers an uncompromising experience in one device."

The Moto Q also makes good business sense for companies – big and small – providing a converged mobility solution to help organizations improve their business, increase productivity and efficiency and enhance customer satisfaction. Features of the Moto Q from Verizon Wireless include:

- Integrated Bluetooth® 1.2 wireless technology** for communicating with compatible headsets, car kits and certain other devices equipped with Bluetooth technology
- EV-DO access for fast downloads of data, email and large attachments
- Wireless Sync for anytime connectivity with e-mail, calendar and contacts synchronization
- Thinnest QWERTY device in the world – 11.5mm includes a familiar thumbwheel to enhance the navigation experience
- Seamless access to corporate applications, messaging, organizational tools and IT support, from across the campus and around the world
- Synchronization with e-mail, calendar, contacts, and tasks entries, regardless of platform or ISP
- Integrated with Windows Mobile® 5.0 software for the convenience of users and IT with access to Yahoo!, Hotmail and other POP3
- All standard desktop document views supported including: Microsoft Word®, Excel®, PowerPoint®, Adobe Acrobat®, etc.
- Supports audio and video formats
- Dual, stereo-quality speakers
- Easy integration with existing IT systems for enhanced IT support
- Enabled for leading corporate e-mail solutions
- Flexibility enables loading of standard corporate VPN
- Password authentication helps ensure network integrity

"The Moto Q is amazing," said Steve Ballmer, CEO of Microsoft Corp. "It blends stylish design and fast network speeds with Microsoft's powerful Windows Mobile software, empowering people to be mobile without concessions."

**Phone First**
The Moto Q – coupled with the nation's most reliable wireless network from Verizon Wireless – delivers what Verizon Wireless customers want most: an exceptional device for making voice calls. Plus, the Moto Q provides the advanced phone capabilities expected in an industry-leading phone, such as voice-activated dialing, smart contacts dialing, speakerphone, Bluetooth** capabilities for certain profiles and more.

**Entertainment in Your Pocket**
The Moto Q offers a portfolio of entertainment capabilities ranging from stereo music and video playback to Web browsing and instant messaging. This unique device allows customers to be entertained when they want. With an amazing color screen, wireless broadband capabilities and a full media experience with Windows Media Player Mobile, the Moto Q's entertainment possibilities are unlimited.

**Personal Productivity**
Optimized for a variety of corporate and personal email technologies, the Moto Q's form factor and QWERTY keyboard let Verizon Wireless customers easily create and manage corporate and personal email. The addition of Wireless Sync from Verizon Wireless helps make life on-the-go easier and more productive. With always-on email, customers can stay connected and get the job done while away from the office – without a delay and in a secure environment.

With Windows Mobile software, the Moto Q also offers corporate mobile messaging support out of the box with Microsoft Exchange Server 2003. For additional wireless access to Exchange and other servers, Good Technologies™ is offering an optimized version of its Good Link email solution for the Moto Q. The Moto Q also offers easy access to personal email based on POP3, web mail and Hotmail™.

**Pricing**
The Moto Q is available exclusively through Verizon Wireless. Customers may purchase the Moto Q for $199.99 after a $100 instant credit when purchased with a qualified Verizon Wireless voice and data plan and two-year customer agreement.

Customers can choose from three calling plans that include voice calling and unlimited data access with Verizon Wireless' BroadbandAccess service:

> **$79.99 monthly access** – includes 450 anytime minutes with unlimited data usage*, unlimited IN calling and unlimited nights and weekends ($0.45 per minute after allowance).
> **$109.99 monthly access** – includes 1,350 anytime minutes with unlimited data usage*, unlimited IN calling and unlimited nights and weekends ($0.35 per minute after allowance).
> **$169.99 a month** – includes 4,000 anytime minutes with unlimited data usage*, unlimited IN calling and unlimited nights and weekends ($0.25 per minute after allowance).

*Unlimited data usage for Internet browsing, email and intranet access within the National Enhanced Services Rate & Coverage Area*

For more information, visit www.verizonwireless.com/q.

**About Verizon Wireless**
Verizon Wireless owns and operates the nation's most reliable wireless network, serving 53 million voice and data customers. Headquartered in Bedminster, NJ, Verizon Wireless is a joint venture of Verizon Communications (NYSE:VZ) and Vodafone (NYSE and LSE: VOD). Find more information on the Web at www.verizonwireless.com. To preview and request broadcast-quality video footage and high-resolution stills of Verizon Wireless operations, log on to the Verizon Wireless Multimedia Library at www.verizonwireless.com/multimedia.

**About Motorola**
Motorola is known around the world for innovation and leadership in wireless and broadband communications. Inspired by our vision of Seamless Mobility, the people of Motorola are committed to helping you get and stay connected simply and seamlessly to the people, information, and entertainment that you want and need. We do this by designing and delivering "must have" products, "must do" experiences and powerful networks -- along with a full complement of support services. A Fortune 100 company with global presence and impact, Motorola had sales of US $36.8 billion in 2005. For more information about our company, our people and our innovations, please visit www.motorola.com.

# # #

**Media Contacts:**
Brenda Boyd Raney
Verizon Wireless
908.306.4834
Brenda.Raney@verizonwireless.com

Juli Burda / Monica Rohleder
Motorola
847.538.5625 / 847.606.1973
Juli.Burda@motorola.com /
Monica.Rohleder@motorola.com

Certain mobile phone features may not be available throughout the entire network or their functionality may be limited. All features, functionality and other product specifications are subject to change without notice or obligation.

*Network dependent feature, not available in all areas. Airtime, data charges, and/or additional charges may apply. Wireless email functionality requires an email account with wireless server capabilities.

**The Moto Q supports Bluetooth "headset", "hands-free" and "music" profiles. In order for Bluetooth devices to communicate with one another, they must utilize the same Bluetooth profile. To determine the profiles supported by other Motorola devices, visit www.hellomoto.com/bluetooth. For other devices, contact their respective manufacturer. Certain Bluetooth features including those listed may not be supported by all compatible Bluetooth-enabled devices, and/or the functionality of such features may be limited in certain devices, or by certain wireless carriers. Contact your wireless carrier about feature availability and functionality.

MOTOROLA and the Stylized M Logo are registered in the US Patent & Trademark Office. The Bluetooth trademarks are owned by their proprietor and used by Motorola, Inc. under license. Microsoft, Windows and Windows Me are registered trademarks of Microsoft Corporation; and Windows XP is a trademark of Microsoft Corporation. All other product or service names are the property of their respective owners. © Motorola, Inc. 2006. All rights reserved.

© Copyright 1994-2008 Motorola, Inc. All rights reserved.

# EXHIBIT I



**MOTOROLA GOOD TECHNOLOGY GROUP**    ABOUT    PRODUCTS    HANDHELDS    HOW TO BUY    CUSTOMER SUPPORT

Company Background
Careers
News Room
Customers
Events
Partners
Resources
Contact Us



ABOUT

### Motorola to Acquire Good Technology

*Acquisition Extends Seamless Mobility Offerings For Enterprises and Consumers*

**SCHAUMBURG, Ill., and SANTA CLARA, Calif., 10 November 2006 —**Motorola, Inc. (NYSI
Good Technology, Inc. today announced that the companies have signed a definitive agreeme
Motorola will acquire privately held Good Technology, a leader in enterprise mobile computing
service. Terms of the transaction were not disclosed.

Good Technology, based in Santa Clara, is a strategic addition to Motorola's Mobile Devices k
acquisition will extend Motorola's mobile computing capabilities and increase the company's e
base. Good Technology's wireless messaging, data access and handheld security offerings pi
and advanced productivity solutions for mobile professionals with enterprise-level device secu
management.

Motorola will build upon Good Technology's customer and carrier relationships by maintaining
strategy. Good Technology's software and service offerings have been chosen by more than '
enterprises around the world. In addition, Good Technology's highly reliable, secure connectiv
offers the potential to power applications beyond email while extending to customers beyond t

"The addition of Good Technology will advance Motorola's vision of seamless mobility," said F
president, Motorola Mobile Devices business. "Good Technology's solutions, talent and custor
complement Motorola's business and extend our ability to deliver compelling products and ser
enterprise customers. Good Technology's software and managed service deliver a rich user e
cost of ownership, industry-leading security and enterprise-class support. These competitive c
have led many enterprise customers to choose Good Technology. This acquisition will continu
Motorola as a leading provider of mobility devices and solutions both for enterprise customers
consumers."

"This is an exciting milestone for our company, and we look forward to scaling our growth as p
Motorola," said Danny Shader, chief executive officer and president of Good Technology. "Mo
reach, scale, widely recognized brand and worldwide carrier and customer relationships make
partner for Good Technology. Our combined teams will create exciting growth opportunities fo
Technology, our customers and our employees. We look forward to working with the Motorola
a rapid and seamless transition."

Motorola has an existing business relationship with Good Technology using Good Mobile Mes
Motorola Q.

The acquisition, which is subject to regulatory and other customary conditions, is expected to

2007.

## Business Risks

The statements in this release that are not historical facts are forward-looking statements base
expectations and involve risks and uncertainties. Such forward-looking statements include, bu
limited to, statements about the anticipated timing of the transaction and the potential impact t
will have on Motorola. Motorola wishes to caution the reader that the factors below and those
Item 1A of Motorola's Form 10-K for the year ended December 31, 2005, as amended, and in
filings could cause Motorola's results to differ materially from those described in the forward-lo
statements. These factors include: (i) unforeseen factors that could impact the timely completi
transaction on the terms described, (ii) difficulties in integrating the operations of the newly ac
and achieving strategic objectives, (iii) difficulties in retaining employees at Good Technology,
and delays in the further development, production, testing and marketing of acquired technolo
uncertainties related to broader deployment of relatively new technologies, including custome
the products and technologies, (vi) the ability to differentiate our products and compete with ot
in the same markets and (vii) the general outlook for the economy and the telecom industry.

## About Motorola

Motorola is known around the world for innovation and leadership in wireless and broadband
communications. Inspired by our vision of Seamless Mobility, the people of Motorola are comr
you get and stay connected simply and seamlessly to the people, information, and entertainm
want and need. We do this by designing and delivering "must have" products, "must do" exper
powerful networks -- along with a full complement of support services. A Fortune 100 compan
presence and impact, Motorola had sales of US $35.3 billion in 2005. For more information ab
company, our people and our innovations, please visit www.motorola.com.

MOTOROLA and the stylized M Logo are registered in the US Patent & Trademark Office. All
or service names are the property of their respective owners.

## About Good Technology

Good Technology makes mobile computing easy and essential for everyone. The company's l
products, Good™ Mobile Messaging (formerly GoodLink), Good Mobile Intranet and Good Mc
securely extend IBM Lotus® Domino®, Microsoft® Exchange, and other enterprise systems to
most popular smartphones and networks. Good's software and managed service deliver a rich
experience, low total cost of ownership through Secure Over-The-Air™ management, industry
security and enterprise-class support and service. Good Technology products are available th
authorized wireless carriers, value-added resellers and directly through Good Technology. GC
GOOD and Design logo™, GOODLINK™ and GOOD TECHNOLOGY™ are Good Technolog
trademarks. Other marks belong to their respective owners. For more information visit www.gc

## Media Contacts

Jennifer Erickson
Motorola, Inc., Jennifer.Erickson@motorola.com or +1-847-435-5320

Reena Mukamal
Good Technology, rmukamal@good.com or +1-408-352-1802

www.motorola.com    Legal    Privacy Statement    Contact Us

© 2008 Good Technology, Inc. All Rights Reserved

# EXHIBIT J

Canalys research release 2008/021



# Smart mobile device shipments hit 118 million in 2007, up 53% on 2006

## – Apple takes third place in global hardware market in Q4

**Singapore and Reading (UK) – Tuesday, 5 February 2008**
**For immediate release**

### Annual highlights

- Converged device shipments (smart phones and wireless handhelds) rose 60% to hit 115 million in 2007
- Shipments of handhelds fell 47% to 3.0 million, from 5.6 million in 2006
- APAC is the largest region by volume – 47.9 million units in 2007, ahead of EMEA at 45.9 million
- North America is growing fast – shipments doubled to 20.9 million, from 10.3 million in 2006
- Nokia remained global market leader, shipping 60.5 million smart phones
- RIM shipments grew 112% year-on-year to 12.2 million, strengthening its second place position
- By OS provider, Symbian leads on 67% share, followed by Microsoft on 13%, with RIM on 10%.

### Q4 highlights – converged devices

- Converged device shipments rose 72% year-on-year in Q4 2007, the highest growth seen all year
- Nokia and RIM retained their number one and two positions
- Apple achieved third place despite its limited geographic coverage, with 7% share
- APAC converged device shipments rose 23%, EMEA 79%, and North America 222%
- Symbian leads with 65% share, ahead of Microsoft on 12%, RIM on 11%, Apple on 7%, and Linux at 5%

### Highlights from the Canalys research

The latest market data from analyst firm Canalys shows how much the converged device market (all smart phones and wireless handhelds) has grown over the past year. These, typically high-end, devices represented around 10% of the global mobile phone market by units in 2007, with annual growth of 60% making them one of the fastest growing segments of the technology industry. Year-on-year growth climbed every quarter throughout 2007, to reach a peak of 72% in Q4.

| Worldwide converged smart mobile device market Market shares Q4 2007, Q4 2006 | | | | | |
|---|---|---|---|---|---|
| Vendor | Q4 2007 shipments | % share | Q4 2006 shipments | % share | Growth Q4'07/Q4'06 |
| Total | 35,522,360 | 100.0% | 20,667,200 | 100.0% | 71.9% |
| Nokia | 18,802,480 | 52.9% | 11,114,630 | 53.8% | 69.2% |
| RIM | 4,046,860 | 11.4% | 1,829,260 | 8.9% | 121.2% |
| Apple | 2,320,840 | 6.5% | - | 0.0% | NA |
| Motorola | 2,301,260 | 6.5% | 1,463,090 | 7.1% | 57.3% |
| Others | 8,050,920 | 22.7% | 6,260,220 | 30.3% | 28.6% |

Source: Canalys estimates, © canalys.com ltd. 2008
Converged smart mobile device market: smart phones and wireless handhelds

Members of the press may quote from this release provided Canalys is clearly shown as the source
For more information e-mail press@canalys.com
© canalys.com ltd. 2008



Apple's entry into this market in 2007 with the iPhone sparked a lot of media attention and speculation about how much it could disrupt the status quo and take share away from companies such as Nokia, RIM, Palm and Motorola. "When you consider that it launched part way through the year, with limited operator and country coverage, and essentially just one product, Apple has shown very clearly that it can make a difference and has sent a wakeup call to the market leaders," said Pete Cunningham, Canalys senior analyst. "What it must demonstrate now is that it can build a sustainable business in the converged device space, expanding its coverage and product portfolio. It will also need to ensure that the exclusive relationships that got it so far so quickly do not prove to be a limit on what it can achieve. Apple's innovation in its mobile phone user interface has prompted a lot of design activity among competitors. We saw the beginnings of that in 2007, but we will see a lot more in 2008 as other smart phone vendors try to catch up and then get back in front. Experience shows that a vendor with only one smart phone design, no matter how good that design is, will soon struggle. A broad, continually refreshed portfolio is needed to retain and grow share in this dynamic market. This race is a marathon, but you pretty much have to sprint every lap."

Canalys estimates that Apple took 28% share of the fast growing US converged device market in Q4 2007, behind RIM's 41%, but a long way ahead of third placed Palm on 9%. This was also enough to put Apple ahead of all Windows Mobile device vendors combined, whose share was 21% in the quarter according to Canalys figures. In EMEA, where the iPhone officially launched part way through the quarter in only three countries, Apple took fifth spot behind Nokia, RIM, HTC and Motorola, but ahead of several established smart phone providers such as Sony Ericsson, Samsung and Palm.

For the full year 2007, as in 2006, the Asia Pacific region was the biggest in volume terms for converged device shipments. Apple has of course not yet launched the iPhone in the region, and many vendors who are successful in other parts of the world, such as RIM and Palm, have also made relatively little impact there so far. Nokia continues to lead in the region, with more than 50% share in converged devices, ahead of Japanese smart phone vendors Sharp and Fujitsu. Motorola, despite enjoying fourth place, has seen its Linux-based smart phone shipments in the region fall 28% from their high in 2006.

"The mobile Linux opportunity remains just that – an opportunity," added Rachel Lashford, manager of Canalys in APAC, "Total Linux-based phone shipments in 2007 were almost flat on 2006. There is still too much fragmentation and not enough momentum for any single open standard around which the energy of developers, manufacturers and operators can coalesce."

Nokia's recent announcement of its intention to acquire Trolltech will no doubt have raised questions among some of Trolltech's mobile phone producing partners about their Linux implementation strategy going

**Canalys research release 2008/021**



forward. Meanwhile Google's Android initiative, like others before it, remains an idea yet to turn into viable commercial products widely accepted by both mobile network operators and the mass market. Although off to a slow start, Canalys expects Linux will account for a significant proportion of mobile phone shipments within the next few years.

Lashford continued: "Rising consumer interest in having a rich, high-speed browsing experience on a mobile device, and the demand for visually sophisticated navigation and location applications will attract more companies into this arena. Flattening mobile data costs, and the advertising-funded possibilities generated by location-based services, will help reduce usage barriers. Improvements in the underlying technologies and innovation in user interfaces will lead to more usable devices. All these factors will help push the high-end mobile phone and smart phone segments forward. Meanwhile supply-side concerns around time to market and build and support costs will drive the industry to look for economies of scale. Mobile Linux can have a big part to play in this future, but at the moment the maturity of the other mobile operating systems puts them a long way ahead."

In Q4 2007, Canalys estimates that Symbian had a 65% share of worldwide converged device shipments, ahead of Microsoft on 12% and RIM on 11%. By region, Symbian led in APAC and EMEA with 85% and 80% shares respectively, while in North America RIM was the clear leader on 42%, ahead of Apple on 27% and Microsoft at 21%.

### About the Smart Mobile Device Analysis services

The shipment estimates discussed in this release come from the market-leading Canalys Smart Mobile Device Analysis Worldwide service. Canalys' globally consistent smart mobile device product segmentation and definitions are used by vendors the world over to provide a coherent view of the total market for smart phones, handhelds and wireless handhelds. Clients receive quarterly market updates, regular reports, trends presentations and forecasts, and direct access to the Canalys analysts. Canalys offers services looking at the smart mobile device markets by country in Asia Pacific, North and Latin America and EMEA, as well as providing global market overviews. It also has services focusing specifically on the rapidly developing markets for mobile navigation and Linux-based mobile phones, and survey-based analysis of consumer and enterprise attitudes and preferences toward mobile applications, products and services. More information is available from the Canalys web site.

Members of the press may quote from this release provided Canalys is clearly shown as the source
For more information e-mail press@canalys.com
© canalys.com ltd. 2008
Page 3 of 4

# EXHIBIT K

# Basic Report

**02/27/2008 - 11:20AM - Reference: 011351800123**

## Subject

# VICK T COX

| | |
|---|---|
| **SSN** | 460-88-XXXX  issued in Texas in 1966 |
| **DOB** | 01/XX/1950 |

## User Supplied Information

| | |
|---|---|
| **Last Name:** | COX |
| **First Name:** | VICK |
| **Middle Initial:** | T |
| **SSN:** | 460-88-XXXX |
| **DOB:** | 01/XX/1950 |
| **Address 1:** | 1317 SHEILA DR<br>PLANO, TX 75023 |

## Sections Available in Report

| | |
|---|---|
| **Subject** | **1 Record** |
| **Possible AKAs for Subject** | **4 Records** |
| **Possible Other Social Security Numbers Associated with Subject** | **2 Records** |
| **Possible Other Records and Names Associated with Social Security Numbers** | **3 Records** |
| **Possible Driver Licenses** | **2 Records** |
| **Possible Addresses Associated with Subject** | **14 Records** |
| **Phone Listings for Subject's Addresses** | **8 Records** |

## Possible AKAs for Subject       (4 Records)

| Name | SSN | Date Of Birth |
|---|---|---|
| VICK, T COX | 460-88-XXXX | |
| COX, VICK | | |
| COX, VICK TAYLOR | 460-88-XXXX | 01/XX/1950 |
| COX, VICK TS | 460-88-XXXX | |

## Possible Other Social Security Numbers Associated with Subject    (2 Records)

| Name | SSN | Date Of Birth |
|---|---|---|
| COX, VICK TAYLOR | 460-88-XXXX | 01/XX/1950 |
| COX, VICK TAYLOR | 460-88-XXXX | 01/XX/1950 |

**Possible Other Records and Names Associated with Social Security Numbers**    (3 Records)

| Name | SSN | Date Of Birth |
|------|-----|---------------|
| CALL, MARTHA M | 460-88-XXXX | |
| MCCALL, TOM | 460-88-XXXX | 08/XX/1951 |
| JAMES, T M | 460-88-XXXX | |

**Possible Driver Licenses**    (2 Records)

**418 E TEXAS ST GRAPEVINE, TX 76051**

| | | | |
|---|---|---|---|
| **Name:** | COX, VICK T | **DOB:** | 01/XX/1950 |
| **DL#:** | 09766XXX | **Issue State:** | TX |
| **Issue Date:** | 08/07/2007 | **Expire Date:** | |
| **Height:** | | **Weight:** | |
| **Eye Color:** | | **Hair Color:** | |
| **Previous DL State:** | | **Previous DL #:** | |
| **SSN:** | | | |

**12712 LINDLEY DR RALEIGH, NC 27614**

| | | | |
|---|---|---|---|
| **Name:** | | **DOB:** | 01/XX/1950 |
| **DL#:** | Due to restrictions by the State this info is not available for display | **Issue State:** | |
| **Issue Date:** | | **Expire Date:** | |
| **Height:** | | **Weight:** | |
| **Eye Color:** | | **Hair Color:** | |
| **Previous DL State:** | | **Previous DL #:** | |
| **SSN:** | | | |

**Possible Addresses Associated with Subject**    (14 Records)

Show Names at Each Address

| Date Range | Address/Phone | Source | Source Reported Dates |
|------------|---------------|--------|-----------------------|
| 07/2007 - 11/2007 | 418 E TEXAS ST GRAPEVINE, TX 76051 | Consumer Bureau 2<br>Composite Info<br>Consumer Bureau 3 | 07/2007 - 11/2007<br>08/2007 - 08/2007<br>07/2007 - 07/2007 |
| 03/2002 - 06/2007 | 4000 STONE BROOKE DR GRAPEVINE, TX 76051 (817) 410-7440 | Consumer Bureau 2<br>Composite Info<br>Phone Listing<br>Consumer Bureau 3<br>Consumer Bureau 1 | 03/2002 - 06/2007<br>07/2003 - 05/2007<br>06/2003 - 05/2006<br>09/2003 - 05/2004<br>09/2003 - 09/2003 |
| 12/1989 - 12/2006 | 1023 SPRINGBROOK DR PLANO, TX 75075 (972) 423-7130 *** 214 | Consumer Bureau 2<br>Composite Info<br>Consumer Bureau 1<br>Consumer Bureau 3 | 12/1989 - 12/2006<br>07/2000 - 06/2001<br>08/1993 - 10/1993<br>09/1991 - 09/1991 |
| 09/2005 - 09/2005 | 5302 VANDERBILT AVE DALLAS, TX 75206 | Consumer Bureau 2 | 09/2005 - 09/2005 |
| 03/2002 - 07/2005 | 1317 SHEILA DR PLANO, TX 75023 | Consumer Bureau 2 | 03/2002 - 07/2005 |

| 03/2002 - 02/2004 | 12712 LINDLEY DR<br>RALEIGH, NC 27614<br>(919) 841-1798 | Consumer Bureau 1<br>Consumer Bureau 2<br>Composite Info<br>Consumer Bureau 3 | 02/2004 - 02/2004<br>03/2002 - 08/2003<br>03/2003 - 03/2003<br>05/2002 - 05/2002 |
| 11/2001 - 02/2004 | 3613 QUAIL HIGH BLVD<br>MORRISVILLE, NC 27560<br>(919) 319-9330 | Consumer Bureau 1<br>Consumer Bureau 2<br>Consumer Bureau 3 | 02/2004 - 02/2004<br>07/2003 - 07/2003<br>11/2001 - 11/2001 |
| 10/2002 - 10/2002 | 703 ACADEMY ST 350A<br>SAN MARCOS, TX 78666 | Consumer Bureau 2 | 10/2002 - 10/2002 |
| 04/2002 - 04/2002 | 1901B GRACY FARMS LN<br>AUSTIN, TX 78758<br>(512) 837-7492 | Consumer Bureau 2 | 04/2002 - 04/2002 |
| 04/2002 - 04/2002 | 1901 GRACY FARMS LN<br>AUSTIN, TX 78758 | Consumer Bureau 2 | 04/2002 - 04/2002 |
| 04/2002 - 04/2002 | 1023 SPRNGBROOK DR<br>RALEIGH, NC 27614 | Consumer Bureau 2 | 04/2002 - 04/2002 |
| 01/1987 - 07/2001 | 730 S WILDWOOD DR<br>IRVING, TX 75060 | Consumer Bureau 2<br>Consumer Bureau 3<br>Consumer Bureau 1 | 01/1987 - 07/2001<br>04/1991 - 04/1991<br>08/1989 - 08/1989 |
| 09/1997 - 09/1997 | 12001 METRIC BLVD<br>AUSTIN, TX 78758 | Consumer Bureau 2 | 09/1997 - 09/1997 |
| 01/1996 - 01/1996 | 5990 RICHMOND HWY 416<br>ALEXANDRIA, VA 22303 | Consumer Bureau 2 | 01/1996 - 01/1996 |

***Other Possible Area Code(s)

## Phone Listings for Subject's Addresses                                      (8 Records)

### 4000 STONE BROOKE DR GRAPEVINE, TX 76051

| **Name:** | PAULOS MARK R | **Phone:** | (817) 488-3137 |

### 1023 SPRINGBROOK DR PLANO, TX 75075

| **Name:** | HOYT M | **Phone:** | (972) 422-0378 |

### 12712 LINDLEY DR RALEIGH, NC 27614

| **Name:** | HAHN DEAN A | **Phone:** | (919) 847-7618 |
| **Name:** | HAHN ELIZABETH T | **Phone:** | (919) 847-7618 |
| **Name:** | HAHN ALAN | **Phone:** | (919) 847-7618 |
| **Name:** | HAHN ANN | **Phone:** | (919) 847-7618 |

### 703 ACADEMY ST 350A SAN MARCOS, TX 78666

| **Name:** | DAVIS BROS CONSTRUCTION | **Phone:** | (512) 805-8014 |

### 730 S WILDWOOD DR IRVING, TX 75060

| **Name:** | STANPHILL MICHELLE B | **Phone:** | (972) 445-0684 |

### 12001 METRIC BLVD AUSTIN, TX 78758

56 phone numbers found, only same last name considered.

** No Phone numbers found during search **

**5990 RICHMOND HWY 416 ALEXANDRIA, VA 22303**

104 phone numbers found, only same last name considered.

** No Phone numbers found during search **

**\*\*\* Report section(s) with no matches:**

Possible High Risk Address, Possible Infractions

**\* Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports the data, as provided by public records and commercially available data sources and is not the source of the data. Before relying on any data, it should be independently verified.**

**\* Option Control Number: NNNN-BASIC\***

**\*CPRS I40504-A 9535810\***

**\* Control Number: expGate\***

**\* \* \* END OF REPORT \* \* \***

# Basic Report

02/27/2008 - 11:21AM - Reference: 011351800123

## Subject

## JOHN A DAVIS

| | |
|---|---|
| **SSN** | 627-12-XXXX  Issued in Texas in 1990 |
| **DOB** | 08/XX/1972 |

### User Supplied Information

| | |
|---|---|
| **Last Name:** | DAVIS |
| **First Name:** | JOHN |
| **Middle Initial:** | A |
| **SSN:** | 627-12-XXXX |
| **Address 1:** | 3801 W SPRING CREEK PY 822<br>PLANO, TX 75023 |

### Sections Available in Report

| | |
|---|---|
| Subject | 1 Record |
| Possible AKAs for Subject | 2 Records |
| Possible Other Social Security Numbers Associated with Subject | 1 Records |
| Possible Other Records and Names Associated with Social Security Numbers | 2 Records |
| Possible Driver Licenses | 1 Records |
| Possible Addresses Associated with Subject | 18 Records |
| Phone Listings for Subject's Addresses | 17 Records |

### Possible AKAs for Subject

(2 Records)

| Name | SSN | Date Of Birth |
|---|---|---|
| DAVIS, JOHN | 627-12-XXXX | 08/XX/1972 |
| DAVIS, JOHN ANTHONY | 627-12-XXXX | 08/XX/1972 |

### Possible Other Social Security Numbers Associated with Subject

(1 Record)

| Name | SSN | Date Of Birth |
|---|---|---|
| DAVIS, JOHN ANTHONY | 672-12-XXXX | 08/XX/1972 |

### Possible Other Records and Names Associated with Social Security Numbers

(2 Records)

| Name | SSN | Date Of Birth |
|---|---|---|
| DAVIS, JACK S | 627-12-XXXX | |

STEGER, BRITTANY          627-12-XXXX

## Possible Driver Licenses                                             (1 Record)

### 4204 DUNDEE DR PLANO, TX 75093

| | | | |
|---|---|---|---|
| **Name:** | DAVIS, JOHN A | **DOB:** | 08/XX/1972 |
| **DL#:** | 07318XXX | **Issue State:** | TX |
| **Issue Date:** | 06/27/2005 | **Expire Date:** | |
| **Height:** | | **Weight:** | |
| **Eye Color:** | | **Hair Color:** | |
| **Previous DL State:** | | **Previous DL #:** | |
| **SSN:** | | | |

## Possible Addresses Associated with Subject                          (18 Records)

Show Names at Each Address

| Date Range | Address/Phone | Source | Source Reported Dates |
|---|---|---|---|
| 11/2007 - 02/2008 | 3801 W SPRING CREEK PKWY 822<br>PLANO, TX 75023 | Consumer Bureau 2<br>Consumer Bureau 3 | 12/2007 - 02/2008<br>11/2007 - 01/2008 |
| 03/2003 - 11/2007 | 4204 DUNDEE LN<br>PLANO, TX 75093<br>(972) 771-2184<br>*** 903 | Consumer Bureau 3<br>Consumer Bureau 2<br>Consumer Bureau 1<br>Composite Info | 08/2005 - 11/2007<br>03/2003 - 06/2006<br>10/2005 - 10/2005<br>07/2005 - 07/2005 |
| 03/1997 - 11/2007 | 206 TRELLIS PL<br>RICHARDSON, TX 75081 | Consumer Bureau 3<br>Consumer Bureau 2<br>Composite Info | 03/1997 - 11/2007<br>03/1997 - 06/1998<br>06/1997 - 06/1997 |
| 04/2003 - 11/2007 | 1596 SUNSET HILL DR<br>ROCKWALL, TX 75087 | Consumer Bureau 3<br>Consumer Bureau 2<br>Composite Info | 02/2004 - 11/2007<br>04/2003 - 10/2004<br>06/2004 - 06/2004 |
| 09/2007 - 09/2007 | 3801 W SPRING CREEK PKWY 1922<br>PLANO, TX 75023<br>(214) 473-8773<br>*** 972 | Consumer Bureau 2 | 09/2007 - 09/2007 |
| 11/2002 - 03/2003 | 2513A DUKE CIR<br>ROWLETT, TX 75088 | Consumer Bureau 2 | 11/2002 - 03/2003 |
| 09/1998 - 11/2002 | 5905 RANGER DR<br>ROCKWALL, TX 75032<br>(469) 771-2184<br>*** 972 | Consumer Bureau 2<br>Composite Info<br>Consumer Bureau 3<br>Consumer Bureau 1 | 09/1998 - 11/2002<br>07/2000 - 06/2001<br>12/1998 - 12/1998<br>10/1998 - 10/1998 |
| 05/1996 - 11/1998 | 345 N FM 1138<br>NEVADA, TX 75173 | Consumer Bureau 2<br>Consumer Bureau 1 | 05/1996 - 11/1998<br>02/1997 - 02/1997 |
| 05/1998 - 05/1998 | 345 N FM<br>NEVADA, TX 75173 | Consumer Bureau 2 | 05/1998 - 05/1998 |
| 05/1998 - 05/1998 | 345 7 FM 1138<br>NEVADA, TX 75173 | Consumer Bureau 2 | 05/1998 - 05/1998 |
| 07/1996 - 03/1997 | 6042 WINTON ST<br>DALLAS, TX 75206 | Consumer Bureau 2<br>Composite Info<br>Consumer Bureau 3<br>Consumer Bureau 1 | 07/1996 - 03/1997<br>11/1996 - 11/1996<br>08/1996 - 08/1996 |
| 02/1997 - 02/1997 | PO BOX 433<br>NEVADA, TX 75173 | Consumer Bureau 2<br>Consumer Bureau 1 | 02/1997 - 02/1997 |
| 03/1995 - 02/1996 | 9823 SUMMERWOOD CIR<br>DALLAS, TX 75243 | Consumer Bureau 2 | 03/1995 - 02/1996 |
| 01/1995 - 10/1995 | 1030 DALLAS DR | Composite Info | 10/1995 - 10/1995 |

| | DENTON, TX 76205 | Consumer Bureau 2 | 01/1995 - 01/1995 |
| 07/1995 - 07/1995 | 1030 DALLAS DR 413 DENTON, TX 76205 | Consumer Bureau 2 | 07/1995 - 07/1995 |
| 05/1995 - 05/1995 | 5101 SAN PEDRO AVE SAN ANTONIO, TX 78212 | Consumer Bureau 2 | 05/1995 - 05/1995 |
| 07/1991 - 07/1991 | 201 1ST ST 912 SAN MARCOS, TX 78666 | Consumer Bureau 1 | 07/1991 - 07/1991 |
| | 206 PRELLIS RICHARDSON, TX 75081 | Consumer Bureau 1 | |

***Other Possible Area Code(s)

## Phone Listings for Subject's Addresses                                        (17 Records)

### 3801 W SPG CRK PKWY 822 PLANO, TX 75023

202 phone numbers found, only same last name considered.

** No Phone numbers found during search **

### 206 TRELLIS PL RICHARDSON, TX 75081

| Name: | LONESTAR GOURMET MEAT DISTRIBUTO | Phone: | (972) 479-0202 |

### 345 N FM 1138 NEVADA, TX 75173

| Name: | NELMS ROY B | Phone: | (972) 843-2829 |
| Name: | NELMS SHARON K | Phone: | (972) 843-2829 |
| Name: | NELMS REY | Phone: | (972) 843-2829 |

### 345 N FM NEVADA, TX 75173

| Name: | NELMS ROY B | Phone: | (972) 843-2829 |
| Name: | NELMS SHARON K | Phone: | (972) 843-2829 |
| Name: | NELMS REY | Phone: | (972) 843-2829 |

### 9823 SUMMERWOOD CIR DALLAS, TX 75243

12 phone numbers found, only same last name considered.

** No Phone numbers found during search **

### 1030 DALLAS DR DENTON, TX 76205

105 phone numbers found, only same last name considered.

** No Phone numbers found during search **

### 5101 SAN PEDRO AVE SAN ANTONIO, TX 78212

| Name: | ART DAVIS ATTORNEY AT LAW | Phone: | (800) 321-6324 |
| Name: | CATSIFAS CHAS | Phone: | (210) 732-3353 |
| Name: | DELGADO CHIROPRACTIC CLINIC P C | Phone: | (210) 738-0662 |

# EXHIBIT L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| *RESEARCH IN MOTION LIMITED* and §<br>*RESEARCH IN MOTION CORPORATION,* §<br>§<br>**Plaintiffs,** §<br>§<br>**v.** §<br>§<br>*MOTOROLA, INC.,* §<br>§<br>**Defendant.** § | **CIVIL ACTION NO. 3:08-CV-0284-G** |

---

**MOTOROLA'S NOTICE OF RELATED CASE AND MOTION TO CONSOLIDATE**

---

**TO THE HONORABLE COURT:**

Defendant Motorola, Inc., hereby files this Notice of Related Case and Motion to Consolidate. This case relates to a subsequently filed case, Civil Action No. 3:08CV0317-O (N.D. Tex.), assigned to the Honorable Reed O'Connor. Motorola has filed a Notice of Related Case in that action, and moved to transfer that case to this Court. Motorola further moves by this submission that the two cases be consolidated. Motorola respectfully further states as follows:

On February 20, 2008 Plaintiffs Research in Motion Limited and Research in Motion Corporation (collectively, "RIM") served the Complaint in this action on Motorola. RIM's complaint asserts twenty-two claims for relief, including, *inter alia*, allegations that Motorola infringes nine patents; requests for declaratory judgment that RIM does not infringe seven Motorola patents (not including the four patents in this action); allegations that Motorola has violated federal antitrust laws; and assertions of five state law claims. *See* Exhibit "A" at ¶¶115-137.

---

On February 21, 2008, RIM filed a related case in this District, further requesting, *inter alia*, declaratory judgment that RIM does not infringe Motorola's U.S. Patent Nos. 5,157,391; 5,394,140; 5,612,682; and 5,974,447. *See* Exhibit "B" at ¶¶15-34. The related case is assigned to Judge O'Connor. The Civil Cover Sheet in the related case specifically lists this action as related to it. *See* Exhibit "B" at 70.

In addition to the two actions filed by RIM in this district, Motorola filed two separate actions in the District of Delaware and in the Eastern District of Texas.[1] *See* Exhibit "C"; Exhibit "D." There is considerable overlap between these four actions. With respect to each of the patents in suit, one party affirmatively asserts patent infringement claims in one district, and the other party defensively seeks declaratory judgment in a different district.

On February 26, 2008, counsel for Motorola contacted counsel for RIM and requested that RIM consent to this motion. On February 28, 2008, counsel for RIM informed counsel for Motorola that RIM was still considering Motorola's request. On March 2, 2008, RIM declined to consent to Motorola's request.

As RIM admits in the Civil Cover Sheet, the other case is certainly related to this action. The parties to the two actions are identical, and Motorola asserts that the four Motorola patents in the related case are infringed by the same RIM products that infringe the seven Motorola patents involved in this action. Throughout its Complaint in this action, RIM refers to the negotiations between RIM and Motorola towards renewing a cross license agreement. That agreement, if consummated, would have encompassed the Motorola patents in suit here as well as the Motorola patents in suit in the related action. In its complaint here, RIM makes frequent

---

[1] Motorola's actions, both denominated *Motorola v. Research In Motion Limited and Research In Motion Corporation*, are Civil Action No. 1:08-cv-00104 (D. Del.) (the Delaware action); and Civil Action No. 2:08-cv-00069-TJW (E.D. Tex.) (the E.D. Texas action).

reference to, and relies on, allegations to the effect that Motorola supposedly "has demanded exorbitant royalties for additional patents, not essential to the standards...." Exhibit "A" at ¶¶ 39, 88, 90, 92, 110, 165, 177, 192, 193, 201-202. Such nonessential patents encompass both the seven Motorola patents of this action and the four Motorola patents of the related case — patents in both actions were involved in the failed negotiations that RIM (incorrectly) alleges to have been the subject of exorbitant or unreasonable royalty demands.

In addition, given the multiplicity and duplication of averments spread out over four different actions in three districts, Motorola is considering motions seeking the most economical and expeditious manner of resolving the pending claims and disputes between the parties. Transferring the related case and consolidating it with this case will facilitate and simplify that process, allowing one Judge in this District to consider and decide on the proper course of action. Motorola has filed a Notice of Related Case and Motion to Transfer with Judge O'Connor in the related action.   If the related action is so transferred, Motorola requests that this Court consolidate this action with the related action.

Pursuant to Federal Rules of Civil Procedure 42(a), consolidation is appropriate if the "actions before the court involve a common question of law or fact." Because the two actions obviously involve closely related issues of fact and law, in the interest of judicial economy and

to avoid the possibility of inconsistent outcomes, it is appropriate for the Court to consolidate the two actions, if the related action is transferred to this Court.

Dated: March 4, 2008                         Respectfully Submitted,


                                             /s/ Eric W. Pinker
                                             Eric W. Pinker, P.C. (TSBN 16016550)
                                             Mark E. Turk (TBSN 00786298)
                                             Angela V. Colmenero (TSBN 24048399)
                                             LYNN TILLOTSON & PINKER, LLP
                                             750 N. St. Paul Street, Suite 1400
                                             Dallas, Texas 75201
                                             (214) 981-3837 Telephone
                                             (214) 981-3839 Facsimile


*Of Counsel*:

Jesse J. Jenner (Motion For Admission *Pro Hac Vice* To Be Submitted)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
*jesse.jenner@ropesgray.com*

Norman H. Beamer (Motion For Admission *Pro Hac Vice* To Be Submitted)
ROPES & GRAY LLP
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 617-4000
*norman.beamer@ropesgray.com*

Nicole M. Jantzi (Motion For Admission *Pro Hac Vice* To Be Submitted)
ROPES & GRAY LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
*nicole.jantzi@ropesgray.com*

---

## CERTIFICATE OF CONFERENCE

Counsel for Motorola contacted counsel for RIM on February 26, 2008 to determine whether they were opposed to the relief requested in this motion. On March 2, 2008, counsel for RIM informed counsel for Motorola that it is opposed to this motion.

Certified on March 4, 2008.

/s/ Eric W. Pinker
Eric W. Pinker

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing was served upon the following counsel *via ECF* on March 4, 2008.

George W. Bramblett, Jr.          William F. Lee
Phillip B. Philbin                Michelle D. Miller
John R. Emerson                   William J. Bohler
HAYNES AND BOONE, LLP             WILMER CUTLER PICKERING HALE AND DORR LLP
901 Main Street, Suite 3100       60 State Street
Dallas, Texas 75202-3789          Boston, Massachusetts 02109
Tel: 214-651-5000                 Tel: 617-526-6000
Fax: 214-651-5940                 Fax: 617-526-5000

/s/ Eric W. Pinker
Eric W. Pinker

# EXHIBIT M



RESEARCH IN MOTION **2007 ANNUAL REPORT**



| U.S. GAAP | | March 4, 2006 | February 26, 2005 |
|---|---|---|---|
| | | | (as restated) |
| Revenue | | $2,065,845 | $1,350,447 |
| Gross margin | | $1,140,247 | $ 714,137 |
| Research & development and selling, | | | |
| marketing and administration | | 473,204 | 296,503 |
| Amortization | | 49,951 | 35,941 |
| Litigation | | 201,791 | 352,628 |
| Investment income | | 66,218 | 37,107 |
| Income before income taxes | | 481,519 | 66,172 |
| Provision for (recovery of) income taxes | | 106,863 | (139,440) |
| Net income | | $ 374,656 | $ 205,612 |
| Earnings per share | | | |
| Basic | | $ 1.98 | $ 1.10 |
| Diluted | | $ 1.91 | $ 1.04 |
| | | | |
| Gross margin | | 55.20% | 52.90% |
| Research and development | | 7.70% | 7.60% |
| Selling, marketing and administration | | 15.20% | 14.40% |
| | | | |
| Cash, cash equivalents, short-term | | | |
| investments and investments | | $1,249,402 | $1,679,717 |
| Total assets | | $2,314,349 | $2,621,985 |
| Shareholders' equity | | $1,995,415 | $1,981,804 |



$3,037.1

$2,065.8

$1,350.4

$594.6

$306.7

03    04    05    06    07



BlackBerry Subscriber Account Base
(in thousands)

8,000

4,900

2,510

1,069

534

03    04    05    06    07

# EXHIBIT N



**Decide with Confidence**

# Business Information Report

To save report(s) to your PC, click here for instructions.

🖨 Print this Report

Copyright 2008 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 061016411L

ATTN: **kolpin 0113518.00123**

Report Printed: FEB 25 2008
**In Date**

## BUSINESS SUMMARY

**MOTOROLA, INC.**
MOTOROLA
**5555 N Beach St**
**Fort Worth, TX 76137**

> **Now Included with this Report**    *NEW!*
> **D&B's Credit Limit Recommendation**
> D&B's industry and risk-based limit guidance
> Learn More                                    **View Now**
> **Payment Trends Profile**
> Payment trends and industry benchmarks
> Learn More                                    **View Now**

This is a **branch** location.

| | |
|---|---|
| **Web site:** | www.motorola.com |
| **Telephone:** | 817 245-6000 |
| **Branch manager:** | AMANDA CIENKUS |
| **Stock symbol:** | MOT |
| **Employs:** | 1,200 here |
| **SIC:** | 3674 |
| | 3663 |
| **Line of business:** | Mfg semiconductors/related devices, mfg radio/tv communication equipment |

**D-U-N-S Number:**        94-790-3621

**D&B Rating:**        **BRANCH**

**D&B PAYDEX®:**

**12-Month D&B PAYDEX: 73**
When weighted by dollar amount, payments to suppliers average 11 days beyond terms.

```
0                          ▽                 100
120 days slow      30 days slow      Prompt  Anticipates
```
Based on trade collected over last 12 months.

*NEW!* Enhanced payment trends and industry benchmarks are available on this business

## SUMMARY ANALYSIS

**D&B Rating:**

The term "BRANCH" in the Rating field indicates that this company is a branch location. D&B Ratings do not appear

on branch reports. For more information, see the D&B Rating Key.

| NEW! | How does MOTOROLA, INC.'s payment record compare to its industry? | ⊙ |
|---|---|---|
| A Payment Trends Profile will show you - <u>View Now</u> | | |

## CUSTOMER SERVICE

If you have questions about this report, please call our Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. If you are outside the U.S. contact your local D&B office.

*** Additional Decision Support Available ***

Additional D&B products, monitoring services and specialized investigations are available to help you evaluate this company or its industry. Call Dun & Bradstreet's Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. or visit our website at www.dnb.com.

## HISTORY

The following information was reported **07/03/2007**:

## CORPORATE FAMILY

Click below to buy a Business Information Report on that family member.
For an expanded, more current corporate family view, use D&B's Global Family Linkage product.

**Headquarters:**

| Motorola, Inc. | Schaumburg, IL | DUNS # <u>00-132-5463</u> |
|---|---|---|

## OPERATIONS

07/03/2007

**Description:**  This is a branch: headquarters are located at 1303 E Algonquin Rd, Schaumburg, IL. Headquarters D-U-N-S 00-132-5463. This branch Operates as a manufacturer of radio or television broadcasting or communications equipment, manufactures semiconductors or related devices.

## SIC & NAICS

**SIC:**
Based on information in our file, D&B has assigned this company an extended 8-digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.

The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

| 36740000 | Semiconductors and related devices |
|---|---|
| 36630000 | Radio and t.v. communications equipment |

**NAICS:**

| 334413 | Semiconductor and Related Device Manufacturing |
|---|---|
| 334220 | Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing |

USIDOCS 6569786v1

## D&B PAYDEX

**NEW!** Enhanced payment trends and industry benchmarks are available on this business

The D&B PAYDEX is a unique, dollar weighted indicator of payment performance based on up to 50 payment experiences as reported to D&B by trade references.

**3-Month D&B PAYDEX: 74**
When weighted by dollar amount, payments to suppliers average 9 days beyond terms.



Based on trade collected over last 3 months.

**12-Month D&B PAYDEX: 73**
When weighted by dollar amount, payments to suppliers average 11 days beyond terms.



Based on trade collected over last 12 months.

When dollar amounts are not considered, then approximately 66% of the company's payments are within terms.

## PAYMENT SUMMARY

The Payment Summary section reflects payment information in D&B's file as of the date of this report.

Below is an overview of the company's dollar-weighted payments, segmented by its suppliers' primary industries:

| | Total Rcv'd (#) | Total Dollar Amts ($) | Largest High Credit ($) | Within Terms (%) | Days Slow <31 (%) | 31-60 (%) | 61-90 (%) | 90> (%) |
|---|---|---|---|---|---|---|---|---|
| **Top industries:** | | | | | | | | |
| Trucking non-local | 9 | 126,000 | 55,000 | 29 | 1 | 64 | 6 | - |
| Nonclassified | 8 | 136,450 | 100,000 | 100 | - | - | - | - |
| Arrange cargo transpt | 4 | 30,500 | 20,000 | 65 | 2 | - | 33 | - |
| Help supply service | 2 | 12,500 | 7,500 | 30 | - | 40 | - | 30 |
| Whol office equipment | 2 | 1,250 | 750 | 100 | - | - | - | - |
| Mfg semiconductors | 1 | 250,000 | 250,000 | 100 | - | - | - | - |
| Mfg electric test prd | 1 | 30,000 | 30,000 | 100 | - | - | - | - |
| Misc business credit | 1 | 7,500 | 7,500 | 100 | - | - | - | - |
| Mfg wood pallets | 1 | 5,000 | 5,000 | - | 100 | - | - | - |
| Mfg environment cntrl | 1 | 2,500 | 2,500 | 100 | - | - | - | - |
| OTHER INDUSTRIES | 14 | 5,750 | 1,000 | 33 | 26 | 15 | 9 | 17 |
| **Other payment categories:** | | | | | | | | |
| Cash experiences | 5 | 500 | 500 | | | | | |
| Payment record unknown | 1 | 50 | 50 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| **Placed for collections:** | | | | | | | | |

| With D&B | 0 | 0 |
|---|---|---|
| Other | 0 | N/A |
| Total in D&B's file | 50 | 608,000 | 250,000 |

The highest **Now Owes** on file is $55,000
The highest **Past Due** on file is $25,000

The payment experiences in this report relate specifically to this branch location. Please refer to the headquarters report if you would like consolidated trade information for the headquarters and its branches.

| **NEW!**   Have MOTOROLA, INC.'s payment habits changed over time? | ? |
|---|---|
| A Payment Trends Profile will show you – <u>View Now</u> | |
| **PAYMENT DETAILS** | |

**Detailed Payment History**

| Date Reported (mm/yy) | Paying Record | High Credit ($) | Now Owes ($) | Past Due ($) | Selling Terms | Last Sale Within (months) |
|---|---|---|---|---|---|---|
| 01/08 | Ppt | 250,000 | 25,000 | 0 | | 1 mo |
| | Ppt | 100,000 | 55,000 | 0 | | 1 mo |
| | Ppt | 35,000 | 20,000 | 0 | | 1 mo |
| | Ppt | 7,500 | 0 | 0 | Lease Agreemnt | 1 mo |
| | Ppt | 2,500 | 2,500 | 0 | N30 | 1 mo |
| | Ppt | 750 | 750 | 0 | Lease Agreemnt | 1 mo |
| | Ppt | 500 | 0 | 0 | | 6-12 mos |
| | Ppt | 500 | 0 | 0 | | 6-12 mos |
| | Ppt | 500 | 0 | 0 | N30 | 1 mo |
| | Ppt | 250 | 100 | 0 | | 1 mo |
| | Ppt | 250 | 250 | 0 | | 1 mo |
| | Ppt | 100 | 100 | 0 | | 1 mo |
| | Ppt | 0 | 0 | 0 | N30 | 1 mo |
| | Ppt | 0 | 0 | 0 | | 6-12 mos |
| | Ppt-Slow 30 | 750 | 0 | 0 | N15 | 6-12 mos |
| | Ppt-Slow 60 | 50,000 | 35,000 | 25,000 | N15 | 1 mo |
| | Ppt-Slow 60 | 750 | 750 | 750 | | 2-3 mos |
| | Ppt-Slow 90 | 15,000 | 100 | 100 | N15 | 6-12 mos |
| | Ppt-Slow 150 | 7,500 | 0 | 0 | N30 | 6-12 mos |
| | Slow 15 | 1,000 | 1,000 | 0 | | 1 mo |
| | Slow 45 | 55,000 | 15,000 | 1,000 | | 1 mo |
| | (022) | 0 | 0 | 0 | Cash account | 6-12 mos |
| 12/07 | Slow 30-240 | 500 | 500 | 500 | | 1 mo |
| | (024) | | | | Sales COD | 1 mo |

| 11/07 | Ppt | 50 | 50 | | | 6-12 mos |
| | Ppt | 50 | 50 | | | 1 mo |
| | Ppt | 0 | 0 | 0 | | 6-12 mos |
| | Ppt | 0 | 0 | 0 | | 6-12 mos |
| | Ppt | 0 | 0 | 0 | | 6-12 mos |
| 10/07 | Slow 60 | 250 | 0 | 0 | N30 | 6-12 mos |
| | (031) | 0 | | | Sales COD | 4-5 mos |
| | (032) | 0 | | | Sales COD | 2-3 mos |
| 09/07 | Ppt-Slow 60 | 250 | 250 | 100 | N10 | 1 mo |
| 06/07 | Ppt | 1,000 | 1,000 | 0 | | 1 mo |
| 05/07 | Slow 30 | 500 | 500 | 500 | | 6-12 mos |
| | Slow 60 | 5,000 | 5,000 | 5,000 | | 2-3 mos |
| | Slow 30-90 | 1,000 | 500 | 500 | | 2-3 mos |
| 03/07 | Ppt | 30,000 | 0 | 0 | | 6-12 mos |
| | Ppt | 0 | 0 | 0 | | 4-5 mos |
| 02/07 | Ppt | 2,500 | 0 | 0 | N30 | 6-12 mos |
| 01/07 | Ppt-Slow 30 | 1,000 | 1,000 | 500 | | 1 mo |
| | Slow 30 | 5,000 | 0 | 0 | | 6-12 mos |
| | Slow 110 | 1,000 | 0 | | | 4-5 mos |
| 11/06 | Ppt | 7,500 | 0 | 0 | N30 | 6-12 mos |
| | Ppt | 2,500 | 0 | 0 | N30 | 6-12 mos |
| | Ppt-Slow 90 | 20,000 | 0 | 0 | N30 | 6-12 mos |
| 10/06 | (047) | 50 | 0 | 0 | N30 | 6-12 mos |
| 03/06 | (048) | 500 | | | | 1 mo |
| | Cash own option. | | | | | |
| 02/06 | Slow 30-60 | 1,000 | 0 | 0 | Regular terms | 6-12 mos |
| 01/06 | Slow 15 | 500 | 0 | 0 | | 6-12 mos |

Payment experiences reflect how bills are met in relation to the terms granted. In some instances payment beyond terms can be the result of disputes over merchandise, skipped invoices etc.

Each experience shown is from a separate supplier. Updated trade experiences replace those previously reported.

| **NEW!** | **Have MOTOROLA, INC.'s payment habits changed over time?** | ⓘ |
| --- | --- | --- |
| A Payment Trends Profile will show you - View Now | | |

## BANKING & FINANCE

D&B has researched this company and found no information available at this time.

## PUBLIC FILINGS

The following Public Filing data is for information purposes only and is not the official record. Certified copies can only be obtained from the official source.

**UCC FILINGS**

| | |
|---|---|
| **Collateral:** | Equipment |
| **Type:** | Original |
| **Sec. party:** | MCGRATH RENTCORP, DFW AIRPORT, TX TRS-RENTEL CO, DFW AIRPORT, TX |
| **Debtor:** | MOTOROLA INC |
| **Filing number:** | 009326928 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, SPRINGFIELD, IL |
| | |
| **Date filed:** | 12/06/2004 |
| **Latest Info Received:** | 01/19/2005 |

| | |
|---|---|
| **Collateral:** | Leased Equipment |
| **Type:** | Original |
| **Sec. party:** | CIT TECHNOLOGIES CORPORATION, DFW AIRPORT, TX |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 3331588 7 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |
| | |
| **Date filed:** | 12/16/2003 |
| **Latest Info Received:** | 01/09/2004 |

| | |
|---|---|
| **Collateral:** | Equipment |
| **Type:** | Amendment |
| **Sec. party:** | CIT TECHNOLOGIES CORPORATION, DFW AIRPORT, TX |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 4030534 4 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |
| | |
| **Date filed:** | 01/14/2004 |
| **Latest Info Received:** | 02/27/2004 |
| **Original UCC filed date:** | 12/16/2003 |
| **Original filing no.:** | 3331588 7 |

| | |
|---|---|
| **Collateral:** | Leased Computer equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | CIT CREDIT FINANCE CORP., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 6355000 1 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |
| | |
| **Date filed:** | 09/25/2006 |
| **Latest Info Received:** | 11/14/2006 |

| | |
|---|---|
| **Collateral:** | Leased Computer equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | CIT CREDIT FINANCE CORP., LIVINGSTON, NJ AGILENT FINANCIAL SERVICES, INC., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 5358230 2 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |
| | |
| **Date filed:** | 11/10/2005 |
| **Latest Info Received:** | 12/22/2005 |

| | |
|---|---|
| **Collateral:** | Leased Computer equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | AGILENT FINANCIAL SERVICES, INC., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 5170836 2 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |

| | |
|---|---|
| **Date filed:** | 05/25/2005 |
| **Latest Info Received:** | 02/06/2006 |

| | |
|---|---|
| **Collateral:** | Leased Computer equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | AGILENT FINANCIAL SERVICES, INC., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 5170806 5 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |

| | |
|---|---|
| **Date filed:** | 05/25/2005 |
| **Latest Info Received:** | 02/06/2006 |

| | |
|---|---|
| **Collateral:** | Leased Computer equipment and proceeds - Leased Equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | AGILENT FINANCIAL SERVICES, INC., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 4322964 0 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |

| | |
|---|---|
| **Date filed:** | 11/10/2004 |
| **Latest Info Received:** | 12/22/2004 |

| | |
|---|---|
| **Collateral:** | Leased Equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | AGILENT FINANCIAL SERVICES, INC., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 4284023 1 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |

| | |
|---|---|
| **Date filed:** | 10/04/2004 |
| **Latest Info Received:** | 10/27/2004 |

| | |
|---|---|
| **Collateral:** | Leased Equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | AGILENT FINANCIAL SERVICES, INC., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 4284002 5 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |

| | |
|---|---|
| **Date filed:** | 10/04/2004 |
| **Latest Info Received:** | 10/27/2004 |

| | |
|---|---|
| **Collateral:** | Leased Equipment and proceeds |
| **Type:** | Original |
| **Sec. party:** | AGILENT FINANCIAL SERVICES, INC., LIVINGSTON, NJ |
| **Debtor:** | MOTOROLA, INC. |
| **Filing number:** | 4169775 6 |
| **Filed with:** | SECRETARY OF STATE/UCC DIVISION, DOVER, DE |

| | |
|---|---|
| **Date filed:** | 06/04/2004 |
| **Latest Info Received:** | 07/20/2004 |

There are additional UCC's in D&B's file on this company available by contacting 1-800-234-3867.

The public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed.

Copyright 2008 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 061016411L