## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MOTOROLA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C. A. No. 08-104-SLR |
| RESEARCH IN MOTION LIMITED | ) | |
| AND RESEARCH IN MOTION | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF NORMAN H. BEAMER

I, Norman H. Beamer, declare as follows:

1. I am a member of the firm of Ropes & Gray LLP, 525 University Avenue, Palo Alto, California, counsel to Plaintiff Motorola, Inc. in the above captioned action. I make this declaration in support of Plaintiff Motorola, Inc.'s Answering Brief Conditionally Opposing Defendant Research In Motion's Motion To Transfer Venue Pursuant To 28 U.S.C. § 1404(a). Unless otherwise stated, I make this declaration based on personal knowledge.

2. In addition to the above captioned action, the parties are involved in two other pending actions: *Motorola, Inc. v. Research In Motion Limited and Research In Motion Corporation*, 2:08-69 (E.D. Texas, Marshall Division) (Ward, J.) ("the Marshall action"); and *Research In Motion Limited and Research In Motion Corporation v. Motorola, Inc.*, 3:08-CV-0284-G (N.D. Texas, Dallas Division) (Fish, J.) ("the Dallas action"). (Collectively, I refer to Research In Motion Limited and Research In Motion Corporation in this declaration as "RIM").

3. Based on the Declarations of June M. Sutton and Monté T. Squire, Esq.and accompanying exhibits, submitted herewith, Motorola filed the above captioned action effective as of one minute past midnight EST on February 16, 2008.

4. Motorola filed the Marshall action on February 16, 2008. As amended, the complaint in the Marshall action asserts that eleven Motorola patents are infringed by at least 23 of RIM's "BlackBerry" products. RIM has counterclaimed for declaratory judgment of invalidity and noninfringement as to all eleven patents.

5. Motorola is currently a party in another suit in the Eastern District of Texas involving some of the same Motorola patents in suit in the above captioned action (*Motorola v. Vtech Communications, Inc.*, 5:07-CV-00171).

6. According to Exhibit C to the Declaration Of Brian Rivers, Esq. filed by RIM in the above captioned action (D.I. 16-2), RIM filed its Dallas action at least one hour after Motorola filed the above captioned action.

7. RIM's complaint brought in the Dallas action alleges infringement of the same nine RIM patents that are in suit in the above captioned action. The RIM patent infringement claims that RIM has brought in the Dallas action are the same as the counterclaims that RIM has brought in the above captioned action.

8. RIM's complaint brought in the Dallas action seeks declaratory judgment that the same eleven Motorola patents that Motorola is asserting in the Marshall action are invalid or not infringed. These claims are the same as the counterclaims that RIM brought in Marshall.

9. RIM's complaint brought in the Dallas action asserts an antitrust claim and related contract claims, alleging that Motorola demanded an exorbitant royalty rate for 76 of Motorola's "essential" patents, after allegedly falsely promising to license those patents on reasonable terms. In this context, "essential" patents are patents that have been designated as "essential" to various telecommunications standards. The 76 "essential" patents listed in RIM's Dallas complaint do not include any of the eleven "non-essential" Motorola patents that are the subject of RIM's

declaratory judgment claims in the Dallas action, or that Motorola is asserting in the Marshall action. Motorola has not asserted the 76 "essential" patents listed in RIM's Dallas complaint in any forum.

10. Attached hereto as Exhibit A is a copy of selected pages from Motorola's Form 10-K Annual Report for the fiscal year ended December 31, 2007, filed with the Securities and Exchange Commission on February 28, 2008.

11. According to publicly available assignment data, two of the RIM patents in suit in the above captioned action, U.S. Patents Nos. 5,699,485 and 5,664,055, were purchased by RIM shortly before RIM filed this lawsuit. The named inventors of those patents are listed on the face of the patents as residing in New Jersey at the time of the application. Based on the initial assignment records, the named inventors apparently worked for AT&T Bell Laboratories in New Jersey, and AT&T was the original owner of these patents. Current public records indicate that the named inventors still live in New Jersey, within 100 miles of Wilmington, Delaware.

12. The remaining seven RIM patents in suit name inventors with residences in or near Waterloo, Ontario, Canada, which according to Google Maps is 524 miles from Wilmington, Delaware and 1,373 miles from Dallas, Texas. Those seven patents were originally assigned to Research In Motion Limited.

13. Based on PACER searches performed under my direction and supervision, I am informed and believe that RIM asserted U.S. Patent No. 6,452,588, which is in suit in the above captioned action, in *Research In Motion v. Handspring, Inc.*, Case No. 02-CY-1480 (D. Del.). In addition, RIM asserted U.S. Patent No. 6,396,482, which is a parent of U.S. Patent No. 6,489,950, which is in suit in the above captioned action, in *Research In Motion v. Good Technology, Inc.*, Case No. 02-CV-556 (D. Del.).

14. Attached hereto as Exhibit B is a copy of selected pages from RIM's Form 40-F Annual Report for the fiscal year ended March 1, 2008, filed with the Securities and Exchange Commission on April 17, 2008.

15. According to Exhibit B, page 28, the total square footage of RIM's facilities worldwide is approximately 1.6 million. The square footage of RIM's space in its leased Irving, Texas facility is 109,000, which is less than 7% of RIM's total facility square footage. According to RIM's web site, http://www.rim.com/careers/search/americas/index.shtml, a copy of which is attached hereto as Exhibit L, RIM products are manufactured and assembled in Waterloo, Ontario, Canada, and RIM has additional facilities in Canada (Mississauga, Ottawa, Halifax), the United States (California, Georgia, Washington, Texas and Illinois) and in Mexico, the Caribbean and Europe

16. Attached hereto as Exhibit C is a copy of a May 30, 2006 Declaration of Brian Rivers In Support Of Rim's Motion To Transfer, filed in *Visto Corporation v. Research In Motion Limited, et al.,* 2:06 - CV – 181 (E.D. Texas). Mr. Rivers states at Paragraph 9 that he had "recently moved to Waterloo, Canada" from Texas.

17. In Motorola's complaint against RIM in the Marshall action, the eleven Motorola patents are asserted against 23 models of RIM products, and associated software. Based on RIM's complaint in the Dallas action, the nine RIM patents in suit are apparently asserted against at least five specific models of Motorola products and three broad categories of Motorola products, *i.e.,* "wireless handsets," "base stations" and "other wireless communication, enterprise, and network related equipment and services."

18. Attached hereto as Exhibit D is a copy of Defendant Motorola, Inc.'s Brief In Support Of Its Motion To Dismiss Or Stay Plaintiffs' Antitrust And Contract Claims; And To

Dismiss, Stay Or Transfer Plaintiffs' Declaratory Judgment Patent Claims, filed April 10, 2008 in the Dallas action.

19. Attached hereto as Exhibit E is a copy of the Declaration Of Brian Blasius, which was submitted in support of Motorola's Motion To Dismiss Or Stay Plaintiffs' Antitrust And Contract Claims; And To Dismiss, Stay Or Transfer Plaintiffs' Declaratory Judgment Patent Claims in the Dallas action.

20. Attached hereto as Exhibit F is a copy of the Declaration of John M. Pickett, which was submitted in support of Motorola's Motion To Dismiss Or Stay Plaintiffs' Antitrust And Contract Claims; And To Dismiss, Stay Or Transfer Plaintiffs' Declaratory Judgment Patent Claims in the Dallas action.

21. Attached hereto as Exhibit G is a copy of *Boston Scientific Corp. v. Johnson & Johnson Inc.*, Civ. No. 07-333 (D. Del. Jan. 24, 2008) (Robinson, J.).

22. Attached hereto as Exhibit H is a copy of *Turn of the Century Solution, LP v. Int'l Rectifier Corp.*, No. 05-816 (D. Del. June 15, 2006) (Robinson, J.).

23. Attached hereto as Exhibit I is a copy of *Inpro II Licensing, S.A.R.L. v. Research In Motion Ltd.*, No. 03-1047 (D. Del. March 5, 2004).

24. Attached hereto as Exhibit J is a copy of *Siemens Med. Sys., Inc. v. Fonar Corp.*, Civ. No. 95-261 (D. Del. Nov. 13, 1995) (Robinson, J.).

25. Attached hereto as Exhibit K is a copy of *Adams v. Crowley*, No. 04-1565 6 (D. Del. May 25, 2005) (Robinson, J.).

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Palo Alto, California on April 30, 2008.

Norman H. Beamer

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2008, I caused to be electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Patricia Smink Rogowski, Esquire
>Connolly Bove Lodge & Hutz LLP
>The Nemours Building
>1007 North Orange Street
>P. O. Box 2207
>Wilmington, DE 19899

I further certify that on April 30, 2008, true and correct copies of the foregoing document will be served by e-mail and hand delivery on the above listed counsel and on the following non-registered participants as indicated below:

### BY E-MAIL

William F. Lee, Esquire [william.lee@wilmerhale.com]
Michelle D. Miller, Esquire [michelle.miller@wilmerhale.com]
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

William J. Bohler [william.bohler@wilmerhale.com]
Wilmer Cutler Pickering Hale and Dorr LLP
1117 California Avenue
Palo Alto, CA 94304

>YOUNG CONAWAY STARGATT &
>TAYLOR, LLP
>
>_____
>Josy W. Ingersoll (No. 1088)
>Elena C. Norman (No. 4780)
>Monté T. Squire (No. 4764)
>The Brandywine Building
>1000 West Street, 17th Floor
>Wilmington, DE 19801
>Telephone: (302) 571-6600
>msquire@ycst.com

# EXHIBIT A

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2007
or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934**

For the transition period from          to
Commission File number 1-7221

# MOTOROLA, INC.
### (Exact name of registrant as specified in its charter)

**DELAWARE**                                                    36-1115800
**(State of Incorporation)**                        **(I.R.S. Employer Identification No.)**
**1303 East Algonquin Road, Schaumburg, Illinois 60196**
**(Address of principal executive offices)**
**(847) 576-5000**
**(Registrant's telephone number)**

### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $3 Par Value per Share | New York Stock Exchange |
| | Chicago Stock Exchange |

### Securities registered pursuant to Section 12(g) of the Act:
### None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☑    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Yes ☐    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐    No ☑

The aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2007 (the last business day of the Registrant's most recently completed second quarter) was approximately $40.6 billion (based on closing sale price of $17.70 per share as reported for the New York Stock Exchange-Composite Transactions).

The number of shares of the registrant's Common Stock, $3 par value per share, outstanding as of January 31, 2008 was 2,254,786,558.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement to be delivered to stockholders in connection with its Annual Meeting of Stockholders, which Proxy Statement will be filed no later than April 29, 2008, are incorporated by reference into Part III.

# Table of Contents

|  |  | Page |
|---|---|---|
|  |  | 1 |
| PART I |  | 1 |
| Item 1. | Business | 1 |
| *General* |  | 1 |
| *Business Segments* |  | 1 |
|  | Mobile Devices Segment | 5 |
|  | Home and Networks Mobility Segment | 10 |
|  | Enterprise Mobility Solutions Segment | 15 |
| *Other Information* |  | 15 |
|  | 2007 Change in Organizational Structure | 15 |
|  | Financial Information About Segments | 15 |
|  | Customers | 16 |
|  | Backlog | 16 |
|  | Research and Development | 16 |
|  | Patents and Trademarks | 16 |
|  | Environmental Quality | 16 |
|  | Employees | 16 |
|  | Financial Information About Foreign and Domestic Operations | 16 |
| *Available Information* |  | 18 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 33 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 33 |
| Executive Officers of the Registrant |  | 34 |
| PART II |  | 34 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 36 |
| Item 6. | Selected Financial Data | 37 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 71 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 75 |
| Item 8. | Financial Statements and Supplementary Data | 122 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 122 |
| Item 9A. | Controls and Procedures | 124 |
| Item 9B. | Other Information | 124 |
| PART III |  | 124 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 124 |
| Item 11. | Executive Compensation | 124 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 124 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 124 |
| Item 14. | Principal Accounting Fees and Services | 124 |
| PART IV |  | 125 |
| Item 15. | Exhibits and Financial Statement Schedules | 125 |
| 15 (a) (1) | Financial Statements | 125 |
| 15 (a) (2) | Financial Statement Schedule and Independent Auditors' Report | 125 |
| 15 (a) (3) | Exhibits | 125 |
| Motorola Omnibus Incentive Plan of 2006 |  |  |
| Motorola, Inc. Award Document for the Motorola Omnibus Incentive Plan of 2006 |  |  |
| Form of Motorola Stock Option Consideration Agreement |  |  |
| Form of Motorola, Inc. Restricted Stock Unit Award Agreement |  |  |
| Form of Motorola, Inc. Award Document for the Motorola Omnibus Incentive Plan of 2006 |  |  |
| Form of Motorola, Inc. Award Document for the Motorola Omnibus Incentive Plan of 2006 |  |  |
| Form of Motorola Stock Option Consideration Agreement |  |  |
| Form of Motorola, Inc. Restricted Stock Unit Award Agreement |  |  |
| Form of Motorola, Inc. Restricted Stock Unit Award Agreement |  |  |
| Motorola 2006 Incentive Plan |  |  |
| Motorola Long-Range Incentive Plan |  |  |
| Motorola Long-Range Incentive Plan |  |  |
| Description of Certain Compensatory Arrangements |  |  |
| Description of Certain Compensatory Arrangements |  |  |

Chairman/CEO Retirement Term Sheet
Amended and Restated Employment Agreement
Agreement with Ruth Fattori
Statement regarding Computation of Ratio of Earnings to Fixed Charges
Subsidiaries of Motorola
Certification of Gregory Q. Brown
Certification of Thomas J. Meredith
Section 906 Certification of Gregory Q. Brown
Section 906 Certification of Thomas J. Meredith

1

# PART I

*Throughout this 10-K report we "incorporate by reference" certain information in parts of other documents filed with the Securities and Exchange Commission (the "SEC"). The SEC allows us to disclose important information by referring to it in that manner. Please refer to such information.*

*We are making forward-looking statements in this report. In "Item 1A: Risk Factors" we discuss some of the risk factors that could cause actual results to differ materially from those stated in the forward-looking statements.*

*"Motorola" (which may be referred to as the "Company," "we," "us," or "our") means Motorola, Inc. or Motorola, Inc. and its subsidiaries, or one of our segments, as the context requires. "Motorola" is a registered trademark of Motorola, Inc.*

## Item 1: Business

*General*

We provide technologies, products and services that make a broad range of mobile experiences possible. Our portfolio includes wireless handsets, wireless accessories, digital entertainment devices, wireless access systems, voice and data communications systems, and enterprise mobility products. With the rapid convergence of fixed and mobile broadband Internet and the growing demand for next-generation mobile communications solutions by people, businesses and governments, we are focused on high-quality, innovative products that meet the expanding needs of our customers around the world.

Motorola is a market leader in the following businesses:

- The **Mobile Devices** business designs, manufactures, sells and services wireless handsets with integrated software and accessory products, and licenses intellectual property.

- The **Home and Networks Mobility** business designs, manufactures, sells, installs and services: (i) digital video, Internet Protocol ("IP") video and broadcast network interactive set-tops ("digital entertainment devices"), end-to-end video delivery solutions, broadband access infrastructure systems, and associated data and voice customer premise equipment ("broadband gateways") to cable television and telecom service providers, and (ii) wireless access systems ("wireless networks"), including cellular infrastructure systems and wireless broadband systems, to wireless service providers.

- The **Enterprise Mobility Solutions** business designs, manufactures, sells, installs and services analog and digital two-way radio, voice and data communications products and systems for private networks, wireless broadband systems and end-to-end enterprise mobility solutions to a wide range of enterprise markets, including government and public safety agencies, as well as retail, utility, transportation, manufacturing, healthcare and other commercial customers.

Motorola is a corporation organized under the laws of the State of Delaware as the successor to an Illinois corporation organized in 1928. Motorola's principal executive offices are located at 1303 East Algonquin Road, Schaumburg, Illinois 60196.

*Business Segments*

Motorola reports financial results for the following three operating business segments:

*Mobile Devices Segment*

The Mobile Devices segment ("Mobile Devices" or the "segment") designs, manufactures, sells and services wireless handsets with integrated software and accessory products, and licenses intellectual property. In 2007, the segment's net sales represented 52% of the Company's consolidated net sales.

Table of Contents

2

### Principal Products and Services

Our wireless subscriber products include wireless handsets with related software and accessory products. We also sell and license our intellectual property. We market our products worldwide to carriers and consumers through direct sales, distributors, dealers, retailers and, in certain markets, through licensees.

### Our Industry

The overall wireless handset industry remains strong. Total industry shipments of wireless handsets (also referred to as industry "sell-in") increased to approximately 1.14 billion units in 2007, an increase of approximately 16% compared to 2006. Demand from new subscribers was strong in emerging markets, led by India and China. Replacement sales in highly-penetrated markets were also strong due to generally favorable economic conditions, as well as compelling new handset designs, attractive handset features and the increased roll-out of high-speed data networks, all creating greater demand.

Industry forecasters predict that the wireless handset industry will continue to grow over the next several years, although the annual rate of growth is expected to be in the 10% range as opposed to the approximately 20% average annual growth the industry experienced from 2003 through 2007. Continued growth is expected to be driven primarily by demand from new subscribers in emerging markets and replacement sales from the current subscriber base.

### Our Strategy

Motorola seeks to be a leading supplier of wireless handsets and mobile experiences to customers globally. To accomplish this objective, our strategy is focused on improving our product portfolio to meet consumer demands and improving our financial performance. This includes transitioning to silicon and software platforms that enable us to lower costs, get to market faster and offer richer consumer experiences.

We have structured our mobile device product portfolio and development into four primary product segments: Mass Market, Feature, Multimedia and Productivity. Our strategy is to offer a broad array of products in each of these product segments.

The Mass Market product segment focuses on voice-centric devices with targeted features. While this segment is maturing in North America, Europe and parts of Asia, it is growing significantly in developing regions. To address this market, we are expanding our handset offerings around our new W Series of handsets. These handsets satisfy everyday communications needs, include targeted features and are offered at affordable price points across all regions and in both CDMA and GSM technologies. The key to our success in the Mass Market product segment is offering products at competitive price points.

The Feature product segment focuses on delivering iconic, fashionable phones with high-end features. During 2007, we refreshed our flagship RAZR franchise with the RAZR2, the luxurious RAZR2 V8, and a RAZR classic with video playback and a digital audio processor music player. We are focused on building an enhanced portfolio of Feature phone devices that deliver compelling 2G and 3G mobile experiences.

The Multimedia product segment is focused on the convergence of voice capabilities with multimedia experiences on a single mobile device. In the recent past, many of our customers have purchased and used different devices from multiple consumer electronics segments to meet their lifestyle needs. In addition to mobile phones, they use devices such as cameras, mobile music and video players, mobile gaming devices and portable navigation devices. Increasingly, these experiences will be delivered through compelling applications and services on a single device. We are developing handsets designed to strengthen our Multimedia product offerings, such as the MOTOROKR Z6 and the S9 headset, a 2008 mobile music offering. We are particularly focused on developing a broader offering of 3G products for the Multimedia product segment.

The Productivity product segment is growing as workforces around the world continue to demand increasingly robust wireless handsets and consumers want their email "on the go." In 2007, we expanded our Q franchise across all regions and major technologies with the launch of the GSM Q8 and UMTS Q9h. We are planning to capitalize on new opportunities in this growing product segment.

Throughout each of these product segments, we have increased our focus in our accessories portfolio to deliver complete mobile experiences and to complement the features and functionalities of the wireless handsets.

Table of Contents

3

Additionally, we are expanding our accessory compatibility across all brands of wireless handsets and Bluetooth-enabled devices.

We are investing in next-generation technologies, such as WiMAX, HSDPA and Long Term Evolution ("LTE"). We believe a strong intellectual property portfolio is critical to our long-term success and to ensuring that we maintain a favorable strategic position in these technologies. We will continue to identify opportunities to generate licensing revenue from these investments. We also believe that innovation is critical to offering devices that demonstrate unique experiences and value propositions for consumers. As an example, in 2007 we began shipping our flagship RAZR2 devices with Crystal Talk, a proprietary technology that automatically adjusts audio quality based on ambient noise conditions to provide the optimal conversational experience. In application services, we continue to work with third parties to improve upon and develop our services and applications, which will deliver rich experiences to the customer. Motorola is committed to investing in evolving technologies to ensure that we continue to deliver enhanced and differentiated wireless handset experiences to consumers.

In January 2008, we announced that we are evaluating alternatives for the structural and strategic realignment of our Mobile Devices business to better equip it to recapture global market leadership and to enhance shareholder value. This may include the separation of the Mobile Devices business from Motorola's other businesses to permit each to grow and better serve their customers.

### Customers

We continue to focus on strengthening our relationships with our customers. The segment has several large customers worldwide, the loss of one or more of which could have a material adverse effect on the segment's business. The largest of the segment's end customers (including sales through distributors) are Sprint Nextel, AT&T, Verizon, China Mobile and America Movil. In 2007, aggregate net sales to these five customers represented approximately 42% of the segment's net sales.

In addition to selling directly to carriers and operators, our Mobile Devices business also sells products through a variety of third-party distributors and retailers, which account for approximately 33% of the segment's net sales. The largest of these distributors is Brightstar Corporation.

The U.S. market continued to be the segment's largest individual market, accounting for approximately 46% of the segment's net sales in 2007, compared to approximately 35% of the segment's net sales in 2006. Approximately 54% of the segment's net sales in 2007 were to markets outside the U.S., the largest of which were Brazil, China and Mexico. Compared to 2006, the segment experienced sales declines in each of its four major sales regions: Asia, the Europe, Middle East and Africa region ("EMEA"), North America and Latin America.

### Competition

The segment believes its overall market share for the full year 2007 was approximately 14%, making it the third-largest worldwide supplier of wireless handsets. The segment experiences intense competition in worldwide markets from numerous global competitors, including some of the world's largest companies, such as Nokia, Samsung, Sony-Ericsson and LG. In 2007, consolidation in the wireless handset industry slowed compared to previous years, and the five largest vendors together held an aggregate market share of approximately 83%, compared to 84% at the end of 2006. During 2007, regulatory changes in China precipitated a substantial increase in the number of manufacturers producing handsets in that market. The increased competition, primarily in the very low tier of the Mass Market product segment, has impacted shipment volumes in China for global vendors, as local vendors gained market share in the fourth quarter of 2007.

Major competitors in the industry are moving to applications and services as key sources of value and are increasing their focus and investments in these areas. In response, Motorola has created a global applications and services team within the Mobile Devices segment to focus on building the applications and services business.

General competitive factors in the market for the segment's products include: design; time-to-market; brand awareness; technology offered; price; product proposition, performance, quality, delivery and warranty; the quality and availability of service; and relationships with key customers.

Table of Contents

4

### Payment Terms

The segment's customers and distributors buy from us regularly with payment terms that are competitive with current industry practices. These terms vary globally and generally range from cash-with-order to 60 days. Extended payment terms beyond 60 days are provided to customers on a limited basis. A customer's outstanding credit at any point in time is limited to a predetermined amount as established by the Company.

### Regulatory Matters

Radio frequencies are required to provide wireless services. The allocation of frequencies is regulated in the U.S. and other countries, and limited spectrum space is allocated to wireless services. The growth of the wireless and personal communications industry may be affected if adequate frequencies are not allocated or, alternatively, if new technologies are not developed to better utilize the frequencies currently allocated for such use. Industry growth may also be affected by the cost of the new licenses required to use frequencies and any related frequency relocation costs.

The U.S. leads the world in spectrum deregulation, allowing new wireless communications technologies to be developed and offered for sale. Examples include wireless local area network systems, such as WiFi, and wide area network systems, such as WiMAX and LTE. Other countries have also deregulated portions of their available spectrum to allow deployment of these and other new technologies, which can be offered without spectrum license costs. Deregulation may introduce new competition and new opportunities for Motorola and our customers. In addition, Mobile WiMAX was recently approved as a global IMT (International Mobile Telecommunications) standard. This action lays the foundation to further expand mobile WiMAX in key bands, making additional spectrum available globally.

In January 2008, the Federal Communications Commission ("FCC") began its auction of 700 MHz band spectrum licenses in the United States. This spectrum can carry large amounts of data across long distances and penetrate walls easier than higher frequencies, enhancing in-building coverage. The open-access conditions are intended to help foster innovation in handsets and applications, however the actual impact of the new licenses is unclear. The open access provision applies to approximately one-third of the U.S. spectrum being auctioned and prevents the licensee from blocking devices or applications that are compatible with the network.

### Backlog

The segment's backlog was $647 million at December 31, 2007, compared to $1.4 billion at December 31, 2006. This decrease in backlog is primarily due to a decline in customer demand driven by gaps in the segment's product portfolio. The 2007 backlog is believed to be generally firm and 100% of that amount is expected to be recognized as revenue in 2008. The forward-looking estimate of the firmness of such orders is subject to future events that may cause the amount recognized to change.

### Intellectual Property Matters

Patent protection is extremely important to the segment's operations. The segment has an extensive portfolio of patents relating to its products, technologies and manufacturing processes. The segment licenses certain of its patents to third parties and generates revenue from these licenses. Motorola is also licensed to use certain patents owned by others. Royalty and licensing fees vary from year to year and are subject to the terms of the agreements and sales volumes of the products subject to licenses. The protection of these licenses is also important to the segment's operations. Reference is made to the material under the heading "Other Information" for additional information relating to patents and trademarks and research and development activities with respect to this segment.

### Inventory, Raw Materials, Right of Return and Seasonality

The segment's practice is to carry reasonable amounts of inventory in manufacturing and distribution centers in order to meet customer delivery requirements in a manner consistent with industry standards. At the end of 2007, the segment had a lower inventory balance than at the end of 2006. The decrease reflects the significant decline in sales volumes during 2007, as well as an ongoing emphasis on managing inventory levels.

Table of Contents

5

Availability of materials and components required by the segment is relatively dependable, but fluctuations in supply and market demand could cause selective shortages and affect results. We currently source certain materials and components from single vendors. Any material disruption from a single-source vendor may have a material adverse impact on our results of operations.

Energy necessary for the segment's manufacturing facilities consists primarily of electricity and natural gas, which are currently in generally adequate supply for the segment's operations. In addition, the cost to operate our facilities and freight costs are dependent on world oil prices, which increased significantly during 2007 and increased our manufacturing and shipping costs. Labor is generally available in reasonable proximity to the segment's manufacturing facilities. However, difficulties in obtaining any of the aforementioned items or a significant cost increase could affect the segment's results.

The segment permits returns under limited circumstances to remain competitive with current industry practices.

The segment typically experiences higher sales in the fourth calendar quarter and lower sales in the first calendar quarter of each year due to seasonal trends in the wireless handset industry.

*Our Facilities/Manufacturing*

Our headquarters is located in Libertyville, Illinois. Our other major facilities are located in Plantation, Florida; Flensburg, Germany; Singapore; Beijing, Hangzhou and Tianjin, China; Jaguariuna, Brazil; Basingstoke, England; and Chennai, India. We have recently announced our intent to exit our Flensburg, Germany facility.

We also use several electronics manufacturing suppliers ("EMS") and original design manufacturers ("ODM") to enhance our ability to lower our costs and/or deliver products that meet consumer demands in the rapidly-changing technological environment. A portion of our handsets are manufactured either completely or substantially by non-affiliated EMS and ODM manufacturers and the percentage of total manufactured unit volume with these manufacturers increased moderately from 2006 to 2007.

In 2007, our handsets were primarily manufactured in Asia and we expect this to continue in 2008. Our largest manufacturing facilities are located in China, Singapore and Brazil. Each of these facilities serves multiple countries and regions of the world.

### Home and Networks Mobility Segment

The Home and Networks Mobility segment ("Home and Networks Mobility" or the "segment") designs, manufactures, sells, installs and services: (i) digital video, Internet Protocol ("IP") video and broadcast network interactive set-tops ("digital entertainment devices"), end-to-end video delivery solutions, broadband access infrastructure systems, and associated data and voice customer premise equipment ("broadband gateways") to cable television and telecom service providers (collectively, referred to as the "home business"), and (ii) wireless access systems ("wireless networks"), including cellular infrastructure systems and wireless broadband systems, to wireless service providers. In 2007, the segment's net sales represented 27% of the Company's consolidated net sales.

*Principal Products and Services*

In the home business, the segment is a leading provider of end-to-end networks used for the delivery of video, data and voice services over hybrid fiber coaxial ("HFC") networks, digital subscriber line ("DSL") and passive optical networks ("PON"). Our portfolio includes: MPEG video encoding equipment for standard-definition and high-definition television ("HDTV" or "HD"); video processing and multiplexing systems; and video-on-demand, switched digital video and conditional access solutions used by network operators and programmers to deliver video programming. We provide a broad array of digital entertainment devices supporting analog, digital and IP video delivery including HD and digital video recording ("DVR") (together, "HD/DVR") applications. We support the delivery of high-speed data and voice services with head-end and central office equipment, along with data and voice modems and gateways for HFC and DSL networks and optical line terminals for PON networks.

In the wireless networks business, the segment provides end-to-end cellular networks, including radio base stations, base station controllers, associated software and services, application platforms and third-party switching for CDMA, GSM, iDEN® and UMTS technologies. The segment also offers a portfolio of WiMAX products to

6

create mobile IP broadband access. WiMAX has the potential to make mobile bandwidth more affordable and accessible for mainstream consumer adoption.

Our products are marketed primarily to cable television operators, television programmers, telecom operators, wireless service providers and other communications providers worldwide and are sold primarily by our skilled sales personnel.

*Our Industry*

The home market is evolving rapidly as cable and telecom network operators expand their video, data and voice services (commonly known as the "triple play") to grow their subscriber base. The competition between cable and telecom service providers is increasing. Telecom operators are expanding their broadband networks and beginning to offer advanced video and data services using IPTV and PON technologies. Cable operators are responding by expanding their investment in HD programming, bundling voice-over-IP services, expanding their broadband data service through Data Over Cable Service Interface Specifications ("DOCSIS") 3.0 channel bonding, and maximizing utilization of network bandwidth using switched digital video.

Our home business is subject to regulation by the FCC in the United States and other governmental communication regulators throughout the world. On July 1, 2007, regulations enacted by the FCC became effective, requiring separation of security functionality from cable set-tops. A full two-way security interface continues to be refined. Once developed and implemented, these changes are expected to increase competition and encourage the sale of set-tops and integrated devices, such as televisions and DVRs, that will allow retail customers direct access to programming. Traditionally, service providers have leased digital entertainment devices to their customers.

In the wireless networks market, the majority of installed cellular infrastructure systems are based on CDMA, GSM, UMTS and iDEN technologies. We supply systems based on each of these technologies and are the sole supplier of proprietary iDEN networks. Advanced infrastructure systems based on these technologies include GPRS, CDMA-1X and EDGE. In addition, some segments of the cellular infrastructure industry have installed, or are in the process of migrating to, 3G networks, which are high-capacity radio access wireless networks providing enhanced data services, improved Internet access and increased voice capacity. The primary 3G technologies are W-CDMA (based on either UMTS or Freedom of Mobile Multimedia Access ("FOMA") technologies) and CDMA2000 1xEVDO. We supply 3G systems based on UMTS and CDMA 2000 1xEVDO technologies. An additional 3G technology standard is TD-SCDMA, driven primarily by the Chinese government and local Chinese vendors. We expect 3G licenses to be awarded in China during 2008.

Industry standards bodies are in the process of defining the next generation of wireless broadband systems after 3G. The Institute of Electrical and Electronics Engineers ("IEEE") is currently developing fixed and mobile broadband standards (802.16d and 802.16e) based on orthogonal frequency division multiplexing ("OFDM") technology, which will utilize wider channels and enable triple play services (voice, data, video). Based upon developments in the 802.16e standard, we expect to see the WiMAX market begin to develop in 2008 as several WiMAX networks come on-line and devices utilizing these networks become more widely available. We are an early leader in next-generation wireless broadband products, including WiMAX technology.

The International Telecommunications Union ("ITU") is also adopting next-generation cellular wireless access standards ("4G") for the cellular infrastructure industry, also based on OFDM technology and known commonly as Long Term Evolution ("LTE"). LTE has widespread industry support, not only from current GSM/UMTS operators, but also from CDMA/EV-DO based carriers. Motorola has been chosen as a trial supplier for a joint Verizon/Vodafone LTE trial that is currently underway.

Licensing bodies of governments around the world are making spectrum available for advanced wireless technologies, including 4G, in recognition of growing demand for wireless broadband services. Currently, Motorola estimates that there are over 1,200 licenses available worldwide for advanced wireless technologies, such as 802.16e, with over 800 licenses outside North America.

Demand for our products depends primarily on: (i) capital spending by providers of cellular and broadband services for constructing, rebuilding or upgrading their communications systems, and (ii) the marketing of advanced communications services by those providers. The amount of spending by these providers, and therefore a majority of our sales and profitability, are affected by a variety of factors, including: (i) the continuing trend of consolidation within the cable, wireline and wireless industries, (ii) the financial condition of operators and alternative providers, including their access to financing, (iii) technological developments, (iv) standardization

efforts that impact the deployment of new equipment, (v) new legislation and regulations affecting the equipment sold by the segment, and (vi) general economic conditions.

In 2007, the home business benefited from increased spending by operators on our products due to the increase in video and data subscribers and the deployment of advanced video platforms by cable operators for HD/DVR applications, as well as from spending by telecom operators upgrading their networks and adding video services. We expect this industry to continue to grow in 2008, driven by continued expansion of broadband network capacity and services.

In 2007, the overall market for traditional CDMA wireless networks was relatively flat and the overall markets for GSM and iDEN wireless networks were down. Forecasted industry trends point to a decline in the CDMA, GSM and iDEN markets in 2008 as next-generation 3G and WiMAX wireless networks are deployed. Sales in the overall wireless network market are expected to be flat, or up slightly, in 2008.

*Our Strategy*

The Home and Networks Mobility segment is focused on leadership in next-generation broadband solutions to accelerate the delivery of personal media experiences. Key elements in the segment's strategy include: (i) providing for seamless convergence of services and applications across delivery platforms within the home and across wireline and wireless networks, (ii) innovating and optimizing our end-to-end network portfolio, and (iii) developing new services that leverage our platforms to provide revenue-generating applications and services to our operator customers while enabling consumers to experience media mobility.

In the home business, we are focused on accelerating the rate of digital penetration by broadband operators in North America through an enhanced suite of digital entertainment devices. These products include basic models supporting the industry movement to all-digital delivery and advanced units supporting HD/DVR functions. We are capitalizing on telecom operators decisions to offer IPTV to their subscribers globally, with products that support delivery of video content using both copper-outside-plant and fiber-to-the-premises ("FTTP") networks. During the year, the segment continued to provide video infrastructure, FTTP access network equipment and advanced digital entertainment devices for the launch of Verizon's FiOS service and is supplying IP interactive set-tops to leading telecommunication companies around the world, including AT&T, SingTel and Telia Sonera.

We are also enhancing and expanding our voice and data portfolio to offer end-to-end solutions for fixed-mobile convergence and next-generation converged IP-based voice, data and video delivery. These solutions include: (i) broadband gateways with support for handing off a mobile voice or data call to a carrier's VoIP or data network, and (ii) next-generation infrastructure products enhancing our cable modem termination system ("CMTS") and PON platforms to expand the bandwidth delivered to a home or business. We developed our first Femtocell gateway in 2007, which enables consumers to connect to a wireless service provider's network via a DSL or cable broadband connection. We are also an industry leader in broadband infrastructure solutions, introducing DOCSIS 3.0 channel bonding on our CMTS and cable modems and commercially deploying our Gigabit PON platform.

In order to enhance our strategy, as well as increase our offerings to wireline carriers, we have completed several strategic acquisitions. During 2007, we completed the acquisition of Netopia, Inc., a broadband equipment provider for DSL customers, which allows for phone, TV and fast Internet connections. We also acquired: (i) Tut Systems, Inc., a leading developer of edge routing and video encoders; (ii) Terayon Communication Systems, Inc., a provider of real-time digital video networking applications to cable, satellite and telecommunication service providers worldwide; (iii) Modulus Video, Inc., a provider of MPEG-4 Advanced Coding compression systems designed for delivery of high-value video content in the IP set-top devices for the digital video, broadcast and satellite marketplaces; and (iv) Leapstone Systems, Inc., a provider of intelligent multimedia service delivery and content management solutions to networks operators. These acquisitions enhance our ability to: (i) provide complete solutions to operators as they deploy advanced services, (ii) assist operators in growing their on-demand content offerings, deploying switched digital video technology, and enabling targeted advertising solutions, and (iii) provide end-to-end video solutions to wireline and wireless operators as they add video to their service offerings.

In the wireless networks business, the segment is investing to be a leader in next-generation wireless broadband technologies with its WiMAX solution. Because of its projected quicker time to market, expected lower cost and expected superior performance, the WiMAX wireless broadband technology, which is based on the IEEE standard 802.16e, represents a compelling offering for existing operators and emerging broadband service providers. In 2007, the segment delivered WiMAX network equipment to Wateen Telecom in Pakistan and Sprint Nextel and Clearwire in the United States. In addition, at the end of 2007, the segment was participating in over

Table of Contents

8

40 WiMAX trials globally. The segment is also leveraging its WiMAX investment to develop its LTE solution. Vodafone and Verizon have launched a coordinated LTE trial in 2008. Motorola has been selected as a supplier to support this trial with both infrastructure equipment and handsets.

*Customers*

The largest of the segment's customers are Comcast, Verizon, KDDI (a service provider in Japan), China Mobile and Sprint Nextel. In 2007, aggregate net sales to these five customers represented approximately 43% of the segment's net sales. The loss of any of the segment's large customers could have a material adverse effect on the segment's business. Further, because many of these contracts are long-term, the loss of a major customer could impact revenue and earnings over several quarters. Although sales in North America continued to account for a majority of the segment's sales, 48% of the segment's net sales in 2007 were outside North America. The segment experienced sales increases in all geographic regions in 2007 compared to 2006.

*Competition*

The businesses in which the segment operates are highly competitive. The rapid technological changes occurring in each of the markets in which the segment competes are expected to lead to the entry of many new competitors. Competitive factors in the market for the segment's products and systems include: technology offered; product and system performance; price; features; quality; delivery and availability. We believe that we are competitively positioned because of our solid relationships with major communication system operators worldwide, our technological leadership and our new product development capabilities. Price is a major area of competition and often impacts margins for initial system bids, particularly in emerging markets. Time-to-market has also been an important competitive factor, especially for new systems and technologies.

We compete worldwide in the market for digital entertainment devices for broadband networks. Based on 2007 annual sales, we believe we are the leading provider of digital cable and IPTV set-tops in North America. Our digital cable and IPTV set-tops compete with products from a number of different companies, including: (i) those that develop and sell products that are distributed by direct broadcast satellite service providers through retail channels, (ii) those that develop, manufacture and sell products of their own design, and (iii) those that license technology from us or other competitors. In North America, our largest competitor is Cisco. Other competitors in North America include ARRIS, Ericsson (which entered the market in 2007 via the acquisition of Tandberg) and Harmonic, Inc. Outside of North America, where we have a smaller market position, we compete with many equipment suppliers, including several consumer electronics companies.

The traditional competitive environment in the North American cable market continues to evolve. On July 1, 2007, regulations enacted by the FCC became effective requiring separation of security functionality from set-tops. To meet this requirement, we provide security modules to cable operators for use with both our own and third-party set-tops. A full two-way security interface specification continues to be refined. Once developed and implemented, these changes are expected to increase competition and encourage the sale of set-tops and integrated devices, such as televisions and DVRs, that will allow retail customers direct access to programming. Traditionally, cable service providers have leased the set-top to their customers.

We also compete worldwide in the market for broadband data and voice products. We believe that we are the leading provider of cable modems worldwide, competing with a number of consumer electronic companies and various original design manufacturers worldwide.

In the wireless networks market, there is widespread competition from numerous competitors, ranging from some of the world's largest diversified companies to foreign, state-owned telecommunications companies to many small, specialized firms. Ericsson is the market leader, followed by the Nokia-Siemens joint venture, Alcatel-Lucent, and two vendors with similar market share, Motorola and Nortel. Huawei, Samsung, NEC and ZTE are also significant competitors.

The segment's wireless networks business is confronting several factors that could impact its business, including price competition, continuing consolidation among competitor telecommunications equipment providers, a decline in our proprietary iDEN business, and vendor financing by competitors as customers continue to look to vendors as an additional source of financing. The market for GSM access systems has become particularly price competitive resulting in significant declines in gross margins in the market for those systems during 2006 and 2007.

*Payment Terms*

Payment terms vary worldwide, depending on the arrangement. Contracts for wireless networks typically include implementation milestones, such as delivery, installation and system acceptance, which generally take 30 to 180 days to complete. Invoicing the customer is dependent on the completion of the milestone. Customer payments are generally due 30 to 60 days from the invoice date, and are typically limited to 90 days in regions outside North America.

As required for competitive reasons, extended payment terms are provided to customers from time-to-time on a limited basis. The segment's payment terms are consistent with industry practice as many of our contracts are awarded through a competitive bid process.

*Regulatory Matters*

Many of our products are subject to regulation by the FCC in the United States and other communications regulatory agencies around the world. In addition, our customers, and their networks into which our products are incorporated, are subject to government regulation. Government regulatory policies affecting either the willingness or the ability of cable and telecom operators, wireless operators and wireline operators to offer certain services, or the terms on which these operators offer the services and conduct their business, may have a material adverse affect on the segment's results. Motorola has developed products using trunking and data communications technologies to enhance spectral efficiencies. The growth and results of the wireless communications industry may be affected by regulations relating to the access to allocated spectrum for wireless communications users, especially in urban areas where spectrum is heavily used.

Historically, reception of digital television programming from a cable broadband network has required a set-top with security technology. This security technology has limited the availability of set-tops to those manufactured by a few cable network manufacturers, including Motorola. FCC regulations requiring separation of security functionality from set-tops that are aimed at increasing competition and encouraging the sale of set-tops in the retail market became effective for most customers on July 1, 2007. Traditionally, cable service providers sold or leased their set-top to their customer. As the retail market develops for set-tops and televisions capable of accepting the security modules, sales of our set-tops may be negatively impacted.

The U.S. leads the world in spectrum deregulation, allowing new wireless communications technologies to be developed and offered for sale. Examples include wireless local area network systems, such as WiFi, and wide area network systems, such as WiMAX and LTE. Other countries have also deregulated portions of their available spectrum to allow deployment of these and other technologies which can be offered without spectrum license costs. Deregulation may introduce new competition and new opportunities for Motorola and our customers.

As more fully described under "Enterprise Mobility Solutions — Regulatory Matters" beginning on page 13 of this Form 10-K, as television transmission and reception technology transitions from analog to more efficient digital modes, various countries around the world are examining, and in some cases already pursuing, the redevelopment of portions of the television spectrum. Certain segments of the spectrum that have historically been utilized for analog television have now been designated to support new commercial communications systems and, therefore, are expected to generate new business opportunities for Motorola in wireless and video technologies. In the U.S., the FCC has begun the auction of spectrum in the 700 MHz band that will be reclaimed by the government in February 2009. License for this spectrum may be used for flexible fixed, mobile and broadcast applications. Although the auction winners will determine the best utilization of the acquired spectrum, both LTE and WiMAX are candidates for technology selection. In addition, a contiguous portion of this spectrum has generated interest for mobile TV applications.

*Backlog*

The segment's backlog was $2.6 billion at December 31, 2007, compared to $3.2 billion at December 31, 2006. The 2007 order backlog is believed to be generally firm and 100% of that amount is expected to be recognized as revenue during 2008. The forward-looking estimate of the firmness of such orders is subject to future events that may cause the amount recognized to change.

10

*Intellectual Property Matters*

Patent protection is extremely important to the segment's operations. The segment has an extensive portfolio of patents relating to its products, systems, technologies and manufacturing processes.

The segment seeks to build upon our core enabling technologies, such as digital compression, encryption and conditional access systems, and wireless air-interface technology in order to lead worldwide growth in the market for wired and wireless communications networks. Our policy is to protect our proprietary position by, among other methods, filing U.S. and foreign patent applications to protect technology and improvements that we consider important to the development of our business. We also rely on our proprietary knowledge and ongoing technological innovation to develop and maintain our competitive position, and will periodically seek to include our proprietary technologies in certain patent pools that support the implementation of standards. We are a founder of MPEG LA, the patent licensing authority established to foster broad deployment of MPEG-2 compliant systems. In addition, we have licensed our digital conditional access technology, DigiCipher® II, to other equipment suppliers and have formed joint ventures with Comcast for development and licensing of conditional access technology.

We also enter into other license agreements, both as licensor and licensee, covering certain products and processes with various companies. These license agreements require the payment of certain royalties that are not expected to be material to the segment's financial results. Royalty and licensing fees vary from year to year and are subject to the terms of the agreements and sales volumes of the products subject to licenses. Reference is made to the material under the heading "Other Information" for information relating to patents and trademarks and research and development activities with respect to this segment.

*Inventory, Raw Materials, Right of Return and Seasonality*

The segment's practice is to carry reasonable amounts of inventory in order to meet customer delivery requirements in a manner consistent with industry standards. At the end of 2007, the segment had lower inventory balances than at the end of 2006, primarily due to the completion of significant project milestones and the sale of the embedded communications computing business.

Availability of materials and components required by the segment is relatively dependable, but fluctuations in supply and market demand could cause selective shortages and affect results. We currently source certain materials and components from single vendors. Any material disruption from a single-source vendor may have a material adverse impact on our results of operations.

Natural gas, electricity, and, to a lesser extent, oil are the primary sources of energy required for our manufacturing operations, which are currently in generally adequate supply for the segments operations. In addition, the cost to operate our facilities and freight costs are dependent on world oil prices, which increased significantly during 2007 and increased our manufacturing and shipping costs. Labor is generally available in reasonable proximity to the segment's manufacturing facilities. However, difficulties in obtaining any of the aforementioned items or a significant cost increase could affect the segment's results.

Generally, we do not permit customers to return products, other than under standard warranty provisions. The segment has not experienced seasonal buying patterns for its products.

*Our Facilities/Manufacturing*

Our headquarters is located in Horsham, Pennsylvania. Major design, integration, manufacturing and distribution centers are located in: Arlington Heights and Schaumburg, Illinois; Chandler, Arizona; Fort Worth, Texas; Taipei, Taiwan; Nogales, Mexico; Bangalore, India; Swindon, England; Hangzhou and Tianjin, China; and Penang, Malaysia. In addition to our own manufacturing, we utilize non-affiliated electronics manufacturing suppliers and original design manufacturers, primarily in Asia, in order to enhance our ability to lower costs and/or deliver products that meet consumer demands.

**Enterprise Mobility Solutions Segment**

The Enterprise Mobility Solutions segment ("Enterprise Mobility Solutions" or the "segment") designs, manufactures, sells, installs and services analog and digital two-way radio, voice and data communications products and systems for private networks, wireless broadband systems and end-to-end enterprise mobility

Table of Contents

11

solutions to a wide range of enterprise markets, including government and public safety agencies (which, together with all sales to distributors of two-way communication products, is referred to as the "government and public safety market"), as well as retail, utility, transportation, manufacturing, healthcare and other commercial customers (which, collectively, are referred to as the "commercial enterprise market"). In 2007, the segment's net sales represented 21% of the Company's consolidated net sales.

### Principal Products and Services

In the government and public safety market, we are the leading provider of advanced mission-critical systems worldwide, with more than 65 years of experience in custom, rugged devices; public safety-grade private networks; sophisticated encryption technology; interoperable voice and broadband data; and complex network design, optimization and implementation services. In the commercial enterprise market, we are a global leader in end-to-end enterprise mobility solutions. Our products and solutions capture, move and manage information in real time to assist our customers in making more efficient business decisions. Our products include advanced data capture products, mobile computing platforms and software management tools, wireless infrastructure, and radio frequency identification ("RFID") infrastructure and tags, and are sold as both integrated solutions and individual devices.

The segment's products are sold through Motorola's direct sales force and through independent and authorized distributors, dealers and value-added resellers, original equipment manufacturers, service operators and independent commission sales representatives. Distributors and value-added resellers may provide a service or add components in order to resell our product to end users. The segment's distribution organization provides systems engineering and installation and other technical and systems management services to meet its customers' particular needs. The customer may also choose to install and maintain the equipment with its own employees, or may obtain installation, service and parts from a network of the segment's authorized service stations or from other non-Motorola service stations.

### Our Industry

We compete in the mobile segment of the communications industry, providing wireless equipment infrastructure and services to public safety, government and enterprise customers.

Within our government and public safety market, interoperability and natural disaster preparedness continue to be important issues for our customers worldwide. We expect this industry to grow in the mid-to-high single digit percentage range in 2008, consistent with previous years. Our extensive portfolio of products includes advanced solutions for each of the major standards-based private network technologies, APCO 25 (Association for Public Safety Communications Officials) and TETRA (terrestrial trunked radio), as well as biometrics and wireless broadband applications. We expect sales to continue to grow worldwide as demand for integrated, interoperable public safety communications increases. As new and better spectrum utilization evolves, we expect to see more demand and greater potential for data applications, such as video surveillance and other data-based products, in 2008 and beyond.

Within our commercial enterprise market, we believe there is a significant growth opportunity as the global workforce continues to become more mobile and the industries and markets that purchase our products continue to expand. The markets in which Motorola competes include enterprise wireless infrastructure, mobile computing solutions, bar code scanning, RFID solutions and mobile network management platforms. Organizations looking to increase productivity and derive benefits from mobilizing their applications and workforces are driving growth in this market, which we expect to be in the high single digits in 2008. With the acquisition of Symbol Technologies, Inc. ("Symbol") in January 2007, Motorola is well positioned to compete effectively in the enterprise space.

### Our Strategy

Motorola has been a leading provider of mission-critical systems in the government and public safety market worldwide for more than 65 years. The acquisition of Symbol is the cornerstone of the segment's strategy to expand its leadership into the commercial enterprise market. We are using our combined scale to maintain and expand our leadership position in these markets worldwide by uniting the two companies' adjacent assets, intellectual property, customer and supplier bases, and industry-leading products. The combination of our direct sales and indirect channel partners provides significant distribution advantages in each of the markets we serve.

Table of Contents

12

In the government and public safety market, our objective is to maintain our leading position as the market and technology evolves. Key strategies include: (i) continuing investment in our analog radio portfolio while leading the ongoing migration to digital products, (ii) leveraging our wireless broadband portfolio to drive growth and enter new markets, (iii) managing the anticipated public/private convergence planned for potential 700MHz public safety systems in the U.S., and (iv) continuing to lead the market for APCO 25 and TETRA standards-based voice and data networking systems around the world.

In the commercial enterprise market, our strategy is to deliver products and solutions that are designed to increase cost effectiveness, enhance efficiency and promote faster execution of critical business processes. Key strategies include offering a comprehensive portfolio of products and services to help businesses: (i) streamline their supply chains, (ii) improve customer service in the field, (iii) increase data collection accuracy, and (iv) enhance worker productivity.

*Customers*

Our products and services are sold worldwide to a diverse set of customers, including government and public safety agencies (police, fire, and emergency management services) and militaries, as well as retail, utility, transportation and logistics, manufacturing, wholesale and distribution, healthcare and other commercial customers. Our sales model emphasizes both direct sales by our in-house sales force and indirect sales through our channel of value-added resellers and distributors. We believe this dual sales approach allows us to meet customer needs effectively, build strong, lasting relationships and broaden our penetration across various markets. Our channel sales force allows us to increase revenues by extending the reach of our products and solutions to meet demand in market segments where our direct sales force does not sell. Resellers and distributors each have their own sales organizations, which complement and extend our sales organization. With deep expertise about specific customers' operations, resellers can be very effective in promoting sales of Motorola products. We believe this tiered distribution approach will allow us to achieve our goal of maintaining gross margin over time, as we drive greater scale from shipping more efficiently through better management of our supply chain.

The largest of the segment's customers are the U.S. Government, Scansource, IBM, Ingram Micro and Wal-Mart. In 2007, aggregate net sales to these five customers represented approximately 19% of the segment's net sales. The loss of any of the segment's largest customers may have a material adverse effect on the segment's business. Further, because some of these contracts are long-term, the loss of a major customer could impact revenue and earnings over several quarters. Net sales to customers in North America represented 62% of the segment's net sales in 2007.

A majority of our sales were made directly through our in-house sales force. However, as noted above, a significant portion of our sales are made through resellers and distributors. Our largest resellers and distributors are Scansource, IBM and Ingram Micro, which primarily sell to the commercial enterprise market.

*Competition*

The businesses in which we operate are highly competitive. Continued evolution in the industry, as well as technological migration, is opening up the market to increased competition. Other key competitive factors include: technology offered; price; payment terms; availability of vendor financing; product and system performance; product features, quality, delivery, availability and warranty; the quality and availability of service; company image; relationship with key customers; and time-to-market. We believe we are uniquely positioned in the industry due to our strong customer relationships, our technological leadership and capabilities, and our range of offerings.

The segment experiences widespread competition in the government and public safety market from a growing number of new and existing competitors. In this market, the segment provides communications and information systems compliant with both existing industry digital standards, APCO 25 and TETRA. Major competitors include: M/A-Com, EADS Telecommunications, Kenwood, EF Johnson, Cisco and large system integrators.

Competitors in this segment may also serve as a subcontractor to a large system integrator and are selected based on a number of competitive factors and customer requirements. The segment is managing the impact of system integrators seeking to move further into the public safety area, specifically in the federal government market. Several other competitive factors may have an impact on the business, including: the consolidation among telecommunications equipment providers; evolving developments in the 700 MHz band, and increasing encroachment by broadband and IP solution providers. As demand for fully-integrated voice, data and broadband systems continues, the segment may face additional competition from public telecommunications carriers.

The commercial enterprise market is highly competitive and acutely influenced by advances in technology, industry standards, product improvements, new product introductions and price competition. Many firms are engaged in the manufacturing and marketing of products in bar code reading equipment, wireless networks and mobile computing devices. Numerous companies, including present manufacturers of scanners, lasers, optical instruments, microprocessors, wireless networks, notebook computers, handheld devices and telephonic and other communication devices, have the technical potential to compete with the segment. Competitors such as Intermec, Cisco and Nokia deliver products in certain parts of the commercial enterprise market.

### Payment Terms

Payment terms vary worldwide. Generally, contract payment terms range from 30 to 60 days from the invoice date within North America and are typically limited to 90 days in regions outside North America. A portion of the contracts in the government and public safety market include implementation milestones, such as delivery, installation and system acceptance, which generally take 30 to 180 days to complete. Invoicing the customer is dependent on the completion of the milestone.

We generally do not grant extended payment terms. As required for competitive reasons, we may provide or work with third-party lenders to arrange for long-term financing in connection with equipment purchases. Financing may cover all or a portion of the purchase price.

### Regulatory Matters

The use of wireless voice, data and video communications systems requires radio spectrum, which is regulated by governmental agencies throughout the world. In the U.S., the FCC and the National Telecommunications and Information Administration ("NTIA") regulate spectrum use by non-federal entities and federal entities, respectively. Similarly, countries around the world have one or more regulatory bodies that define and implement the rules for use of the radio spectrum, pursuant to their respective national laws and international coordination under the International Telecommunications Union ("ITU"). Consequently, the business and results of this segment could be affected by the rules and regulations adopted by the FCC, NTIA or regulatory agencies in other countries from time to time. The availability of additional radio spectrum may provide new business opportunities. Regulatory changes in current spectrum bands may also provide opportunities or may require modifications to some of our products so they can continue to be manufactured and marketed.

The segment manufactures and markets products in spectrum bands already made available by regulatory bodies. These include voice and data infrastructure, mobile radios and portable or handheld units. Our products span the public safety, enterprise, commercial and consumer markets and operate both on licensed and unlicensed spectrum. In addition, new spectrum bands and modified regulations provide possible opportunities for new business.

As television transmission and reception technology transitions from analog to more efficient digital modes, various countries around the world are examining, and in some cases already pursuing, the redevelopment of portions of the television spectrum. In the U.S., pursuant to federal legislation, analog television stations must cease operation in the broadcast television spectrum by February 17, 2009. The soon-to-be available spectrum that has historically been utilized for analog television (the so-called "digital dividend" spectrum) can provide new opportunities for Motorola and for our competitors. In parallel, 108 MHz of spectrum historically used for broadcast television is being redeveloped for new uses, including broadband and narrowband wireless communications. Under rules adopted by the FCC, this portion of the spectrum under redevelopment (the 700 MHz band) will support new commercial and public safety communications systems. As of February 2008, approximately 40 public safety customers are already implementing narrowband 700 MHz systems in areas where television incumbency is not an issue. Additional agencies are expected to deploy systems as broadcast television is cleared from the 700 MHz band. The FCC also has made provisions for a 700 MHz band nationwide public safety broadband network to be built over the next 10 years. In addition, segments of the spectrum are being auctioned for commercial use and Motorola could see new business opportunities as auction winners implement broadband systems on that spectrum.

Internationally, the ITU World Radio Conference held in Geneva in November 2007 identified spectrum that could be made available as part of a "digital dividend" as television transitions from analog to digital technology globally. Countries around the world are studying the potential size, timing and use of this potentially available spectrum. In November 2007, the European Commission issued a statement promoting a common European approach to its use. The United Kingdom has already decided to redevelop spectrum as a result of the digital

Table of Contents

14

transition and is making available 112 MHz of spectrum through auctions. Canada recently released a consultation requesting industry input on making additional spectrum available for public safety use in the 700 MHz band. A number of other countries around the world have also indicated their intention to pursue the availability of digital dividend spectrum.

A global focus on enhancing security and "connecting the unconnected" is providing new opportunities for Motorola's wireless broadband and RFID products. In addition to offering products that operate in licensed broadband, Motorola offers wireless broadband solutions that operate in bands where no license is required, providing an economical means for enhancing connectivity in developing countries. Government funding to enhance connectivity in African countries is fueling new opportunities for these products. Likewise, interest in strengthening border security and global tracking and security of products provides greater opportunities for Motorola's RFID products.

In addition, some of our operations use substances regulated under various federal, state, local and international laws governing the environment and worker health and safety, including those governing the discharge of pollutants into the ground, air and water, the management and disposal of hazardous substances and wastes and the cleanup of contaminated sites. Certain of our products are subject to various federal, state, local and international laws governing chemical substances in electronic products.

*Backlog*

The segment's backlog was $2.3 billion as of December 31, 2007, compared to $2.0 billion as of December 31, 2006. The 2007 order backlog is believed to be generally firm and approximately 74% of that amount is expected to be recognized as revenue during 2008. The forward-looking estimate of the firmness of such orders is subject to future events that may cause the amount recognized to change.

*Intellectual Property Matters*

Patent protection is extremely important to the segment's operations. The segment has an extensive U.S. and international portfolio of patents relating to its products, systems, technologies and manufacturing processes, including recent research developments in scanning, information collection, network communications and network management. We have also filed additional patent applications in the U.S. Patent and Trademark Office as well as in foreign patent offices.

The segment licenses some of its patents to third parties and this revenue is not significant. Motorola is also licensed to use certain patents owned by others. Royalty and licensing fees vary from year to year and are subject to the terms of the agreements and sales volumes of the products subject to licenses.

We actively participate in the development of open standards for interoperable, mission-critical digital two-way radio systems. We have published our technology and licensed patents to signatories of the industry's two primary memorandums of understanding defined by the Telecommunications Industry Association ("TIA") Project 25 and European Telecommunications Standards Institute ("ETSI") Terrestrial Trunked Radio ("TETRA").

Notwithstanding the expiration of certain patents and the resulting potential for increased competition for certain of our products in the future, we believe that our extensive patent portfolio will continue to provide us with a competitive advantage. Furthermore, we believe we are not dependent upon a single patent, or a few patents. Our success depends more upon our proprietary know-how, innovative skills, technical competence and marketing abilities. In addition, because of changing technology, our present intention is not to rely primarily on patents or other intellectual property rights to protect or establish our market position. However, the segment continues to litigate against competitors to enforce its intellectual property rights in certain technologies and is currently involved in several such lawsuits. Reference is made to the material under the heading "Other Information" for information relating to patents and trademarks and research and development activities with respect to this segment.

*Inventory, Raw Materials, Right of Return and Seasonality*

The segment's practice is to carry reasonable amounts of inventory to meet customers' delivery requirements in a manner consistent with industry standards. The segment provides custom products which requires the stocking of inventories and large varieties of piece parts and replacement parts in order to meet delivery and warranty requirements. To the extent suppliers' product life cycles are shorter than the segment's, stocking of lifetime buy

inventories is required to meet long-term warranty and contractual requirements. In addition, replacement parts are stocked for delivery on customer demand within a short delivery cycle. At the end of 2007, the segment had a higher inventory balance than at the end of 2006, primarily as a result of the acquisition of Symbol during 2007.

Availability of materials and components required by the segment is relatively dependable, but fluctuations in supply and market demand could cause selective shortages and affect results. We currently source certain materials and components from single vendors. Any material disruption from a single-source vendor may have a material adverse impact on our results of operations.

Natural gas, electricity and, to a lesser extent, oil are the primary sources of energy for the segment's operations, which are currently in generally adequate supply for the segment's operations. In addition, the cost to operate our facilities and freight costs are dependent on world oil prices, which increased significantly during 2007 and increased our manufacturing and shipping costs. Labor is generally available in reasonable proximity to the segment's manufacturing facilities. However, difficulties in obtaining any of these items or a significant cost increase could affect the segment's results.

Generally, the segment's contracts do not include a right of return, other than for standard warranty provisions. For new product introductions in our government and public safety market, we may enter into milestone contracts providing that the product could be returned if we do not achieve the milestones. Due to buying patterns in the markets we serve, sales tend to be somewhat higher in the fourth quarter.

*Our Facilities/Manufacturing*

Our primary offices are located in Schaumburg, Illinois and Holtsville, New York. Major design, integration, manufacturing and distribution centers are located in: Holtsville, New York; Schaumburg, Illinois; Basingstoke, England; Arad, Israel; Tianjin, China; Taunusstein and Berlin, Germany; Reynosa, Mexico; McAllen, Texas; Brno, Czech Republic; and Penang, Malaysia. In addition to our own manufacturing, we utilize non-affiliated electronics manufacturing suppliers, primarily in Asia, in order to enhance our ability to lower costs and deliver products that meet consumer demands.

### Other Information

*2007 Change in Organizational Structure.* Effective as of the second quarter of 2007, the Company realigned its operating business segments into the following: (i) Mobile Devices, (ii) Home and Networks Mobility, and (iii) Enterprise Mobility Solutions.

*Financial Information About Segments.* The response to this section of Item 1 incorporates by reference Note 11, "Information by Segment and Geographic Region," of Part II, Item 8: Financial Statements and Supplementary Data of this document.

*Customers.* Motorola has several large customers, the loss of one or more of which could have a material adverse effect on the Company. Motorola's largest end customers (including sales through distributors) are Sprint Nextel, Verizon, China Mobile, AT&T and America Movil. No single customer accounted for more than 10% of the Company's net sales in 2007.

Approximately 2% of Motorola's net sales in 2007 were to various branches and agencies, including the armed services, of the U.S. Government. All contracts with the U.S. Government are subject to cancellation at the convenience of the Government.

Government contractors, including Motorola, are routinely subjected to numerous audits and investigations, which may be either civil or criminal in nature. The consequences of these audits and investigations may include administrative action to suspend business dealings with the contractor and to exclude it from receiving new business. In addition, Motorola, like other contractors, reviews aspects of its government contracting operations, and, where appropriate, takes corrective actions and makes voluntary disclosures to the U.S. Government. These audits and investigations could adversely affect Motorola's ability to obtain new business from the U.S. Government.

Table of Contents

16

*Backlog.* Motorola's aggregate backlog position for all Motorola segments, as of the end of the last two fiscal years was approximately as follows:

| | |
|---|---|
| December 31, 2007 | $5.5 billion |
| December 31, 2006 | $6.6 billion |

Except as previously discussed in this Item 1, the orders supporting the 2007 backlog amounts shown in the foregoing table are believed to be generally firm, and approximately 89% of the backlog on hand at December 31, 2007 is expected to be recognized as revenue in 2008. The forward-looking estimate of the firmness of such orders is subject to future events that may cause the amount recognized to change.

*Research and Development.* Motorola's business segments participate in very competitive industries with constant changes in technology. Throughout its history, Motorola has relied, and continues to rely, primarily on its research and development ("R&D") programs for the development of new products, and on its production engineering capabilities for the improvement of existing products. Technical data and product application ideas are exchanged among Motorola's business segments on a regular basis. Management believes, looking forward, that Motorola's commitment to R&D programs should allow each of its segments to remain competitive.

R&D expenditures relating to new product development or product improvement were $4.4 billion in 2007, compared to $4.1 billion in 2006 and $3.6 billion in 2005. R&D expenditures increased 8% in 2007 as compared to 2006, after increasing 14% in 2006 as compared to 2005. Motorola continues to believe that a strong commitment to research and development is required to drive long-term growth. Approximately 27,000 professional employees were engaged in such R&D activities during 2007.

*Patents and Trademarks.* Motorola seeks to obtain patents and trademarks to protect our proprietary position whenever possible and practical. As of December 31, 2007, Motorola, Inc. and its wholly owned subsidiaries owned approximately 10,064 utility and design patents in the U.S. and 12,914 patents in foreign countries. These foreign patents are mostly counterparts of Motorola's U.S. patents, but a number result from research conducted outside the U.S. and are originally filed in the country of origin. During 2007, Motorola, Inc. and its wholly owned subsidiaries were granted 696 U.S. utility and design patents. Many of the patents owned by Motorola are used in its operations or licensed for use by others, and Motorola is licensed to use certain patents owned by others. Royalty and licensing fees vary from year to year and are subject to the terms of the agreements and sales volumes of the products subject to licenses.

*Environmental Quality.* Compliance with federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, has no material effect on capital expenditures, earnings or the competitive position of Motorola.

*Employees.* At December 31, 2007 and December 31, 2006, there were approximately 66,000 employees of Motorola and its subsidiaries.

*Financial Information About Geographic Areas.* The response to this section of Item 1 incorporates by reference Note 10, "Commitments and Contingencies" and Note 11, "Information by Segment and Geographic Region" of Part II, Item 8: Financial Statements and Supplementary Data of this document, the "Results of Operations—2007 Compared to 2006" and "Results of Operations—2006 Compared to 2005" sections of Part II, "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item A: Risk Factors" of this document.

*Available Information*

We make available free of charge through our website, *www.motorola.com/investor,* our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements, other reports filed under the Securities Exchange Act of 1934 ("Exchange Act") and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange

Commission ("SEC"). Our reports are also available free of charge on the SEC's website, *www.sec.gov.* Also available free of charge on our website are the following corporate governance documents:

- Motorola, Inc. Restated Certificate of Incorporation
- Motorola, Inc. Amended and Restated Bylaws
- Motorola, Inc. Board Governance Guidelines
- Motorola, Inc. Director Independence Guidelines
- Principles of Conduct for Members of the Motorola, Inc. Board of Directors
- Motorola Code of Business Conduct, which is applicable to all Motorola employees, including the principal executive officer, the principal financial officer and the controller (principal accounting officer)
- Audit and Legal Committee Charter
- Compensation and Leadership Committee Charter
- Governance and Nominating Committee Charter

All of our reports and corporate governance documents may also be obtained without charge by contacting Investor Relations, Motorola, Inc., Corporate Offices, 1303 East Algonquin Road, Schaumburg, Illinois 60196, E-mail: *investors@motorola.com*, phone: 1-800-262-8509. Our Internet website and the information contained therein or incorporated therein are not intended to be incorporated into this Annual Report on Form 10-K.

# EXHIBIT B

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

# FORM 40-F

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

or

☑    **ANNUAL REPORT PURSUANT TO SECTION 13(a) OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended March 1, 2008

Commission File Number 0-29898

---

# Research In Motion Limited

*(Exact name of Registrant as specified in its charter)*

| **Ontario** | **3661** | **Not Applicable** |
|---|---|---|
| *(Province or other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification No..)* |

**295 Phillip Street**
**Waterloo, Ontario**
**Canada, N2L 3W8**
**(519) 888-7465**
*(Address and telephone number of Registrant's principal executive offices)*

**Research In Motion Corporation**
**122 West John Carpenter Parkway, Suite 430**
**Irving, Texas 75039**
**(972) 650-6126**
*(Name, address and telephone number of agent for service in the United States)*

---

Securities registered or to be registered pursuant to Section 12(b) of the Act:
**Common Shares, no par value**

Securities registered or to be registered pursuant to Section 12(g) of the Act:
**None**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
**None**

For annual reports, indicate by check mark the information filed with this Form:

☑ Annual information form          ☑ Audited annual financial statements

Indicate the number of outstanding shares of each of the Registrant's classes of capital or common stock as of the close of the period covered by this annual report.

**The Registrant had 562,652,461 Common Shares outstanding as at March 1, 2008.**

Indicate by check mark whether the Registrant by filing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). If "Yes" is marked, indicate the file number assigned to the Registrant in connection with such Rule.

**TABLE OF CONTENTS**

CORPORATE STRUCTURE                                                                          6

    THE COMPANY                                                                               6
    INTERCORPORATE RELATIONSHIPS                                                              6

GENERAL DEVELOPMENT OF THE BUSINESS                                                          6

NARRATIVE DESCRIPTION OF THE BUSINESS                                                        8

    OVERVIEW                                                                                  8
    INDUSTRY BACKGROUND                                                                      10
    SUCCESS FACTORS                                                                          12
    STRATEGY                                                                                 15
    PRODUCTS AND SERVICES                                                                    16
    THIRD PARTY SOFTWARE DEVELOPERS                                                          20
    INDUSTRY ASSOCIATIONS                                                                    20
    SALES, MARKETING AND DISTRIBUTION                                                        21
    CUSTOMERS                                                                                21
    COMPETITION                                                                              22
    PRODUCT DESIGN, ENGINEERING AND RESEARCH & DEVELOPMENT                                   23
    INTELLECTUAL PROPERTY                                                                    25
    PRODUCTION                                                                               26
    REGULATORY MATTERS                                                                       26
    ENVIRONMENTAL REGULATIONS AND COSTS                                                      27
    EMPLOYEES                                                                                27
    FACILITIES                                                                               28
    LEGAL PROCEEDINGS                                                                        29
    RISK FACTORS                                                                             35

DIVIDEND POLICY                                                                             57

DESCRIPTION OF SHARE CAPITAL                                                                57

    COMMON SHARES                                                                            58
    CLASS A COMMON SHARES                                                                    58
    PREFERRED SHARES                                                                         58

MARKET FOR SECURITIES OF THE COMPANY                                                        59

DIRECTORS AND OFFICERS                                                                      59

TRANSFER AGENTS AND REGISTRARS                                                              64

MATERIAL CONTRACTS                                                                          64

INTERESTS OF EXPERTS                                                                        64

ADDITIONAL INFORMATION & DOCUMENTS INCORPORATED BY REFERENCE                                64

GLOSSARY                                                                                    66

APPENDIX A                                                                                  72

    CHARTER OF THE AUDIT COMMITTEE                                                           72

        1. AUTHORITY                                                                        72

        2. PURPOSE OF THE COMMITTEE                                                         72

        3. COMPOSITION OF THE COMMITTEE                                                     72

        4. MEETINGS OF THE COMMITTEE                                                        73

5. DUTIES AND RESPONSIBILITIES OF THE COMMITTEE .................... 73

6. FUNDING ..................................................... 74

7. DISCLOSURE AND REVIEW OF CHARTER ....................... 74

# ANNUAL INFORMATION FORM

## CERTAIN INTERPRETATION MATTERS

*Unless the context otherwise requires, all references to the "Company" or "RIM" include Research In Motion Limited and its predecessors. Certain terms have the meanings specified in the Glossary. All dollar references, unless otherwise noted, are in United States dollars.*

The *BlackBerry* and *RIM* families of related marks, images and symbols are the exclusive properties and trademarks of Research In Motion Limited. *RIM, Research In Motion, BlackBerry* and *Suretype* are registered with the U.S. Patent and Trademark Office and such names may be pending or registered in other countries. All other brands, product names, company names, trademarks and service marks are the properties of their respective owners.

### Special Note Regarding Forward-Looking Statements

This Annual Information Form ("AIF") contains forward-looking statements within the meaning of the U.S. Private Securities Litigation Reform Act of 1995 and applicable Canadian securities laws, including statements relating to:

- business trends;
- the Company's expectations with respect to the demand for wireless devices and services;
- the Company's expectations with respect to factors influencing the commercial success in the wireless solutions and services market;
- competition and changes in the competitive landscape;
- the Company's management and protection of intellectual property and other proprietary rights;
- the Company's expectations regarding foreign sales;
- the Company's plans and expectations with respect to matters relating to its historical stock option granting practices, including regulatory investigations and litigation in connection therewith;
- other potential legal proceedings and the Company's liability under current legal proceedings; and
- the Company's dividend policy and sufficiency of its financial resources.

The words "expect", "anticipate", "estimate", "may", "will", "should", "intend", "believe", "plan" and similar expressions are intended to identify forward-looking statements. Forward-looking statements are based on estimates and assumptions made by RIM in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors that RIM believes are appropriate in the circumstances. Many factors could cause RIM's actual results, performance or achievements to differ materially from those expressed or implied by the forward-looking statements, including, without limitation, the following factors, which are discussed in greater detail in the "Risk Factors" section of this AIF.

4

- risks related to the restatement of RIM's previously filed financial statements as a result of its internal review of its stock option granting practices, and regulatory investigations or litigation relating to those matters, including possible sanctions or penalties against the Company or its directors or officers;

- third-party claims for infringement of intellectual property rights by RIM and the outcome of any litigation with respect thereto;

- RIM's ability to successfully obtain patent or other proprietary or statutory protection for its technologies and products;

- RIM's ability to obtain rights to use software or components supplied by third parties;

- RIM's ability to enhance current products and develop new products;

- RIM's ability to establish new, and to build on existing, relationships with its network carrier partners and distributors;

- RIM's dependence on its carrier partners to grow its BlackBerry subscriber account base;

- RIM's dependence on a limited number of significant customers;

- the efficient and uninterrupted operation of RIM's network operations center and the networks of its carrier partners;

- the occurrence or perception of a breach of RIM's security measures, or an inappropriate disclosure of confidential or personal information;

- RIM's ability to manage production facilities and its reliance on third-party manufacturers for certain products;

- RIM's reliance on its suppliers for functional components and the risk that suppliers will not be able to supply components on a timely basis or in sufficient quantities;

- the continued quality and reliability of RIM's products and services;

- risks associated with RIM's expanding foreign operations;

- restrictions on import and use of RIM's products in certain countries due to encryption of the products and services;

- effective management of growth and ongoing development of RIM's service and support operations;

- risks associated with acquisitions, investments and other business initiatives;

- reduced spending by customers due to the uncertainty of economic and geopolitical conditions;

- intense competition within RIM's industry, including the possibility that strategic transactions by RIM's competitors or carrier partners could weaken RIM's competitive position or that RIM may be required to reduce its prices to compete effectively;

- dependence on key personnel and RIM's ability to attract and retain key personnel;

- reliance on third-party network infrastructure developers and software platform vendors;

- foreign exchange risks;

- changes in interest rates affecting RIM's investment portfolio and the creditworthiness of its investment portfolio;

- government regulation of wireless spectrum and radio frequencies;

- the costs and burdens of compliance with new government regulations;

- continued use and expansion of the Internet;

- regulation, certification and health risks, and risks relating to the misuse of RIM's products;

5

- tax liabilities, resulting from changes in tax laws or otherwise, associated with RIM's worldwide operations; and
- difficulties in forecasting RIM's quarterly financial results and the growth of its subscriber base.

These factors should be considered carefully, and readers should not place undue reliance on RIM's forward-looking statements. RIM has no intention and undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## CORPORATE STRUCTURE

### The Company

The Company was incorporated under the *Business Corporations Act* (Ontario) ("OBCA") on March 7, 1984 and commenced operations at that time. The Company has amalgamated with several of its wholly-owned subsidiaries, the last amalgamation occurring on February 24, 2003 through the filing of articles of amalgamation under the OBCA on February 24, 2003. RIM's registered and principal business office is 295 Phillip Street, Waterloo, Ontario, N2L 3W8, telephone: (519) 888-7465, telecopier: (519) 888-6906.

### Intercorporate Relationships

The Company has three material subsidiaries. All are wholly owned, directly or indirectly, by RIM.

| Name of Subsidiary | Jurisdiction of Incorporation or Organization |
|---|---|
| Research In Motion Corporation | Delaware, U.S.A. |
| Research In Motion UK Limited | England and Wales |
| RIM Finance, LLC | Delaware, U.S.A. |

## GENERAL DEVELOPMENT OF THE BUSINESS

RIM is a leading designer, manufacturer and marketer of innovative wireless solutions for the worldwide mobile communications market. Through the development of integrated hardware, software and services that support multiple wireless network standards, RIM provides platforms and solutions for seamless access to time-sensitive information including email, phone, SMS messaging, Internet and intranet-based applications. RIM technology also enables a broad array of third party developers and manufacturers to enhance their products and services with wireless connectivity to data.

RIM's portfolio of award-winning products, services and embedded technologies are used by thousands of organizations around the world and include the BlackBerry wireless platform, the RIM Wireless Handhelds™ product line, software development tools and other hardware and software.

6

Significant product and business developments over the last three fiscal years have been as follows:

*Fiscal 2008*

- The BlackBerry subscriber base increased to over 14 million users from 8 million the previous year;
- Launched a number of new handsets including the BlackBerry 8300 series (BlackBerry 8310, BlackBerry 8320 and BlackBerry 8330), additional BlackBerry 8800 series (BlackBerry 8820, BlackBerry 8830 World Edition) and additional 8100 series (BlackBerry 8110, BlackBerry 8120, BlackBerry Pearl 8130);
- Added over 80 new carrier and distribution channel relationships for a total of over 350 carriers and distribution channels in 135 countries;
- Launched BlackBerry Professional software for small and medium sized businesses and BlackBerry Unite! for the home computer;
- Launched BlackBerry Connect™ service on five new devices with more than 20 carrier partners worldwide;
- Launched BlackBerry Enterprise Server™ enhancements for v4.1.5;
- Launched the first devices (BlackBerry 8820, 8320 and 8120) with WiFi; and
- Attained Common Criteria EAL 2+ certification for BlackBerry Enterprise Server 4.1.3 and BlackBerry Wireless Handheld Software 4.1.0.

*Fiscal 2007*

- The BlackBerry subscriber base increased to more than 8 million users from 4.9 million the previous year;
- Launched a number of new handsets including the BlackBerry Pearl with camera and multimedia capabilities, the BlackBerry 8800 with built-in GPS and the BlackBerry 8703e™;
- Added 100 new carrier relationships for a total of over 270 carriers in 110 countries;
- Launched BlackBerry Enterprise Server Express™ for small and medium-sized businesses and BlackBerry Enterprise Server for MDS Applications™ and announced Hosted BlackBerry Enterprise Server™;
- Launched BlackBerry Connect™ service on 50 new devices with 80 carrier partners worldwide;
- Acquired Ascendent Systems, to enable PBX integration in instant messaging and unified communications platforms which allows RIM to offer an increasingly differentiated wireless offering;
- Acquired SlipStream Data Inc., to leverage their proprietary compression algorithms that will significantly increase the speed of on-device internet browsing, email and attachment downloads as well as improve overall battery life and bandwidth efficiency of Blackberry devices;
- Expanded global relationship with Yahoo! and Launched Yahoo! Go for Mobile 2.0; and

7

- Announced enhancement to the BlackBerry Smart Card Reader to enable controlled access to PCs.

*Fiscal 2006*

- The BlackBerry subscriber base nearly doubled to over 4.9 million subscribers from 2.5 million the previous year;
- Launched several new handsets including the BlackBerry 8700 Series, the BlackBerry 7130e™, the BlackBerry 7270™, the BlackBerry 7105t™ and the BlackBerry 7100i™;
- Added 110 new carrier relationships for a total of over 160 carriers in over 60 countries;
- Launched BlackBerry Enterprise Server™ v4.1 and BlackBerry Mobile Data System™ (MDS) v4.1;
- Added instant messaging support through agreements with Novell® GroupWise®, AOL®, Yahoo!® and Google®;
- Launched BlackBerry Connect™ service on 12 new devices with 33 carrier partners worldwide;
- Announced an extensive technology collaboration with Intel® Corporation;
- Launched the BlackBerry Smart Card Reader™, a lightweight, wearable smart card reader that enables controlled access to BlackBerry devices using Bluetooth® technology and advanced AES-256 encryption;
- Launched BlackBerry Internet Service™ v2.0; and
- Concluded litigation proceedings with NTP, Inc. in the United States.

## NARRATIVE DESCRIPTION OF THE BUSINESS

### Overview

RIM is a leading designer, manufacturer and marketer of innovative wireless solutions for the worldwide mobile communications market. Through the development of integrated hardware, software and services that support multiple wireless network standards, RIM provides platforms and solutions for seamless access to time-sensitive information including email, phone, SMS messaging, Internet and intranet-based applications. RIM technology also enables a broad array of third party developers and manufacturers to enhance their products and services with wireless connectivity to data.

RIM's portfolio of award-winning products, services and embedded technologies are used by thousands of organizations around the world and include the BlackBerry® wireless solution, software development tools, and other software and hardware. Founded in 1984 and based in Waterloo, Ontario, RIM operates offices in North America, Europe and Asia Pacific. The common shares of RIM are listed on the Nasdaq Stock Market (Nasdaq: RIMM) and the Toronto Stock Exchange (TSX: RIM).

RIM's primary revenue stream is generated by the BlackBerry wireless solution. The BlackBerry wireless solution is comprised of wireless devices, software and services. It can provide users with a wireless extension of their work and personal email accounts, including Outlook®, IBM®

8

Lotus Notes®, Novell® GroupWise® and many ISP email services. When incorporating BlackBerry® Enterprise Server, the BlackBerry wireless solution allows Microsoft® Exchange, IBM Lotus® Domino® and Novell GroupWise users to send and receive corporate email and instant messages securely. The BlackBerry wireless solution also enables the use of personal information management ("PIM"), functions such as calendar, address book, task list and other functions associated with personal organizers. The BlackBerry® Mobile Data System (BlackBerry MDS) allows users to securely access data from enterprise applications and the Internet. BlackBerry® Internet Service, RIM's offering for the consumer and prosumer markets, allows the integration of up to 10 supported email accounts on the same BlackBerry smartphone. Both BlackBerry Enterprise Solution and BlackBerry Internet Service allow Internet browsing and full phone functionality on the user's smartphone. In addition, BlackBerry devices offer a range of multimedia capabilities. BlackBerry service is provided through a combination of RIM's Network Operations Center ("NOC") and the wireless networks of carrier partners.

RIM currently markets various models of its smartphones, including: BlackBerry 8800 Series, BlackBerry 8100 Series, BlackBerry 8300 Series, BlackBerry 8700 Series and BlackBerry 7100 Series. These products have been designed to accommodate the technical requirements of one of the GSM®/GPRS/EDGE, CDMA/1xRTT/EvDO, UMTS or iDEN® protocols. Additionally, RIM supports older model devices on the GPRS, Mobitex and DataTAC networks.

In addition, the Company markets the BlackBerry® Smart Card Reader, which is a lightweight, wearable smart card reader that enables controlled access to BlackBerry smartphones using Bluetooth technology and advanced AES-256 encryption. The BlackBerry Smart Card Reader is FIPS 140-2 validated and can be used to comply with certain government or corporate security requirements by enabling two-factor authentication for BlackBerry smartphones and applications. The BlackBerry Smart Card Reader provides support for a variety of industry standard smart cards including the U.S. Department of Defense's Common Access Card ("CAC"). The BlackBerry Smart Card Reader also supports S/MIME and can be used in conjunction with the S/MIME Support Package for BlackBerry smartphones.

The Company's sales and marketing efforts include collaboration with strategic partners and distribution channels to promote the sales of its products and services as well as its own supporting sales and marketing teams.

RIM also offers the BlackBerry® Connect™ Licensing Program, which enables leading device manufacturers to equip their handsets with BlackBerry functionality, including push technology to automatically deliver email and other data, so users and organizations can take advantage of BlackBerry wireless services on a broader selection of devices and operating systems. Through the BlackBerry Connect licensing program, RIM has entered into development agreements with or licensed certain of RIM's intellectual property to ASUSTek Computer, Inc., High Tech Computer Corporation, Motorola®, Inc., Nokia® Corporation, Palm®, Inc., Samsung® Electronics and Sony Ericsson Mobile Communication AB. BlackBerry® Connect™ software is available for a number of operating systems, including Palm OS®, Windows Mobile® and Symbian OS®.

9

The Company believes that the demand for wireless devices and services is being fuelled by several key global trends, including the following:

- commercial availability of high-speed wireless networks which allow for the delivery of both voice and data communications on a single wireless handheld;

- emergence of mobile access to corporate intranets and enterprise applications as a competitive necessity;

- broad acceptance of email as a reliable, secure and indispensable means of communication;

- the growth of instant messaging as a business and personal communications tool;

- recognition by corporations of the productivity gains achieved through the wireless enablement of enterprise data applications beyond email;

- growing popularity of portable information devices;

- availability of smaller, lighter and cheaper converged handhelds, offering both voice and data capabilities;

- introduction of lower data pricing models by wireless carriers;

- proliferation of the Internet;

- growing reliance on data applications for personal communications; and

- the growing number of mobile workers around the world.

Participants in the wireless device and services market require significant technical expertise to meet the stringent demands of the market for products with small size, reasonable battery life, connectivity, behind-the-firewall integration, security, extended functionality, multi-network support, global availability, and ease of use. Moreover, potential entrants must overcome other significant barriers to entry, including developing alliances with industry leading third parties such as global wireless network service providers, securing specialized component suppliers, establishing adequate financial resources and fostering relationships with software application developers.

Wireless devices and services are expected to play a significant role in the growing use of voice, Internet, corporate intranet, instant messaging, email and eCommerce applications. The integration and focus of expert teams from various engineering disciplines have allowed RIM to develop products that RIM believes possess significant benefits over those of its competition. The secure, single email inbox, push and network efficiency characteristics of RIM's two-way packet switched wireless solutions that support multiple network protocols, as well as the Company's relationships with wireless carriers around the world, and the ability of BlackBerry products to wirelessly enable corporate and personal applications, position RIM to maintain its role as a leading wireless solution supplier.

### Industry Background

#### *The Wireless Communications Industry*

The wireless communications industry involves the provisioning of wireless voice and data services using radio frequency technologies ("RF") on a variety of competing wireless networks. These networks are typically comprised of a distinct voice layer upon which data transmission

10

layers have been subsequently installed. The most widely deployed wireless voice and data networks include but are not limited to, GSM™/GPRS/EDGE, CDMA/1XrTT/EvDO and iDEN. It is important to note that the two primary international voice and data networks (GSM/GPRS/EDGE and CDMA/Ev-DO) continue to be upgraded to next generation technologies that offer greater speeds and increased abilities to support subscriber concentration in the same and new RF spectrum. The migration path for GSM/GPRS/EDGE includes the addition of UMTS technologies such as HSPA (which is made up of HSDPA and HSUPA). The path for CDMA/Ev-DO includes the addition of WCDMA technologies. The rollout of these newer technologies is already underway and commercially available in some markets.

In order to capitalize on the capabilities of the voice and data networks, handheld and handset vendors have released new converged devices to market and remain in pursuit of optimal form factors and features to provide end users with a greater degree of choice and value from integrated voice and data capabilities on one convenient and user friendly device. Examples of these products include the BlackBerry 8800 Series, the BlackBerry 8300 Series, the BlackBerry 8100 Series, and the BlackBerry 7700 Series devices. Other converged voice and data products of note include the Apple iPhone, Danger Hiptop™, HTC S620, Motorola Q, Nokia E62, Palm Treo™ 700 & 750, and Sony Ericsson P900™ Series.

### Wireless Communications Industry Markets and Segments

The wireless communications industry is comprised of three distinct markets that are organized based on who purchases the devices, services and software solutions. The consumer market is characterized by end users who purchase devices themselves for personal use, the prosumer market is characterized by end users who purchase devices for business and some personal use, and the enterprise market is where solutions are purchased by IT and line of business managers for deployment to employees.

Products designed for the enterprise market typically include a converged device that is deployed in conjunction with a behind-the-firewall messaging server. Products designed for the prosumer and consumer market are typically hosted by either the vendor or wireless carrier and range in their depth of features from email only, to email, PIM and other data services such as Instant Messaging.

RIM believes that the following factors will influence commercial success in the wireless solutions and services market:

- small size and light weight converged devices;
- reasonable battery life;
- intuitive interface and ease of use;
- access to compelling applications;
- integration with corporate PBX;
- extensive geographic coverage;
- competitive pricing;
- flexible architecture;
- end-to-end security;

11

- trusted brand;
- push-based outbound port architecture;
- extensive customer care capabilities;
- multi-network support; and
- connectivity to enterprise and/or personal email and applications.

RIM believes that significant barriers to entry include the following:

- proprietary technology, including hardware and software expertise and intellectual property rights;
- existing strategic alliances and relationships;
- access to components and established supplier relationships;
- existing customer and channel relationships;
- scarcity of highly qualified personnel;
- significant development costs and time-to-market;
- manufacturing expertise;
- significant financial resources and capacity;
- regulatory barriers such as Federal Communications Commission ("FCC") approval and network certification; and
- market recognition of industry leaders.

### Success Factors

Through development and integration of hardware, software and services, RIM provides end-to-end wireless solutions for seamless access to time-sensitive information including email, voice, messaging, Internet and intranet-based applications. RIM's integration and focus of research and development teams in radio frequency, hardware and software design, antenna design, circuit board design, integrated circuit design, power management, industrial design, and manufacturing engineering result in cost-effective solutions that offer small size, efficient battery usage, ease of use, robust security and a significant return on investment to customers.

RIM believes that the following characteristics give it a competitive advantage and differentiate its products and services:

- *"**Always On, Always Connected**"*. The BlackBerry wireless solution uses a push-based architecture where the device is in constant connection with the network. BlackBerry users are provided with immediate message delivery, which has become the established industry benchmark.
- ***Extended Functionality.*** Users increasingly require smartphones to be versatile, easy-to-use and provide a robust level of functionality in terms of configuration, features and customizable options. RIM has consistently developed products that balance end users' demand for features with the demands of IT managers for security and manageability. RIM's focus on business-grade solutions has won RIM a market-leading role for the enterprise market and a prominent position in the emerging prosumer and consumer market.

12

- *Pricing*. The return on investment for BlackBerry provides customers with rapid payback for their purchase. The primary sources of benefits include personal productivity and team workflow enhancements. Additionally, the low bandwidth nature of BlackBerry allows carriers to offer service packages to their customers at favorable rates compared to conventional usage of session based networking over wireless networks. In addition, RIM continues to launch new IT administrator and end user feature sets designed to lower the cost of buying, deploying and managing the solution. The network efficiency of the BlackBerry solution may also lead to lower data roaming charges for customers.

- *Strength of the BlackBerry Brand and Market Awareness.* BlackBerry is recognized as a premier smartphone brand, presenting a barrier to entry for competitors attempting to offer a similar product. Additionally, the deployment of over 100,000 BlackBerry Enterprise Servers around the world makes it more difficult for a new solution to gain a market foothold.

- *Support for Multiple Carriers, Geographies and Network Protocols.* The BlackBerry solution offers choice and manageability for global customers. Through relationships with hundreds of leading wireless carriers and distribution partners around the world, RIM is able to offer customers their choice of carrier depending on their needs in a particular geography. In addition, BlackBerry supports many network protocols including, GSM/GPRS/EDGE/UMTS, CDMA/1xRTT/EvDO, iDEN, Mobitex and DataTAC, offering customers the best choice of carriers and network technologies for their particular region without changing the underlying BlackBerry infrastructure. RIM will continue to launch new products for next generation networks as the deployment scale and the economies around these networks are established.

- *Support for Third Party Devices.* Through its BlackBerry licensing programs, RIM provides a choice of devices for use with the BlackBerry architecture. Through licensing relationships with partners such as Asus, BenQ-Siemens, HTC, Motorola, Inc., Nokia, Palm, Inc., Samsung and Sony Ericsson customers are able to use handsets and handhelds developed by third party OEMs to access the BlackBerry wireless platform.

- *Intellectual Property Rights.* RIM has sought to protect the technology that it has developed through a combination of patent, copyright and trade secret protection as well as through contractual arrangements.

- *Extensibility and Flexible Architecture.* RIM has designed its device and server platform architecture to support open standards to make it attractive for other software developers to create custom applications for BlackBerry. The BlackBerry Independent Software (ISV) Alliance program is a well established and comprehensive program aimed at providing the resources, support and tools, software developers need to develop and sell innovative, market-driven applications for BlackBerry users. The program has several hundred developers participating and has produced thousands of applications for both enterprise and individuals that continue to benefit customers. In addition, RIM has added

13

additional Application Programming Interfaces "APIs" to the BlackBerry® Java Development Environment (BlackBerry JDE) to enable the next wave in mobile application development. RIM believes its product architecture is more flexible and open than that used by many of its competitors. Through the Mobile Data System "MDS" feature of BlackBerry Enterprise Solution, customers can quickly and easily design wireless applications and/or provide access to existing corporate application data wirelessly to their employees.

- **Access to Key Corporate Data Stores.** BlackBerry Enterprise Server provides corporations with the means to provide wireless access to all four main corporate data stores from a single integrated platform. BlackBerry is the only wireless platform that provides access to corporate email and PIM, corporate voice PBX and hybrid IP/PBX stores, real-time computing and corporate IM such as IBM SameTime and Microsoft Live Communications Server, and enterprise applications.

- **Security.** BlackBerry was designed as an end-to-end solution with comprehensive security specifically for enterprise access to email, PIM and other corporate information from a single wireless device. Through integration with Microsoft Exchange, Lotus Domino and Novell GroupWise, the BlackBerry wireless solution provides corporate users with secure wireless access to their own corporate email rather than having to establish an additional email account. RIM's complete security solution for the enterprise includes; end-to-end data encryption to ensure confidentiality, robust remote IT management, support for internet security standards, full application control, multiple user authentication schemes, secure boot ROM and signed API access and firewall integrity preservation. In addition to the security built into the BlackBerry enterprise solution, RIM has developed a BlackBerry Smart Card Reader which further enhances the device security for a wide range of government users. RIM's solution has received several security validations across the globe, including Common Criteria EAL 2+ certification for BlackBerry Enterprise Server 4.1.3 and BlackBerry Wireless Handheld 4.1.0. This is the first Common Criteria certification to be awarded to a mobile solution.

- **Manageability.** Other features of the BlackBerry wireless solution include over-the-air calendar synchronization, over-the-air folder management, wireless synchronization of deletes, enhanced IT manageability and personal organizer features such as contacts, tasks and memos. RIM also provides a robust corporate applications platform that masks the complexities of wireless application development by providing an integrated framework using web-services and object oriented programming tools that provides preconfigured support for end-to-end security and multiple data transport methods.

- **BlackBerry Outbound Port Architecture.** BlackBerry is architected using a secure infrastructure that does not require IT managers to compromise firewall security through the opening of an inbound firewall port. The BlackBerry network operations center ("NOC") offers a number of efficiency and security benefits to carriers and end-users. These benefits are outlined in detail in the section "Competition".

14

- *Multiple Channels.* RIM has launched products specifically tailored for the prosumer and consumer market to augment its original behind-the-firewall, server-based products for the corporate market. This increases the market touch points available to RIM where the Company has been focused on expanding its channel reach beyond carrier enterprise and retail and into third party retailers.

## Strategy

Key components of RIM's business strategy include:

- *Extend Technology Leadership.* RIM is currently recognized as a leader in the wireless data communications industry for designing and developing the BlackBerry wireless solution. RIM intends to maintain its leadership by focusing on the further development of two-way wireless technologies and enabling applications, protecting its intellectual property and encouraging the adoption of its platform by wireless network service providers globally and their customers, and licensing the BlackBerry platform to key handset and service vendors.

- *Broaden Strategic Alliances and Relationships.* RIM intends to continue to strengthen and develop its strategic alliances and relationships, and enter into similar relationships to affirm and enhance its competitive position as a primary wireless handheld and solutions provider to the mobile data communications industry. Areas of strategic alliances and relationships include, but are not limited to, enterprise and other software applications companies, global telecommunications carriers, OEM handset and converged wireless communication device manufacturers, intranet applications and portal companies, internet social networking providers, microchip manufacturers and global systems integrators.

- *Promote and Enhance Development of Third Party Software.* RIM will continue to enhance software development tools, provide technical support and accommodate external software developers to further promote the development of software applications for the BlackBerry platform.

- *Expand the Global Reach of the BlackBerry Platform.* RIM plans to continue to foster relationships with key carriers, distributors and customers to expand the BlackBerry addressable market and provide customers with access to their corporate or personal data anywhere in the world.

- *Extend BlackBerry's Reach into the Prosumer and Consumer Market.* RIM has and will continue to undertake in a number of initiatives aimed at expanding further into the prosumer and consumer market. These initiatives include partnerships with leading prosumer and consumer portal and applications companies such as Google, Yahoo and Facebook, expanding channel distribution into retail, indirect and Value Added Reseller (VAR) channels, as well as launching handsets with consumer friendly features such as the BlackBerry Pearl and BlackBerry Curve.

15

- ***Maintain Market Leadership and Expand Customer Base.*** RIM intends to maintain its position as a market leader by focusing its sales and marketing efforts on the continued use of strategic alliances and relationships to promote the sale of its products, as well as utilizing indirect sales and marketing teams. In addition, RIM intends to continue to grow its leadership through focusing on developing leading edge handsets as well as enabling existing enterprise applications and third party applications.

- ***Enhance and Expand the BlackBerry Wireless Solution.*** RIM believes that the functionality of the BlackBerry wireless solution can be further enhanced for both corporate, prosumer and consumer markets. RIM will focus on improving and enhancing its service, designing new, compelling form factors for different market segments and enabling additional applications for BlackBerry either independently, through acquisitions or through partnerships.

- ***Continue to Invest in Highly Qualified Personnel.*** RIM believes that the quality and skills of its senior management team and other personnel within the organization have been key factors in its progress to date. RIM intends to continue its recruiting strategies and operations in order to attract personnel to support its product development and growth strategies.

- ***Pursue Licensing and Strategic Relationships with Industry Leaders.*** Through its BlackBerry Connect and BlackBerry Built-In licensing programs, RIM will continue to pursue arrangements with partners to allow third party handsets to access the BlackBerry architecture in order to broaden the addressable market and offer greater choice to end-users.

## Products and Services

RIM's primary revenue stream is generated by the BlackBerry® wireless solution, comprised of wireless devices, software and service. BlackBerry service is provided through a combination of RIM's NOC and the wireless networks of RIM's carrier partners.

The Company's revenue mix for fiscal years 2008 and 2007 is as follows:

| | March 1, 2008 | | March 3, 2007 | |
|---|---|---|---|---|
| Revenue (U.S. $000's) | | | | |
| Devices | $4,768,610 | 79.4% | $2,215,951 | 73.0% |
| Service | 860,641 | 14.3% | 560,116 | 18.4% |
| Software | 234,388 | 3.9% | 173,187 | 5.7% |
| Other | 145,756 | 2.4% | 87,849 | 2.9% |
| | $6,009,395 | 100% | 3,037,103 | 100% |

Other revenue includes accessories, non-warranty repairs, and non-recurring engineering development contracts ("NRE").

16

### BlackBerry Smartphones

BlackBerry® smartphones are communication tools that incorporate wireless technology to deliver simple, mobile communications access. Utilizing push-based technology that automatically delivers email and other data to a BlackBerry smartphone, as well as a mobile phone and fully integrated browser and organizer applications, BlackBerry products make it easy to manage information and communications from a single, integrated device.

BlackBerry smartphones are available from over 350 carriers and distribution channels and are designed to operate on a variety of carrier network types, including GSM/GPRS/EDGE, CDMA/Ev-DO, iDEN, UMTS and Mobitex. In addition, certain BlackBerry smartphones offer GPS and WiFi capabilities.

The following BlackBerry smartphones are currently available:

- **The BlackBerry® Pearl™ Series** — Extrapolating on the success of the BlackBerry Pearl 8100 smartphone, RIM has developed the BlackBerry Pearl Series of smartphones to service varying end user and network needs. Though the BlackBerry Pearl 8110 and BlackBerry Pearl 8130 support two different networks—GSM/GPRS and CDMA, respectively—both feature built-in GPS capabilities. The BlackBerry Pearl 8120 also runs on the GSM/GPRS network and allows users access to their email, the Internet and other data services using Wi-fi® networks. Continuing the precedent set by the BlackBerry Pearl 8100, all three new smartphones have a SureType® keyboard and are small and easy-to-use. In addition to email, phone and Internet services, the newer members of the BlackBerry Pearl Series offers a compelling multimedia experience with an updated two-megapixel camera, an improved onboard media player, desktop media management software and an external port for hot-swapping microSD memory cards.

- **BlackBerry® Curve™ Series** — In 2008, RIM developed two additional versions of this popular smartphone. The BlackBerry Curve 8310 offers built-in GPS, enabling the use of various location based services. The BlackBerry Curve 8320 is Wi-fi® ready so that users can access their data services using Wi-fi networks. Like their predecessor, both the BlackBerry Curve 8310 and BlackBerry Curve 8320 smartphones run on the GSM network, feature full QWERTY keyboards and maintain the same sleek shape and size and weight. All three offer email, web browser, text messaging (SMS and MMS), instant messaging, organizer applications, mapping and phone as well as a two-megapixel camera, enhanced multimedia and expandable memory.

- **BlackBerry® 8800 Series** — This series which includes the BlackBerry 8800 smartphone as well as the BlackBerry 8830 World Edition smartphone, expanded in 2008 to include the BlackBerry 8820 smartphone with Wi-fi and UMA support. Like the rest of the BlackBerry 8800 series, this smartphone features a large, sharp screen with built-in light-sensing technology, expandable memory, a media player, wireless modem and a high-capacity battery.

- **BlackBerry® 8700 Series** — including BlackBerry 8700c, BlackBerry 8700f, BlackBerry

17

*8700g, BlackBerry 8707h, BlackBerry 8700r and BlackBerry 8700v.* The BlackBerry 8700 Series features web browsing and attachment handling performance, a bright, auto-sensing screen, speakerphone, dedicated send/end phone buttons, Bluetooth support and an Intel XScale® processor. In addition, the 8707 supports UMTS.

*BlackBerry Enterprise Solution*

- ***BlackBerry® Enterprise Server*** – BlackBerry Enterprise Server is robust software that acts as the centralized link between wireless smartphones, enterprise applications and wireless networks. The BlackBerry Enterprise Server integrates with enterprise messaging and collaboration systems to provide mobile users with access to email, enterprise instant messaging, and personal information management tools. All data between applications and BlackBerry® smartphones flows centrally through the BlackBerry Enterprise Server. It also provides advanced security features and offers administrative tools that simplify management and centralize control.

- ***BlackBerry® Mobile Data System (BlackBerry® MDS)*** – BlackBerry MDS is a flexible and open development framework for extending enterprise applications wirelessly to BlackBerry smartphone users. As it passes an application to a BlackBerry smartphone and then information to any back-end system, BlackBerry MDS leverages the internationally certified security features, seamless wireless connectivity, and enhanced manageability of the BlackBerry® Enterprise Solution. With BlackBerry MDS, organizations can take advantage of a variety of features by choosing their preferred development method when creating wireless applications for BlackBerry smartphones. BlackBerry MDS components include BlackBerry MDS Developer Tools, BlackBerry Device Software, and BlackBerry MDS Services.

- ***BlackBerry® Mobile Voice System (BlackBerry® MVS)*** – BlackBerry Mobile Voice System allows organizations to converge office desk phones and BlackBerry smartphones, so users can access standard enterprise voice features whether at their desks or on the go. BlackBerry MVS encompasses BlackBerry® MVS Client software for BlackBerry smartphones and the Ascendent® Voice Mobility Suite from Ascendent Systems (a subsidiary of RIM). It unifies fixed and mobile voice communications so users can be reached at a single business phone number and access enterprise voice features with an intuitive and integrated approach. BlackBerry MVS offers advanced security features and system management functionality, such as enabling organizations to route mobile calls through the PBX, automatically authenticating BlackBerry smartphone users and enabling their phone calls to be logged or recorded for corporate or regulatory requirements.

- ***BlackBerry® Professional Software*** – BlackBerry Professional Software is a wireless messaging and collaboration solution for small and medium-sized businesses. It is designed to give organizations the features and security performance employees need, at a lower cost and with less complexity than a larger enterprise solution.

18

- *Hosted BlackBerry® Enterprise Server* – Hosted BlackBerry Enterprise Server is a simple, cost-effective way to take advantage of wireless capabilities that can help businesses succeed in competitive markets. Hosted BlackBerry Enterprise Server does not require purchase, installation or management of BlackBerry Enterprise Server software, removing the need for any upfront software costs, deployment overhead or ongoing IT support costs. Hosted BlackBerry Enterprise Server is available as outsourced server solution for companies that use hosted email solutions.

### Service

The Company generates revenues from BlackBerry service relating to monthly access billings charged to its BlackBerry subscriber account base. For the fiscal year ended March 1, 2008, RIM's BlackBerry subscriber account base increased to over 14 million subscriber accounts from approximately 8 million the previous year. The Company's service revenue is generated by charging a monthly infrastructure access fee to a carrier/reseller when a carrier or other reseller bills the end customer.

### Software

An important part of the BlackBerry wireless solution is the software that is installed at the corporate server level and in some cases on desktop personal computers. Software revenues include fees from licensed BES software and Client Access Licenses ("CALs"), Technical Support ("T-Support") and upgrades. Additional revenues come from BlackBerry Professional Software as well as from the BlackBerry MVS solutions.

### TSupport

TSupport is a comprehensive suite of annual technical support and software maintenance programs. TSupport is designed to meet customers' unique BlackBerry support needs by offering them a single point of contact for BlackBerry technical support directly with RIM. Support can be provided for all BlackBerry software regardless of where it was initially purchased. There are five service support levels to satisfy different customer's specific BlackBerry support needs.

### Non-Warranty Repairs

RIM generates revenue from its repair and maintenance program for devices that are returned to RIM by the carrier, reseller or customer for repair after the expiration of the contractual warranty period.

### NRE

Occasionally RIM enters into engineering development contracts with certain of its customers whereby the Company undertakes the development of new or custom products or software for a fixed-price fee. RIM also may earn NRE revenue from certain carriers for pre-launch activities. The NRE revenue is earned based upon the completion of specific contract milestones.

19

## BlackBerry Licensing Program

The BlackBerry Licensing Program provides additional infrastructure access fees (service revenue) for RIM. The licensing program, branded BlackBerry Connect and BlackBerry Built-In, enables mobile device manufacturers to equip their handsets with the integrated ability to connect to the BlackBerry infrastructure using the same secure, push-based wireless architecture and infrastructure that has been approved and adopted by RIM's customers. BlackBerry Application Suite for Windows Mobile-based devices allows devices from third party manufacturers to utilize the software applications and services of BlackBerry. They provide an open, global platform and address the distinct desire of end users, IT departments, carriers and licensees alike.

## Third Party Software Developers

RIM provides a feature rich open standards based development platform which allows third party and enterprise developers to rapidly extend the reach of enterprise and individual applications to BlackBerry devices. Through both partner and RIM's own efforts, the BlackBerry provides a developer with a robust choice of application options and development environments. The architecture of the platform provides both a rich set of Application Program Interfaces ("API") and standard interfaces and services available on both the device and through the Mobile Data System ("MDS") feature of BlackBerry Enterprise Server "BES". Development options include both standard and enhanced browser or thin client, standard Java2 Micro Edition ("J2ME") thick client and a new rich application capability utilizing the power of standard Web Services. To assist the developer in creating applications and the administrator who will deploy and manage them, the BES/MDS feature set includes services such as application deployment and administration, security, data push capability, data compression and wireless network connectivity. These services greatly assist the developer in reducing the application development and deployment cycle time. A full suite of tools are available through a free download from the BlackBerry website to allow a developer to create, simulate, debug and deploy applications on the BlackBerry platform utilizing a standard Windows based PC environment. Partner efforts have extended application development capability to additional standard environments such as Visual Studio® and Sun NetBeans. RIM also provides extensive developer support and information through both the website and various support groups.  The BlackBerry Alliance Program provides Business Development, Marketing and Technical Support to its members with the goal of building a strong ecosystem of companies delivering software and service solutions for BlackBerry.

## Industry Associations

RIM is an active participant in numerous industry associations and standards bodies including:

- 3G Americas
- 3rd Generation Partnership Project 2
- AeA and AeA Europe
- Australian Mobile Telecommunication Association
- BITKOM (Germany)
- Bluetooth SIG

20

- CALCE Electronic Products and Systems Consortium
- Canada China Business Council
- Canadian Manufacturers & Exporters
- Canadian Chamber of Commerce
- CDMA Development Group
- Cellular Telephony and Internet Association (USA)
- European Telecom Standards Institute
- EICTA (Europe)
- GSM Association
- Information Technology Association of Canada
- Information Technology Industry Council (USA)
- Intellect (UK)
- International Trademark Association
- International Wireless Packaging Consortium
- IPC Association Connecting Electronics Industries (USA)
- Java Community Process
- Open Mobile Alliance
- Surface Mount Technology Association
- Telecommunications Industry Association
- US Information Technology Office (USITO) (China)
- WiFi — Alliance
- World Wide Web Consortium

RIM's involvement with these and other associations includes standards development, government advocacy, joint marketing, participation in conferences and trade shows, training, technology licensing by RIM and business development.

**Sales, Marketing and Distribution**

RIM markets and sells its BlackBerry wireless solution primarily through global wireless communications carriers (carrier partners), who distribute the solution to end users. RIM has a number of carrier-focused business units that support the sales and marketing efforts of RIM's carrier partners through training, technical account management and sales and marketing support. RIM also markets and sells its BlackBerry wireless solution through third party distribution channels. As of March 1, 2008, RIM's marketing, sales and business development, BlackBerry operations, customer support, billing and technical support teams consisted of approximately 1,100 people.

**Customers**

RIM is dependent on an increasing number of significant global carrier partner customers with respect to the sales of its products both in terms of the numbers of devices sold and the aggregate value of its sales. While the Company sells its products and services to a variety of customers, three customers comprised 19%, 14% and 10% of trade receivables as at March 1, 2008 (at March 3, 2007 two customers comprised 23% and 13% of trade receivables). Additionally, three customers comprised 21%, 15% and 12% of the Company's revenue in fiscal 2008 (at March 3,

21

2007 four customers comprised 19%, 14%, 11% and 11% of the Company's revenue).

The primary direct customers for the BlackBerry wireless solution are wireless carriers. The Company sells GPRS/EDGE, CDMA/Ev-DO and iDEN devices and software to carriers, who in turn bundle devices and software with airtime and sell the complete solution to end customers. The Company also sells devices through indirect channels and these devices are resold by a third party with or without a service plan from our carrier partners. Software is licensed directly to end customers, although it is distributed by carriers, resellers and directly through RIM. The Company's BES supports multiple networks and devices, so that BlackBerry service from multiple carriers can be deployed within a company using the same BES software.

In fiscal 2008, 58.7% of the Company's revenues were derived from the United States, 7.3% were derived from Canada and the remaining 34.0% were derived from other foreign jurisdictions.

## Competition

The competitive environment for the wireless data communications industry is rapidly evolving and, to date, no technology has been exclusively or commercially adopted as the industry standard for wireless data communication. Accordingly, both the nature of competition and the scope of the business opportunities afforded by this market are currently uncertain. Strategic relationships in the wireless data communications industry are also evolving. Specific infrastructure manufacturers, network operators and other businesses within the industry may currently be customers of, suppliers to, strategic partners with, or investors in other businesses. The Company is currently working with a number of businesses, some of which are direct competitors with each other and others of which are current or potential competitors of RIM. It is unclear to what extent network infrastructure developers, enterprise software vendors, PC or PDA vendors, or key network operators will seek to provide integrated wireless solutions, including access devices developed internally or through captive suppliers.

In the wireless data communications access market, the Company is aware of several suppliers of access devices for public wireless data networks, including: Apple Inc.; Casio Inc.; Danger, Inc.; Telefonaktiebolaget LM Ericsson; Fujitsu Limited; HandEra, Inc.; Hewlett-Packard Company; Hitachi America, Ltd.; Intermec Technologies Corporation; Itronix Corp; Kyocera Corp or Kyocera International Inc.; Microsoft Corporation; Mitsubishi Corporation; Motorola, Inc.; NEC Corp.; Nokia Corp.; Novatel Wireless, Inc.; NTT DoCoMo Inc.; Option NV, Palm, Inc.; Sanyo Electronic Co. Ltd.; Samsung Electronics Co., Ltd.; Sendo Ltd.; Sharp Corporation; Sierra Wireless Inc.; Sony Corporation; and Sony Ericsson Inc., among others. In addition, the Company may face competition from companies focused on providing middleware to facilitate end-to-end wireless messaging solutions. Companies in this category include Motorola Inc.; IBM Corporation; Microsoft Corporation; Notify Technology Corporation; Openwave Systems Inc.; Seven Networks, Inc.; Sybase, Inc.; and Visto Corporation, among others.

A variety of approaches are being pursued as diverse handset and handheld vendors attempt to provide mobile access to corporate data. These approaches include smartphones, PDA's, wireless PDA's, phone/PDA hybrids, converged voice and data devices, a variety of middleware offerings and other end-to-end integrated wireless solutions.

22

A key aspect of competitive differentiation among industry participants involves the inclusion of a sophisticated NOC in the system architecture. RIM pioneered the use of a sophisticated multi-node centralized architecture responsible for the routing of messages to and from devices. The key benefits of the NOC are message delivery reliability, network utilization efficiency and security. By isolating firewalls from the devices, NOCs avoid the need for numerous simultaneous inbound connections through the firewall which is a significant security consideration for many IT managers. Other benefits of NOCs include eliminating the opportunity for Denial of Service attacks against the firewall, protecting against bad packets reaching devices, and enhancing service quality by providing advanced compression and by acting as a buffer between the limited capacity of wireless networks and the massive capacity of the wired environment. Companies that operate independent NOCs include RIM, Motorola Inc. and Visto Corporation. Nokia Corporation operates a carrier-based NOC. Companies that do not provide a NOC include Microsoft Corporation and Notify Technology Corporation.

It is important to note that the cost of operating the NOC is often charged directly to carriers by the solution vendor as is the case with RIM. Carriers typically include the NOC fee within data plans at the same or lower prices than data plans provided for solutions without NOCs partly because of the superior network efficiency of NOC-based systems. As such, end users get a better performing solution with a significantly superior security model at the same or lower cost to products without NOCs.

**Product Design, Engineering and Research & Development**

The Company's research and development strategy seeks to provide broad market applications for products derived from its technology base. As of March 1, 2008, RIM's research and development team consisted of approximately 2,900 employees. Research and development expense in fiscal 2008 was $359.8 million, compared to $236.2 million in fiscal 2007.

Efficiencies in board layout and component integration utilizing the latest in High Density Interconnection ("HDI"), component packaging and attachment technology combined with proprietary software and firmware features allow RIM to customize its core proprietary hardware designs to address new applications, network protocols and transmission frequencies. RIM's radio transceiver technology can be adapted to support multiple protocols in the wireless data communications market, supporting its position as a primary supplier of wireless and related hardware and software products.

RIM has developed its own radio code stack and launched a new device platform incorporating this radio code stack as well as utilizing the Marvell PXAxxx and Qualcomm processor families.

The development and support of RIM's products require several key areas of expertise within RIM to be closely integrated. RIM has recruited and developed teams with expertise in these required areas and the Company believes that the integration and focus of these teams provides RIM with a significant competitive advantage. The following chart outlines several of these key areas of expertise together with their design and user benefits.

23

| Key Area of Expertise | Design and User Benefits |
|---|---|
| RF Engineering | High performance radio — low cost, small size, efficient battery consumption, better coverage |
| Analog RF & Digital ASIC | Integration — low cost, small size |
| Audio | Improve audio quality in all environments through hardware and signal processing design. Excellent multi-media capability. |
| Display | High resolution bright displays with improved power characteristics |
| Intelligent Antennas | Effective radiated power — better coverage and efficient battery consumption |
| Power Management | Low power requirements — efficient battery consumption |
| Firmware | Integration, customization — low cost, Small size, efficient battery consumption |
| Software Tools | Software development kits — more applications available |
| Testing Software | Fast and thorough test/debug — low cost, better quality, improved service/support |
| Product Design | Award winning products / outstanding customer experience through software and user interfaces |

One of the significant competitive advantages of RIM's radio design is that its proprietary technology can be extended through development efforts to other protocols and to emerging digital network standards.

The Company's research and development efforts are focused primarily on the following areas:

- evolving the functionality, security and performance of its BlackBerry wireless solution and BlackBerry wireless devices;
- developing new devices for current and emerging wireless network technologies and market segments;
- building device software including compilers, Java Virtual Machine, radio code, and BlackBerry applications;
- developing server and desktop software for corporate, institutional and Prosumer environments;
- developing infrastructure systems to provide the underlying support for wireless network and Internet connectivity;
- providing a platform and tools for third party software developers and enterprises to write and wirelessly enable applications;
- providing tools and components to enable other manufacturers and operating system vendors to embed BlackBerry connectivity in their products; and
- improving manufacturing and testing technologies.

The Company also engages in longer term fundamental research both directly and by selective funding of university research projects. Product development research is funded in part by purchase commitments for a product or products under development. The Company endeavors to

24

take advantage of specific government and academic financial assistance programs to support its research activities where available. The Company dedicates a large portion of its software investment to the overall BlackBerry wireless solution. This includes device applications, server software and infrastructure, with an emphasis on satisfying the needs of both corporate IT departments and individual customers.

The Company has previously entered into two project development agreements with Technology Partnerships Canada ("TPC"), which provide partial funding for certain research and development projects.

Funding from TPC for the first agreement ("TPC-1") totaled $3.9 million and was repayable in the form of royalties of 2.2% on gross product revenues resulting from the project. The Company was obligated to pay royalties on all project revenues up to a maximum of $6.1 million. The Company has fully repaid its obligations with respect to TPC-1.

The second agreement with TPC is for a development project ("TPC-2") under which total contributions from TPC have been $23.3 million. The Company had fulfilled all prerequisite funding conditions and recorded all of the contributions as at February 28, 2004. This contribution is repayable to TPC in the form of a royalty of 2.2% on gross business revenues, subject to the Company maintaining a minimum number of Canadian employees and to certain annual maximum amounts through fiscal 2015, not exceeding $46 million. The Company has recorded $4.3 million on account of TPC royalty repayment expense with respect to TPC-2 obligation during fiscal 2008 (March 3, 2007 - $2.8 million).

The Company also qualifies for investment tax credits ("ITC's") on eligible expenditures on account of Canadian scientific research and experimental development. In fiscal 2007 and fiscal 2008, the Company recognized the benefits of its ITC's in its consolidated statement of operations as a reduction in income tax expense.

**Intellectual Property**

The policy of the Company is to apply for patents, acquire and/or seek other appropriate proprietary or statutory protection when it develops valuable new or improved technology. RIM believes that the rapid pace of technological change in the communications industry makes patent and trade secret protection important, but this protection must be supported by other means including the ability to attract and retain qualified personnel, new product introductions and frequent product enhancements.

RIM protects its technology through a combination of patents, designs, copyrights, trade-secrets and contractual arrangements. RIM seeks to patent key concepts, components, protocols, processes and other inventions that it considers to have commercial value or that will likely give RIM a technological advantage. Although RIM applies for patent protection primarily in Canada, Europe and the United States, the Company has filed, and will continue to file, patent applications in other countries where there exists a strategic technological or business reason to do so. To broadly protect RIM's inventions, the Company has a team of in-house patent attorneys and also consults with outside patent attorneys who interact with employees, review invention disclosures and prepare patent applications on a broad array of core technologies and

25

competencies. As a result, RIM owns rights to an array of patented and patent pending technologies relating to wireless communication technology.

It is RIM's general practice to enter into confidentiality and non-disclosure agreements with its employees, consultants, contract manufacturers, customers, potential customers and others to attempt to limit access to and distribution of its proprietary information. In addition, the Company generally enters into agreements with employees that include an assignment to the Company of all intellectual property developed in the course of employment.

RIM also enters into various types of licensing agreements related to technology and intellectual property rights. RIM enters certain of these agreements to obtain rights that may be necessary to produce and sell products for the wireless industry. RIM may also license its technology and intellectual property to third parties through various licensing agreements.

## Production

RIM owns a 242,000 square foot manufacturing facility strategically located within close proximity to the Company's research and development facilities and labs in Waterloo, Ontario. An expansion of an additional 50,000 square feet and renovation of the existing building was completed by RIM in July 2007. The expanded facility will be used for co-location of some dispersed manufacturing operations functions, incremental production and material storage requirements.

During the course of calendar 2007, additional manufacturing capacity was added to support the higher ramp volumes required for the various new products introduced and ongoing production ramp activities.

RIM fully integrates manufacturing with its internal research and development activities. RIM expects that these benefits will continue to be significant and will grow incrementally as it pursues its objective of positioning itself to provide cost-effective and innovative access device solutions across the entire range of current wireless network standards. In addition, RIM outsources production of high volume products to contract manufacturers.

With continued supply chain investment and the addition of flexible production capacity and distribution through the extension of outsourcing partnerships, RIM is well positioned to fulfill the requirements of carrier customers seeking a reliable, assured source of supply for handheld device orders.

The Company expects to further leverage and expand outsourcing partnerships and increase its outsourcing volumes for handheld manufacturing during fiscal 2009 due to increasing device shipments and global distribution demands.

## Regulatory Matters

In addition to the regulatory requirements applicable to any business, an access device manufacturer must obtain certification from the radio/telecommunications regulatory authorities

26

in most jurisdictions before commencing commercial sale of its products in those jurisdictions. A significant competitive advantage exists for manufacturers with established businesses who have previously met the certification requirements for their products and who are familiar with the regulatory process.

RIM's products must be approved by the Federal Communications Commission ("FCC") before they can be used in commercial quantities in the United States. In Canada, the relevant regulatory authority is Industry Canada while the European Community ("EC") sets requirements for use in EC member states. Regulatory requirements are similar in other jurisdictions. All regulators require that access devices meet various standards, including limits with respect to interference with other electronic equipment and safety standards with respect to human exposure to electromagnetic radiation.

RIM's BlackBerry wireless devices, which are made commercially available by RIM, meet FCC, Industry Canada, and EC requirements. In addition, RIM devices have obtained the necessary regulatory approvals required by other countries where such products are made commercially available by RIM.

Some of the Company's operations are subject to various regulations in the United States covering the accessibility requirements for persons with disabilities. These regulations include Section 255 of the US Telecommunications Act, the FCC HAC Act concerning hearing-aid compatible telephones, and Section 508 of the US Rehabilitation Act. These regulations are going through a review process and expected revisions will be more stringent and encompassing over time, may be required in more places of RIM's business including Europe, Australia and Canada and may require the Company to incur substantial costs for compliance.

At the present time, RIM has the required regulatory certifications for its testing facilities which allow the Company to perform all the testing required by the FCC and Industry Canada, and most of the testing required by the EC. In addition, RIM can also perform some of the testing which is required by other international regulatory authorities in some of the countries where the Company makes its products commercially available.

### Environmental Regulations and Costs

Some of the Company's operations are subject to regulation under various provincial, federal, state and international laws relating to environment protection and the proliferation of hazardous substances. In parts of Europe and North America, the Company is currently obligated to comply with substance bans, packaging and certain recycling requirements. In addition, the Company may be required to comply with substance bans in other jurisdictions and product take-back requirements that would make the Company responsible for recycling and/or disposing of products the Company has sold. These and other environmental laws may become more stringent over time, may be required in more places of RIM's business and may require the Company to incur substantial costs for compliance.

27

**Employees**

As of March 1, 2008, RIM had 8,387 employees, including: 2,910 in the advanced research, product development, standards and licensing areas; 1,076 in sales, marketing and business development; 1,355 in customer care and technical support; 1,552 in manufacturing and 1,494 in administration, which includes information technology, BlackBerry network operations and service development, finance, legal, facilities and corporate administration.

**Facilities**

*Waterloo, Ontario, Canada*

The Company's corporate headquarters and manufacturing facility are located in Waterloo. The campus-type layout of 22 buildings, 13 of which are owned and nine of which are leased, currently houses the corporate, administration, finance, engineering, research and development, sales and marketing and manufacturing operations. The buildings which are owned contain approximately 1,141,685 square feet; RIM occupies approximately 966,165 square feet, with the balance being sublet to tenants. Additionally, RIM currently occupies approximately 274,084 square feet in eight leased buildings. RIM also recently acquired two additional buildings and land adjacent to the main campus as well as an additional 37.48 acres of land in north Waterloo to accomodate continued growth in the area.

*Other*

RIM leases 101,442 square feet outside Ottawa, Ontario, used primarily for research and development and engineering functions, and has also acquired a 157,696 square foot building with acreage to establish a permanent presence in the area. RIM also leases 50,168 square feet in Mississauga, Ontario, used for a variety of sales, research and development and engineering activities. Construction of a new 160,000 square foot facility in Mississauga is scheduled to be completed in calendar 2008. In addition, RIM leases an 82,028 square foot facility in Halifax, Nova Scotia, used for customer service operations. Construction of a new 153,000 square foot customer service operations center, located in the greater Halifax area, is scheduled to be completed in early summer 2008.

RIM leases facilities in various locations throughout the United States, including 109,448 square feet for its U.S. headquarters in Dallas, Texas, which houses certain sales, marketing, legal, customer service operations and administration activities. In total, RIM leases 238,434 square feet throughout the United States. In addition, RIM has recently opened a small 2,300 square foot sales office located in Mexico City.

RIM also has established offices in Europe and Asia Pacific. The RIM operations in Europe are headquartered out of a 68,893 square foot leased facility in Slough, UK, used for customer service operations, sales, marketing, BlackBerry network operations, information technology and administrative activities. In calendar 2007, RIM leased an additional 32,981 square foot facility in close proximity to the European headquarters. A number of other small offices leased in France, Germany, Italy, Spain, and U.K. add approximately 47,000 square feet, and are primarily used for sales and marketing activities. In Asia Pacific, RIM operates 26,001 square feet in Hong Kong, Australia, Japan and China, conducting sales and marketing activities, in addition to the 32,733 square foot customer operations support center located in Singapore.

28

# EXHIBIT C

UNITED STATES DISTRICT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| VISTO CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 2:06 – CV – 181 |
| vs. | ) | |
| | ) | |
| RESEARCH IN MOTION LIMITED | ) | |
| RESEARCH IN MOTION CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

DECLARATION OF BRIAN RIVERS IN SUPPORT OF
RIM'S MOTION TO TRANSFER

## DECLARATION OF BRIAN RIVERS

I, Brian Rivers, declare as follows:

1. I have personal knowledge of the facts stated herein and if called to testify could competently testify to the following matters.

2. I am the Vice President of Licensing at Research In Motion Ltd. ("RIM Ltd.") and Research In Motion Corp. ("RIM Corp.") (collectively "RIM"), the defendants in the above-captioned litigation.

3. RIM Ltd. is a Canadian corporation with its principal place of business in Waterloo, Ontario, Canada. RIM Ltd. does not have offices in the United States.

4. RIM Corp. is a Delaware Corporation, and is a wholly-owned subsidiary of RIM Ltd. RIM Corp.'s principle place of business and only offices are in Irving, Texas. Irving represents RIM's U.S. home forum, and has been RIM's U.S. headquarters since October 2003.

5. RIM Corp. has the right to grant distributorships in the United States for RIM Ltd.'s products and services, including distribution of the products at issue in RIM's declaratory judgment claims, and is the only entity currently distributing RIM products in the United States. RIM's intellectual property and licensing activities are conducted in its Irving offices. In addition, research and development, design engineering, and manufacturing also take place at the Irving offices.

6. The Irving office provides temporary office space for visiting employees and provide access to the RIM internal network and other necessary resources such as assistants, conference

2

rooms, videoconferencing, email, phone, fax, copying and other equipment that allows employees to continue to work their normal schedule even when away from Waterloo.

7.  RIM's documents can be accessed in its Irving offices.  All records and files relating to licensing are physically located in the Irving office and nowhere else.

8.  I have been the point person at RIM regarding the Visto matter.  I may provide testimony regarding RIM's actions related to the Visto patents.

9.  Although I recently moved to Waterloo, Canada, I previously lived in the Northern District of Texas, still maintain an office at RIM's Irving office and spend a significant amount of time working from that office.  Since I work here in the Dallas area, I would find appearing at trial in Dallas much more convenient than Marshall.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30th day of May, 2006, in Irving, Texas.

_Brian Rivers_

Brian Rivers

3

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| *RESEARCH IN MOTION LIMITED* and | § | |
| *RESEARCH IN MOTION CORPORATION,* | § | |
| | § | CIVIL ACTION NO. 3:08-CV-0284-G |
| Plaintiffs, | § | ECF |
| | § | |
| | § | ORAL ARGUMENT REQUESTED |
| v. | § | |
| | § | |
| *MOTOROLA, INC.,* | § | |
| | § | |
| Defendant. | § | |

---

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO
DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO
DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT
PATENT CLAIMS**

---

Eric W. Pinker, P.C. (TSBN 16016550)
Mark E. Turk (TSBN 00786298)
Angela V. Colmenero (TSBN 24048399)
**Lynn Tillotson & Pinker, LLP**
750 N. St. Paul Street, Suite 1400
Dallas, Texas 75201
(214) 981-3837
(214) 981-3839 - telecopier

April 10, 2008

*Of Counsel*:

Jesse J. Jenner*
Steven Pepe
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
jesse.jenner@ropesgray.com

Norman H. Beamer*
**ROPES & GRAY LLP**
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 617-4000
norman.beamer@ropesgray.com

Nicole M. Jantzi*
**ROPES & GRAY LLP**
700 12th Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
nicole.jantzi@ropesgray.com
* Admitted Pro Hac Vice

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................6

ARGUMENT .......................................................................................................................9

I.    RIM'S ANTITRUST AND CONTRACT CLAIMS SHOULD BE DISMISSED............9

    A.    The Requirements Of A Well-Pleaded Complaint ...................................................10

    B.    RIM's Sherman Act, Section 2 Claim ("Thirteenth Cause Of Action")
        Should Be Dismissed ...............................................................................................11

        1.    RIM's Failure to Plead Antitrust Injury Alone Warrants Dismissal..............12

            (a)    No antitrust injury to RIM......................................................................12

            (b)    No injury to competition .........................................................................14

        2.    RIM's Failure To Plead Anticompetitive Conduct Also
            Warrants Dismissal ......................................................................................15

    C.    RIM's Breach Of Contract Claims Also Should Be Dismissed ............................20

        1.    Breach of Contract With The Standards Organizations (RIM's
            "Tenth And Fourteenth Cause of Action") ...................................................20

        2.    Promissory Estoppel (RIM's "Eleventh And Fifteenth Cause of Action") ...21

        3.    Breach of Contract – Breach of § 5.3 of the 2003 Cross-License
            Agreement With RIM (RIM's "Twelfth Cause of Action") ..........................22

II.    IF NOT DISMISSED, RIM'S ANTITRUST AND CONTRACT CLAIMS
     SHOULD BE BIFURCATED AND STAYED ................................................................23

III.    RIM'S DECLARATORY JUDGMENT PATENT CLAIMS SHOULD BE
      DISMISSED, OR IN THE ALTERNATIVE STAYED OR TRANSFERRED,
      IN FAVOR OF MOTOROLA'S EASTERN DISTRICT OF TEXAS ACTION............29

    A.    This Court Has Discretion To Dismiss RIM's Declaratory Judgment Claims........30

    B.    The Discretionary Guidelines Established By The Applicable Authorities
        Require Dismissal Of RIM's Declaratory Judgment Claims ...................................30

        1.    The RIM (Dallas) and Motorola (Marshall) lawsuits were filed essentially
            simultaneously and, therefore, the first to file rule is inapplicable ................32

            (a)    The first to file rule does not apply .........................................................32

            (b)    Absent either action being first-filed, Motorola's choice of forum
                 (Marshall) should hear the claims on Motorola's patents ...................34

       2.     The "Fairness" factors support dismissal ...................................................... 36

       3.     The "Efficiency" factors support dismissal .................................................. 38

            (a)    The convenience of the parties and witnesses is a neutral factor ......... 38

            (b)    Judicial economy strongly favors dismissal ......................................... 41

C.     Alternatively, RIM's Declaratory Judgment Claims Should Be Stayed
       Pending Final Resolution Of Motorola's Patent Infringement Action,
       Or Transferred To The Eastern District Of Texas .................................................. 43

CONCLUSION ............................................................................................................................... 44

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967)....................................................................................30

*Affymetrix, Inc. v. PE Corp.,*
    219 F. Supp. 2d 390 (S.D.N.Y. 2002).........................................................25

*Akzona Inc. v. E.I. Du Pont De Nemours & Co.,*..........................................24, 25
    607 F. Supp. 227 (D. Del. 1984)................................................................

*Ameen v. Merck & Co., Inc.,*...............................................................................21
    226 Fed. Appx. 363 (5th Cir. 2007)..........................................................

*American Hoist & Derrick Co. v. Sowa and Sons, Inc.,*....................................19
    725 F.2d 1350 (Fed. Cir. 1984)................................................................

*ASM America, Inc. v. Genus, Inc.,*......................................................................25
    No. 01-2190, 2002 WL 24444 (N.D. Cal. Jan. 9, 2002).........................

*Aurora Corp. of Am. v. Fellowes, Inc.,*..............................................................33
    No. CV 07-8306-GHK................................................................

*Baxter Intern., Inc. v. Cobe Lab, Inc.,*...............................................................25
    No. 89 C 9460, 1992 WL 77665 (N.D. Ill. Apr. 7, 1992).......................

*Bell Atlantic Corp. v. Twombly,*.............................................................10, 11, 13
    127 S.Ct. 1955 (2007).............................................................

*Brandt, Inc. v. Crane,*.........................................................................................26
    97 F.R.D. 707 (N.D. Ill. 1983).................................................

*Broadcom Corp. v. Qualcomm, Inc.,*...................................................................27
    501 F.3d 297 (3d Cir. 2007)....................................................

*Candela Corp. v. Palomar Med. Techs., Inc.,*....................................................41
    No. 9:06-CV-277, 2007 WL 738615 (E.D. Tex. Feb. 22, 2007)............

*Capco Int'l, Inc. v. Haas Outdoors, Inc.,*...........................................................37
    No. Civ.A. 3:03-CV-2127G, 2004 WL 792671 (N.D. Tex. Apr. 9, 2004)

*Chip-Mender, Inc. v. Sherwin-Williams Co.,*
  2006 U.S. Dist. LEXIS 2176 (D. Cal. 2006) ........................................... 25

*CMI, Inc. v. Verax Sys., Inc.,*
  No. CIV-85-035, 1987 WL 46536 (W.D.N.Y. July 22, 1987) ................................. 26

*Components, Inc. v. Western Electric Company,*
  318 F. Supp. 959 (D. Me. 1970) ........................................... 26

*Connexus Credit Union v. Connex Credit Union,*
  219 F.R.D. 465 (W.D. Wisc. 2003) ........................................... 33

*Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.,*
  154 S.W.3d 634 (Tex. App.-Houston [14th Dist.] 2004) ........................................... 21

*EMC Corp. v. Norand Corp.,*
  89 F.3d 807 (Fed. Cir. 1996) ........................................... 30, 36

*ESS Tech. v. PC-Tel, Inc.,*
  No. C-99-20292 RMW ........................................... 27

*Genentech v. Eli Lilly & Co.,*
  998 F.2d 931 (Fed. Cir. 1993) ........................................... 30, 31

*Hahn v. Star Bank,*
  190 F.3d 708 (6th Cir. 1999) ........................................... 24

*Hammond & Taylor, Inc. v. Duffy Tingue Co.,*
  161 A.2d 238 (Del. Ch. 1980) ........................................... 23

*Hayes v. Solomon,*
  597 F.2d 958 (5th Cir. 1979) ........................................... 17

*Hindes v. Wilmington Poetry Soc.,*
  138 A.2d 501 (Del. Ch. 1958) ........................................... 23

*Hunt-Collin Elec. Coop., Inc. v. Rayburn Country Elec. Coop., Inc.,*
  No. S-87-211-CA, 1988 WL 428654 (E.D. Tex. Feb. 5, 1988) ........................................... 33, 34

*Hynix Semiconductor, Inc. v. Rambus, Inc.,*
  441 F. Supp. 2d 1066 (N.D. Cal 2006) ........................................... 26

*i2 Techs. US, Inc. v. Lanell,*
  No. Civ.A. 302CV0134G, 2002 WL 1461929 (N.D. Tex. July 2, 2002) ........................................... 37

*Implant Innovations, Inc. v. Nobelpharma AB,*
  No. 93 C 7489, 1996 WL 568791 (N.D. Ill. Oct. 2, 1996) ........................................... 26

*In re Innotron Diagnostics,*
  800 F.2d 1077 (Fed. Cir. 1986)................................................................................25, 26

*In re Rambus,*
  2007 WL 431524 (F.T.C. Feb. 5, 2007) ....................................................................28

*Int'l Equity Capital Growth Fund v. Clegg,*
  Civ.A. 14995, 1997 WL 208955 (Del. Ch. Apr. 22, 1997) ......................................23

*International Development Corp. v. INTP, Inc.,*
  2004 WL 2533560 (N.D. Tex. November 8, 2004)....................................................30

*J & A Sales & Mktg., Inc. v. J.R. Wood, Inc.,*
  No. 01 C 6749, 2002 WL 653897 (N.D. Ill. Apr. 19, 2002)......................................33

*John Wood Group USA, Inc. v. ICO, Inc.,*
  26 S.W.3d 12 (Tex. App. 2000)................................................................................22

*Kinetic Concepts, Inc. v. Connectics Corp.,*
  2004 U.S. Dist. Lexis 17969 (W.D. Tex. September 9, 2004) ..................................35

*Landis v. N. Am. Co.,*
  299 U.S. 248 (1936)..................................................................................................24

*Landmark Graphics Corp. v. Seismic Micro Tech., Inc.,*
  2006 U.S. Dist. LEXIS 77664 (S.D.Tex. 2006) .......................................................25

*Lockheed Martin Corp. v. L-3 Commcn's Corp.,*
  405 F. Supp. 2d 1381 (N.D. Ga. 2005)..............................................................33, 34

*Lum v. Bank of America,*
  361 F.3d 217 (3d Cir. 2004)......................................................................................18

*Mag Instrument, Inc. v. J. Baxter Brinkmann International Corp.,*
  123 F.R.D. 543 (N.D.Tex. 1988) ..............................................................................24

*Maranatha Temple v. Enter. Prods. Co.,*
  893 S.W.2d 92 (Tex. App. 1994)..............................................................................22

*McDaniel v. Anheuser-Busch, Inc.,*
  987 F.2d 298 (5th Cir. 1993) ....................................................................................24

*Medtronic, Inc. v. Camp,*
  No. Civ. 02-285 PAM/JGL, 2002 WL 539073 (D. Minn. Apr. 1, 2002) ...................33

*Melder v. Morris,*
  27 F.3d 1097 (5th Cir. 1994) ................................................................................18, 19

*Metro Optics, Inc. v. Contex, Inc.*,
    1996 WL 302697 (N.D.Tex. 1996).............................................................36, 44

*Mill Creek Press, Inc. v. Thomas Kinkade Co.*,
    No. 3:04-CV-1213-G, 2004 WL 2607987.....................................................34

*Mobil Oil Exploration Co. v. Fed. Energy Regulatory Comm'n*,
    814 F.2d 998 (5th Cir. 1987) .........................................................................33

*Moore U.S.A., Inc. v. Standard Register Co.*,
    139 F. Supp. 2d 348 (W.D.N.Y. 2001) ..........................................................26

*Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*,
    512 F.3d 137 (5th Cir. 2007) ........................................................................10

*Nokia Corp. v. Qualcomm, Inc.*,
    C.A. NO. 2330-VCS, Dkt. 316 ......................................................................27

*Norris v. Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007) ...........................................................11, 12, 15

*PAJ, Inc. v. Yurman Design, Inc.*,
    1999 WL 68651 (N.D. Tex. 1999)...................................................................37

*Penn. Gen. Ins. Co. v. CaremarkPCS*,
    No. 3:05-CV-0844-G, 2005 WL 2041969 (N.D. Tex. Aug. 24, 2005) .................33, 34, 37, 38

*Performance Printing Corp. v. The Upper Deck Co.*,
    No. 3:98-CV-0035-R, 1999 WL 184125 (N.D. Tex. Mar. 29, 1999)......................................19

*Pharmacia, AB v. Hybritech, Inc.*,
    Civ. No. 84-699, 1984 WL 1479 (S.D. Cal. Oct. 19, 1984) ......................................26

*Raytheon Co. v. Nat'l Union Fire Ins. Co.*,
    306 F. Supp. 2d 346 (S.D.N.Y. 2004)..............................................................33

*Recoton Corp. v. Allsop, Inc.*,
    999 F. Supp. 574 (S.D.N.Y. 1998)..................................................................33

*Research In Motion, et al. v. Visto Corporation*,
    Civil Action No. 3:06-CV-0783-0 (N.D. Texas, July 11, 2006) ............................................35

*Research In Motion Limited, et al. v. Visto Corporation*,
    CA No. 3:06-CV-0783-D (N.D. Texas Oct. 19, 2006)...........................................................42

*Research in Motion Ltd. v. Visto Corp.*,
    457 F. Supp. 2d 708 (E.D. Tex. 2006)...................................................................35

*Sealed Appellant I v. Sealed Appellee I,*
   156 Fed. Appx. 630 (5th Cir. 2005)..................................................................................18

*Serco Servs. Co. v. Kelley Co.,*
   51 F.3d 1037 (Fed. Cir. 1995)......................................................................................30

*Sherwin-Williams Company v. Holmes County,*
   343 F.3d 383 (5th Cir. 2003) ..................................................................................30, 31

*Swofford v. B & W, Inc.,*
   336 F.2d 406 (5th Cir. 1964) ........................................................................................25

*Symbol Techs., Inc. v. Data Gen. Corp.,*
   40 U.S.P.Q.2d 1216 (S.D.N.Y. 1996)............................................................................34

*United States v. Humana Health Plan of Texas, Inc.,*
   336 F.3d 375 (5th Cir. 2003) ........................................................................................18

*Verizon Commun., Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004).................................................................................................11, 20

*Verizon Emple. Benefits Comm. v. Glaid,*
   2006 U.S. Dist. LEXIS 85941 (D. Tex. 2006)..............................................................41

*W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24,*
   751 F.2d 721 (5th Cir. 1985) ........................................................................................44

*Wilton v. Seven Falls Company,*
   515 U.S. 277 (1995)................................................................................................30, 43

*Wolf Designs, Inc. v. Donald McEvoy Ltd.,*
   341 F. Supp. 2d 639 (D. Tex. 2004) .............................................................................43

**STATUTES** ......................................................................................................................12

15 U.S.C. § 15(a) ................................................................................................................44

28 U.S.C. § 1404(a) ...........................................................................................................30

28 U.S.C. § 2201 ................................................................................................................

**OTHER AUTHORITIES**

6 Charles A Wright, Arthur R. Miller, and Mary K. Kane, *Federal Practice & Procedure*
§ 1418...................................................................................................................................35

Fed. R. Civ. P. 8 ...............................................................................................................10, 11

Fed. R. Civ. P 9(b) ...........................................................................................................10, 18

Fed. R. Civ. P. 12(b)(6)...........................................................................................................10

Fed. R. Civ. P. 21 ....................................................................................................................44

Fed. R. Civ. P. 42(b) ...............................................................................................................24

Fed. R. Civ. P. 45(b)(2)(C) .....................................................................................................40

Texas R. Civ. P. 176.3 .............................................................................................................40

Defendant Motorola respectfully submits this brief in support of its motion to (i) dismiss plaintiffs Research In Motion Limited's ("RIM Canada") and Research In Motion Corporation's (" RIM Corporation") (collectively, "RIM") antitrust and contract claims; (ii) bifurcate and stay any antitrust or contract claims not dismissed; and (iii) dismiss, stay or transfer RIM's declaratory judgment claims against Motorola's patents.

## INTRODUCTION

Motorola has, for many years, been a leader in the research and development of wireless telecommunications technology. As a result of its efforts, Motorola has been awarded an extensive portfolio of patents in this area, including both "essential" patents (patents that must be practiced by anyone wishing to make a product that complies with a telecommunications "standard") and "non-essential" patents (those that are not required to be compliant with the "standard"). Motorola's patents are so valuable that dozens of companies, including many of Motorola's direct competitors, have taken licenses under Motorola's patents.

Until the end of 2007, RIM was one such company. In 2003, Motorola licensed to RIM certain Motorola "essential" and "non-essential" patents. When it came time to discuss renewal of this license, RIM demanded that Motorola license its valuable patents to RIM at a much lower royalty rate than others have paid. Because Motorola was not willing to capitulate to RIM's demand for special treatment, RIM anticipated that Motorola would file a patent infringement action against RIM, which Motorola did file (on *only* its "non-essential" patents) in the Eastern District of Texas (Marshall). In an attempt to preempt Motorola's patent enforcement action, RIM manufactured this complex antitrust and contract action, leveling outrageous misconduct charges at Motorola, in addition to asserting a score of unrelated patent claims.

In essence, RIM accuses Motorola of lying to industry standards groups, attempting to force RIM into taking patent licenses at exorbitant rates, and other unsupportable misconduct charges. The bankruptcy of RIM's offensive charges will be laid bare if these claims ever are tested on the merits. What matters on this motion, however, is that RIM has lumped together its strident antitrust and contract claims with twenty patent infringement claims, creating a cumbersome and unmanageable litigation that will completely forestall a timely and sensible resolution of these disputes. In fact, RIM's February 16 and February 21 complaints bundle together what are actually *three separate and independent lawsuits* that, remarkably, *do not have overlapping patents*:[1]

- **RIM's patent infringement claims**: RIM's affirmative claims against Motorola for infringement of *nine RIM patents* (February 16 complaint, Causes Of Action 1-9).[2]

- **The declaratory judgment claims against Motorola's patents:** RIM's pre-emptive claims against Motorola, seeking a declaratory judgment that *eleven Motorola patents* are invalid or not infringed (February 16 complaint, Causes Of Action 16-22, and February 21 complaint, Claims 1-4). These claims are duplicative of the affirmative patent infringement action commenced by Motorola simultaneously in Marshall.[3]

---

[1] RIM filed the complaint commencing this action on February 16, 2008 (Docket Entry 1). On February 21, RIM filed a separate complaint in this District (No. 3:08-CV0317-O at Docket Entry 1), which was subsequently consolidated with this action (Docket Entry 25).

[2] RIM's patent infringement claims are duplicative of a declaratory judgment action filed by Motorola on February 16 in the District of Delaware ("the Delaware action"). And they are also identical to the counterclaim that RIM has filed in the Delaware action. On March 31, 2008, RIM moved to transfer the Delaware action to this Court. Motorola intends to request that the Delaware court stay consideration of that motion until this motion is resolved.

[3] On March 31, 2008, RIM filed a motion to transfer the Marshall action to this district. Motorola intends to oppose that motion on the same grounds that support its motion here to

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 2 OF 46 PAGES

- **The antitrust/contract claims:** RIM's antitrust claim (February 16 complaint, Cause Of Action 13) and contract claims (February 16 complaint, Causes Of Action 10-12, 14-15), alleging that Motorola supposedly demanded exorbitant terms for *76 "essential" patents* after falsely promising to license those patents on reasonable terms.[4] These Motorola "essential" patents are completely different from the Motorola "non-essential" patents in the Marshall action.

To try any one of these three, *unrelated* groups of claims will present a difficult enough challenge — they need not and should not be tried together. By this motion, Motorola seeks three forms of relief to simplify this lawsuit and to avoid protracted, expensive, and unnecessarily-complicated litigation:

1. **Dismissal of RIM's Antitrust/Contract Claims:** This motion first asks this Court to dismiss RIM's contrived antitrust/contract claims for failure to state a proper claim. These non-patent claims, distilled to their essence, simply reflect the fact that Motorola and RIM (unlike dozens of other Motorola licensees) have not yet been able to agree on a rate for Motorola's "essential" patents. Far from an antitrust violation or breach of contract, Motorola and RIM

---

dismiss, stay or transfer RIM's declaratory judgment claims. The relief that Motorola seeks in this motion and in its opposition to RIM's Marshall motion is designed to prevent overlapping, parallel litigations in multiple jurisdictions. We recognize, however, that the Courts may want to confer as to the appropriate jurisdictions to hear each of these actions. *VCode Holdings, Inc. v. Cognex Corp.*, No. 2:07-CV-138, 2007 WL 2238054, at *2 (E.D. Tex. Aug. 3, 2007) (indicating that Court conferred with the Court in the District of Minnesota regarding whether transfer would accomplish judicial economy); *Taylor v. Ishida Co., Ltd.*, No. 3:02-CV-0402-D, 2002 WL 1268028, at *7-8 (N.D. Tex. May 31, 2002).

[4] If RIM's allegations of exorbitant terms are ultimately tried, the record will show that Motorola's terms are hardly exorbitant. In fact, Motorola has offered terms to RIM that are comparable to those that have been accepted by many other competitors. Motorola's course of dealing with the entire industry has validated the reasonableness of Motorola's licensing terms. *RIM simply wants to pay less than what others pay.*

---

simply have an ordinary licensing dispute. Because a mere licensing dispute is not an antitrust violation, anticompetitive conduct, or a breach of contract, these claims are deficient.

What is more, this motion is not merely an exercise in requiring RIM to plead properly-grounded averments. To the contrary, RIM cannot fix its deficient pleadings at least because:

- Even if Motorola actually had made exorbitant demands (it did not), RIM has not been injured. RIM was licensed under the "essential" patents until December 31, 2007, and has paid nothing and lost nothing since then. Once this litigation runs its course, RIM will either have lost, because it was indeed offered a license under fair and reasonable terms and thus has not been injured; or RIM will have won, and will obtain a license under what this Court determines are fair and reasonable terms. Either way, because RIM will become licensed on fair and reasonable terms, *there has not been, and will never be, any injury to RIM*.

- RIM implies, but does not affirmatively allege, that Motorola has refused to license its "essential" patents unless RIM takes a license to its "non-essential" patents. RIM also falsely charges that Motorola is using the "non-essential" patents as a threat to extort unreasonable terms for the "essential" patents. But, *RIM never actually pleads that Motorola has refused to license the "essential" patents separately, because Motorola has never refused to do so. Nor does RIM acknowledge that it never requested licensing terms for the "essential" patents only.* RIM knows it can have a license under the "essential" patents, with or without a license to the "non-essential" patents.

For these and other reasons explained below, the antitrust and contract claims cannot stand.

**2. Bifurcation and Stay of RIM's Antitrust/Contract Claims**: Any antitrust or contract claim that is not dismissed should be bifurcated and stayed.  What these claims actually ask the Court to do is to determine "fair, reasonable and nondiscriminatory" licensing terms for Motorola's "essential" patents.  RIM, in fact, explicitly requests this determination early in its February 16 Complaint (¶6(d)).  But what RIM does not tell the Court is that this rate determination requires a massive, multifaceted analysis never before attempted by another Court.  Such a determination requires, *at least*: (i) analysis of the validity, and the applicability to the technology standard, of at least the 76 "essential" Motorola United States patents on the list that RIM has attached to the complaint (but which *are not otherwise the subject of any infringement or declaratory judgment claims in this action or elsewhere*); (ii) an assessment of the various alternative technologies that were being considered at the time the applicable standard was adopted, as compared to the technologies covered by the "essential" patents; and (iii) an analysis of how the value of these "essential" Motorola patents compares with the value of "essential" patent portfolios owned and licensed by others that are part of the adopted standard.

This will be an adjudicative nightmare, but one that this Court need never undertake, if resolution of the patent infringement and declaratory judgment claims of both parties results in a complete settlement between the parties.  Because those patent claims can be resolved more expeditiously than the antitrust and contract claims, logic dictates that RIM's patent infringement claims, and Motorola's patent infringement claims in Marshall, each should be adjudicated first.  Then, only if that outcome has not resulted in a global settlement, this Court might be called on to provide what is, in effect, an advisory opinion as to reasonable terms for licensing the 76 "essential" Motorola United States patents that are not otherwise in suit anywhere.  Staying any remaining antitrust/contract claims will make this orderly sequence possible.

**3. Dismissal, Stay or Transfer of RIM's Declaratory Judgment Claims**: To simplify RIM's unmanageable lawsuit further, and to undo RIM's anticipatory invocation of the Declaratory Judgment Act, this Court should exercise its discretion to dismiss, stay or transfer to Marshall RIM's declaratory judgment claims against Motorola's "non-essential" patents. This action and Motorola's Marshall action were instituted *simultaneously* at the moment that a litigation standstill agreement between the parties ended on February 15. The authorities hold that under such circumstances, a party's declaratory judgment claims filed in anticipation of a patentee's action do not serve the purposes of the Declaratory Judgment Act. The preferred forum is that of the patentee. Accordingly, the claims on Motorola's patents should proceed in Marshall — patentee Motorola's choice of forum. That will leave RIM free to proceed here on its own patent claims.

— oOo —

In sum, RIM is nothing more than a recalcitrant former licensee who hopes to extract a more favorable licensing deal by overwhelming the licensing negotiations with a protracted, expensive, and unnecessarily-complicated litigation. With this in mind, the Court can and should streamline this action as outlined above, for efficient and fair administration.

## FACTUAL BACKGROUND

Motorola has been a leading innovator in telecommunications and other technologies over the course of nearly eight decades. (App. 19-23).[5] As part of its participation in standards-setting organizations, Motorola has declared the identity of patents that it considers "essential" to

---

[5] "App." refers to the Appendix submitted herewith.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS        PAGE 6 OF 46 PAGES

a standard, and has agreed to license its "essential" patents on "FRAND" (Fair, Reasonable and

Non-Discriminatory) terms as required by the standard organizations. (App. 1, Blasius ¶ 3).[6]

In particular, at least 76 Motorola United States patents have been identified by Motorola

as being "essential" to complying with the ETSI (European Telecommunications Standards

Institute) standards referred to in RIM's February 16 complaint (¶¶ 42-45, & Complaint

Appendix A).[7] Motorola has licensed its "essential" ETSI patents to dozens of companies,

including many of Motorola's competitors in the industry.[8] (App. 1, Blasius ¶ 3). Indeed,

Motorola has been, and remains, willing to license its "essential" patents without requiring that a

licensee (like RIM) also take a license under any "non-essential" patents. In fact, most of

Motorola's agreements that cover licenses under "essential" patents provide no license at all for

"non-essential" patents. (App. 2, Blasius ¶ 6).

From 2003 through the end of 2007, RIM was licensed under a number of Motorola's

"essential" and "non-essential" patents. One of the terms of that license provided for RIM's

payment to Motorola of an up-front, lump sum amount for use of certain "essential" and "non-

essential" Motorola patents. Motorola determined the lump sum amount based on a typical

"essential" patent royalty rate used in other Motorola licenses, applied to an estimate of RIM's

---

[6] "Blasius" refers to the Declaration of Brian Blasius at App. 1-2.

[7] Although RIM identifies 76 "essential" Motorola patents in its complaint, Motorola has submitted 1357 declarations regarding essential patents to the ETSI alone. (App. 11, Beamer ¶ 9 ("Beamer" refers to the Declaration of Norman H. Beamer at App. 9-14)).

[8] In addition to Motorola, a number of other companies long ago identified "essential" patents to the ETSI standards, and promised to offer FRAND licenses. However, in contrast to Motorola's early contribution, RIM has only recently designated 4 patents as "essential" to an ETSI standard. Two of these patents, which are among the patents included in RIM's patent infringement claims in this action, were not even developed by RIM but were instead purchased by RIM shortly before RIM filed this lawsuit. (App. 9-10, Beamer ¶¶ 7-8). Thus, unlike Motorola, RIM has contributed next to nothing to this standard.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 7 OF 46 PAGES

future sales over the five-year term of the license — an estimate that turned out to be significantly lower than RIM's actual performance.[9]  (App. 1-2, Blasius ¶ 4).  Because RIM's *actual* sales greatly increased after 2003, the "effective" royalty rate (Complaint ¶ 4) of the lump sum payment is much lower than Motorola projected based on RIM's *estimated* future sales.   In fact, this supposed, misleading "effective rate" is much less than the rates offered to, and accepted by, Motorola's other competitors.  (App. 1-2, Blasius ¶¶ 4-5).

When the time came, in late 2007, for RIM and Motorola to negotiate the terms of a new license, RIM wanted a deal based on this misleading "effective" royalty rate instead of rates Motorola actually offered to a typical competitor.   During those renewal negotiations, Motorola offered RIM a license under its "essential" and certain "non-essential" patents.  This offer attributed a royalty rate to the "essential" patents that is comparable to that used by Motorola to arrive at the lump sum payment offered to and accepted by RIM in 2003, as well as the rate offered to and accepted by other companies.  (App. 2, Blasius ¶ 5).  RIM resisted — presumably because its much greater revenue, relative to 2003, would naturally mean larger royalty payments.  Put simply, RIM does not want FRAND terms — it wants a sweetheart deal.

Motorola and RIM were unable to reach agreement before the expiration of the license on December 31, 2007, or by the end of a 45-day standstill period on February 15, 2008.  (App. 2, Blasius ¶ 7).  At 12:01 am on February 16, upon expiration of the standstill agreement, Motorola commenced an action in the District of Delaware (1:08-cv-104-SLR) requesting a declaratory judgment that certain RIM patents were invalid or not infringed.  (App. 9-10, Beamer ¶ 3).  At

---

[9] As RIM states in its Complaint, "During the five-year term of the 2003 Cross-License Agreement, RIM achieved substantial growth in its development and sale of smart phones and accompanying wireless e-mail services.... the BlackBerry® subscriber base grew from 534,000 to approximately 8 million."  (¶ 86).

approximately the same time that the Delaware action was filed, Motorola also filed a separate action asserting certain Motorola "non-essential" patents against RIM in the Eastern District of Texas (No. 2:08-CV-69-TJW), a jurisdiction that regularly handles patent disputes and in which Motorola is currently a party in another suit involving some of the same patents (*Motorola v. VTech Communications, Inc.*, No. 5:07-CV-00171). (App. 4-5, Pickett ¶¶ 8-10; App. 10-11, Beamer ¶¶ 4-5).[10]   Notably, while RIM apparently expected that Motorola would sue RIM for infringement of Motorola's "essential" patents, *Motorola did not assert any of its "essential" patents against RIM.* (App. 11, Beamer ¶ 10).

## ARGUMENT

### I.   RIM'S ANTITRUST AND CONTRACT CLAIMS SHOULD BE DISMISSED

Over the course of its fifty-five page complaint, RIM alleges that Motorola has somehow violated the antitrust laws and allegedly renounced its contractual and promissory obligations. RIM weaves this story from an unremarkable fact — Motorola and RIM have not yet agreed on the FRAND terms at which RIM will license Motorola's "essential" patents. But *this does not amount to a breach of contract, much less an antitrust violation*. Indeed, a close examination of these allegations reveals that nowhere in its lengthy complaint does RIM plead the facts required to state antitrust and contract claims. For example, RIM does not plead, because it cannot:

(1)   any actual injury either to RIM itself or to the marketplace, attributable to Motorola's alleged failure to supply RIM with a license on FRAND terms (thus, there is no antitrust injury and no contract damages due to breach);

(2)   that Motorola intended to violate its FRAND obligations (*i.e.*, there can be no antitrust violation based on a mere breach of contract); or even

---

[10] "Pickett" refers to the Declaration of John M. Pickett at App. 3-5.

(3)     that RIM requested (or has been denied) a license from Motorola covering solely Motorola's "essential" patents on FRAND terms.[11]

Because of at least these deficiencies in its complaint, each of RIM's antitrust and contract claims should be dismissed under Fed. R. Civ. P. 12(b)(6).

### A.     The Requirements Of A Well-Pleaded Complaint

Fed. R. Civ. P. 8(a)(2) assures that defendants receive fair notice of complaints against them by requiring plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."[12] *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (explaining that Rule 8 was designed to "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests'" (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957))). Complaints that fail to meet this standard should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

As both the Fifth Circuit and the Supreme Court have recently reiterated, a complaint *must* allege "'enough facts to state a claim to relief that is plausible on its face'" and "'raise a right to relief beyond the speculative level.'" *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 140 (5th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965). Meeting this standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

---

[11] RIM might refer to a number of unclear allegations and assert that they plead such a specific request or denial. RIM's pleadings do not clearly articulate any such thing. If RIM attempts to rely on any such unclear allegation, it should be required to replead with particularity, so that such statements can be scrutinized in light of Fed. R. Civ. P. 11.

[12] As will be discussed in further detail below, RIM's Sherman Act, Section 2 claim is actually based on a theory of promissory fraud and is thus also subject, in part, to the more stringent pleading requirements of Fed. R. Civ. P. 9(b) — an even higher standard that RIM's complaint fails to meet.

of action will not do." *Twombly*, 127 S. Ct. at 1965, *quoted in Norris v. Hearst Trust*, 500 F.3d

454, 464 (5th Cir. 2007).

RIM's complaint is replete with just such conclusory, non-specific allegations and

formulaic recitations that do not meet even the minimum requirements under Rule 8 and should,

therefore, be dismissed under Fed. R. Civ. P. 12(b)(6).

**B.**    **RIM's Sherman Act, Section 2 Claim ("Thirteenth Cause Of Action") Should Be Dismissed**

RIM has not sufficiently pleaded that Motorola is in violation of Section 2 of the

Sherman Act. (Complaint ¶¶ 180-85). There are two elements to establish liability for unlawful

monopolization under Sherman Act, Section 2: "[1] the possession of monopoly power in the

relevant market [and] [2] the willful acquisition or maintenance of that power as distinguished

from growth or development as a consequence of a superior product, business acumen, or

historic accident." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S.

398, 407 (2004) (internal quotations omitted). "[T]he possession of monopoly power will not be

found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id.*

In addition to the *anticompetitive conduct* requirement, a plaintiff asserting unlawful

monopolization also must demonstrate the presence of an *antitrust injury*: (1) to its business or

property; and (2) to competition in the marketplace. Clayton Act, Section 4 (15 U.S.C. § 15(a));

*Norris*, 500 F.3d at 465 & n.16. RIM's antitrust claim fails on both anticompetitive conduct and

antitrust injury grounds.[13]

---

[13] Motorola is well aware of the Third Circuit's recent *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297 (3d Cir. 2007), decision and that RIM apparently seeks to base its allegations on that decision. The *Broadcom* decision is inapposite because its facts are markedly different and it did not address the arguments made by Motorola in this motion.

Although this Court "'must assume that [RIM] can prove the facts alleged in its . . . complaint[, i]t is not, however, proper to assume that [RIM] can prove facts that it has not alleged or that [Motorola has] violated the antitrust laws in ways that have not been alleged.'" *Norris*, 500 F.3d at 464 (quoting *Associated Gen. Contractors of Cal. v. Cal. State Council*, 459 U.S. 519, 526 (1983)).

1.    **RIM's Failure to Plead Antitrust Injury Alone Warrants Dismissal**

The Fifth Circuit's recent decision in *Norris* clarified that a private plaintiff alleging a violation of Sherman Act, Section 2 must show antitrust injury: (1) to business or property; *and* (2) to competition in the marketplace – both resulting from alleged anticompetitive conduct.[14] As the Fifth Circuit has explained: "The Supreme Court has long held that suits under section 4 of the Clayton Act (15 U.S.C. § 15(a)) for violation of either Section 1 or Section 2 of the Sherman Act require *not only injury to the plaintiff's business or property resulting from the alleged violation, but also a showing of antitrust injury and standing*." *Norris*, 500 F.3d at 465 & n.16 (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *Doctor's Hosp. of Jefferson v. S.E. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997); *Walker v. U-Haul Co. of Miss.*, 747 F.2d 1011, 1014-15 (5th Cir. 1984); and *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 303 (5th Cir. 1984)). *RIM has not adequately pleaded any such injury, because there is none.*

(a)    **No antitrust injury to RIM**

RIM's sole statement of injury to itself is as follows: "RIM has suffered injury to its business and property and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image." (Complaint ¶ 184). This is fatally

---

[14] The private cause of action is established in Section 4 of the Clayton Act. 15 U.S.C. § 15(a).

deficient. The Supreme Court has stated — only last term in an antitrust case — that "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1965. RIM's self-serving, conclusory statements fail to show or allege how it has suffered any injury to its business and property that may be attributed to any anticompetitive conduct. This is not surprising — RIM has suffered no injury at all.

RIM's vague and formulaic assertion that its business is threatened by unspecified "imminent loss" of profits, potential customers and good will is also fatally deficient. (Complaint ¶ 184). As an initial matter, Motorola has not sued RIM on its "essential" patents. RIM can still negotiate and enter into a FRAND license for Motorola's "essential" patents, if RIM wants to. Undoubtedly because of this, RIM's complaint does not (because it cannot) plead any specific manner in which it will "imminently" or otherwise lose any profits, customers or good will — one way or another, RIM will eventually have a FRAND license for "essential" patents and will continue its business without missing a beat. Any allegation by RIM of a "threat" is in reality an admission by RIM that it has an obligation to become licensed, which is not itself an injury.

This failure to plead any *actual* injury to RIM is easily explained by RIM's admissions in its Complaint. RIM admits, for example, that Motorola is obligated to offer licenses under its "essential" patents on FRAND terms. (Complaint ¶¶ 3, 60-61, 188). RIM further appears to admit that it is, in turn, obligated to obtain a license to Motorola's "essential" patents. (Complaint ¶¶ 6(d), 66). RIM's averments show nothing more than the parties, while agreeing that RIM is entitled to a FRAND license for "essential" patents, have so far been unable to agree on FRAND terms. That is not an antitrust injury.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 13 OF 46 PAGES

Notably, RIM *never unambiguously alleges* that it ever sought a license to Motorola's "essential" patents alone (it has not).[15] RIM, therefore, cannot assert that it has experienced any injury that is directly attributable to Motorola's alleged refusal to offer FRAND royalty terms for its "essential" patents. Instead, the "facts" that RIM alleges show that the only "threat" faced by RIM is that it will, at some point, have to pay the same FRAND royalties for its use of Motorola's "essential" patents that many other companies pay and that RIM does not dispute are owed. This, too, is not an antitrust injury. Motorola has not refused to license the "essential" patents on FRAND terms (and no such allegation has been made) and no other assertedly anti-competitive conduct has been alleged. Therefore, there is no antitrust injury to RIM.

### (b)     No injury to competition

Likewise, RIM's sole statement of injury to competition in the marketplace is as follows: "Motorola's conduct has foreclosed competition in each of the relevant Mobile Wireless Technology Markets." (Complaint ¶ 183). Again, this is no more than a "formulaic recitation" which the Supreme Court has repeatedly proscribed and, moreover, is belied by marketplace reality — Motorola has dozens of licensees to its "essential" patents, *including nearly every single one of its competitors*. All are competing vigorously, as anyone who ever watched a television commercial for wireless cellular phones knows.[16]

Again, RIM's admissions appearing it its own complaint explain why RIM cannot plead *actual* injury to competition. RIM admits, for example, that Motorola disclosed the existence of

---

[15] RIM attempts to gloss over this issue by asserting instead that the licensing terms RIM and Motorola attempted to negotiate for a broad license to *both* Motorola's "essential" *and* "non-essential" patents were too high. (*E.g.*, Complaint ¶¶ 39, 192-193).

[16] In 2007, Motorola had a 13.9% share of the wireless phone market, and its major competitors were Nokia (38.2% market share), Samsung (14.1%), Sony-Ericsson (9%) and LG (7%). (App. 45). Notably, all of these companies are licensed to Motorola's essential patents.

its "essential" patents to each standard setting organization *before* the release and promulgation of each standard. (Complaint ¶¶ 58-59, 62-63). RIM further admits that Motorola agreed to license its "essential" patents on FRAND terms.[17] (Complaint ¶¶ 3, 60-61, 188). Indeed, RIM admits in its pleading that, as an entrant in the marketplace, RIM readily obtained such a license in 2003 (as did nearly every one of Motorola's competitors). (Complaint ¶ 84). RIM thus admits that Motorola's behavior has been, if anything, pro-competitive, especially given Motorola's propensity to license its patents to its direct competitors.

In sum, absent any cognizable, properly-pleaded antitrust injury, RIM's Sherman Act claim must be dismissed. *Norris*, 500 F.3d. at 469 ("We hold that the district court properly dismissed the antitrust claims for lack of antitrust injury and antitrust standing.").

### 2. RIM's Failure To Plead Anticompetitive Conduct Also Warrants Dismissal

RIM's Sherman Act claim also is defective because RIM fails to allege any cognizable basis for its claim that Motorola has unlawfully monopolized several alleged "marketplaces."[18] Specifically, RIM has failed to (1) plead facts sufficient to show that Motorola has breached its FRAND obligations and (2) plead with particularity that Motorola made and/or violated its FRAND obligations with any intention to defraud the relevant standard setting organizations. In

---

[17] RIM does not allege (because it cannot) that Motorola has refused to offer FRAND license terms to any other competitor or would-be competitor in any of the alleged marketplaces RIM suggests is impacted.

[18] The mere ownership of patents that happen to be listed as "essential" to a standard can not *per se* bestow market power. *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45-46 (2006) (a patent does not of itself confer market power or a presumption thereof for purposes of the antitrust laws). For example, when 144 companies have registered patents with the ETSI standards organization (App. 10, Beamer ¶ 7), it is absurd to consider every one of those companies as possessing monopoly power.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 15 OF 46 PAGES

the absence of fraudulent intent, mere breach of contract (if any such breach occurred) is insufficient to satisfy the anticompetitive conduct requirement.

As an initial matter, RIM has failed to assert that Motorola has breached its contractual FRAND obligations. RIM's asserted basis for its unlawful monopolization claim is that Motorola "made false FRAND commitments to [standards organizations], that it used to induce [standards organizations] into incorporating Motorola's patented technologies into the approved standards."[19] (Complaint ¶ 181). But RIM has not pleaded (because it cannot) that it has requested or has been denied a license from Motorola covering solely Motorola's "essential" patents on FRAND terms. Nor has RIM pleaded (again, because it cannot) that *any* current or would-be market participant has requested or has been denied such a FRAND "essential" patents license. (Indeed, Motorola has dozens of licensees under its "essential" patents, including many of its competitors). RIM's February 16 complaint states no facts that, even when assumed to be true, would establish a breach of Motorola's FRAND commitments. *In short, the fact that Motorola and RIM have not yet agreed to a FRAND license is not a breach of the ETSI contract.* Thus, for this reason, RIM has not adequately pleaded a breach of the contract with standards setting organizations.

---

[19] 15 U.S.C. § 15(b) provides a four-year statute of limitations for antitrust violations. Therefore, because RIM asserts that Motorola's acts giving rise to RIM's alleged injury were fraudulent statements supposedly made by Motorola to the standards bodies at some time prior to February 16, 2004, RIM's claims cannot stand for this additional reason. *See Mir v. Little Co of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988), cited by *Norcen Energy Resource Ltd. v. Pacific Gas & Elec. Co.*, No. C-94-0911-VRW, 1994 WL 519461, at *14 (N.D. Cal. Sept. 19, 1994) ("Furthermore, even if some harm to competition could be found, plaintiff's cause of action based on the events in this paragraph is now time barred. 15 USC § 15b provides a four year statute of limitations for antitrust violations. The limitations period begins to run when the defendant commits the acts giving rise to the alleged injury.").

But even if RIM had adequately pleaded breach (which it has not), an alleged breach of

contract without any further allegation of anticompetitive behavior does not support an antitrust

violation. *See Hayes v. Solomon*, 597 F.2d 958, 972 (5th Cir. 1979) (denying plaintiffs'

"Procrustean effort to apply the rubric of antitrust laws to an acrimonious falling-out between

two close business associates" and explaining that "'[t]he antitrust laws were never meant as a

panacea for all wrongs'" (citation omitted)); *see also Florida Seed Co., Inc. v. Monsanto Co.*,

105 F.3d 1372, 1376 (11th Cir. 1997) ("Simply put, this is not an antitrust case but rather a

breach of contract case."); *Funteas v. BP Products North America, Inc.*, No. 03-C-7624, 2005

WL 736226, at *4 (N.D. Ill. Mar. 30, 2005) ("Nothing in Plaintiff's complaint supports the idea

that Defendants' conduct raises antitrust concerns; Plaintiff is reminded that the Sherman Act is

not designed to be a remedy for run of the mill breach of contract claims."). Indeed, Motorola is

not aware of any authority that a breach of contract, without more, can give rise to an antitrust

violation. *Norcen Energy Resource Ltd. v. Pacific Gas & Elec. Co.*, No. C-94-0911-VRW, 1994

WL 519461, at *15 (N.D. Cal. Sept. 19, 1994) ("All these allegations amount to, however, is a

claim that defendant PGT breached a contract. Nothing suggests that the breach caused an injury

to competition. As such, this paragraph cannot support a monopolization claim.").[20] RIM's

---

[20] Even the Third Circuit's *Broadcom* opinion only acknowledged a possible antitrust claim
where plaintiff properly pleaded that a FRAND promise was "intentionally false." *Broadcom*,
501 F.3d at 314 ("We hold that (1) in a consensus-oriented private standard-setting environment,
(2) a patent holder's *intentionally false promise* to license essential proprietary technology on
FRAND terms, (3) coupled with an SDO's reliance on that promise when including the
technology in a standard, and (4) the patent holder's subsequent breach of that promise, is
actionable anticompetitive conduct." (emphasis added)). *Broadcom* does not suggest that mere
breach of contract alone is a basis for an antitrust complaint. To the contrary, see *id.* at 312 n.7
(Noting that "[i]n *Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F.Supp.2d 1066, 1080-81
(N.D.Cal.2006), the Court balanced the competing policies underlying patent and antitrust law
and concluded that Rambus's *'breach of the [SDO] disclosure policies, without more, cannot
give rise to antitrust liability,'*" but that "'Hynix [was] not barred from asserting that Rambus's

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 17 OF 46 PAGES

attempt to convert the parties' thus-far unsuccessful licensing negotiations into an antitrust

violation giving rise to treble damages and attorney's fees is, therefore, insufficient.  Incomplete,

unsuccessful licensing negotiations do not violate the Sherman Act.

Because RIM's antitrust claim that Motorola has somehow improperly acquired and

exercised monopoly power is predicated on fraud (supposed false statements to standards

organizations that Motorola would license on FRAND terms when in fact it never intended to),

RIM's complaint must "'set forth specific facts that support an inference of fraud.'"  *United*

*States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 384-85 (5th Cir. 2003)

(citation omitted);  *Lum v. Bank of Am.*, 361 F.3d 217, 228-29 (3d Cir. 2004) ("***Because***

***plaintiffs have alleged fraud as a basis for their antitrust cause of action, this claim is subject***

***to the heightened pleading requirement of Rule 9(b)***");  *see also Melder v. Morris*, 27 F.3d

1097, 1100 n.6 (5th Cir. 1994) (heightened pleading required where securities law claim was

based on allegations of fraudulent conduct) .

Indeed,  Fed. R. Civ. P. 9(b) requires that "the circumstances constituting fraud . . . shall

be stated with particularity."  To satisfy Rule 9(b), a complaint must allege the "'who, what,

when, where, and how of the alleged fraud.'"  *Sealed Appellant I v. Sealed Appellee I*, 156 Fed.

Appx. 630, 633 (5th Cir. 2005) (citations omitted).  This heightened pleading requirement

"serves an important screening function," reducing strike suits, protecting defendants from harm

to their reputation or goodwill, and providing defendants with fair notice of the plaintiff's claims.

*Melder*, 27 F.3d at 1100.

---

overall course of conduct, which may include the circumstances and intent behind its decision to
not disclose its patents and patent applications, violated antitrust laws.' *Id.* at 1081.").

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 18 OF 46 PAGES

RIM's allegations concerning Motorola's alleged current breach of its promise to license

on FRAND terms does not amount to fraudulent inducement of its contract with ETSI and does

not meet Rule 9(b). "[G]enerally, there is no inference of fraudulent intent not to perform from

the mere fact that a promise made is subsequently not performed." *Willard*, 336 F.3d at 386; *see

also American Hoist & Derrick Co. v. Sowa and Sons, Inc.*, 725 F.2d 1350, 1368 (Fed. Cir.

1984) ("Further, with respect to the intent-to-monopolize counterclaim based on fraud, we

emphasize that a specific intent, greater than an intent evidenced by gross negligence or

recklessness, is an indispensable element."). RIM's complaint does not plead that Motorola

never intended to grant FRAND terms to others — and, in fact, Motorola has granted FRAND

licenses on dozens of occasions.

Although allegations of circumstantial evidence of fraudulent intent may be sufficient for

a claim of promissory fraud to survive dismissal, *some evidence* — such as "a party's denial of

the alleged promise that was subsequently breached or no pretence of performance by the

defendant" — *must be pleaded*. *Performance Printing Corp. v. Upper Deck Co.*, No. 3:98-CV-

0035-R, 1999 WL 184125, at *3 (N.D. Tex. Mar. 29, 1999). RIM's own allegations, however,

demonstrate that Motorola did *not* act with fraudulent intent. RIM admits, for example, that

Motorola *did offer* RIM (and that RIM accepted) a license to its "essential" patents on FRAND

terms in 2003. (Complaint ¶ 84). This fact alone establishes that Motorola did not enter into its

FRAND obligations with ETSI having a hidden intent not to grant FRAND licenses.

Despite these many failings, RIM asks this Court to base an antitrust cause of action on

an alleged (although not fully pleaded) breach of contract, simply because Motorola and RIM

have so far failed to arrive at mutually-agreeable FRAND licensing terms over the course of

several months' negotiations. Allowing RIM's asserted cause of action to stand would place

Motorola and other innovators of standards-essential technology in an untenable position —

either accept an *unreasonably* low royalty rate for use of its technologies or face a preemptive

antitrust lawsuit like this one.  This would be a dangerous precedent.

Its inevitable affect would be to chill innovators like Motorola from participating in

standards setting organizations and to create a wave of baseless antitrust suits from non-

innovators looking for a cheap license.  As the Supreme Court stated in a recent Section 2 case,

courts must be wary of mistaken inferences and false condemnations, lest they "chill the very

conduct the antitrust laws are designed to protect." *Verizon Commc'ns*, 540 U.S. at 414.

Moreover, they should be wary of imposing duties to deal "that it cannot explain or adequately

and reasonably supervise." *Id.*  Innovation and competition in the marketplace would be hurt,

not helped, by lawsuits like this.

Having failed to plead — let alone plead with particularity — facts sufficient to support a

claim of *unlawful* monopolization, RIM's Sherman Act claim should be dismissed.  *Trinko*, 540

U.S. at 410 (dismissing Sherman Act, Section 2 claim for failure to plead anticompetitive

conduct satisfying willful acquisition or maintenance element).

**C.    RIM's Breach Of Contract Claims Also Should Be Dismissed**

    **1.    Breach of Contract With The Standards Organizations (RIM's "Tenth And Fourteenth Cause of Action")**

As discussed above in connection with the insufficiency of the antitrust pleading, *see*

Section I.B, *supra*, RIM has failed to plead adequately either (1) that Motorola has, in fact,

breached its contractual obligations with any standards organization to grant a FRAND license

for "essential" patents or (2) that, even if there has been a breach, any such breach has caused or

will cause any injury to RIM.  RIM will receive a FRAND license – even if this Court has to

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 20 OF 46 PAGES

determine the FRAND terms — and, when it does, RIM will have incurred no injury.

Accordingly, RIM has failed adequately to plead breach of the contract with the standards

organizations, and this claim should be dismissed.[21]

### 2. Promissory Estoppel (RIM's "Eleventh And Fifteenth Cause of Action")

For many of the same reasons presented above, RIM's promissory estoppel claim arising

out of promises to standards organizations also must be dismissed. Specifically, under Texas

law, "the elements of promissory estoppel are (1) a promise, (2) foreseeability by promissor of

reliance on that promise, and (3) substantial detrimental reliance by the promisee." *Ameen v.*

*Merck & Co.*, 226 Fed. Appx. 363, 374 (5th Cir. 2007) (citing *Pegram v. Honeywell, Inc.*, 361

F.3d 272, 288 (5th Cir. 2004) (applying Texas law)). Again as discussed above, *see* Section

I.B.1, *supra*, although RIM alleges that it has relied on Motorola's FRAND obligations as part of

RIM's decisions to practice various standards (Complaint ¶ 171), RIM fails properly to plead

that this reliance has been to its detriment — it has pleaded no possible injury — so its

promissory estoppel claim should be dismissed.[22]

Additionally, RIM has admitted that Motorola's FRAND obligations to standards

organizations are contractual. (Complaint ¶¶ 188-189). As a result, because promissory estoppel

applies only when no valid contract exists, *Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*,

---

[21] RIM's fourteenth cause of action is merely a declaratory judgment counterpart of its tenth
cause of action, and should be dismissed for the same reasons. In addition, because the
declaratory judgment cause of action is duplicative of the affirmative cause of action, this Court
should exercise its discretion to dismiss this cause of action, *infra*, Section III.A.

[22] Here again, RIM's fifteenth cause of action is just the declaratory judgment counterpart of its
eleventh cause of action, and should be dismissed for the same reasons. And, because the
declaratory judgment cause of action is duplicative of the affirmative breach of contract cause of
action, the Court should exercise its discretion to dismiss this claim, *infra*, Section III.A.

---

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 21 OF 46 PAGES

154 S.W.3d 634, 636-37 (Tex. App. – Houston [14th Dist.] 2004, pet. abated) (collecting cases),

RIM's promissory estoppel claim should be dismissed for this additional reason.

### 3. Breach of Contract – Breach of § 5.3 of the 2003 Cross-License Agreement With RIM (RIM's "Twelfth Cause of Action")

RIM's Twelfth Cause Of Action is somewhat different. Rather than relying on

Motorola's agreement with standards organizations, this claim alleges that Motorola breached

Section 5.3 of the 2003 Motorola/RIM agreement, which provides (Complaint ¶ 85): "At least

one year prior to termination of this Agreement, RIM and MOTOROLA agree to begin good

faith negotiations, related to the terms and conditions of this Agreement to extend the terms and

conditions hereof beyond the date of termination."

Although RIM's claim is ultimately doomed (the facts of the parties' negotiations

demonstrate that Motorola has, at all times, acted in good faith), Motorola should not be forced

to expend unnecessary resources defending its conduct in negotiations. This provision is

unenforceable on its face. *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 21 (Tex.

App. 2000) ("an agreement to negotiate in the future is unenforceable, even if the agreement

calls for a 'good faith effort' in the negotiations"); *Maranatha Temple v. Enter. Prods. Co.*, 893

S.W.2d 92, 104 (Tex. App. 1994) ("Courts have long held that an agreement to enter into

negotiations in the future is unenforceable. The fact that this particular agreement to negotiate in

the future includes a term calling for ... a 'good faith effort' in the negotiations does not remove

the agreement from this rule." (citations omitted)).

Delaware law is to like effect.[23] In Delaware, "a classic example of a legally

unenforceable provision [is] an agreement to agree in the future" that fails to provide all material

[23] Section 8.11 of the 2003 Motorola/RIM cross-license agreement specifies that Delaware law applies. (App. 11, Beamer ¶ 12).

terms of the future agreement. *Hammond & Taylor, Inc. v. Duffy Tingue Co.*, 161 A.2d 238,

239-40 (Del. Ch. 1980); *Int'l Equity Capital Growth Fund v. Clegg*, No. Civ.A. 14995, 1997 WL

208955, at *9 & n.3 (Del. Ch. Apr. 22, 1997) (agreements to negotiate in good faith may not be

enforced unless all the material terms of the contract have been agreed to by the parties).

Paragraph 5.3 fails this test, as it fails to define any terms of a future contract, and instead leaves

all terms for future negotiation.  As held in *Hindes v. Wilmington Poetry Soc'y*, 138 A.2d 501,

503-04 (Del. Ch. 1958): "Clearly from the language itself the parties intended to sit down at a

future time and decide on the amount of royalties.... [T]his is the classic case of agreeing to

agree in the future.  It is unenforceable...."

Finally, RIM's Twelfth Cause Of Action is also deficient because RIM fails to plead

effectively that any such breach has caused or will cause injury to RIM, *supra*, Section I.B.1.

Accordingly, RIM's Twelfth Cause Of Action should be dismissed for this separate reason.

## II.     IF NOT DISMISSED, RIM'S ANTITRUST AND CONTRACT CLAIMS SHOULD BE BIFURCATED AND STAYED

Each of the three separate lawsuits that RIM has artificially bundled together in its

Complaints — RIM's patent claims, RIM's declaratory judgment claims, and RIM's antitrust

and contract claims — is by itself complex and potentially difficult for the Court and jury to

manage.  None of RIM's three lawsuits involves overlapping patents.  Trying all three sets of

claims in a single lawsuit would be unwieldy, at best.  To the extent RIM's antitrust and contract

claims are not dismissed, they should be bifurcated from the patent-related claims, and stayed

pending resolution of those claims.[24]  This will achieve judicial economy and efficiency.  In

---

[24] Other relief sought by this motion, *infra*, Section III, seeks to dismiss, stay or transfer RIM's
declaratory judgment claims against Motorola's "non-essential" patents.  If that relief is granted,

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 23 OF 46 PAGES

fact, resolution of the patent claims will likely result in a global settlement that also covers Motorola's "essential" patents, thereby saving valuable Court resources and time, and reducing the burden and costs on the parties.

Fed. R. Civ. P. 42(b) grants the Court discretion to bifurcate claims in the interest of convenience and economy:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of ... any number of claims, ... always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution....

See *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 305 (5th Cir. 1993) (bifurcation appropriate if issue to be separately tried is distinct and separate from the other issues). The Court has broad discretion to bifurcate "'as part of its wide discretion in trial management.'" *Mag Instrument, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 123 F.R.D. 543, 544 (N.D. Tex. 1988) (citation omitted).

In addition, implicit in Rule 42(b), and pursuant to the inherent power to control its proceedings, the Court has the power to stay all proceedings (including discovery) on the bifurcated claims. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Hahn v. Star Bank*, 190 F.3d 708, 719 (6th Cir. 1999); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 232 (D. Del. 1984).

The rationale for bifurcating and staying the antitrust and contract claims here is similar to the rationale for the common practice of staying patent damages issues in patent cases. As this Court observed in *Mag Instrument, Inc.*, 123 F.R.D. at 544-45 (citations omitted):

> then the bifurcation aspect of the motion would permit RIM's patent infringement claims on its own patents to be expeditiously discovered and tried by this Court.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 24 OF 46 PAGES

Trials of liability and damages are often bifurcated. This type of
bifurcation is "an effective method of simplifying factual presentation, reducing
costs, and saving time."

... The trial of the damages question in such a suit is often difficult and
expensive, while being easily severed from the trial of the questions of validity
and infringement of the patent....

... Bifurcation in a patent case further avoids unnecessarily confusing the
jury. Evidence of damages is often lengthy, complex, and extremely detailed.

*To like effect Swofford v. B & W, Inc.*, 336 F.2d 406, 415 (5th Cir. 1964); *Landmark Graphics*

*Corp. v. Seismic Micro Tech., Inc.*, No. H-05-2618, 2006 U.S. Dist. LEXIS 77664 (S.D. Tex.

Oct. 25, 2006).

Indeed, patent issues are routinely bifurcated from antitrust and/or related state-claim

issues. *In re Innotron Diagnostics*, 800 F.2d 1077, 1084-85 (Fed. Cir. 1986). As the Federal

Circuit stated in *In re Innotron*, bifurcation serves the interests of justice on several grounds (800

F.2d at 1085):

- "Convenience of all is served in trying the less complex patent issues first"

- "Expedition is served because the patent issues on the present schedule will be ready for
  trial more than a year before the antitrust issues can be made ready" and

- "Avoidance of prejudice and confusion is served in trying first the patent issues, without
  injecting the different [non-patent] issues which required different proof and different
  witnesses" [25]

---

[25] District Courts regularly bifurcate and stay antitrust and other non-patent claims. *See, e.g.,*
*Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465, 2006 U.S. Dist. LEXIS 2176, at *38
(N.D. Cal. Jan. 3, 2006) ("[p]roceeding on the antitrust claims simultaneously with the patent
claims may delay resolution of the case by increasing its complexity"); *Affymetrix, Inc. v. PE*
*Corp.*, 219 F. Supp. 2d 390, 399 (S.D.N.Y. 2002) (stay of discovery on issues such as sales and
market share, relevant to Sherman Act and related claims); *Akzona Inc.*, 607 F. Supp. at 232-33,
236 ('[i]f a case contains a large number of dissimilar and complex issues, bifurcation is often
advisable"; "strong likelihood that consideration of the patent validity issues will be delayed
significantly if tried together with the antitrust issues"); *ASM Am., Inc. v. Genus, Inc.*, No. 01-
2190, 2002 WL 24444, at *7 (N.D. Cal. Jan. 9, 2002) (staying "wide swath of non-overlapping
discovery on the antitrust claims"); *Baxter Int'l., Inc. v. Cobe Labs., Inc.*, No. 89 C 9460, 1992
WL 77665, at *2 (N.D. Ill. Apr. 7, 1992) (staying discovery on issues such as scope of relevant

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 25 OF 46 PAGES

RIM's antitrust and contract claims are completely independent of RIM's and Motorola's patent infringement claims, and are ripe candidates for bifurcation and stay of both discovery and trial. RIM's antitrust and contract claims are directed to an allegation that Motorola is supposedly not offering RIM a license to Motorola's "essential" patents under FRAND terms. In contrast, RIM's declaratory judgment claims deal with a completely different set of patents, Motorola "non-essential" patents. And RIM's patent infringement claims are directed to RIM's patents, which are also totally irrelevant to the antitrust and contract claims. Because these claims are directed to very different causes of action, there will be little or no overlap in discovery and trial of these independent claims.

To the extent that RIM's antitrust and contract claims are not dismissed, the Court will be required to determine whether the terms that Motorola has offered RIM, and many other licensees, comply with Motorola's FRAND obligations. This will be an onerous task. Numerous commentators have discussed the various considerations and widely varying factors involved in the lengthy and complex determination of FRAND terms.[26] Moreover, there is widespread agreement that the FRAND requirement is vague and susceptible to many interpretations. ("FRAND obligations are so vague as to risk becoming toothless," *id.* at 3). *See Hynix Semiconductor, Inc. v. Rambus, Inc.*, 441 F. Supp. 2d 1066, 1074 (N.D. Cal. 2006) (noting

---

market and impact of patents on market); *Components, Inc. v. W. Elec. Co.*, 318 F. Supp. 959, 967 (D. Me. 1970) (in contrast to patent issues, antitrust claims "cannot possibly be ready for trial for many months, and the trial itself of these claims will take a substantial amount of time"); *Moore U.S.A., Inc. v. Standard Register Co.*, 139 F. Supp. 2d 348, 353 (W.D.N.Y. 2001); *Brandt, Inc. v. Crane*, 97 F.R.D. 707 (N.D. Ill. 1983); *Implant Innovations, Inc. v. Nobelpharma AB*, No. 93 C 7489, 1996 WL 568791 (N.D. Ill. Oct. 2, 1996) ; *CMI, Inc. v. Verax Sys., Inc.*, No. CIV-85-035, 1987 WL 46536 (W.D.N.Y. July 22, 1987); *Pharmacia, AB v. Hybritech, Inc.*, 224 U.S.P.Q. 975 (S.D. Cal. 1984).

[26] *E.g.*, Treacy and Lawrance, "FRANDly fire: are industry standards doing more harm than good?" *Journal of Intellectual Property Law & Practice*, 2007.  (App. 48-55).

---

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

the "staggering lack of defining details in the [standards organization's] patent policy" and declining to enforce a contract based on the policy).

Although no Court has actually determined FRAND rates or FRAND terms, the instances thus far where a Court has attempted to characterize the FRAND analysis are instructive. Some courts have suggested in *dicta* that FRAND license terms could be determined by the same *Georgia-Pacific* test used to calculate the reasonable royalty that an adjudicated infringer would pay to a patent holder, although no Court has actually attempted such an approach.[27] *See Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 314 n.8 (3d Cir. 2007); *ESS Tech. v. PC-Tel, Inc.*, No. C-99-20292 RMW, 2001 WL 1891713, at *3 (N.D. Cal. Nov. 28, 2001). Application of the *Georgia-Pacific* test requires a particularized examination of the patents at issue (in this case, at least the 76 United States patent identified in RIM's complaint). *ESS*, 2001 WL 1891713, at *6.

The requirement to consider patent-specific issues was also addressed by the Delaware Chancery Court. That court refused to adjudicate a claim seeking a declaration regarding the methodology for determining FRAND terms, on the basis that doing so would require the state court to adjudicate federal patent infringement and validity issues. *Nokia Corp. v. Qualcomm, Inc.*, C.A. No. 2330-VCS, Dkt. 316 at 25-26 (Del. Ch. Oct. 17, 2007) (App. 61-62). Because

---

[27] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp 1116 (S.D.N.Y. 1970) (providing fifteen factors used to determine reasonable royalty damages for patent infringement), *modified,* 446 F.2d 295 (2d Cir. 1971).

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 27 OF 46 PAGES

*Nokia* would not stipulate to the validity and infringement of the patents at issue, it was forced to drop its FRAND claim.[28]

The Federal Trade Commission (FTC) attempted to calculate FRAND terms in *In re Rambus*. There, the FTC decided to adopt a "but for" analysis for determining FRAND terms:

> [W]e conclude that in the "but for" world Rambus's royalty rates would have been negotiated under the constraint of a RAND commitment. A reasonable royalty "is or approximates the outcome of an auction-like process appropriately designed to take lawful advantage of the state of competition existing ex ante ... between and among available IP options." The parties agree that the "*ex ante* value of a technology is the amount that the industry participants would have been willing to pay to use a technology over its next best alternative prior to the incorporation of the technology into a standard."

*In re Rambus*, 2007 WL 431524 (F.T.C. Feb. 5, 2007) (citations omitted). Accordingly, the FTC inquiry required a complicated analysis of the patentee's licenses, competitive licenses, and a comparison with competitive technology. Putting this in perspective, for the ETSI standards alone, Motorola has designated at least the 76 United States patents listed in RIM's complaint (each of which has corresponding foreign counterpart patents). A number of other companies have also designated essential patents under those standards. On top of that, during the formulation of the standards, many alternative approaches were considered. All of these competing and overlapping technologies would have to be evaluated and compared in the FRAND analysis.

Moreover, license agreements involving essential technologies typically involve numerous non-royalty terms as well as cross-licenses. That would be true for any Motorola/RIM

---

[28] *Compare Nokia*, Dkt. 1 at ¶66 (App. 69) (seeking a declaration of FRAND methodology in Complaint), *with Nokia*, Dkt. 354, "Prayer for Relief" (App. 125-126) (removing request for FRAND methodology from Amended Complaint).

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 28 OF 46 PAGES

agreement here. Thus, RIM is actually demanding that the Court determine FRAND terms (*i.e.*, construct a complicated contractual relationship) rather than merely calculate a royalty.

It is clear that RIM is really asking the Court, in its non-patent claims, to undertake an incredibly complex and time-consuming analysis to determine the FRAND rate and terms that would apply to a Motorola/RIM "essential" patents license. It is not the Court's obligation (and a waste of judicial resources) to have the Court act as mediator in this business dispute to divine licensing terms — but that is, in essence, precisely what RIM asks of this Court. The Court would be well within its discretionary authority to decline to engage in this effort, pending resolution of the parties' patent disputes. While complex, patent disputes are routinely tried in Federal Court and are far less complicated than RIM's proposed FRAND adjudication. This Court should do as many Courts have routinely done in similar circumstances: bifurcate and stay all discovery on any of RIM's complex and diversionary antitrust and contract claims that are not dismissed, pending resolution of the patent claims.

## III.    RIM'S DECLARATORY JUDGMENT PATENT CLAIMS SHOULD BE DISMISSED, OR IN THE ALTERNATIVE STAYED OR TRANSFERRED, IN FAVOR OF MOTOROLA'S EASTERN DISTRICT OF TEXAS ACTION

RIM seeks a declaratory judgment that eleven Motorola patents are invalid and not infringed (Causes Of Action 16-22 of the February 16 complaint; Claims 1-4 of the February 21 complaint). These claims are entirely duplicative of Motorola's simultaneously-filed patent infringement action against RIM in Marshall.

RIM's declaratory judgment claims, filed in an attempt to anticipate the Marshall action, should be dismissed. In the alternative, these claims should either be stayed pending resolution of the mirror-image case brought by Motorola (the true plaintiff) in Marshall, or transferred to that district for consolidation with Motorola's patent claims.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 29 OF 46 PAGES

**A.      This Court Has Discretion To Dismiss RIM's Declaratory Judgment Claims**

The Declaratory Judgment Act gives the Court wide discretion in deciding whether to invoke jurisdiction over RIM's declaratory judgment claims.  The Act provides that "any court of the United States ... *may* declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201 (emphasis added).  The Supreme Court has held that the Act grants discretion to the courts rather than an absolute right to a litigant.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287-88 (1995) ("By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants."); *see also Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 389 (5th Cir. 2003).

This Court may, "in its discretion dismiss a declaratory judgment ... suit if the same issue is pending in litigation elsewhere." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967); *to like effect, Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037, 1039-40 (Fed. Cir. 1995).  In such a situation, these claims should be dismissed because they "serve no useful purpose."  *Wilton*, 515 U.S. at 287-88; *see also EMC Corp. v. Norand*, 89 F.3d 807, 815 (Fed. Cir. 1996) ("this case was not one that furthered the objectives of the Declaratory Judgment Act").

**B.      The Discretionary Guidelines Established By The Applicable Authorities Require Dismissal Of RIM's Declaratory Judgment Claims**

When substantially related claims are pending before two federal courts (as is the case here), the general rule in patent cases is that the court of the first-filed action should resolve the dispute.  *Genentech v. Eli Lilly & Co.*,  998 F.2d 931, 937 (Fed. Cir. 1993).  But "the first to file rule is not a rigid or inflexible rule to be mechanically applied." *Int'l Dev. Corp. v. INTP, Inc.*, No. 3:04-CV-854-P, 2004 WL 2533560, at *1 (N.D. Tex. Nov. 8, 2004).  "Exceptions . . . are not

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 30 OF 46 PAGES

rare and are made when justice or expediency requires ...." *Genentech*, 998 F.2d at 937. Such

exceptions include "'considerations of judicial and litigant economy, and the just and effective

disposition of disputes.'" *Serco Servs.*, 51 F.3d at 1039 (citation omitted). Also, obviously, if

the actions are filed essentially simultaneously, the first to file rule does not apply, *infra*, Section

III.B.1.

The Fifth Circuit has set forth discretionary guidelines for dismissal of declaratory

judgment actions that are consistent with Federal Circuit authority such as *Genentech*. These

factors include:

> (1) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant;
> (2) whether the plaintiff engaged in forum shopping in bringing the suit;
> (3) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist;
> (4) whether the federal court is a convenient forum for the parties and witnesses; and
> (5) whether retaining the lawsuit would serve the purposes of judicial economy.

*Sherwin-Williams Co.*, 343 F.3d at 389. This list is not exhaustive, and a court may consider

other factors in deciding how to exercise its discretion to decide or dismiss a declaratory

judgment action.

The first, second and third factors are generally directed to issues of fairness in

proceeding with the declaratory judgment action. The fourth and fifth factors focus on issues of

convenience and efficiency. These "fairness" and "efficiency" factors, addressed below, under

Federal Circuit and Fifth Circuit authority, demonstrate that RIM's declaratory judgment patent

counterclaims should be dismissed.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 31 OF 46 PAGES

1. **The RIM (Dallas) and Motorola (Marshall) lawsuits were filed essentially simultaneously and, therefore, the first to file rule is inapplicable**

As a threshold matter, this lawsuit and the Marshall action were effectively filed simultaneously and, therefore, the first to file rule is inapplicable. In such circumstances, patentee-Motorola's choice of Marshall should prevail.

(a) **The first to file rule does not apply**

Motorola and RIM entered into a Standstill Agreement effective December 5, 2007, to provide additional time to resolve their licensing dispute and avoid litigation. That Standstill Agreement expired at "the end of the day" on February 15, 2008. (App. 2, Blasius ¶ 7). After the standstill period expired, both Motorola and RIM filed their respective lawsuits. RIM contends it filed its complaint in this action at 00:01 am on February 16, via a manual drop box located outside the courthouse; Motorola began to file its complaint electronically in the Eastern District at the same exact time — a process that was completed at 00:23 am. (App. 4-5, Pickett ¶¶ 8-10).[29]

Accordingly, given that both parties intended to file their respective complaints at the earliest possible time, started the process of filing at the same time, and finished only about *twenty minutes* apart, neither case can be considered first filed. Indeed, this Court has found the first to file rule inapplicable in cases filed *six hours* apart:

> In this case, the plaintiffs filed the instant action for declaratory judgment six hours before the state suit was filed....

---

[29] This is an unusual instance where modern computer technology is slower than manual methods. The electronic filing procedure took 23 minutes to complete given the required electronic steps and amount of data to transmit, while the drop box procedure took at most a few seconds to complete. (App. 4-5, Pickett ¶¶ 5-7, 9). But both parties apparently acted simultaneously.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 32 OF 46 PAGES

> ... [I]n instances such as this, where the difference in filing times is a matter of
> hours, this court will not automatically assume that [the declaratory judgment
> action was first-filed].

*Pa. Gen. Ins. Co. v. CaremarkPCS*, No. 3:05-CV-0844-G, 2005 WL 2041969, at *3 (N.D. Tex.

Aug. 24, 2005).

Other Courts in this Circuit have held likewise. *See, e.g., Hunt-Collin Elec. Coop., Inc. v.*

*Rayburn Country Elec. Coop., Inc.*, No. S-87-211-CA, 1988 WL 428654, at *2 (E.D. Tex. Feb.

5, 1988) ("to blindly apply the first to file rule only on the basis of the actual filing date,

especially when the actions are filed only days apart, would not further the goals of the rule");

*see also See Mobil Oil Exploration Co. v. Fed. Energy Regulatory Comm'n*, 814 F.2d 998, 1000,

1001 (5th Cir. 1987) (finding that where parties "engaged in a 'race to the courthouse'" and filed

petitions "substantially simultaneously," jurisdiction was to be determined by "coin toss" under

the circumstances of the case).[30]

---

[30] Additionally, a number of other courts have also found the first to file rule to be inapplicable
in cases where competing complaints were filed within a relatively-short period of time. *See,
e.g., Aurora Corp. of Am. v. Fellowes, Inc.*, No. CV 07-8306-GHK, 2008 WL 709198, at *1
(C.D. Cal. Feb. 27, 2008) ("Application of the first-filed rule here, where the parties filed nearly
simultaneous actions in competing jurisdictions the first day that courts were open after the '276
Patent was issued, would invoke none of the merits of the first-filed rule, while promoting the
sort of race to the courthouse that is the worst feature of the rule."); *Lockheed Martin Corp. v. L-
3 Commc'ns Corp.*, 405 F. Supp. 2d 1381, 1383 (N.D. Ga. 2005) ("This court recognizes that the
first-filed rule should not be mechanically applied, especially in light of the fact that the two
actions at issue here were filed on the same date, merely hours apart."); *Raytheon Co. v. Nat'l
Union Fire Ins. Co.*, 306 F. Supp. 2d 346, 352 n.39, 354 (S.D.N.Y. 2004) (explaining that
"because the Massachusetts action was filed only two days before the New York action, the
filing dates lack significance and may be disregarded"); *Connexus Credit Union v. Connex
Credit Union*, 219 F.R.D. 465, 466-67 (W.D. Wis. 2003) (finding that first to file rule did not
apply where complaints were filed less than four hours apart); *J & A Sales & Mktg., Inc. v. J.R.
Wood, Inc.*, No. 01 C 6749, 2002 WL 653897, at *4 (N.D. Ill. Apr. 19, 2002) (complaints filed
"within hours of each other, making priority of filing mostly serendipitous"); *Medtronic, Inc. v.
Camp*, No. Civ. 02-285 PAM/JGL, 2002 WL 539073, at *3 (D. Minn. Apr. 1, 2002) (complaints
filed thirty minutes apart); *Recoton Corp. v. Allsop, Inc.*, 999 F. Supp. 574, 576-77 (S.D.N.Y.
1998) ("[t]he exceptions to the first filed doctrine include ... the minimal difference in time

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 33 OF 46 PAGES

      **(b)**     **Absent either action being first-filed, Motorola's choice of forum (Marshall) should hear the claims on Motorola's patents**

Because the first to file rule is not applicable, the declaratory judgment plaintiff's choice of forum should be given little or no weight. *Hunt-Collin Elec. Coop., Inc.*, 1988 WL 428654, at *3 n.4 ("the deference to be given plaintiff's choice of forum ... have little relevance in the present [simultaneous filing] situation"); *Symbol Techs., Inc. v. Data Gen. Corp.*, 40 U.S.P.Q.2d 1216, 1217 (S.D.N.Y. 1996) (declaratory judgment plaintiff's choice of forum given no weight when actions simultaneously filed).

Where, as here, the declaratory judgment claim is merely a mirror-image of a substantive infringement claim, courts have stated a presumption in favor of the substantive infringement action. *Lockheed Martin Corp. v. L-3 Commc'ns Corp.*, 405 F. Supp. 2d 1381, 1383 (N.D. Ga. 2005) (holding that, where actions are simultaneously filed, the dispositive factor is which "action is the substantive law suit as opposed to a declaratory action with derivative claims").

This Court, for example, in the context of a trademark suit, has noted that there is a "'general policy that *a party whose rights are being infringed should have the privilege of electing where to enforce its rights*,'" and that "[s]everal courts in this circuit, including this court, have ... found that *allowing an alleged infringer to proceed with a declaratory judgment action divests the true plaintiff of this right*." *Mill Creek Press, Inc. v. Thomas Kinkade Co.*, No. 3:04-CV-1213-G, 2004 WL 2607987, at *7, *8 (N.D. Tex. Nov. 16, 2004) (citing cases); *see also Pa. Gen. Ins. Co.*, 2005 WL 2041969, at *6 ("There is a 'general policy that a party whose rights are being infringed should have the privilege of electing where to enforce its rights.'"

---

between the filing of the two actions" ); *see also Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 217, 219 (2d Cir. 1978) (disregarding first to file rule where the competing suits were filed merely days apart).

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 34 OF 46 PAGES

(citation omitted)); *Kinetic Concepts, Inc. v. Connetics Corp.*, No. SA-04-CA-0237-XR, 2004 U.S. Dist. LEXIS 17969 (W.D. Tex. Sept. 9, 2004) (same).

Significantly, RIM's declaratory judgment claims brought here have already been brought as compulsory counterclaims to Motorola's patent infringement action in Marshall. (No. 2:08-CV-00069-TJW, Docket 30). "Ideally, once a court becomes aware that an action on its docket involves a claim that should be a compulsory counterclaim in another pending federal suit, it will stay its own proceedings or will dismiss the claim with leave to plead it in the prior action." 6 Charles A Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 1418 (2d ed. 1990); *Research In Motion, Ltd. v. Visto Corp.*, No. 3:06-CV-0783-D, slip op. at 2 (N.D. Tex. July 11, 2006) ("The court declines to hear declaratory judgment actions for patent invalidity and noninfringement that are pending as compulsory counterclaims in an earlier-filed lawsuit.").

Under the circumstances here, in which both Motorola and RIM effectively filed their complaints at the same time, Motorola, as the alleged victim of RIM's infringement, should be given the right to select the forum for its patent infringement case to be heard.[31]

In any event, whether or not the first to file rule is applicable here, the fairness and efficiency factors, *supra*, Section III.B, dictate that RIM's declaratory judgment claims should be dismissed, as demonstrated below.

---

[31] If the Court agrees with Motorola (thereby de-coupling Motorola's and RIM's patent claims), Motorola would concede by parity of reasoning that RIM's affirmative claims on its patents should go forward here rather than in Delaware, where Motorola has filed its declaratory judgment action.

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 35 OF 46 PAGES

2.    The "Fairness" factors support dismissal

The fairness factors, set forth *supra*, p. 31, weigh strongly against the Court invoking jurisdiction over RIM's declaratory judgment claims.

In particular, both Federal Circuit and Fifth Circuit authority consider whether a party files a declaratory judgment suit in an attempt to anticipate a suit in another forum. *Serco Servs., L.P.*, 51 F.3d at 1040; *Metro Optics, Inc. v. Contex, Inc.*, No. 3:95-cv-2157-T, 1996 WL 302697 (N.D. Tex. Mar. 14, 1996). When a declaratory judgment plaintiff preempts the patentee, knowing full well that the patentee is about to file suit, such behavior does nothing to further the objectives of the Declaratory Judgment Act. *EMC Corp.*, 89 F.3d at 815. The Federal Circuit in *EMC Corp.*, 89 F.3d at 814-15, colorfully described appropriate circumstances — *i.e.*, "the type of situation the Declaratory Judgment Act was intended to address":

> [A] patent owner engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword. . . . Guerilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive  environment of the business community with uncertainty and insecurity....

(citation omitted.) *See also BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir. 1993) ("The purpose of the Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side. It accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action.").

Contrary to the patentee inaction of *EMC Corp.* and *BP Chemicals*, anticipatory filing of a declaratory judgment in circumstances such as are present here — where Motorola did act as promptly as possible to enforce its patents — is a quintessential ground for discretionary

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 36 OF 46 PAGES

dismissal of a declaratory judgment action. This Court, like others, routinely has used this as a basis for dismissal.[32] As this Court explained (*Pa. Gen. Ins. Co.*, 2005 WL 2041969, at *6):

> Courts will generally not allow a party to select its preferred forum by filing an action for a declaratory judgment when it has notice that another party intends to file suit involving the same issues in a different forum.

Such a pre-emptive declaratory judgment action is precisely what happened here. In fact, in its motion to transfer the Marshall action to this District *RIM admits that it took measures "[t]o ensure that RIM's Northern District of Texas Complaint was the first filed action between the parties."* (App. 200). The facts confirm this admission. RIM's counsel went to Court the day the Standstill Agreement was to expire in order to test and verify the time stamp on the drop box. At 6:31 pm on Friday, February 15, RIM's counsel emailed a Court employee and advised, "We went ahead and checked the stamp machine and it now [incorrectly] reads February 16, 6:30 am." When RIM learned that the drop box was not functioning properly, RIM did all it could to ensure it would get a 00:01 filing time from the clerk's office. (App. 131-132).

Because RIM admits that it preemptively filed this suit in anticipation of Motorola's suit to gain the advantage of its preferred forum, RIM's declaratory judgment claims should be dismissed in favor of Motorola's affirmative claims in Marshall.

---

[32] *Capco Int'l, Inc. v. Haas Outdoors, Inc.*, No. 3:03-CV-2127G, 2004 WL 792671, at *4 (N.D. Tex. Apr. 9, 2004) (held: impermissible anticipatory declaratory judgment action, brought on the very day that the parties had set as a target date for resolution); *i2 Techs. US, Inc. v. Lanell*, No. 3:02-CV-0134-G, 2002 WL 1461929, at *8 (N.D. Tex. July 2, 2002) ("Generally, courts disfavor anticipatory suits because they are an aspect of forum shopping. "). *See also Kinetic Concepts, Inc.*, 2004 U.S. Dist. LEXIS 17969, at *10-11 ("The Court generally will not allow a party to secure its preferred forum by filing an action for a declaratory judgment when it has notice that another party intends to file suit involving the same issues in a different forum."); *PAJ, Inc. v. Yurman Design, Inc.*, No. 3:98-cv-2847-P, 1999 WL 68651, at *3 (N.D. Tex. Feb. 9, 1999) (declaratory judgment suit was "classic example of a race to the courthouse").

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 37 OF 46 PAGES

3.      The "Efficiency" factors support dismissal

The "efficiency" factors to be considered are: "whether the federal court is a convenient

forum for the parties and witnesses" and "whether retaining the lawsuit would serve the purposes

of judicial economy," *supra*, p. 31. As discussed below, the former factor is neutral, *see Pa.*

*Gen. Ins. Co.*, 2005 WL 2041969, at *8, and the latter factor strongly supports dismissal of

RIM's declaratory judgment claims.

(a)      The convenience of the parties and witnesses is a neutral factor

Dallas, Texas is not significantly more or less convenient to the parties than Marshall,

Texas, especially given their close proximity to each other and the geographically-diverse

locations of potential witnesses.

In the first place, RIM should not complain that the Eastern District of Texas is

inconvenient, because it has itself filed patent infringement claims in that Court, and sought to

have declaratory judgment claims asserted against its patents transferred from the Northern

District of Texas to the Eastern District of Texas. *Research in Motion Ltd. v. Visto Corp.*, No.

3:06-CV-0783-D (N.D. Tex. May 17, 2007).[33] (App. 134-145).

In perspective, Motorola and RIM are major international companies with domestic and

internationally located facilities and activities. The employees of each are located and travel

worldwide. Motorola's headquarters is located in Schaumberg, Illinois and RIM Limited's

headquarters is located in Waterloo, Ontario, Canada. Their businesses, including sales

---

[33] In addition, RIM has often been sued in the Eastern District of Texas in the past and has not
sought transfer. *Antor Media Corp. v. Nokia, Inc.*, No. 2:2005-CV-00186; *Minerva Indus., Inc.
v. Research In Motion Corp*, No. 2:2007-CV-00230; *Minerva Indus., Inc. v. Research In Motion
Corp.*, No. 2:08-CV-00020; *Reese v. Samsung Telecommunications Am., LP*, No. 2:2005-CV-
00415; *Saxon Innovations LLC v. Nokia Corp.*, No. 6:2007-CV-00490; *Williams Wireless
Techs., Inc v. Research In Motion*, No. 4:2006-CV-00305. (App. 12, Beamer ¶ 19).

activities, are not limited to where the companies are headquartered. The vast majority of Motorola's and RIM's employees are nowhere near Dallas or Marshall and either district will be equally convenient for these employees. (App. 19-23; App. 156-161, 175, 177). *See Jarvis Christian College v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1998) ("The minor inconvenience Exxon may suffer in having to litigate this case in Tyler-only 203 miles distant-rather than in Houston, can in no rational way support the notion of abuse of discretion."); *Walter Oil & Gas Corp. v. Teekay Shipping*, 270 F. Supp. 2d 855 (S.D. Tex. 2003) (holding that defendant with a large business presence would not be inconvenienced by transfer from Galveston to Houston); *Good Sportsman Marketing LLC v. Testa Associates, LLC*, No. 6:05-CV-90, 2005 WL 2850302, at *4 (E.D. Tex. Sept. 1, 2005) ("Trying a case in Tyler hardly inconveniences a global company with assets and operations dispersed throughout the United States and the world.").

In addition, neither forum is in any sense the "center of gravity" of the case. In patent cases, the place of the alleged wrong is any location where an act of infringement occurs. *See Datamize, Inc. v. Fidelity Brokerage Servs., LLC*, No. 2:03-CV-321-DF, 2004 WL 1683171, at *10 (E.D. Tex. Apr. 22, 2004); *Good Sportsman Mktg. LLC v. Testa Assocs.*, LLC, No. 6:05-CV-90, 2005 WL 2850302, at *4 (E.D. Tex. Sept. 1, 2005). The two districts have an equal nexus and interest in RIM's declaratory judgment action and Motorola's corresponding patent infringement action.

RIM may point to the fact that RIM Corporation has an office in Irving, Texas, and argue that the convenience factor thus favors this District. This does not present a significant convenience issue, given the overwhelmingly more significant presence of RIM in Canada and elsewhere and the short distance (about 165 miles or an hour flight) between Irving and Marshall. Moreover, the Irving facility has nothing to do with the central issue in the case —

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 39 OF 46 PAGES

whether RIM's products infringe Motorola's patents. All of RIM's product design, development, and manufacturing pertinent to infringement issues took place in Canada — not Texas. Motorola understands that the square footage of the leased space of the Irving facility is a tiny fraction of RIM's facilities in Canada, and that there are a few dozen employees in that small facility, compared to RIM's overall employee count of over 4,700.[34]  (App. 177).

Motorola notes that, in the submissions to the Marshall and Delaware Courts in support of RIM's motions to transfer, RIM relies on the presence of Motorola facilities in this district. However, RIM does not identify any key Motorola witnesses that work at those facilities, and Motorola is not aware of any such witnesses. In any event, Motorola will make its employees available as witnesses in Marshall as necessary.

Nor does third party (or former employee) witness convenience favor either forum. Potential witnesses on these claims will include the inventors of the eleven Motorola patents in suit. All but two of those inventors are located at various locations around the country that are equally far from this District and the Eastern District of Texas. The remaining two live in the Dallas area, and are subject to process in the Eastern District. (App. 12-13, Beamer ¶ 21).[35]

---

[34] Motorola does note that, according to RIM's recent submissions in the Delaware and Marshall actions, several Irving employees have responsibility for RIM licensing and United States sales activities and that licensing discussions between Motorola and RIM took place at RIM's Irving facility. But these facts bear little or no relevance to RIM's declaratory judgment action against Motorola's patents. In any event, if needed at trial, RIM can compel its employees to appear at trial traveling the short distance to Marshall. This can hardly be considered a significant inconvenience or a reason to disregard Motorola's choice of forum. *See generally Frost v. ReliOn, Inc.*, No. 3:06-CV-0822-G, 2007 WL 670550, at *4 (N.D. Tex. Mar. 2, 2007) (stating that "where key witnesses are employees of the party seeking transfer, their convenience is entitled to less weight because that party will be able to compel their testimony at trial").

[35] Fed. R. Civ. P. 45(b)(2)(C); Texas R. Civ. P. 176.3(a) ("A person may not be required by subpoena to appear or produce documents or other things in a county that is more than 150 miles from where the person resides or is served.").

---

Moreover, the difference in distance from the respective Courts is not significant, particularly given the availability of modern video-deposition technology, which reduces or even eliminates the need for many third-party witnesses to travel. *See Candela Corp. v. Palomar Med. Techs., Inc.*, No. 9:06-CV-277, 2007 WL 738615, at *5 (E.D. Tex. Feb. 22, 2007).

As to availability of documents, document production and discovery in this case likely will be handled electronically. Technological advances have significantly diminished the importance of this consideration. *Verizon Employee Benefits Comm. v. Glaid*, No. 3:05-CV-1984-G, 2006 U.S. Dist. LEXIS 85941, at *11 (N.D. Tex. Nov. 28, 2006).

### (b)  Judicial economy strongly favors dismissal

RIM has deliberately created an unmanageable litigation that will be an administrative nightmare, *supra*, page 2-6. Even if, as requested above, RIM's antitrust and contract claims are dismissed or bifurcated, allowing RIM's declaratory judgment claims to go forward here is not in the interest of judicial economy and will have the effect of totally frustrating Motorola's right to an expeditious hearing of its patent infringement claims.

Trying both Motorola's eleven patents and RIM's nine patents in one action will be unduly complicated and difficult to manage. The eleven Motorola patents are asserted against at least 23 models of RIM products, and associated software. The nine RIM patents are apparently asserted against at least five specific models of Motorola products and three broad categories of Motorola products, *i.e.*, "wireless handsets," "base stations" and "other wireless communication, enterprise, and network related equipment and services." (App. 13, Beamer ¶ 22). Trying either group of patents alone will be complicated enough — trying both groups (all twenty patents) in one lawsuit, including claim construction proceedings, is a formidable proposition that can

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 41 OF 46 PAGES

properly be avoided, and should be avoided, by means of the relief Motorola seeks in this motion.[36]

Further complicating the sheer volume of products and patents, the technology of the Motorola patents is quite different from the technology of the RIM patents. Motorola's patents relate to graphical user interface features for cell phones and sending/receiving messages within a wireless communications system. In contrast, RIM's patents relate to the physical keyboard layout and advanced signal processing compression techniques for coding human speech using variables such as pitch, lag and gain. Because these technologies are in diverse fields, Motorola and RIM *each* will likely present expert testimony *from several different experts*. (App. 13, Beamer ¶ 23).

RIM grossly generalizes in its motion papers filed in Marshall that the Motorola and RIM patents generally relate to "substantially similar technology" (*i.e.*, wireless communication device) (App. 201). RIM recently made a similar argument in this District that was summarily rejected by the Court: "Merely because the patents pertain to wireless transmission of email and other data does not, of course, show that they are so related that the litigation should be conducted in a single forum." *Research In Motion Ltd. v. Visto Corp.*, No. 3:06-CV-0783-D, slip op. at 12 (N.D. Tex. Oct. 19, 2006) (App. 190).

In addition to creating unnecessary burden, trying both patent cases together raises additional significant and unnecessary risks of confusing the jury. For example, a jury in a patent case is expected to limit its infringement analysis to a comparison between the construed claims and the accused device. It should not compare the accused device with the patentee's

---

[36] RIM's declaratory judgment claims against Motorola's patents will be tried as counterclaims to Motorola's infringement claims for the same patents in the Eastern District of Texas.

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 42 OF 46 PAGES

commercial product. Having Motorola's and RIM's patents and Motorola's and RIM's products

in one action would substantially increase the likelihood that the jury would become confused

and incorrectly compare Motorola's products with RIM's products, or *vice versa.*

Finally, dismissal of RIM's declaratory judgment claims will not cause any delay. RIM

has already filed these claims as counterclaims in the Marshall action. The Court docket in

Marshall is no less expeditious than for this district.[37]

> **C.    Alternatively, RIM's Declaratory Judgment Claims Should Be Stayed Pending Final Resolution Of Motorola's Patent Infringement Action, Or Transferred To The Eastern District Of Texas**

The distinction between staying, rather than dismissing, declaratory judgment claims "is

of little moment" — the same discretionary standards apply. *Wilton*, 515 U.S. at 283.

As this Court held in *Wolf Designs, Inc. v. Donald McEvoy Ltd.*, 341 F. Supp. 2d 639,

642-43 (N.D. Tex. 2004):

> When related cases are pending in two federal courts, there is an inherent power in each of those courts, when presented with an appropriate motion, to stay the proceedings before it in deference to the related action. See *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). Indeed, a stay pending the outcome of litigation in another court between the same parties, involving the same or controlling issues, is an appropriate means of avoiding unnecessary waste of judicial resources. *ACF Industries, Inc. v. Guinn*, 384 F.2d 15, 19 (5th Cir. 1967). Such questions of docket management are left to the sound discretion of the district court, and it is the district court's responsibility to weigh the competing interests of the parties relating to the appropriateness of a stay. *Landis*, 299 U.S. at 255.

---

[37] According to the 2007 Annual Report of the Director of the Administrative Office of the U.S. Courts, the median time interval from filing to trial, in which trials were completed, during the 12-month period ending September 30, 2007, for jury trials, in the Northern District of Texas was 21 months (for 29 trials). That figure for the Eastern District of Texas was 17 months (for 40 trials). (App. 13, Beamer ¶ 25).

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 43 OF 46 PAGES

Accordingly, if the Court does not dismiss RIM's declaratory judgment claims, Motorola, for the reasons discussed above in Sections III.B.1 through III.B.3(b), requests that this Court stay RIM's declaratory judgment claims pending resolution of Motorola's identical Eastern District action. Coupled with dismissal or bifurcation of the non-patent claims, this will leave this Court free to proceed expeditiously with RIM's affirmative claims for infringement of its own patents.

As a further alternative, the Court could sever these claims from this action pursuant to Fed. R. Civ. P. 21, and transfer them for consolidation with the pending case in the Eastern District of Texas pursuant to 28 U.S.C. § 1404(a). *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 n.1 (5th Cir. 1985) (when faced with duplicative litigation, "[i]n addition to outright dismissal, it sometimes may be appropriate to transfer the action"); *Metro Optics, Inc*, 1996 WL 302697, at *2 (transferring declaratory judgment action that was filed in this district "for the sole purpose of securing a favorable forum in anticipation of litigation"). This, too, would enable the Motorola patent claims to proceed in Marshall while allowing the RIM patent claims to proceed here.

## CONCLUSION

For the foregoing reasons, Motorola respectfully requests (1) that RIM's antitrust and contract claims (the tenth through fifteenth causes of action in the February 16 complaint) be dismissed; (2) that any antitrust and contract claim that is not dismissed be bifurcated and stayed pending resolution of RIM's patent infringement claims; and (3) that RIM's declaratory judgment patent claims (the sixteenth through twenty-second causes of action of the February 16 complaint, and the four claims in the consolidated second complaint), be dismissed, stayed

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 44 OF 46 PAGES

pending final resolution of Motorola's Eastern District of Texas patent infringement action, or

transferred to the Eastern District of Texas.

## REQUEST FOR ORAL ARGUMENT

Motorola respectfully requests that the Court hear oral argument on this motion.

Motorola submits that oral argument will be helpful to the Court in resolving the procedure and

legal issues raised by the motion, particularly in light of the fact that resolution of the issues

involves co-ordination with the proceedings in two other District Courts.


Dated: April 10, 2008.                    Respectfully Submitted,

                                          /s/ Eric W. Pinker
                                          Eric W. Pinker, P.C. (TSBN 16016550)
                                          Mark E. Turk (TSBN 00786298)
                                          Angela V. Colmenero (TSBN 24048399)
                                          LYNN TILLOTSON & PINKER, LLP
                                          750 N. St. Paul Street, Suite 1400
                                          Dallas, Texas 75201
                                          (214) 981-3837
                                          (214) 981-3839 – telecopier


*Of Counsel*:

Jesse J. Jenner
Steven Pepe
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
*jesse.jenner@ropesgray.com*

Norman H. Beamer
ROPES & GRAY LLP
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 617-4000
*norman.beamer@ropesgray.com*

**DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

PAGE 45 OF 46 PAGES

Nicole M. Jantzi
**ROPES & GRAY LLP**
700 12th Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
nicole.jantzi@ropesgray.com

DEFENDANT MOTOROLA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR
STAY PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS; AND TO DISMISS, STAY OR
TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS

PAGE 46 OF 46 PAGES

## CERTIFICATE OF CONFERENCE

Counsel for Motorola contacted counsel for RIM on April 3, 2008 to determine whether RIM would oppose the relief requested in this motion.  On April 3, counsel for RIM informed counsel for Motorola that RIM is opposed to Motorola's motion.

Certified on April 10, 2008.

/s/ Norman H. Beamer
Norman H. Beamer

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing was served upon the following counsel *via ECF* on April 10, 2008.

George W. Bramblett, Jr.
Phillip B. Philbin
John R. Emerson
HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202-3789
Tel: 214-651-5000
Fax: 214-651-5940

William F. Lee
Michelle D. Miller
William J. Bohler
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: 617-526-6000
Fax: 617-526-5000

/s/ Eric W. Pinker
Eric W. Pinker

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| *RESEARCH IN MOTION LIMITED* and | § | |
| *RESEARCH IN MOTION CORPORATION,* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. 3:08-CV-0284-G** |
| **v.** | § | **ECF** |
| | § | |
| *MOTOROLA, INC.,* | § | |
| | § | |
| **Defendant.** | § | |

### DECLARATION OF BRIAN BLASIUS

I, Brian Blasius, declare

1.      I make this declaration in support of Defendant Motorola, Inc.'s Brief In Support Of Its Motion To Dismiss Or Stay Plaintiffs' Antitrust And Contract Claims; And To Dismiss, Stay Or Transfer Plaintiffs' Declaratory Judgment Patent Claims.  Unless otherwise stated, I make this declaration based on personal knowledge.

2.      I am currently employed by Motorola, Inc. as Director of Intellectual Property Outbound Licensing in its Mobile Devices business.

3.      As part of its participation in standards organizations, Motorola has declared the existence of patents that it considers "essential" to a standard, and has agreed to license them on "FRAND" (Fair, Reasonable and Non-Discriminatory) terms as required by standards organizations.  Motorola has licensed its "essential" patents to dozens of companies, including many of Motorola's competitors in the industry.

4.      From 2003 through the end of 2007, Research In Motion Limited (RIM) was licensed under a number of Motorola's "essential" and "non-essential" patents.  One of the terms

of that license provided for RIM's payment to Motorola of an up-front, lump sum amount for use of certain "essential" and "non-essential" Motorola patents.  Based on information I have reviewed and my personal knowledge, this lump sum amount was based on a typical essential patent royalty rate used in other Motorola licenses, applied to an estimate of RIM's future sales over the five-year term of the license, which estimate turned out to be significantly lower than RIM's actual performance.

     5.     In late 2007, RIM and Motorola had negotiations to renew their license.  During those renewal negotiations, Motorola offered RIM a license under its "essential" and certain "non-essential" patents.  This offer attributed a royalty rate to the "essential" patents that is comparable to that used by Motorola to arrive at the lump sum payment offered to and accepted by RIM  in 2003 as well as the rate offered to and accepted by other companies.

     6.     Motorola has been, and remains, willing to license its "essential" patents without requiring that a licensee  also take a license under any "non-essential" patents.  Most of Motorola's agreements that cover licenses under "essential" patents provide no license for "non-essential" patents.

     7.     During the 2007 negotiations, Motorola and RIM entered into a Standstill Agreement effective December 5, 2007, to provide additional time for the negotiations.  That Standstill Agreement expired at "the end of the day" on February 15, 2008.

     I declare under penalty of perjury that the foregoing is true and correct.

Executed in Libertyville, Illinois on April 9th, 2008.

_____

Brian Blasius

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| *RESEARCH IN MOTION LIMITED* and | § | |
| *RESEARCH IN MOTION CORPORATION,* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. 3:08-CV-0284-G** |
| **v.** | § | **ECF** |
| | § | |
| *MOTOROLA, INC.,* | § | |
| | § | |
| **Defendant.** | § | |

## DECLARATION OF JOHN M. PICKETT

I, John M. Pickett, hereby declare the following:

### I.    INTRODUCTION

1.    I am a member of the law firm of Young, Pickett & Lee, 4122 Texas Boulevard, Texarkana, Texas 75503.

2.    Our firm has been retained by Motorola, Inc. ("Motorola") to serve as local counsel in two patent infringement lawsuits currently pending in the Eastern District of Texas. The first lawsuit (Motorola, Inc. v. Research In Motion Limited and Research In Motion Corporation, 2:08-cv-69) is pending in Marshall ("the Marshall action"), the Honorable Judge T. John Ward, presiding. The second lawsuit (Motorola, Inc. v. VTech Communications, Inc. and VTech Telecommunications Ltd., 5:07-cv-171) is pending in Texarkana, the Honorable Judge David Folsom, presiding.

3.    I am admitted to practice law in the States of Texas and Arkansas, in the U.S. District Court for the Western District of Arkansas, the U.S. District Court for the

Eastern and Northern Districts of Texas, and before the United States Court of Appeals for the 5th and 8th Circuits.

## II.    EASTERN DISTRICT OF TEXAS ECF FILING PROCEDURES

4.    The Eastern District of Texas permits parties to file complaints using the Electronic Case Filing System ("ECF").

5.    In order to file a complaint in the Eastern District of Texas using ECF, a party must create a new case file and subsequently upload a Civil Cover Sheet, the complaint, any exhibits, and the form of payment for the filing fee.

6.    The date and time of filing for ECF is determined by the time the case file is created and the uploaded filing documents are submitted, including the payment of the filing fee electronically through Pay.gov, the official Website for making online payments to federal government agencies, such as the United States District Court Clerk's office.

7.    The time period between the creation of a case file and submission of the filing documents, including the payment electronically of the filing fee, is dependant upon the time it takes to upload the filing documents and pay the filing fee. This time period can vary based on several factors, *e.g.*, the length of the complaint, the amount and length of the exhibits, and the speed of the computer used for filing.

## III.    FILING OF FEBRUARY 16, 2008 MOTOROLA V. RIM COMPLAINT

8.    In order to avoid an erroneous filing date of Friday, February 15, 2008, the creation of the case file for the Marshall action did not commence until 00:01 a.m. Central time on Saturday, February 16, 2008.

9.    The process of creating the case file, uploading the filing documents (Civil Cover Sheet, 11-page complaint, and Exhibits A-G), submitting the filing documents and paying the filing fee electronically was completed at 00:23 a.m., which was the time entered on the ECF confirmation notice that I received.

10.    Attached hereto as Exhibit A is a true and correct copy of the ECF notice showing a date filed of February 16, 2008, and a time filed of 00:23 a.m. Central time.

11.    It is my understanding that RIM has alleged that Motorola commenced the filing of the Marshall action before midnight on February 16, 2008, in its motion to transfer papers filed in the Marshall action and the District of Delaware action (Motorola, Inc. v. Research In Motion Limited and Research In Motion Corporation, 1:08-cv-104).  RIM's allegations are untrue, and thus without merit. As stated above in ¶¶8-9, the filing of the Marshall action did not begin until after midnight on February 16, 2008.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 4, 2008
       at Texarkana, TX

                                        John M. Pickett

# EXHIBIT A

**Misti McLelland**

| | |
|---|---|
| **From:** | txedCM@txed.uscourts.gov |
| **Sent:** | Saturday, February 16, 2008 12:24 AM |
| **To:** | txedcmcc@txed.uscourts.gov |
| **Subject:** | Activity in Case 2:08-cv-00069 Motorola, Inc. v. Research In Motion Limited Complaint |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court [LIVE]

### Eastern District of TEXAS

**Notice of Electronic Filing**

The following transaction was entered by Pickett, John on 2/16/2008 at 0:23 AM CST and filed on 2/16/2008

| | |
|---|---|
| **Case Name:** | Motorola, Inc. v. Research In Motion Limited |
| **Case Number:** | 2:08-cv-69 |
| **Filer:** | Motorola, Inc. |
| | Research In Motion, Corporation |

**Document Number:** 1

**Docket Text:**
COMPLAINT *for Patent Infringement* against Research In Motion, Corporation, Research In Motion Limited ( Filing fee $ 350 receipt number 1433502.), filed by Research In Motion, Corporation, Motorola, Inc.. (Attachments: # (1) Exhibit A# (2) Exhibit B# (3) Exhibit C# (4) Exhibit D# (5) Exhibit E# (6) Exhibit F# (7) Exhibit G# (8) Civil Cover Sheet)(Pickett, John)


**2:08-cv-69 Notice has been electronically mailed to:**

Motorola, Inc.     jpickett83@aol.com

John Michael Pickett     jpickett@youngpickettlaw.com, jpickett83@aol.com

**2:08-cv-69 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-0
] [69b3ab357877d7c124333e976b7dc16c0bbc48f10500d3eabd42873a26a9a2c91e7

64c65d6b4fde240ce49ab4cdcd3e89db6969df036717d2e9d75b1c4ee38cb]]
**Document description:**Exhibit A
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-1
] [4175743f1d8a86c9a6d1b9282cca3ebd7059211e69b5d96ba033a6e76082238d428
0333f243694548d4e29363a6f665fe2f5a33c465a5c8818a061bd92cfff10]]
**Document description:**Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-2
] [0979ce171de151dbb004d8ff55f05eabfbc013800e09ac710c3d6d266fad2936ced
44c84973c8df810082b8821768a248335459f0cbf8c1a398a934963f79f0d]]
**Document description:**Exhibit C
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-3
] [bcec540b7c9eaf0e3d4920036346601412387 2b407d59bf98ae4d664afd41634a90
9624573740c2866659418cc3d42ed618f5e885efb57af550df51b18714d3d]]
**Document description:**Exhibit D
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-4
] [7e65bd3d72a2ce60e4ea569b37ab2f5d33ceec6cb66cc84a5d0849dddcff75ff371
ddb46c8cb9c538a18f5006a5f745fc9372d2a604356eaf66211db93e15f8e]]
**Document description:**Exhibit E
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-5
] [3dcd666e3b4e6f8a30945518272c47fe3a566c031b24aed2c2eefac296d22e5f4cf
6e3b059d853506b5e4837311158a39615f2dab3dc27111351771b854a3b48]]
**Document description:**Exhibit F
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-6
] [54cd881b636495ab74a30430a9eaa499cdaf040bd5142a1bdc111a540b4096e3d35
2da898af48aa50e793bfd9beca2be3532534feb2a9596bb6778a1d9c236d4]]
**Document description:**Exhibit G
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-7
] [3b06e3fd58b618860a8f9ebf71261f0566820f3325981a9f2e62d4187675ecdd896
aa9a036732cfc8a2f83e570753baf966d7f55b762080e98fae8521b7e7a32]]
**Document description:** Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-8
] [00ea46104a83c4ef6c33e16fc7f3ac0d66baf52c5e07a22c5ee18bc4e5584223dd5
298ec388b6089f2977f0896319b5c02205bfde2b2a77e08118055eaafed5f]]

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED INC., | ) ) ) |
| | ) Civ. No. 07-333-SLR; |
| Plaintiffs, | ) Civ. No. 07-348-SLR; |
| | ) Civ. No. 07-409-SLR; |
| v. | ) and |
| | ) Civ. No. 07-765-SLR |
| JOHNSON & JOHNSON INC. and CORDIS CORPORATION, | ) ) |
| | ) |
| Defendants. | ) |

Josy W. Ingersoll, Esquire and Karen E. Keller, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Richard L. Delucia, Esquire, Paul M. Richter, Esquire, Michael K. Levy, Esquire and Jerry Canada, Esquire of Kenyon & Kenyon LLP, New York, New York.

Steven J. Balick, Esquire, John G. Day, Esquire and Lauren E. Maguire, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendants. Of Counsel: David T. Pritikin, Esquire, William H. Baumgartner, Jr., Esquire, Paul E. Veith, Esquire and Russell E. Cass, Esquire of Sidley Austin LLP, Chicago, Illinois.

**MEMORANDUM OPINION**

Dated: January 24, 2008
Wilmington, Delaware

*Stewart J. Robinson*

**ROBINSON, District Judge**

## I. INTRODUCTION

Currently pending before the court are several motions in several related declaratory judgment patent actions. Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively, "BSC") have filed four complaints against defendants Johnson & Johnson, Inc. and Cordis Corporation (collectively, "J&J"), seeking a judgment that each of four J&J patents are invalid: U.S. Patent Nos. 7,217,286 ("the '7286 patent") (Civ. No. 07-333, D.I. 1); 7,223,286 ("the '3286 patent") (Civ. No. 07-348, D.I. 1); 7,229,473 ("the '473 patent") (Civ. No. 07-409, D.I. 1); and 7,300,662 ("the '662 patent") (Civ. No. 07-765, D.I. 1). J&J has filed, in each action, a motion to dismiss for lack of subject matter jurisdiction and a motion to transfer to the District of New Jersey. (Civ. No. 07-333, D.I. 10, 21; Civ. No. 07-348, D.I. 8, 19; Civ. No. 07-409, D.I. 7, 22; Civ. No. 07-765, D.I. 8, 9) For the reasons that follow, the court denies each of these motions.

## II. BACKGROUND

### A. The Patents and Technology at Issue

The four patents at issue relate generally to drug-eluting coronary stents. The '7286, '3286, and '473 patents are all members of the same patent family, and issued from continuation applications each claiming priority to the same patent. Each of these patents share a common specification. The '662 patent shares two common inventors with the '7286, '3286, and '473 patents but is not a member of the same patent family.

Additional competitors in the coronary stent market, Abbott Laboratories and Abbott Cardiovascular Systems, Inc. (collectively, "Abbott"), manufacture a drug-eluting

stent under the "Xience V" brand.  BSC manufactures a drug-eluting stent under the

"Promus" tradename, which is a private-labeled version of Abbott's Xience V stent.

Abbott makes these stents in the United States.  BSC takes possession of the stents in

California, ships them to its facility in Massachusetts, then readies them for transfer and

sale in Europe.  (Civ. No. 07-333, D.I. 14 at 4)  BSC does not sell the Promus stent in

the United States as it has not yet received FDA approval.[1]  (Id., D.I. 1 at ¶¶ 17-18)

### B. Concurrent Litigation

Abbott previously filed declaratory judgment actions against J&J in which Abbott

contested the validity of the '7286 patent (Civ. No. 07-259) and other J&J-owned

patents not named in the present BSC actions (Civ. No. 06-613).  Abbott filed four

motions to supplement its complaints in Civ. Nos. 06-613 and 07-259 to add patents at

issue in the present BSC actions; the court denied those motions, and subsequently

dismissed both actions.  Specifically, Civ. No. 06-613 was dismissed for lack of subject

matter jurisdiction, while Civ. No. 07-259 was dismissed because J&J was first to file its

lawsuit concerning the '7286 patent in the District of New Jersey.  (Civ. No. 07-259, D.I.

25)  There are now four lawsuits pending in the District of New Jersey in which J&J

asserts infringement of each of the '7286, '3286,'473 and '662 patents by Abbott.[2]

A patent infringement suit is also pending in the Northern District of California

entitled Medtronic Vascular et al. v. Advanced Cardiovascular Systems, Inc. et. al.

---

[1]The court understands as well that Abbott has not received FDA approval for
the Xience V stent.

[2]District of New Jersey Civ. Nos. 07-2255, 07-2477, 07-2728, 07-5636
(collectively, the "New Jersey actions" or the "Abbott" actions).

("Medtronic"),[3] in which plaintiffs assert that Abbott's stents infringe several stent

patents not at issue in this litigation.[4]  The Medtronic court granted a motion by BSC to

intervene as a counter-claimant, finding that the facts as alleged show that a sufficient

controversy exists to warrant the issuance of a declaratory judgment.[5]  (Medtronic, Civ.

No. 06-1066, D.I. 159 at 2, found in the present docket at Civ. No. 07-333, D.I. 15, ex.

A)

## III.  STANDARD OF REVIEW

A party may bring either a factual or facial challenge to the court's jurisdiction in

a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of

Civil Procedure 12(b)(1).  See Turicentro, S.A. v. American Airlines Inc., 303 F.3d 293,

300 n.4 (3d Cir. 2002).  A facial attack, such as presented in the case at bar, contests

the sufficiency of the pleadings; a defendant contends that, even if all such allegations

were true, they would be insufficient to establish the court's jurisdiction.  When

_____

[3]Northern District of California Civ. No. 06-1066.

[4]U.S. Patent Nos. 6,605,057, 6,190,358, and 6,858,037.

[5]The Medtronic court stated:

[I]t appears that a party seeking to invervene as of right under Rule 24(a) need
not possess constitutional Article III standing in this circuit . . . In any event, even
if standing were required, the court finds that the "facts alleged, under all the
circumstances, show that there is a substantial controversy, between parties of
adverse legal interests, of sufficient immediacy and reality to warrant the
issuance of a declaratory judgment."  Medimmune, Inc. v. Genentech, Inc., 127
S.Ct. 764, 774 (2007).  BSC has been actively promoting the medical device at
issue (the Promus stent) in the United States, FDA approval is expected in early
or mid-2008, Abbott is already manufacturing that stent for BSC in the United
States, BSC is already selling that stent in Europe, and plaintiffs have accused
that stent in this patent infringement action.

addressing a facial attack, the court must consider all the allegations of the complaint

as true, and test the existance of jurisdiction at the time the complaint was filed and

henceforth.[6] Id. (citation omitted); Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d

1340, 1344 (Fed. Cir. 2007) (citations omitted).

> The Declaratory Judgment Act provides that,

> in the case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). This "actual controversy" requirement refers to the types of

"cases" and "controversies" justiciable under Article III. See MedImmune, Inc. v.

Centocor, Inc., 127 S.Ct. 764, 771 (2007) (citation omitted). Article III standing requires

"a plaintiff to allege personal injury fairly tracable to the defendant's allegedly unlawful

conduct and likely to be redressed by the requested relief." Teva Pharm. USA, Inc. v.

Novartis Pharm. Corp., 482 F.3d 1330, 1337 (Fed. Cir. 2007) (citing Allen v. Wright,

468 U.S. 737, 751 (1984)). Of these standing requirements, injury-in-fact is the most

determinative. Id. (citing Schlesinger v. Reservists Comm. to Stop the War, 418 U.S.

208, 218 (1974)). "[T]he Supreme Court maintains the necessity of avoiding issuing

advisory opinions based on hypothetical facts." Id. (citing Elec. Bond & Share Co. v.

Sec. & Exch. Comm'n, 303 U.S. 419 (1938)); see also MedImmune, 127 S.Ct. at 771

(the dispute must be "definite and concrete, touching the legal relations of parties

having adverse legal interests," "real and substantial," and "admi[t] of specific relief

---

[6]In contrast, no presumption of truth is afforded plaintiff's allegations in the case of a factual attack. See Turicentro, 303 F.3d at 300 n.14.

through a decree of a conclusive character, as distinguished from an opinion advising

what the law would be upon a hypothetical state of facts") (citations omitted). Thus, the

declaratory judgment plaintiff has the burden "under all the circumstances, [to] show

that there is a substantial controversy, between the parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment."[7]  MedImmune, 127 S.Ct. at 771.

## IV. DISCUSSION

### A. Motions to Dismiss

In the present case, BSC asserts that it "intends to begin selling its Promus stent

in the United States in 2008; FDA approval is pending."  (Civ. No. 07-333, D.I. 1 at ¶ 18)

Although BSC claims that FDA approval is imminent, BSC does not provide any details

regarding the status of its application.[8]  On this record, J&J asserts that BSC has failed

---

[7]The Federal Circuit has recognized, in view of MedImmune, that its previous "reasonable apprehension of suit test" is no longer the appropriate standard.  See Sony Elecs., Inc. v. Guardian Media Techs., Ltd., 497 F.3d 1271, 1284 (Fed. Cir. 2007) (citing MedImmune, 127 S.Ct. at 771 & n.11).
In addition to the reasonable apprehension of suit test, the Federal Circuit previously articulated a two-part test for determining whether the controversy requirement is met where a patentee brings a declaratory judgment action against an alleged future infringer:  "(1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under 35 U.S.C. § 271(a) (1982), or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming."  Lang v. Pacific Marine and Supply Co., Ltd., 895 F.2d 761, 764 (Fed. Cir. 1990).  It is unclear whether the Lang test, minus the requirement that a "reasonable apprehension of suit" results, remains applicable.  Another court considering the issue has interpreted MedImmune as overruling the Lang test.  See Geisha, LLC v. Tuccillo, No. Civ. A. 05-5529, 2007 WL 2608558, *8 (N.D. Ill. Sept. 4, 2007).

[8]The complaints in the 07-348, 07-409, and 07-765 actions do not provide additional detail.  BSC's responsive brief adds only that it expects to begin marketing

6

to demonstrate a present or even imminent dispute and either actual or imminent harm to BSC, since:  (1) the FDA has not approved the Promus stents; (2) BSC is unable to identify with any certainty if or when FDA approval will be forthcoming; and (3) it is undisputed that BSC has not marketed or sold the Promus stent in the United States. (Id., D.I. 16 at 1-2)

As the Promus stent is merely a private-labeled version of Abbott's Xience V stent, the New Jersey litigations filed by J&J, accusing Abbott of infringing the '7296, '3286, and '473 patents at issue in this case, also concern the same stent at issue in this case.  In the New Jersey cases, J&J asserts jurisdiction based upon, inter alia, Abbott's announcement that it sought FDA approval for its stent in 2007 and plans to launch the Xience V stent in the United States in the first half of 2008.[9]  (e.g., New Jersey Civ. A. No. 07-2477, ¶ 9)  J&J can not have it both ways.  If it was appropriate to file against Abbott, jurisdiction is equally appropriate over BSC in the present case; i.e., there is no reason to believe that BSC will not get FDA approval if Abbott does.[10]  The

_____

and selling the Promus stent in the first or second quarter of 2008; BSC avers that this is "imminently" by any definition.  (Civ. No. 07-333, D.I. 14 at 12)  BSC has submitted a press release which indicates that an FDA advisory committee has recommended approval of Abbott's Xience V stent, dated November 29, 2007.  (Civ. No. 07-765, D.I. 10, ex. A)  Presumably, approval of the Promus stent would follow that of the Xience V, though no additional information regarding the status of either application is provided.

[9]The New Jersey actions have, until very recently, been stayed; no motions to dismiss have been filed.

[10]There is also no indication that potential FDA approval is "years away."  See Telectronics Paging Systems, Inc. v. Ventritex, Inc., 982 F.2d 1520, 1527 (Fed. Cir. 1992); compare Lang v. Pacific Marine and Supply Co., Ltd., 895 F.2d 761, 764-65 (Fed. Cir. 1990) (finding that plaintiff failed to meet the actual controversy requirement required to maintain its declaratory judgment claim for patent infringement where "the accused infringing ship's hull would not be finished until at least 9 months after the

7

court finds, therefore, that it may properly exercise jurisction over this matter;

defendant's motions to dismiss are denied.

### B. Motions to Transfer

#### 1. Standards

Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any

other district where the action might have been brought for the convenience of parties

and witnesses and in the interests of justice.  Congress intended through § 1404 to

place discretion in the district court to adjudicate motions to transfer according to an

individualized, case-by-case consideration of convenience and the interests of justice.

Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Affymetrix, Inc. v. Synteni,

Inc., 28 F. Supp. 2d 192, 208 (D. Del. 1998).

The burden of establishing the need to transfer rests with the movant "to

establish that the balance of convenience of the parties and witnesses strongly favors

the defendants." Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981) (citing

Shulte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970).  "Unless the balance is

strongly in favor of a transfer, the plaintiff's choice of forum should prevail". ADE Corp.

v. KLA-Tencor Corp., 138 F. Supp. 2d 565, 567 (D. Del. 2001); Shutte, 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply so long as plaintiff

has selected the forum for some legitimate reason.  C.R. Bard, Inc. v. Guidant Corp.,

997 F. Supp. 556, 562 (D. Del. 1998); Cypress Semiconductor Corp. v. Integrated

Circuit Systems, Inc., No. Civ. A. 01-199, 2001 WL 1617186 (D. Del. Nov. 28, 2001);

_____

complaint was filed").

8

Continental Cas. Co. v. American Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999). Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993).

The Third Circuit Court of Appeals has indicated that the analysis for transfer is very broad. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). Although emphasizing that "there is no definitive formula or list of factors to consider," id., the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." Id. (citations omitted).

The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases."

Id. (citations omitted).

## 2. Analysis

J&J argues that practical considerations "overwhelmingly favor" transferring the present litigations to the District of New Jersey, since the Abbott actions "involve exactly the same patents and exactly the same accused products as the [BSC] cases," and "[c]laim construction issues, infringement issues, and validity issues will thus be identical" in these cases. (Civ. No. 07-333, D.I. 21 at 4) J&J also points out that the New Jersey actions were first-filed vis-a-vis the BSC actions and no unique wrong has occurred in the District of Delaware. (Id. at 4-5) Finally, J&J argues that, while BSC is a Delaware corporation, its principal place of business is in Massachusetts, and Delaware is not its "home turf." (Id. at 6) J&J is both incorporated in and domiciled in New Jersey, where its relevant documents are presumably located. (Id.) Much of the research and development leading to the patents in suit was done in New Jersey, and the inventors of the patents in suit are domiciled there. (Id.)

In response, BSC argues that, while pursuing its claims against Abbott in New Jersey, J&J neither filed suit against BSC in New Jersey nor moved to join BSC as a party to the Abbott suits. (Id., D.I. 24 at 2-4, 8) BSC asserts that J&J's claims of "inconvenience" ring hollow in view of J&J's history of litigation (as both plaintiff and defendant) in Delaware. (Id. at 7) BSC claims that the private interests do not favor transfer, since: (1) BSC is incorporated in Delaware and both parties have litigated in this court previously; (2) the Promus stent, when approved, will be sold across the United States; (3) both companies are large corporations; (4) witnesses from both sides likely reside in many states; (5) the distance between the New Jersey and Delaware

10

district courts is roughly 60 miles; (6) key inventor witnesses would be within the subpoena power of this court for trial; and (7) the location of books and records is of little importance in view of electronic document production.  (Id. at 8-10)  With respect to the public factors, BSC is not a party to the New Jersey litigation, although the same product and same patents are involved in both suits.  (Id. at 11)  Trial is currently scheduled in the cases at bar for August 2009 (id., D.I. 19); since no trial date has yet been set in the New Jersey actions, BSC may wait longer in the event of a transfer to learn whether it can move forward with its Promus stents (Id., D.I. 24 at 13).

The court finds that the private interests implicated do not compel transfer to New Jersey.  As an initial matter, a corporation's decision to incorporate in a particular state is a rational and legitimate reason to litigate in that state.  See Stratos Lightwave, Inc. v. E20 Comm's, Inc., No. Civ. A. 01-309, 2002 WL 500920, *2 (D. Del. Mar. 26, 2002).  J&J has identified no witness who is reluctant to testify and who is beyond the subpoena power of the court.  J&J does not suggest that its documents can not be produced in Delaware, especially in this age where document production is typically done electronically.  Both parties are large corporations who have litigated in Delaware previously; the financial burden on J&J to litigate in Delaware, as compared to neighboring New Jersey, is not unduly harsh.  In sum, the private interests do not compel disrupting plaintiff's legitimate forum choice.

The court also finds that J&J has not met its burden to demonstrate that the public interests implicated weigh "strongly" in favor of transfer in this case.  Although this case involves the same patents and products as those under consideration in New Jersey, BSC is not a party to that litigation.  Cf. Cashedge, Inc. v. Yodlee, Inc., No. Civ.

A. 06-170, 2006 WL 2038504, *2 (D. Del. July 19, 2006) ("Importantly, the same parties

are currently litigating in the Northern District of California.") (granting transfer) (cited by

J&J at Civ. No. 07-333, D.I. 21 at 5).  The record does not indicate that the New Jersey

cases may be tried prior to August 2009.[11]  See Invitrogen Corp. v. Incyte Genomics,

Inc., No. Civ. A. 01-692, 2002 WL 883963, *3 (D. Del. May 1, 2002) (denying motion to

transfer where record did not reflect that cases filed elsewhere, involving the same

patents, were close to trial or resolution).  BSC seeks the timely resolution of its claims

and, on this record, there is no indication that transfer will facilitate that end.[12]  BSC's

claims that maintaining the present actions will "open the door to inconsistent rulings"

regarding claim construction and validity regarding the asserted patents is, at this time,

entirely speculative.  (Civ. No. 07-333, D.I. 21 at 5)  Accordingly, the motions to transfer

will be denied, without prejudice to renew should circumstances change.

## V.  CONCLUSION

For the aforementioned reasons, each of defendant's motions to dismiss and to

transfer are denied.  An appropriate order shall issue.

---

[11]The court notes that the scheduling order entered in the New Jersey actions
dated January 23, 2008 does not contemplate a trial date.  Claim construction briefing
in those cases is not set to conclude until February 2009.  (New Jersey Civ. No. 07-
2477, D.I. 20)

[12]Under the first-filed rule, "[i]n all cases of federal competent jurisdiction, the
court which first has possession of the subject must decide it."  E.E.O.C. v. Univ. of PA,
850 F.2d 969, 970 (3d Cir. 1988) (quotation omitted).  The rule "gives a court the power
to enjoin the subsequent prosecution of proceedings involving the same parties and the
same issues already before another district court."  Id. at 971 (internal quotations and
citation omitted).  To the extent that courts have found that the first to file rule does not
require the parties to each suit be identical, see Time Warner Cable, Inc. v. GPNE
Corp., 497 F. Supp. 2d 584, 589-90 (D. Del. 2007), the court exercises its discretion to
retain jurisdiction over the actions at bar given the risk of prejudice to BSC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED INC., | ) ) ) |
| Plaintiffs, | ) Civ. No. 07-333-SLR; ) Civ. No. 07-348-SLR; ) Civ. No. 07-409-SLR; |
| v. | ) and ) Civ. No. 07-765-SLR |
| JOHNSON & JOHNSON INC. and CORDIS CORPORATION, | ) ) ) |
| Defendants. | ) |

**O R D E R**

At Wilmington this 24th day of January, consistent with the memorandum opinion

issued this same date;

IT IS ORDERED that:

1. Defendants' motions to dismiss (Civ. No. 07-333, D.I. 10; Civ. No. 07-348,

D.I. 8; Civ. No. 07-409, D.I. 7; Civ. No. 07-765, D.I. 8) are denied.

2. Defendants' motions to transfer (Civ. No. 07-333, D.I. 21; Civ. No. 07-348,

D.I. 19; Civ. No. 07-409, D.I. 22; Civ. No. 07-765, D.I. 9) are denied.

_____
United States District Judge

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TURN OF THE CENTURY          )
SOLUTION, L.P.,              )
                             )
         Plaintiff,          )
                             )
    v.                       )     Civ. No. 05-816-SLR
                             )
INTERNATIONAL RECTIFIER      )
CORPORATION,                 )
                             )
         Defendant.          )

**MEMORANDUM ORDER**

At Wilmington this  15th  day of June, 2006, having

considered defendant's motion to transfer and the papers

submitted in connection therewith;

IT IS ORDERED that said motion to transfer (D.I. 9) is

denied, for the reasons that follow:

1. **Introduction.** On November 29, 2005, plaintiff Turn of

the Century Solution, L.P. ("TOCS") filed a complaint for patent

infringement against defendant International Rectifier

Corporation ("IRC").  (D.I. 1)  The patents-in-suit are U.S.

Patent No. 5,600,836 and U.S. Patent No. 5,835,909 (collectively

"patents-in-suit").  (Id.)  TOCS contends that IRC conceded

infringement of the patents-in-suit during its defense of a 2004

California state breach of contract case.[1]  IRC filed an answer

_____

[1]Anthony Sneed v. Niel Armstrong and International Rectifier
Corporation, Los Angeles Superior Court Case No. BC 296142.

and asserted several affirmative defenses.  (D.I. 6)  IRC then
filed this motion to transfer to the Central District of
California.  (D.I. 9, 10)  TOCS opposes the motion (D.I. 12) and
IRC has filed its reply.  (D.I. 14)

2.   **Background.**  TOCS is a Pennsylvania limited partnership
with its principal place of business in Ambler, Pennsylvania.
(D.I. 1 at ¶ 1)  It has no employees and its annual revenue has
never exceeded $500,000 during its decade of existence.  (D.I. 12
at 6)

3.   IRC is a Delaware corporation with its principal place
of business in El Segundo, California.  (D.I. 1 at ¶ 2)  IRC has
6,000 employees in twenty countries and at least four states and
had a revenue of over one billion dollars in fiscal 2005.  (D.I.
12 at 6)  IRC does not have any offices or employees in Delaware.
(D.I. 10 at 1)

4.   In 2004, IRC was sued for breach of a Non-Disclosure
Agreement by Anthony Sneed for its purported use of Sneed's Y2K
remediation.  (D.I. 11 at 2)  IRC defended the <u>Sneed</u> case by
showing that the Y2K remediation it used was a technique
previously described in the patents-in-suit.  (<u>Id.</u>)  TOCS alleges
that IRC's description of its Y2K remediation technique during
its defense of the <u>Sneed</u> case was a concession to infringing on
the patents-in-suit.  IRC indicates that its four witnesses to
testify in the <u>Sneed</u> case regarding its Y2K remediation technique

2

are also "percipient to the facts showing non-infringement in this case." (Id.) All four witnesses currently reside in California, and only two of the four are currently IRC employees. (Id. at 2-3)

5.   **Standard of Review.**  Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice.  Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice.  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp.2d 192, 208 (D. Del. 1998).

6.   The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981) (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". ADE Corp. v. KLA-Tencor Corp., 138 F. Supp.2d 565, 567 (D. Del. 2001); Shutte, 431 F.2d at 25.

3

7.   The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del 1998); Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 WL 1617186 (D. Del. Nov. 28, 2001); Continental Cas. Co. v. American Home Assurance Co., 61 F. Supp.2d 128, 131 (D. Del. 1999).  Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993).

8.   The Third Circuit Court of Appeals has indicated that the analysis for transfer is very broad. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).  Although emphasizing that "there is no definitive formula or list of factors to consider," id., the Court has identified potential factors it characterized as either private or public interests.  The private interests include:  "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the

4

parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." Id. (citations omitted).

9.    The public interests include:  "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." Id. (citations omitted).

10.  **Discussion.**  IRC asserts that the most compelling reason to transfer the case is that its four key witnesses reside in California, and two of the four are third-party witnesses not within the subpoena power of the court.  (D.I. 10 at 5)  IRC further argues that its burden and expense would be greatly reduced by litigating in California, where the witnesses and evidence are located and where the alleged infringement occurred. (Id. at 7)  IRC also contends that plaintiff's choice of forum should be given little deference because plaintiff has "no alleged connection to Delaware."  (Id. at 5)

5

11.   TOCS opposes the motion to transfer on several grounds.
TOCS first points out that its principal place of business is
only 33 miles from Wilmington, Delaware in Ambler, Pennsylvania,
so its choice of forum should be afforded deference because
Delaware is considered its "home turf." (D.I. 12 at 4)  TOCS
contends that it had legitimate reasons to file suit in Delaware
based on its geographic proximity and past experiences with this
jurisdiction. (Id. at 4-5)  Further, since IRC is a Delaware
corporation enjoying all the benefits and protections of this
state's laws, it cannot credibly contend that litigation in the
state is inconvenient. (Id. at 5)

12.   Weighing the arguments against the Jumara balancing
test, the court finds that the asserted advantages of moving the
case to the Central District of California are insufficient to
warrant a transfer. Defendant's complaints about litigating here
are outweighed by the fact that IRC has enjoyed the benefits and
protections of incorporation in Delaware and that the state has
an interest in litigation regarding companies incorporated within
its jurisdiction.

13.   IRC has demonstrated that it would be more costly and
more inconvenient for its four main witnesses from the Sneed case
to provide testimony in Delaware. Considering that discovery can
be conducted at any location convenient to the parties and their
employees, the only event that will take place in Delaware is the

6

trial.  The travel expenses and inconveniences incurred for that
purpose, by a Delaware defendant conducting world-wide business,
is not overly burdensome.  Regarding IRC's two witnesses outside
of the court's subpoena power, IRC has not attempted to show that
either would be unwilling to travel to Delaware to testify.
Rather, IRC merely speculates that the time required for cross-
country travel would be too burdensome for these two witnesses to
be able to testify in Delaware.[2]  (D.I. 14 at 4)

     14.  IRC devotes much of its argument to showing why the
plaintiff's choice of forum should be given little or no
deference by the court.  IRC first downplays the significance of
the court's "home turf" rule and then contends that the location
of the alleged infringement is the preferred forum for
litigation.  (D.I. 14 at 4-6)  In doing so, IRC relies almost
exclusively on cases outside this jurisdiction while ignoring the
case law within this jurisdiction that gives great deference to
the plaintiff's choice of forum.  See, e.g., C.R. Bard, Inc., 997
F. Supp. at 562.

---

     [2]From a practical standpoint, much of the testimony
presented at trial these days is presented via recorded
depositions, as opposed to witnesses traveling and appearing
live.  There certainly is no obstacle to IRC's embracing this
routine trial practice.

7

15. **Conclusion.** For the reasons stated, defendant's motion to transfer (D.I. 9) is denied.

United States District Judge

# EXHIBIT I



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INPRO II LICENSING, S.A.R.L.,                  )
                                               )
              Plaintiff,                       )
                                               )
       v.                                      )       Civil Action No. 03-1047 GMS
                                               )
                                               )
T-MOBILE USA, INC., RESEARCH IN                )
MOTION LIMITED, and RESEARCH                   )
IN MOTION CORPORATION,                         )
                                               )
              Defendants.                      )

## MEMORANDUM

### I.    INTRODUCTION

On November 18, 2003, the plaintiff InPro II Licensing, S.A.R.L. ("InPro") filed suit against

the defendants Research In Motion Limited ("RIM, Ltd."), Research In Motion Corporation ("RIM

Corp.") (together the "RIM Defendants") and T-Moble USA, Inc. ("T-Mobile") (collectively the

"Defendants") alleging infringement of its '079 patent. Approximately three weeks before the filing

of this action, on October 31, 2003, RIM Ltd. and RIM Corp. filed a declaratory judgment action in

the Northern District of Texas against InPro over the same '079 patent asserted in this action and

also another patent, the '957 patent (the "Texas Litigation").  Presently before the court is the

Defendants' motion to transfer this action to the Northern District of Texas pursuant to the first-filed

rule and/or 28 U.S.C. 1404(a).  For the following reasons, the court will deny the Defendants'

motion.

### II.   BACKGROUND

The plaintiff InPro is a Luxembourg private limited company that has its principle place of

business in Luxembourg.  Defendant T-Mobile is a Delaware corporation with its corporate offices

located in Bellevue, Washington. Defendant RIM Corp. is also a Delaware corporation with its

principle place of business located in Irving, Texas. Defendant RIM Ltd. is a corporation organized

under the laws of Ontario, Canada with its principle place of business located in waterloo, Ontario,

Canada.

InPro is the record owner of the '079 patent at issue in this action, which relates to

technology for personal digital assistants, or PDAs. Leading up to the filing of the present litigation,

InPro had engaged T-Mobile and RIM Ltd. in licensing discussions, contending that their sale of

certain products, including those sold under the trade name "Blackberry," may infringe the '079

patent, as well as the '957 patent which is not at issue in this action. The parties exchanged a series

of written and oral communications and conducted at least one face-to-face meeting. In the midst

of the parties' negotiations, RIM Ltd. and RIM Corp. filed the Texas Litigation. After discovering

that RIM Ltd. and RIM Corp. had filed an action in the Northern District of Texas, InPro initiated

its own suit against them, as well as T-Mobile, in this court.

## II.    DISCUSSION

### A.    Transfer Pursuant to 1404(a)

Section 1404(a) provides that "[f]or convenience of [the] parties and witnesses, in the interest

of justice," the court may transfer a civil action "to any other district . . . where it might have been

brought." 28 U.S.C. § 1404(a). When considering a motion to transfer, the court must engage in

"a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties

and the witnesses and the interests of justice, but all relevant factors, including "practical

considerations that could make the trial easy, expeditious, or inexpensive . . . and the local interest

in deciding local controversies at home." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 875, 879-80

2

(3d Cir. 1995).

Although not specifically enumerated in Section 1404(a), the court should consider certain public and private interests in making its determination. *See id.* at 879. These public interest factors include: (1) enforceability of the judgment; (2) practical considerations that would make the trial easy, expeditious, or inexpensive; (3) relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.* Among the private interests a court should consider are: (1) the plaintiff's forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of witnesses who may be unavailable for trial in one of the fora; and (6) the location of books and records. *Id.* Taking each of these considerations in turn, the *Jumara* factors do not sway the court in favor of either InPro or the Defendants.

1.    Public Factors

For public factor (1), the court sees nothing in the parties' papers indicating that a judgment would be any less enforceable in Delaware than in Texas. With regard to factor (3) of the public considerations, the Defendants admit that "both the Northern District of Texas and the District of Delaware are efficient in the administration and resolution of civil matters." (Opening Memorandum of Law in Support of Defendants' Motion to Transfer or Stay at 11). Just as a patent controversy is not unique to Delaware, neither is it unique to Texas, rendering public factor (5) neutral as well. *See Corixa Corp. V. IDEC Pharms. Corp.*, C.A. No. 01-615-GMS, 2002 WL 265094, at *4 (D. Del. Feb. 25, 2002) ("[T]he court can hardly describe the patents as a local controversy."). Furthermore, the

3

court will presume that both the District of Delaware and the Northern District of Texas are equally
able in applying federal law. Given that this infringement action has been brought under the United
States patent laws, the court also sees no difference between the two fora for purposes of public
factor (6).

Although at a glance public factors (2) and (4), the Defendants' preference and the local
interest in deciding controversies at home, weigh slightly in favor of transfer, the court ultimately
concludes that they do not tip the balance in favor of transfer. The Defendants argue that there is
more local interest in resolving this matter in Texas because one of the defendants, RIM Corp.,
which has the exclusive right to grant distributorship in the United States of RIM Ltd.'s accused
products, operates its business in Texas. Notably, however, two of the defendants, RIM Corp. and
T-Mobile, are incorporated under the laws of Delaware, while none of the defendants are
incorporated in Texas. Moreover, short of invoking judicial estoppel, the court finds many of the
Defendants' arguments in favor of these factors to be disingenuous considering that RIM Ltd. has
brought infringement actions in the District of Delaware on five previous occasions[1] in the last three
years.[2] Moreover, in one of those actions, RIM Ltd. successfully opposed a motion to transfer the

---

[1] These actions include *Research In Motion v. Glenyare*, Case No. 01-CV-322, filed on
May 16, 2001 (patent infringement action before the Honorable Roderick R. McKelvie);
*Research In Motion v. Good Technology, Inc.*, Case No. 02-CV-556, filed on June 19, 2002
(patent infringement action before the Honorable Joseph J. Farnan); *Research In Motion v. Good
Technology, Inc.*, Case No. 02-CV-566, filed on July 11, 2002 (copyright infringement action
before Judge Farnan); *Research In Motion v. Good Technology, Inc.*, Case No. 02-CV-1338,
filed on July 29, 2002 (trademark infringement action before Judge Farnan); *Research In Motion
v. Handspring, Inc.*, Case No. 02-CV-1480, filed on September 18, 2002 (patent infringement
action before Judge Farnan).

[2] In a letter to the court dated March 2, 2004, the Defendants requested leave to file
additional briefing on the issue of whether or not the RIM Defendants' previously filed cases in
this district are distinguishable from the present action. For the purposes of its findings here, the

case out of this court.[3] These considerations serve to neutralize the little weight the court would have

given factors (2) and (4) in the Defendants' favor.

### 2.    Private Factors

Likewise, to the extent factors (2), (4), (5) and (6) of the private considerations may weigh

in favor of the Defendants, they are also neutralized by the Defendants' persistent use of this court.

More specifically, the Defendants contend the balance of convenience weighs strongly in favor of

transferring this case to Texas because InPro has a weak connection to its chosen forum of Delaware.

They further claim that there is no reason to believe that there are any relevant witnesses or

documents located in Delaware.  However, the Defendants do not affirmatively represent that there

are any documents or witnesses in Texas either.  Given the lack of factual support for their

contentions in this regard and the fact, previously noted, that they have filed their own infringement

actions in the District of Delaware at least five other times in the recent past, the court is not

convinced that retaining this action in the present forum would pose any significant inconvenience

to the Defendants.

As for the remaining private considerations, factor (1) clearly weighs against transfer, as

InPro has chosen to file its action in the District of Delaware.  Private factor (3) is inapposite in that

the claim arose neither in the Northern District of Texas nor in the District of Delaware. The alleged

infringing products in this action are produced by RIM Ltd., which is incorporated under the laws

of the province of Ontario, Canada and has its principle place of business in Waterloo, Ontario,

---

court does not consider such additional briefing to be necessary and hereby denies the
Defendants' request.

[3]*Research In Motion v. Good Technology, Inc.*, Case No. 02-CV-556, D.I. 129 (March 23,
2003).

5

Canada. Indeed, there is nothing in the parties' filings indicating that any decision concerning the design or manufacture of the alleged infringing products was made in any jurisdiction outside of Canada.

**B.    Transfer Pursuant to the First-Filed Rule**

Finally, the court will not entertain the Defendants' first-filed argument as a separate basis for transfer. The tactics employed by the parties on both sides of this action can fairly be described as "hard ball," if not "sharp," practices that essentially negate one another for first-filed rule purposes. That is, as a result of the Defendants' tactics, the court will not give them the benefit of deciding this issue on the first filing rule alone. On the other hand, it will not reward InPro's tactics by granting it an exception to the first-filed rule. Instead, the court will simply add this factor to its *Jumara* analysis and find that it is also neutral for the reasons just stated.

**III.    CONCLUSION**

As the court finds the balance of the *Jumara* factors to be largely neutral, it is left with the directive that it is the movants' burden to establish the need for transfer; and "the plaintiff's choice of venue [will] not be lightly disturbed." *Jumara* 55 F.3d at 879 (citations omitted). InPro has filed this litigation in the District of Delaware. In the court's view, the Defendants' have not met their burden of persuasion. Accordingly, the court will deny the Defendants' motion and decline to transfer this action.

Dated: March 5, 2004



UNITED STATES DISTRICT JUDGE

FILED

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

6

# EXHIBIT J



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SIEMENS MEDICAL SYSTEMS, INC., a Delaware corporation, and SIEMENS AG, a German corporation, )<br><br>Plaintiffs, )<br><br>v. )<br><br>FONAR CORPORATION, a Delaware corporation, and RAYMOND V. DAMADIAN, M.D. MRI SCANNING CENTERS MANAGEMENT CO., INC., a Delaware corporation, )<br><br>Defendants. ) | Civil Action No. 95-261-SLR |

**MEMORANDUM ORDER**

## I. INTRODUCTION

On April 27, 1995, Siemens Medical Systems, Inc. brought this action in the United States District Court for the District of Delaware against Fonar Corporation ("Fonar") for a declaratory judgment that Siemens had not infringed certain Fonar patents and that Fonar was guilty of certain "inequitable conduct" in securing the patents.  On June 15, 1995, Siemens served Fonar and Raymond V. Damadian, M.D. MRI Scanning Centers Management Co. ("RVDC") an amended complaint adding a patent infringement claim against both defendants.  In its amended complaint, Siemens seeks a declaratory judgment that U.S. Letters patent 5,061,897 (the "'897 patent"), 4,675,609 (the "'609 patent"), 4,871,966 (the "'966 patent"), 3,789,832 (the "'832

patent"), and 4,616,180 (the "'180 patent") are invalid and not infringed.

Presently before the court is defendants' motion to dismiss, stay or transfer the case from this District to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1404.  (D.I. 13)  For the reasons discussed below, the motion will be denied.

## II. BACKGROUND

Plaintiff Siemens Medical Systems, Inc. ("Siemens") is a Delaware corporation with its principal place of business in Iselin, New Jersey.  Siemens is a wholly-owned subsidiary of plaintiff Siemens AG, a German corporation.  Defendants Fonar and RVDC are Delaware corporations.  Fonar is headquartered in Melville, New York, in the Eastern District of New York.

On September 2, 1992, Fonar filed a patent infringement suit in the United States District Court for the Eastern District of New York against, _inter alia_, General Electric Company ("the GE litigation"), alleging, _inter alia_, infringement of the '966 patent and the '832 patent.  By letter dated October 7, 1992, Fonar charged Siemens with infringement of these same patents and stated its intent to file suit for infringement upon the completion of the GE litigation.

In April of this year, prior to the jury verdict on liability in the GE litigation, Siemens instituted the present action.  On June 14, 1995, plaintiffs' amended complaint was filed.  Two days later, on June 16, 1995, Fonar filed an action in the Eastern District of New York charging Siemens with

infringement of the '897 patent and the '609 patent, which Fonar

had asserted against defendant Hitachi in the GE litigation.[1]

On June 19, 1995, Fonar filed the pending motion.

III. DISCUSSION

    A.  Motion to Dismiss

    Title 28, Section 2201 provides, in relevant part:

> In a case of actual controversy within its
> jurisdiction, . . . any court of the United
> States, upon the filing of an appropriate
> pleading, may declare the rights or other
> legal relations of any interested party
> seeking such declaration, whether or not
> further relief is or could be sought.

28 U.S.C. § 2201(a).  Ordinarily, where an action has been filed

in two district courts, the court in which the action was first

filed will preside over the litigation.  Optical Recording Corp.

v. Capitol EMI Music, Inc., 803 F. Supp. 971 (D.Del. 1992).

Defendants contend, however, that "where a party purposefully

misuses [Section 2201] to engage in forum shopping, dismissal is

the rule."  (D.I. 13 at 9, citing Pacific Employers Ins. Co. v.

M/V Captain W.D. Cargill, 751 F.2d 801, 804 (5th Cir.), cert.

denied, 474 U.S. 909 (1985) and Ven-Fuel, Inc. v. Dep't of the

Treasury, 673 F.2d 1194, 1195 (11th Cir. 1982)).  Here,

defendants argue,

> Siemens' misuse of the Declaratory Judgment
> Act is obvious . . ..  It clearly did not
> file this suit to avoid accrual of avoidable
> damages.  Those damages have already
> multiplied unchecked over the three years of
> willful infringement that have elapsed since
> Siemens was offered license terms in October

---

1.  Hitachi settled at the outset of trial.  (D.I. 13 at 7 n.2)

3

> 1992.  Nor did Siemens sue here to obtain an
> early adjudication of its rights.  It knew
> Fonar was prepared to file suit immediately
> after the GE Litigation concluded if Siemens
> failed to negotiate a license in good faith.
> ...  Siemens' earnest race to the courthouse
> began only when the GE Litigation drew to its
> inevitable close.

(<u>Id</u>. at 10-11)(citation omitted).

Moreover, defendants argue, the first filed rule may be abandoned where inconsistent with judicial and litigant economy and the just and effective disposition of disputes.  (<u>Id</u>. at 13, citing <u>Serco Services Co., L.P. v. Kelly Co., Inc.</u>, 34 U.S.P.Q.2d 1217 (Fed.Cir. 1995)).  In the present case, defendants aver, "the inventions at issue are exceedingly complex," and "the technology of the patents in suit is the same as the technology and patents involved in the later-filed action in the Eastern District of New York[,]" and "the same technology involved in the GE Litigation recently concluded before Judge Waxler in that District."  (D.I. 13 at 12-13)  According to defendants, the Eastern District's "familiarity with the subject matter of the litigation will reduce the expenditure of judicial resources in the handling of this case, a consideration which 'alone is sufficient . . . to justify departure from the first filed rule.'"  (<u>Id</u>. at 13, quoting <u>Optical Recording</u>, 803 F. Supp. at 974).  Defendants contend that Siemens' amendment of its complaint to add a claim for infringement of the '180 patent does not change the analysis, primarily because the '180 patent is "self-evidently similar to those involved in the GE Litigation."  (D.I. 13 at 15)

4

Lastly, defendants argue that a declaratory judgment action can be dismissed "in the interests of judicial economy and for the convenience of the parties and the witnesses." (D.I. 13 at 17)(citations omitted). According to defendants, "[t]he convenience of the litigants virtually compels dismissal here," in that (1) Siemens is headquartered in Iselin, New Jersey; (2) Fonar has no offices in Delaware; and (3) documents and witnesses relating to the patents at issue, their prosecution, and Fonar's enforcement of them, are all located in New York.[2] Should any witness be unwilling, defendants contend, their attendance at trial could be compelled only in New York. (D.I. 13 at 18)

Plaintiffs respond that they chose the Delaware forum not for reasons of forum shopping, but because it was more convenient than the New York forum, and that dismissal is therefore unwarranted. (D.I. 14 at 11-12)(citations omitted) Moreover, plaintiffs argue, the prosecution of this action in Delaware is not inconsistent with judicial and litigant economy and the just and effective disposition of disputes. According to plaintiffs,

> because many of the patents and issues
> involved in the prior GE cases are different
> from those here, little if any judicial
> economy would be achieved by having this case
> tried in the Eastern District of New York.

---

2. According to defendants, all four of the named inventors on the '966 patent, all three of the named inventors on the '609 patent, and the "lead" inventor on the '897 patent reside in the Eastern District of New York, the named inventor on the '832 patent resides in Woodbury, New York, and the inventor on the '180 patent "apparently lived in Ohio at the time the patent was issued." (D.I. 13 at 7-9)

> Of the four Fonar patents involved here, only
> **two** were tried in the prior GE case, and they
> were tried to a jury rather than the judge.
> The Siemens' patent was not before that court
> at all.

(<u>Id</u>. at 18)(emphasis in original).  As for effective disposition,

plaintiffs contend, the Delaware court "moves faster [than the

New York court], as reflected in the Annual Report of the

Administrative Office of the United States Courts (the "AO

Report"), and is recognized as having a commendable familiarity

with complex litigation in general, and with patent litigation in

particular."  (D.I. 14 at 12)  Nor, plaintiffs argue, does the

convenience of the parties or witnesses warrant dismissal.

According to plaintiffs, (1) Melville, New York is only 147 miles

from Wilmington; (2) Wilmington is "more centrally located, which

makes it more accessible to Siemens' New Jersey and North

Carolina locations, and avoids the judicially-recognized and

infamous traffic congestion in New York City and Long Island;"

and (3) the location of documents is irrelevant.  (D.I. 14 at 7,

12)

     Based on the record before it, the court concludes that

defendants have failed to meet their burden of demonstrating that

the relevant factors warrant dismissal.  Plaintiffs have not

clearly engaged in forum shopping in contravention of the purpose

behind the Declaratory Judgment Act.  Nor is the court persuaded

that reasons of judicial and litigant economy, the just and

effective disposition of disputes or the convenience of the

parties or witnesses justify dismissal.  Therefore, defendants'
motion to dismiss will be denied.

>    B.  Motion to Transfer
>
>    Title 28, Section 1404(a) provides:
>
>>    For the convenience of the parties and the
>>    witnesses in the interests of justice, a
>>    district court may transfer any civil action
>>    to any other district or division where it
>>    might have been brought.

Congress intended through § 1404 to place discretion in the
district court to adjudicate motions to transfer according to an
individualized, case-by-case consideration of convenience and the
interests of justice.  Stewart Org. v. Ricoh Corp., 487 U.S. 22,
29 (1988).  "The standard under which transfer applications are
considered requires district courts to consider the convenience
of parties and witnesses, the interest of justice, and whether
the action could have been brought in the transferee court."
SportsMEDIA Technology Corp. v. Upchurch, 839 F.Supp. 8, 9
(D.Del. 1993).  The parties do not dispute that this action could
have been brought in the Eastern District of New York.

>    As a general rule, "[b]ecause plaintiffs' choice of
forum is accorded substantial weight, the burden is on the
defendants to establish that the balance of convenience of the
parties and witnesses **strongly** favors the defendants." Bergman v.
Brainin, 512 F.Supp. 972, 973 (D.Del. 1981) (citing Shutte v.
Armco Steel Corp., 431 F.2d 22,25 (3d Cir. 1970), cert denied,
401 U.S. 910 (1971))(emphasis added).  Plaintiffs' choice of
forum is "paramount."  See, e.g., Wesley-Jessen Corp. v.

<u>Pilkington Visioncare, Inc.</u>, 157 F.R.D. 215, 216 (D.Del 1993).
Indeed, the deference to the plaintiffs' choice of forum will
apply so long as the plaintiffs have chosen the forum for some
legitimate reason. <u>See</u>, <u>Tuff-Torq. Corp v. Hydro-Gear Ltd.
Partnership</u>, 882 F.Supp. 359, 362 (D.Del. 1994).[3]  In the
present case, plaintiffs have a legitimate reason for their forum
choice: the fact that defendants are incorporated in Delaware.[4]
Therefore, even if Delaware is not plaintiffs' "home turf" for
purposes of this action, deference to plaintiffs' choice will
still apply.

---

3.  <u>See</u> <u>also</u> <u>In re M.L.-Lee Acquisition Fund II, L.P.</u>, 816 F.Supp
973, 976 (D.Del. 1993)(emphasis added)("While transfer of a case
will generally be regarded as less inconvenient to a plaintiff if
the plaintiff has not chosen its "home turf" or a forum where the
alleged wrongful activity occurred, the plaintiff's choice of
forum is still of paramount consideration, and the burden remains
at all times on the defendants to show that the balance of
convenience and the interests of justice weigh strongly in favor
of transfer.").

4.  As this court has previously held:

> At the outset, the fact that [defendant]
> incorporated in Delaware should not be
> disregarded lightly.  By incorporating in
> Delaware, it can be assumed that [defendant]
> desired the benefits that it believed
> Delaware provides to chartered corporations.
> [Defendant] chose Delaware as its legal home
> and should not now complain that another
> [party] has decided to sue [defendant] in
> Delaware.

<u>Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.</u>, 821
F.Supp. 962, 965 (D.Del 1993).

8

With respect to convenience of the parties and witnesses, defendants contend that (1) Siemens' headquarters in Iselin, New Jersey is "a comparatively short distance from the Eastern District of New York courthouse in Hauppauge[;]" and (2) "[d]ocuments and witnesses relating to the [p]atents, their prosecution, and Fonar's enforcement of them, are all located in New York. (D.I. 13 at 18) As noted above, plaintiffs counter that (1) Melville, New York is only 147 miles from Wilmington; (2) Wilmington is "more centrally located, which makes it more accessible to Siemens' New Jersey and North Carolina locations, and avoids the judicially-recognized and infamous traffic congestion in New York City and Long Island;" and (3) the location of documents is irrelevant. (D.I. 14 at 7, 12)

Even if the Eastern District of New York were the more convenient trial forum for both the parties and the non-party witnesses, this would not be sufficient to compel a transfer. This court in Wesley-Jessen analyzed an analogous situation in which a defendant made a similar showing, and concluded that transfer was inappropriate for three reasons. First, the court noted that, being a company engaged in business throughout the United States, the claim that litigation away from the most convenient forum is burdensome is somewhat suspect. 157 F.R.D. at 218. Defendant Fonar is similarly situated with business operations throughout the United States. (D.I. 14 at 6) The second factor noted by the court in Wesley-Jessen is the incorporation of defendant in Delaware. Here again, the court

outlined the heightened burden on such a business.  "Absent some

showing of a unique or unexpected burden, these corporations

should not be successful in arguing that litigation in their

state of incorporation is inconvenient."  Id.  Finally, the court

noted the somewhat archaic nature of the "convenience of the

parties" factor in determining a motion to transfer.

> A third reason for denying the motion to
> transfer is that technological advances have
> substantially reduced the burden of having to
> litigate in a distant forum . . ..  These
> technologies have shortened the time it takes
> to transfer information, reduced the bulk or
> size of documents or things on which
> information is recorded and can be
> transferred and have lowered the cost of
> moving that information from one place to
> another.

Id.  The court finds that defendants have not demonstrated that

litigation in Delaware imposes on them a unique or unexpected

burden.

The final factor to be addressed by the court is the

interest of justice.  In analyzing this factor the court looks to

judicial resources, cost to the parties, access to proof, and the

availability of compulsory process.  Critikon, 821 F.Supp. at

966.  With respect to judicial resources, defendants argue that

the New York court's "familiarity with the subject matter of this

litigation will reduce the expenditure of judicial resources in

the handling of this case . . .."  (D.I. 13 at 13)  As noted

above, plaintiffs respond that the Delaware court "moves faster,

as reflected in the . . . AO Report . . ., and is recognized as

having a commendable familiarity with complex litigation in

10

general, and with patent litigation in particular." (D.I. 14 at

12)  Specifically, plaintiffs contend,

> [t]he AO Report for the 12-month period
> ending in September 1994 reported that each
> judge in the Eastern District of New York had
> 663 pending cases.  That case load is **more
> than four times** the 155 pending cases per
> judge in the District of Delaware.  The AO
> Report also indicated that the median time
> from filing to trial in civil cases is 26
> months in the Eastern District of New York,
> compared with 16 months in the District Court
> of Delaware.

(<u>Id</u>. at 18)(emphasis in original).  Moreover, plaintiffs argue,

> because many of the patents and issues
> involved in the prior GE cases are different
> from those here, little if any judicial
> economy would be achieved by having this case
> tried in the Eastern District of New York.
> Of the four Fonar patents involved here, only
> **two** were tried in the prior GE case, and they
> were tried to a jury rather than the judge.
> The Siemens' patent was not before that court
> at all.

(<u>Id</u>.)(emphasis in original).

Based on these arguments, the court is not persuaded

that this case would be resolved in the Eastern District of New

York more efficiently or expeditiously than in the District of

Delaware.  The efficient use of judicial resources does not

require the transfer of this case.

Addressing compulsory process, defendants argue that

"should any [of the New York] witnesses prove to be unwilling,

their attendance at trial can be compelled only if the trial

proceeds in New York." (D.I. 13 at 18)  These witnesses include

"most of the named inventors of the patents in issue . . .."

(D.I. 19 at 5)  Plaintiffs respond that "Fonar has not provided a single example of a witness who is unwilling to attend trial in Delaware."  According to plaintiffs, the patent inventors specifically identified by defendants are all employed by Fonar, and their attendance can be compelled regardless of the reach of this court's subpoena power.  (Id. at 20)

The court agrees with plaintiffs that here, as in Critikon, 821 F.Supp. at 967, defendants

> ha[ve] not represented to the [c]ourt that [the witnesses] would be unwilling to testify at trial voluntarily.  [To the extent these witnesses are] ... employee[s] of [Fonar], ... the [c]ourt must assume that [they] would be willing to testify absent a subpoena.

Accordingly, the court finds that this factor does not weigh strongly in defendants' favor.

Defendants make no specific argument concerning the cost to the parties, and the court is not persuaded that the net cost of litigating in Delaware will be significantly greater than that of litigating in the Eastern District of New York.

With respect to access to proof, defendants contend that transfer is appropriate because "documents and witnesses relating to the patents at issue, their prosecution, and Fonar's enforcement of them, are all located in New York."  (D.I. 13 at 18)  Plaintiffs respond that

> [d]iscovery by document production and deposition normally proceeds in patent cases without regard to the location of the forum, in that documents are either made available for inspection where they are kept by the producing party, or copies are simply provided to the requesting party's counsel.

12

> Depositions normally proceed where the
> witness is located or at counsel's office. .
> . . Fonar's counsel is located in Minnesota
> . . ..

(D.I. 14 at 19-20)

As this court held in <u>Critikon</u>:

> The location of documents, in the context of
> access to proof, in a document-intensive case
> such as this can be misleading.  No matter
> where the trial is held, [defendants'] ...
> counsel and [plaintiffs'] ... counsel will be
> required to travel to [various places] to
> select and produce the requested discovery.
> Regardless of where trial is held, the
> documents will be copied and mailed to the
> offices of counsel and subsequently
> transported to trial.

821 F.Supp. at 966-67.  For this reason, the court finds that

defendants have not established that this factor compels the

transfer of this action.

Based on the record as it presently stands, defendants

have failed to demonstrate that the interests of justice dictate

transferring this action.

### C.  Motion to stay

Lastly, defendants urge this court to stay these

proceedings pending resolution of the action Fonar filed against

Siemens in the Eastern District of New York after plaintiffs

filed the present action.  (D.I. 13 at 19)  The court finds no

basis in this record for granting this relief and, therefore, the

motion to stay will be denied.

IV. CONCLUSION

Therefore, at Wilmington, this 1st day of November, 1995, IT IS ORDERED that defendants' motion to dismiss, stay or transfer this action (D.I. 13) is denied.

_____
United States District Judge

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11            )
Trustee of the Post-Confirmation      )
Bankruptcy Estates of CORAM           )
HEALTHCARE CORPORATION,   a           )
Delaware Corporation, and of          )
CORAM, INC., a Delaware               )
corporation,                          )
                                      )
          Plaintiff,                  )
                                      )
     v.                               ) Civ. No.  04-1565-SLR
                                      )
DANIEL D. CROWLEY; DONALD J.          )
AMARAL; WILLIAM J. CASEY; L. PETER    )
SMITH; and SANDRA L. SMOLEY,          )
                                      )
          Defendants.                 )


MEMORANDUM ORDER


     At Wilmington this 25th day of May, 2005, having reviewed

defendants' motions to transfer, and the papers submitted in

connection therewith;

     IT IS ORDERED that said motions (D.I. 3, 15) are denied, for

the reasons that follow:

     1.  **Background facts.**  On August 8, 2000, Coram Healthcare

Corporation and Coram, Inc. (hereafter "Coram") filed a Chapter

11 petition in the United States Bankruptcy Court for the

District of Delaware, together with a proposed plan of

reorganization.  In December 2000, the bankruptcy court denied

confirmation of the plan, based in part on the fact that defendant Crowley had a conflict of interest by reason of his position as CEO of Coram and his contractual relationship with one of Coram's three major lenders.[1]  After denying confirmation of Coram's second proposed plan of reorganization,[2] the bankruptcy court entered an order appointing plaintiff Chapter 11 Trustee of Coram.  On October 27, 2004, the bankruptcy court confirmed the Trustee's plan of reorganization, which plan was implemented on December 1, 2004.  Coram is now a private company owned by its former lenders.  Under the Trustee's plan as approved by the bankruptcy court, the right to pursue causes of action against Coram's former directors was reserved to the Trustee for the benefit of Coram's former unsecured trade creditors and its former common shareholders.

2.  **Standard of review.**  Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice.  Congress intended through § 1404 to place discretion in

---

[1]It is alleged that between November 30, 1999, when Crowley became CEO, and July 31, 2000, Crowley caused Coram to pay certain lenders approximately $60 million.

[2]The bankruptcy court found in this regard that the Outside Directors, the remaining defendants herein, had done nothing in response to the court's order denying confirmation of the first plan of reorganization.

2

the district court to adjudicate motions to transfer according to
an individualized, case-by-case consideration of convenience and
the interests of justice. Stewart Org., Inc. v. Ricoh Corp., 487
U.S. 22, 29 (1988); Affymetrix, Inc. v. Synteni, Inc., 28 F.
Supp.2d 192, 208 (D. Del. 1998).

    3.    The burden of establishing the need to transfer rests
with the movant "to establish that the balance of convenience of
the parties and witnesses strongly favors the defendants."
Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981) (citing
Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970).
"Unless the balance is strongly in favor of a transfer, the
plaintiff's choice of forum should prevail". ADE Corp. v. KLA-
Tencor Corp., 138 F. Supp.2d 565, 567 (D. Del. 2001); Shutte, 431
F.2d at 25.

    4.    The deference afforded plaintiff's choice of forum will
apply as long as a plaintiff has selected the forum for some
legitimate reason. C.R. Bard, Inc. v. Guidant Corp., 997 F.
Supp. 556, 562 (D. Del 1998); Cypress Semiconductor Corp. v.
Integrated Circuit Systems, Inc., 2001 WL 1617186 (D. Del. Nov.
28, 2001); Continental Cas. Co. v. American Home Assurance Co.,
61 F. Supp.2d 128, 131 (D. Del. 1999). Although transfer of an
action is usually considered as less inconvenient to a plaintiff
if the plaintiff has not chosen its "'home turf' or a forum where
the alleged wrongful activity occurred, the plaintiff's choice of

forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993).

5.    The Third Circuit Court of Appeals has indicated that the analysis for transfer is very broad. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). Although emphasizing that "there is no definitive formula or list of factors to consider," id., the Court has identified potential factors it characterized as either private or public interests. The private interests include:  "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." Id. (citations omitted).

6.    The public interests include:  "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court

4

congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." Id. (citations omitted).

7. **Analysis.** Defendants move to transfer this case to the District of Colorado. In support of their motions, defendants recite several facts. First, none of the defendants live in or near Delaware.[3] Coram, now a private company, is incorporated in Delaware with its principal place of business in Denver, Colorado. Coram's employees and business records are located as well in Denver, Colorado. Plaintiff, Coram's Chapter 11 Trustee, resides in Philadelphia. According to defendants, these facts compel the transfer of this case to Colorado because no one involved in the litigation has a direct connection to the District of Delaware.

8. I respectfully disagree. Coram (through its directors) chose Delaware as its place of incorporation and chose to file for bankruptcy protection in Delaware's bankruptcy court. The bankruptcy court appointed plaintiff the Chapter 11 Trustee and gave him the authority to commence the instant proceedings against the company's former fiduciaries. These facts demonstrate a substantial connection to Delaware. Moreover,

---

[3]Three of the defendants, Mr. Casey, Mr. Crowley and Ms. Smoley, live in California, while Mr. Amaral lives in Nevada and Mr. Smith lives in Illinois.

5

given the fact that most discovery will be taken in the same fashion regardless of where trial may proceed,[4] the convenience of the defendants is not a compelling factor.  For these reasons, and consistent with my practice, I decline to transfer this case on the record presented.[5]

_____
United States District Judge

_____

[4]Depositions generally do not last more than 7 hours; the parties should be able to work out convenient places for their location.  Document production may well be in electronic format.

[5]Employees of parties must make themselves available for purposes of depositions and trial.  It is not apparent to me whether the employees of Coram (in its present corporate form) are subject to this court's jurisdiction.  However, neither is it apparent at this stage of the proceedings whether they will voluntarily appear as witnesses, under the circumstances at bar. Therefore, I will reconsider my decision not to transfer **only** if specifically identified, critical witnesses decline to testify in Delaware and cannot be compelled to do so.

6

# EXHIBIT L





Home > Careers > Search Opportunities > Americas

Company    Products    Investors    **Careers**    Newsroom

SEARCH [        ] GO

Explore RIM

Why RIM?    Search Opportunities    Students / New Grads    Career Help    Contact Us

Americas

Europe, Middle East and Africa

Asia Pacific

Engineering@ RIM

Events

**Career Opportunities**
Find an Opportunity at RIM today!

**Create/Access your Profile**
Upload your resume and track positions

**Help**
Technical Support and Frequently Asked Questions

## Americas

**No limits to what you can achieve.**

Welcome to RIM in the Americas.

We value leadership, entrepreneurial spirit, international experience, and an interest in wireless technology.
At RIM, you'll work with industry experts in a stimulating, energy-driven and positive environment. You will be inspired and supported to achieve your best, expand your horizons and unleash your creativity on a daily basis. There is no limit to what you can achieve!



The RIM environment advocates a strong commitment to learning and growth. We believe it is the wide-ranging expert knowledge of our staff that contributes to making us one of the leaders of the wireless industry. That's why, as part of our employee development program, RIM offers training, educational support and professional association fees where applicable.

The regions supported in the Americas are Canada, USA and South America. RIM's Global Headquarters are located in Waterloo, Canada. Our Waterloo location is our largest employee population, and includes a large campus with a state-of-the-art testing lab and manufacturing facility, where RIM products are manufactured and assembled.

Other locations in RIM Americas are:

**Canada**
- Waterloo, Ontario
- Mississauga, Ontario
- Ottawa, Ontario
- Halifax, Nova Scotia

**USA**
- Redwood City, California
- Atlanta, Georgia
- Seattle, Washington
- Dallas, Texas
- Chicago, Illinois
- and home offices throughout North America.

**Other locations**
- Mexico
- Carribean

There are a number of career opportunities in the Americas. You may be interested in joining our Hardware, Software, Sales, Marketing, Quality Assurance, Resources or Technical Support teams.

RIM employees enjoy many rewards including a free BlackBerry® device upon joining the company. We are a growing worldwide company, and there are a number of opportunities where candidates can relocate from other parts of the world.

Check out our career opportunities in the Americas!

Legal · Privacy Policy | Copyright© 2008 Research In Motion Limited, unless otherwise noted.

HOME    EVENTS    CONTACT    BLACKBERRY.COM